EXHIBIT A

# IGNITE LAUNCH AGENT AGREEMENT

**INTERNAL USE ONLY:**

AGENT NO.: 33670

DBA NAME: MINNEAPOLIS

This Ignite Launch Agent Agreement (this "**Agreement**") is between Ignite Payments, LLC ("**Ignite Payments**") and FRANCES GRACE, LP _____ (*Insert Agent legal name*) ("**Agent**").

Ignite Payments is an Independent Sales Organization and Member Service Provider as defined under the Rules. Ignite Payments is in the business of providing Services. Agent is a person or entity in the business of soliciting purchasers of Services. Ignite Payments and Agent wish to enter into a relationship in which Agent will represent Ignite Payments with respect to soliciting purchasers of Ignite Payments Services on the terms and conditions contained in this Agreement.

## Agreement

In consideration of the foregoing and the covenants and conditions in this Agreement, Agent and Ignite Payments agree as follows:

## 1. Agent Obligations

**1.1.     General Obligations**.

a. Professional and Compliant Business Practices. Agent will operate its business, including maintaining the security of related business, Prospective Merchant, Merchant and cardholder records, in a professional manner in compliance with this Agreement and all applicable laws (including Privacy Laws), regulations, court orders, Rules and Agent Business Conduct Standards, which are incorporated into this Agreement as they may now exist or be enacted, adopted, issued or promulgated.

b. Promotional Information; Use of Trade names and Trademarks.   Marketing materials, including business cards and stationary, and Web sites created by Agent (other than those Ignite Payments materials printed from the Ignite Payments marketing website) that contain trade names, trademarks, service marks or logos of, or that reference the services provided by, Ignite Payments, Ignite Payments' sponsor bank, FDC or any Card Brand must be submitted to agent.compliance@firstdata.com for review. Agent agrees to not disseminate or publish any such materials or Web sites until Agent has received written approval from agent.compliance@firstdata.com. In compliance with the law, Agent may not send unsolicited fax advertisements that promote Ignite Payments Services to Merchants or Prospective Merchants. Because Agent is not a registered ISO, Rules require that Agent's business telephone be listed and answered by reference to the registered ISO (i.e. "Ignite Payments") and permit Agent to also reference its approved fictitious business name.

**1.2.     Agent Representations**. To comply with legal requirements, Agent represents, warrants and covenants that:

i.      Agent shall present, and shall cause its Representatives to present, to each person who executes a Merchant Agreement a copy of such Merchant Agreement at or before the time the person executes the Merchant Agreement.

ii.     Agent shall use, and shall cause its Representatives to use, only the Merchant Agreement that is designated by Ignite Payments. Agent shall use, and shall cause its Representatives to use, the most current version of such Merchant Agreement.

iii.    In Face-to-Face Agent Transactions ("**Face-to-Face Agent Transactions**" means those transactions in which Agent meets in person with a merchant, which does not include

transactions conducted over the telephone, by facsimile, or over the Internet) where a person executes a paper, rather than an electronic, version of the Merchant Agreement, Agent shall leave, and shall cause his or her Representatives to leave, with each such person a copy of the executed Merchant Agreement.

iv.   In Face-to-Face Agent Transactions where a person executes an electronic, rather than a paper, version of the Merchant Agreement, Agent shall, and shall cause its Representatives to, either (1) advise each such person that a sample copy of the then-current version of the standard Merchant Agreement is available on the Ignite Payments Web site, or (2) leave with each such person a hardcopy or electronic copy of the executed Merchant Agreement.

v.   Agent shall not misrepresent, and shall prohibit its Representatives from misrepresenting, any term of the Merchant Agreement.

vi.   Agent shall provide, and shall cause its Representatives to provide, full and fair disclosure of the Merchant Agreement to Prospective Merchants and Merchants, including disclosures related to all charges, minimum fees, limitations, initial and renewal terms of agreements and warranty services.

vii.   Agent shall not misrepresent, and shall prohibit its Representatives from misrepresenting, the manner in which Ignite Payments provides its services or the procedures Ignite Payments follows, including services and procedures related to chargebacks, loss prevention, ATM/Debit and equipment leasing.

viii.   Agent and Agent Personnel will not make, or offer to make, any payments to, or confer, or offer to confer, any benefit upon any employee, agent or fiduciary of any third party (including any government, or agency or instrumentality thereof) with the intent to influence the conduct of such employee, agent or fiduciary in relation to the business or affairs of such third party.

ix.   If Agent becomes aware of any actual or alleged fraudulent activities or misrepresentations by it or its Representatives, whether or not related to the Ignite Payments Services, Agent will promptly advise Ignite Payments and take all necessary corrective action the Agent determines in its discretion, to be necessary or appropriate.

x.   Agent shall not charge any fee to any of its Representatives in respect of such Representative's right to act on Agent's behalf in connection with performance of Agent's obligations under this Agreement.

Agent's failure to satisfy any of the above legal requirements will constitute a breach of this Agreement and be subject to remedial and other action as provided under this Agreement.

Additionally, as Agent is engaged in a separate business, Agent represents, warrants and covenants will use its full legal name (not Agent's DBA name) (1) for Agent's bank accounts, recruiting and similar materials relating to operation of Agent's business, (2) when signing any agreements with merchants for any services offered by Agent that are not described in and billed under the Merchant Agreement including sale, lease and/or rental of point-of-sale terminals and other ancillary products or services, and (3) for any agreements that are between Agent and a third party (including any merchant, lease company, bank, Yellow Page company or other vendor) for any purchase, sale or services (including leases, rental agreements, agreements for web design services, advertising services).

Agent also represents, warrants and covenants that execution and delivery of this Agreement by Agent and the consummation of the transaction herein contemplated does not conflict in any material respect with or constitute a material breach or material default under the terms and conditions of any documents, agreements or other writings to which it is a party, including any covenant not to compete or confidentiality agreement with any third party.

**1.3.** **Assessments**.       Subject to Agent's challenge rights as noted below, the parties agree that at any time following the 10th Business Days after delivery of written notice to Agent from agent.compliance@firstdata.com (a "**Deduction Notice**"), Ignite Payments may deduct from any Residuals payable to Agent hereunder: (i) the amount of any fine, assessment or other amount charged to Ignite Payments by any third party relating to Agent's violation of any law, regulation, court order or Rule; or (ii) fines to Agent by Ignite Payments for Agent's breach of a material term of this Agreement (including **Section 1.2**) or repeated breach of any term of this Agreement, which fines shall be an amount equal to the greater of $250.00 or: (1) for the first fine, an amount equal to the product of (A) 10% multiplied by (B) an amount equal to the average of Agent's monthly Residuals for the 3 calendar months preceding the date on which the fine is assessed ("**Three Month Average Residuals**"), or (2) for each fine thereafter, an amount equal to the product of (A) 20% multiplied by (B) Three Month Average Residuals. The parties agree that if Agent disputes any such Deduction Notice issued to Agent pursuant to this **Section 1.3**, Agent may challenge such Deduction Notice by delivering a written notice ("**Challenge Notice**") to Ignite Payments at agent.compliance@firstdata.com within 10 Business Days after Ignite Payment's delivery of such Deduction Notice. The Challenge Notice must state all reasons why the Deduction Notice should not have been issued. If Ignite Payments fails to act on the Challenge Notice within 20 Business Days after its receipt thereof, then First Data shall not deduct any amount from Residuals payable to Agent in respect of the Deduction Notice. The deduction by Ignite Payments of the amount of any assessment, fine or charge against Agent from Residuals payable hereunder does not constitute a waiver of any legal rights or remedies Ignite Payments may have against Agent. Ignite Payments reserves the right to pursue any and all legal rights and remedies against Agent under this Agreement or applicable law.

**1.4.** **Prospective Merchants; Merchants; Merchant Agreements**.

a.       Ignite Payments will not accept Prospective Merchant types that are identified as "Unqualified/Unacceptable" in the Ignite Payments Credit Policy posted under Resources/Policies on MyAgentOffice.com, as it may be modified from time to time by Ignite Payments in its sole discretion (the "**Unacceptable List**"). Agent agrees to use best efforts to verify that each Prospective Merchant conducts or intends to conduct a bona fide, lawful business operation (e.g., by inspecting a Prospective Merchant's premises to determine if it has the proper facilities, equipment, inventory and license to conduct its business or reviewing its Internet site). Agent also agrees to use its best efforts to inform Ignite Payments of any information that could reasonably be considered relevant to a determination of any Prospective Merchant or Merchant's creditworthiness.

b.       All Merchant Agreements are subject to review and rejection or approval by Ignite Payments in its sole discretion. Ignite Payments will not approve Merchant Agreements that are not fully completed and executed by the Prospective Merchant. Ignite Payments may terminate any Merchant Agreement at any time in accordance with its terms.

c.       Agent may recommend to Ignite Payments and/or its sponsor bank the discount rate and fees charged to a Prospective Merchant or Merchant pursuant to the Merchant Agreement, but Ignite Payments and/or its sponsor bank in its final and sole discretion may accept or reject such recommendation. Ignite Payments or its sponsor bank in its sole discretion may change any fees charged to a Merchant under a Merchant Agreement from time to time without prior notice to Agent.

d.       All Merchant Agreements (whether partially or fully completed), Merchant Accounts and Merchant or Prospective Merchant accounts, records and related information are owned by Ignite Payments, its sponsor bank or the applicable acquirer and may not be transferred, assigned, sold or exchanged, in whole or in part, by Agent. Accordingly, at Ignite Payments' request, Agent agrees to provide Ignite Payments with all information, files and materials related to Prospective Merchants and

Merchants solicited or signed by Agent under this Agreement. If this Agreement terminates or Agent abandons a Prospective Merchant, Ignite Payments may complete the processing of such Prospective Merchant's submitted application and assist such merchant with the installation of any equipment. If this Agreement terminates, Ignite Payments shall not be required to terminate any Merchant Agreement with any Merchant.

**1.5.    Non-Competitive Sale of Services**. Agent, any former or current owner of a controlling interest in Agent, or any former or current partner, member, officer or director of Agent: (i) will not engage in any act that would injure Ignite Payments' relationship with its employees, agents, Prospective Merchants, Merchants or Ignite Payments' sponsor bank; (ii) will not directly or indirectly induce or influence any merchant to cancel or terminate any existing Merchant Account or Merchant Agreement; and, (iii) except with respect to any Prospective Merchant that Ignite Payments rejects or is on the Unacceptable List, (1) shall represent only Ignite Payments with respect to soliciting Prospective Merchants for the purchase of Services within the Territory, and (2) may not engage in any other Competing Activity. Nothing in this Agreement restricts or prohibits Agent from soliciting merchants, Prospective Merchants or Merchants for the purchase of any product or service that is not competitive to the Ignite Payments Services.

## 2. Agent Personnel

**2.1.    Agent Personnel**. Subject to **Section 2.2**, Agent shall have the right to designate suitable and desirable Agent Personnel, including Representatives. Agent shall be solely responsible for Agent Personnel and their acts, including any failure to comply with the terms of this Agreement that are applicable to Agent or failure to comply with Rules and applicable law, regulations and court orders. Agent Personnel shall be hired at Agent's own risk, expense and supervision, and Agent Personnel shall not have any claim against Ignite Payments for salaries, residuals, benefits, commissions, items of cost, or any other form of compensation or reimbursement. Agent acknowledges and agrees that no Agent Personnel are employees of Ignite Payments, and Agent is solely responsible for any taxes, payroll reporting, workers' or unemployment compensation insurance, compensation, benefits or any other obligations or liabilities that may arise (including verification of work eligibility in U.S.) due to Agent's hiring, retention or termination of or relationship with any Agent Personnel.

**2.2.    Representative Registration**. Prior to a Representative being permitted to solicit or submit any Merchant Applications, Agent must receive written confirmation from agent.compliance@firstdata.com that Ignite Payments has registered such Representative. Agent must provide Ignite Payments with a completed Ignite Payments Sales Representative Registration Form (located under Resources/Forms at MyAgentOffice.com) for such Representative and any other documentation or information concerning the Representative requested by Ignite Payments from time to time. Ignite Payments reserves the right to refuse to register or revoke the registration of any proposed or approved Representative that Ignite Payments, in its sole discretion, determines is a detriment to the business of Ignite Payments. Agent must notify Ignite Payments in writing of the termination of any Representative within three Business Days of such termination.

## 3. Ignite Payments' Obligations

**3.1.    Grant of Authority**. Ignite Payments hereby grants to Agent the right, on a non-exclusive basis, to solicit Prospective Merchants for the purchase of the Services from Ignite Payments within the Territory provided that no such Prospective Merchants already have, and have not had in the previous 90 days, an open Merchant Account.

**3.2.    Ignite Payments Services**. Ignite Payments shall be responsible for all processing and accounting functions relating to the clearing and settlement of Card transactions, including: (i) Merchant

processing and settlement; (ii) Merchant credit research; (iii) Merchant activation and approval; (iv) Merchant security and recovery; (v) Merchant customer services; (vi) Merchant chargeback and retrieval services; and (vii) all other back office services, including collecting amounts due from Merchants to Ignite Payments. Ignite Payments may contract with other persons to perform these functions on behalf of Ignite Payments but Ignite Payments remains primarily responsible for the functions. Subject to **Section 5.2**, Ignite Payments will make available to Agent training on the Ignite Payments Services.

## 4. Licensing

**4.1.     License.** Subject to **Section 1.1(b)** and this **Section 4**, Ignite Payments grants to the Agent during the Term, the limited, non-exclusive, non-assignable, revocable right to use the Trademarks (i) displayed on **Exhibit B** (as it may be modified from time to time by Ignite Payments in its sole discretion and provided to Agent via email or on MyAgentOffice.com), and (ii) posted under Policies on MyAgentOffice.com (as they may be modified from time to time by Ignite Payments or FDC in their sole discretion and provided to Agent via email or on MyAgentOffice.com) in the Territory in connection with Agent's marketing materials for the Ignite Payments Services. Upon termination of this Agreement, (i) the limited rights granted to Agent to use the Trademarks under this **Section 4** shall immediately terminate; (ii) Agent shall immediately cease and desist from all use of the Trademarks and any trade name, trademark, service mark, or logotype associated with Cards ("**Marks**"), except to the extent such use may be authorized under a separate agreement; (iii) at Ignite Payments' request, Agent will deliver to Ignite Payments all material and papers upon which the Trademarks or Marks appear or to which the Trademarks or Marks relate, including correspondence and information on Prospective Merchants or Merchants solicited or procured while the Agent solicited on behalf of Ignite Payments; and (iv) Agent will take all necessary actions to correct information that states or suggests that Agent is connected in any manner with Ignite Payments or its Trademarks, including correction of telephone and other directories, telephone information providers, postal offices, electronic mail providers, letterhead, business cards, office signage, Web page(s) on the Internet, domain name registries (if applicable), any post domain URL path (if applicable) and other communication delivery services.  Agent shall direct that all inquiries be forwarded to Ignite Payments' Moorpark office or such other place designated by Ignite Payments. If Agent fails to take any required action within 30 days of the termination of this Agreement, then Agent appoints, without power of revocation, Ignite Payments as its attorney in fact to act in Agent's place and with Agent's authority to take such corrective actions with the same legal force and effect as if such acts were performed by Agent.

**4.2.     Ownership of Trademarks**. Agent acknowledges that Ignite Payments or FDC is the owner or licensee of the Trademarks, and Card Brands are the owners of their respective Marks. Agent acknowledges that Ignite Payments, FDC and the Card Brands hold the exclusive right, title and interest in and to their respective marks. Agent will not at any time do or cause to be done any act or thing contesting or in any way impairing or tending to impair any part of such right, title and interest. In connection with the use of the Trademarks or Marks, Agent shall not in any manner represent that it has any ownership in the Trademarks, Marks or registrations thereof, and Agent acknowledges that use of the Trademarks or Marks do not create in the Agent's favor any right, title or interest in or to the Trademarks or Marks or the goodwill attached to and associated with the Trademarks or Marks. All uses of the Trademarks or Marks by the Agent shall inure to their respective owner. Agent will at no time during or after the Term register, adopt or use, any word or mark which is likely to be similar to or confusing with the Trademarks or Marks or any other marks owned or utilized by Ignite Payments or FDC. Agent agrees to not, at any time, use any Mark on its own behalf or suggest, imply or in any manner create an impression that it is a member of MasterCard, VISA, American Express, Discover or any other Card Brand with respect to which merchants submit transactions for processing under a Merchant Agreement. Any Card Brand may at any time and without notice prohibit Agent from using its Marks for any reason.

Agent must comply with additional terms governing Agent's use of Trademarks or Marks that may be posted on MyAgentOffice.com from time to time.

## 5. Relationship of the Parties

**5.1.    Independent Contractor**. Neither Agent nor any Agent Personnel is an employee of Ignite Payments for any purpose whatsoever. Agent is an independent contractor and as such is not eligible for any compensation, benefits, insurance or other employment terms that are provided to employees of Ignite Payments or any Ignite Payments Affiliates. Ignite Payments is interested only in the results obtained by Agent and Ignite Payments has no right to control Agent or Agent Personnel, including no right to require Agent or Agent Personnel to: (i) devote a fixed or minimum number of hours to selling or any other effort, (ii) follow prescribed itineraries or instructions, (iii) bind Ignite Payments, or (iv) do anything that would alter Agent's independent contractor status.  At all times, Agent has the sole right and responsibility to supervise, direct, and control Agent's business operations and Agent Personnel, including Agent office account receivables and payables and other office administration functions.

**5.2.    Expenses; Taxes**. Agent is solely responsible for all expenses and disbursements that may be incurred or due by Agent in connection with its performance of its obligations under this Agreement, including promotional materials, general selling, training, travel, entertainment, insurance, office equipment, maintenance, supplies, rental, lease, legal or accounting expenses; purchase or lease of office space; Agent Personnel salaries, benefits, taxes and other costs and expenses; and any federal, state or local tax or insurance obligations that may arise in connection with Agent's activities or due to receipt of payments by Agent under this Agreement.

**5.3.    Other**. Agent does not have the right or authority to and will not, and will not permit any Agent Personnel to, hold itself out as having any right, power or authority to create any contract or obligation, either express or implied, on behalf of, in the name of or binding upon Ignite Payments, or to pledge Ignite Payments' credit, or to extend credit in Ignite Payments' name. Without the prior written consent of Agent, Ignite Payments has no right or authority to, and will not, commit Agent in any matter or use Agent's name in any way not specifically authorized by this Agreement.

## 6. Term

**6.1.    Term**. Provided that both Agent and Ignite Payments execute this Agreement, this Agreement is effective on the first day of the calendar month in which it is signed by the last of the parties hereto (the "**Effective Date**"). This Agreement shall remain in effect for a one year period that begins on the Effective Date (the "**Initial Term**") and automatically renew for successive terms of one year each (each a "**Renewal Term**" and together with the Initial Term, the "**Term**"), unless either party provides the other party with written notice at least 60 days before the end of the then-current term that it will terminate this Agreement at the end of the then-current term.

**6.2.    Termination by Ignite Payments**.

   a.    With Cause without any Right to Cure. In addition to any other rights and remedies that it may have and notwithstanding **Section 6.2.b.**, Ignite Payments in its sole discretion may terminate this Agreement upon five calendar days prior written notice to Agent if any reasonable evidence is discovered indicating (i) Agent or any Agent Personnel have: (1) violated any confidentiality or intellectual property rights protected by this Agreement; (2) violated any applicable law, regulation, court order or Rule; or (3) committed any act of misrepresentation, fraud, forgery, dishonesty or other willful or malicious act; (ii) Agent has ceased its operation and activity as a sales agent for Ignite Payments; (iii) Ignite Payments is unable, after good faith efforts for a period of 30 days, to locate Agent; (iv) Agent generates less than 25

Case 3:23-cv-00815-BJD-MCR   Document 1-3   Filed 07/13/23   Page 7 of 27 PageID 29
DocuSign Envelope ID: D088B3BF-A055-4C8B-AC35-A5EB5CB7CF53

EXHIBIT A

new Open Accounts during any consecutive twelve month period; (v) Agent, any former or current owner of a controlling interest in Agent, or any former or current partner, member, officer or director of Agent, or any Agent Personnel breaches Agents obligations under **Section 8.1.d.** of this Agreement; or (vi) Agent's monthly Residual payment falls below $250.00.

      b.    <u>With Cause with a Right to Cure</u>. In addition to any other rights and remedies that it may have and notwithstanding **Section 6.2.a.**, Ignite Payments may terminate this Agreement if Agent is in breach of any of the terms, conditions, representations, warranties or covenants of this Agreement, including, without limitation, **Section 1.5.**, or the Agent Business Conduct Standards, but only upon giving Agent written notice of such breach and Agent's failure to cure such breach within 10 Business Days after receipt of such notice; provided, however, that if a cure cannot reasonably be accomplished within such 10-day period, Ignite Payments, in its sole discretion, may toll the cure period so long as the Agent commences a cure within such 10-day period and thereafter diligently pursues such cure as promptly as practical, but in no event will a cure period exceed 90 calendar days.

      c.    <u>Agent Insolvency</u>. If Agent makes any assignment of assets or business for the benefit of creditors, or if a trustee or receiver is appointed to administer or conduct its business or affairs, or if it is adjudged in any legal proceeding to be either a voluntary or involuntary bankruptcy, then the rights granted herein to Agent shall forthwith cease and terminate without prior notice or legal action by Ignite Payments.

**6.3.**    **Termination by Agent**. In addition to any other rights and remedies that it may have, Agent may terminate this Agreement if Ignite Payments is in breach of its obligations under **Section 7**, but only upon giving Ignite Payments written notice of such breach and Ignite Payments' failure to cure such breach within 10 Business Days after receipt of such notice, unless a cure cannot reasonably be accomplished within such period. In that case, the cure period will be tolled so long as Ignite Payments commences a cure within such 10-day period and thereafter diligently pursues such cure as promptly as practical, but in no event may a cure period exceed 90 calendar days.

**6.4.**    **Termination by Mutual Agreement**. The parties may terminate this Agreement at any time in a writing signed by both parties.

<h3 align="center">7. <u>Payments</u></h3>

**7.1.**    **Right to Payment**.

      a.    Ignite Payments shall pay Residuals and certain other amounts set forth in this **Section 7** to Agent during the Term and after termination of this Agreement subject to the terms of this Agreement, including this **Section 7** and **Section 8**. Agent acknowledges and agrees that notwithstanding anything to the contrary set forth in any agreement entered into between Agent and Ignite Payments prior to the Effective Date (each, a "**Prior Agreement**"), all Merchant Accounts boarded by Agent on or after the Effective Date shall be boarded solely under this Agreement, and no such Merchant Accounts may be boarded under any Prior Agreement.

      b.    Ignite Payments in its sole discretion may immediately discontinue payment of any amounts due to Agent after termination of this Agreement if: (i) Ignite Payments terminates this Agreement pursuant to **Sections 6.2.a(i), 6.2.a(ii), 6.2.a(iii), 6.2.a(v), 6.2(a)(vi), 6.2.b** or **6.2.c** above; (ii) Agent, any former or current owner of a controlling interest in Agent, or any former or current partner, member, officer or director of Agent: (1) engages in any act that would injure Ignite Payments' relationship with its employees, agents, Prospective Merchants, Merchants or Ignite Payments' sponsor bank; (2) directly or indirectly induces or influence any merchant to cancel or terminate any existing

Merchant Account or Merchant Agreement; or, (3) engages in a Competing Activity; (iii) Agent fails to remain in compliance with all terms and conditions of this Agreement that survive termination of this Agreement; (iv) Agent fails to remain current on all obligations to Ignite Payments and Ignite Payments' sponsor bank(s); or (v) Agent's monthly Residual payment falls below $250.00.

**7.2.    Payment for Services**. Subject to the terms of this Agreement,

a.       On or about the 20th day of each calendar month Ignite Payments shall pay to Agent a Residual for Merchant Accounts boarded by Agent on or after the Effective Date that are Open Accounts in accordance with the terms set forth in **Exhibit C**.

b.       At least monthly Ignite Payments shall pay to Agent payments for certain third party or other products and services subject to the terms set forth under Resources/Forms on MyAgentOffice.com. Ignite Payments may change the terms, including the amounts, of any such payments by providing Agent with at least 30 days prior written notice of such changes.

Agent must request an adjustment to any amounts paid to or by Agent pursuant to this **Section 7** within the 90 day period following the initial credit or debit or Ignite Payments has no obligation to make such adjustment.

**7.3.    Merchant Losses**. Ignite Payments shall bear the risk for Merchant Losses (other than those caused by the gross negligence or willful misconduct of Agent or Agent Personnel) and shall not deduct such Merchant Losses from any amounts due to Agent under this Agreement.

**7.4.    Right to Offset**. Agent hereby authorizes Ignite Payments at any time and from time to time, without notice or demand to Agent or to any other person (any such notice and demand being hereby expressly waived), to set off, recoup and to appropriate and apply any and all funds of Agent held by Ignite Payments, Ignite Payments' Affiliates or Ignite Payments' sponsor bank, against and on account of Agent's obligations to Ignite Payments or any Ignite Payments' Affiliates under this Agreement or any other agreement, including fees for equipment or the Services, whether such obligations are liquidated, unliquidated, fixed, contingent, matured or unmatured. Agent is prohibited from setting-off, offsetting or otherwise reducing or applying against any amounts due and owing to Ignite Payments under this Agreement or otherwise, any amounts owed or alleged to be owed to Agent by Ignite Payments under this Agreement or otherwise. Ignite Payments may in its sole discretion exercise the rights described in this **Section 7.4** by direct debit to Agent's bank account.  This offset right is in addition to all other rights and remedies available to Ignite Payments.

**7.5.    Right to Debit and Credit Agent's Bank Account**. All financial transactions between Agent and Ignite Payments, including payment for equipment purchases, may be automatically debited and credited by Ignite Payments, in its sole discretion, directly through Agent's bank account. Agent irrevocably consents to the debiting and crediting of its bank account(s) as provided herein. With respect to equipment transactions only, Ignite Payments shall provide 10 days advance written notice to Agent prior to initiating a debit entry. In order to activate automatic debit and credit service, Agent shall provide Ignite Payments with the required depository information and execute ACH Authorization Agreement Direct payments (Debits) Form and ACH Authorization Agreement Direct Payments (Credits) Form provided to Agent by Ignite Payments or any other form that Ignite Payments may request from time to time to accomplish the purposes set forth in this **Section 7.5**.

**7.6.    Loan**. Subject to applicable law, once every 12 months during the Term of this Agreement, Agent may be eligible (in Ignite Payments' sole discretion) to receive a loan from Ignite Payments in an amount equal to the product of two multiplied by Three Month Average Residuals subject to the terms and

conditions of a promissory note in the form provided by Ignite Payments and executed by Agent if Agent: (a) is not in breach of its obligations under this Agreement; (b) is current on all financial obligations to Ignite Payments and Ignite Payments Affiliates; and (c) has not had a promissory note payable to Ignite Payments outstanding at any time within the preceding 30 days.

### 8. Purchase and Sale of Agent Residual Rights

**8.1. Residual Rights - Purchase**.

     a.     During the Term, Ignite Payments may elect but is not required to purchase Agent's unencumbered right to receive future Residuals (excluding Residuals for Referral Open Accounts) subject to: (i) the terms and conditions of this Section 8.1; and (ii) Agent's completion of Ignite Payment's online Residual purchase process through MyAgentOffice.com.

     b.     Agent will not be eligible to accept any Residual purchase offer until the end of the second calendar quarter occurring after the Effective Date of this Agreement. In no event will Ignite Payments purchase (i) more than $500,000 worth of Residual rights from Agent during any consecutive 365 day period; (ii) more than $5,000,000 worth of Residual rights in the aggregate under this Agreement; and (iii) more than 5% of Agent's Residual rights in the number of Eligible Accounts during any calendar quarter. The 5% ceiling will be based on the number of Eligible Accounts existing on the first day of the calendar quarter following the date Acceptance is received by Ignite Payments. Ignite Payments online Residual purchase process is available through MyAgentOffice.com.

     c.     For purposes of this **Section 8.1**, Residual rights shall be valued at the multiples for each merchant account type established from time to time by Ignite Payments, in its sole discretion. Ignite Payments will post said multiples on MyAgentOffice.com. Ignite Payments shall have the right, in its sole discretion, to modify said multiples on 90 days prior written notice to Agent.

     d.     Agent agrees and covenants on behalf of: (i) itself, (ii) any former or current owner of a controlling interest in Agent, (iii) any former or current partner, member, officer or director of Agent and (iv) Agents Personnel that they will not directly or indirectly (a) solicit any Merchant corresponding to any Residual rights purchased by Ignite Payments; or (b) influence any Merchant corresponding to any Residual rights purchased by Ignite Payments to cancel its Ignite Payments Merchant Account.

**8.2. Residual Rights – Cessation of Business**.

     a.     During the Term of this Agreement, as long as Agent has not Accepted an Ignite Payments' offer to purchase Residual rights, if applicable, under **Section 8.1** of this Agreement within the prior 365 days, Ignite Payments, in its sole discretion, may elect but is not required to purchase Agent's unencumbered rights to receive future Residuals if Agent ceases to conduct the business of soliciting merchants for the purchase of Services from Ignite Payments and any and all competitors of Ignite Payments ("**Cessation of Business**") subject to the terms and conditions of this **Section 8.2**. Ignite Payments shall not purchase (i) more than $1,000,000 worth of Residual rights from Agent during any consecutive 365-day period; (ii) more than $4,000,000 worth of Residual rights in the aggregate under this Agreement. If Residual rights corresponding to Agent's Open Accounts exceed the aggregate ceiling of $4,000,000, Ignite Payments shall have the option of purchasing, the excess Residual rights over the aggregate ceiling of $4,000,000 in the final installment or continuing to pay monthly Residuals on the Open Accounts. Agent may Accept Ignite Payments offer to purchase Agent's Residual rights by completing and submitting the Acceptance of Ignite Payments Offer to Purchase Agent's Residual Rights (Cessation of Business) form as it is found at MyAgentOffice.com (also known as the Acceptance of Ignite Payments Offer to Purchase Agent's Residual Rights (Retirement) form) (the "**Cessation of**

DocuSign Envelope ID: D088B3BF-A95F-4C83-A625-A5EB5CB7CFE2

**Business Form**"), to Ignite Payments on or before the last day of the calendar quarter in which Agent retires. Submission of Acceptance shall be deemed made as of the date that the Cessation of Business Form is received by Ignite Payments.

b.        For purposes of this **Section 8.2**, Residual rights shall be valued at the multiples for each Merchant Account Type established from time to time by Ignite Payments, in its sole discretion. Ignite Payments shall post said multiples on MyAgentOffice.com. Ignite Payments shall have the right, in its sole discretion, to modify said multiples on 90 days prior written notice to Agent.

c.        Upon receiving Acceptance: (i) Ignite Payments will fix Agent's percentage of Gross Processing Revenue at its then current level; (ii) Ignite Payments will not be required to pay Agent Residuals or any other payment for any Open Accounts opened after receipt of Acceptance; and (iii) the portfolio of Eligible Accounts existing on the date Acceptance is received and which continue to exist on the date the last Residual rights are purchased shall be referred to herein as "**Cessation of Business Portfolio**"; and (iv) this Agreement will automatically terminate.

d.        Ignite Payments' remaining purchase and payment obligations to Agent, if any, pursuant to this **Section 8.2** shall immediately terminate if, after delivering Acceptance pursuant to this **Section 8.2** and before all Ignite Payments payment obligations have been met, (i) Agent or any person having any ownership interest in Agent engages in a Competing Activity or carries out any act that would injure Ignite Payments in its relationship with its employees, customers or Merchants; (ii) Agent or any former or current owner of a controlling interest in Agent, or any former or current partner, member, officer or director of Agent or Agents Personnel directly or indirectly (a) solicit any Merchant in the Cessation of Business Portfolio; or (b) influence any Merchant in the Cessation of Business Portfolio to cancel its Ignite Payments Merchant Account.

**8.3.     Right to Receive Future Residuals; Right of Last Refusal**. Subject to **Section 9** and provided Agent is not in breach of this Agreement, at any time during the Term, Agent may sell its right to receive future Residuals under this Agreement ("**Right to Receive Future Residuals**") to an Unrelated Third Party subject to the following terms and conditions:

a.        Agent hereby grants to Ignite Payments a right of last refusal to purchase Agent's Right to Receive Future Residuals. If Agent receives a bona fide offer from a willing and able Unrelated Third Party buyer to purchase Agent's Right to Receive Future Residuals (a "**TP Offer**"), Agent shall notify Ignite Payments of the amount and terms of such TP Offer. Ignite Payments shall have the right to purchase Agent's Right to Receive Future Residuals on terms equal to the TP Offer, and Agent shall not sell or in any way transfer Agent's Right to Receive Future Residuals without first presenting Ignite Payments with the opportunity to match any TP Offer. Ignite Payments shall have 15 days to notify Agent of its decision whether or not to exercise its right to purchase Agent's Right to Receive Future Residuals.

b.        If Ignite Payments does not exercise its right of last refusal, provided that Agent and Unrelated Third Party buyer execute and provide to Ignite Payments a residual re-direction letter in the form required by Ignite Payments, Agent may sell its Right to Receive Future Residuals in accordance with the terms of this **Section 8.3** and the TP Offer.

c.        Nothing in this **Section 8.3** shall be construed or interpreted to impair any of Ignite Payments' rights under this Agreement, including **Section 9**, or to allow Agent to sell any interest in a Merchant, Merchant Agreement or Merchant Account, except for the sale of Agent's Right to Receive Future Residuals as set forth in this **Section 8.3**.

**9. <u>Confidentiality</u>**

**9.1.     Restrictions on Use or Disclosure of Confidential Information**. Each of Ignite Payments and Agent agree that, without the written consent of the other, it will not divulge or disclose to third parties, directly or indirectly, any Confidential Information or use such Confidential Information except to the extent required in its business relationship with the other party or to carry out its obligations under this Agreement. For the avoidance of doubt, Agent shall keep the terms, conditions and existence of this Agreement strictly confidential, and under no circumstance may Agent distribute this Agreement or any other Ignite Payments Confidential Information for any purpose, including with respect to Agent's rights under **Section 8.3**, without Ignite Payments' prior written consent. No party will obtain any proprietary rights to any Confidential Information of the other party. Each party shall retain Confidential Information in its possession and control and shall protect the secrecy of such Confidential Information using the degree of care it uses to protect the secrecy of its own Confidential Information, but in no event less than a commercially reasonable degree of care.

**9.2.     Exceptions**. Notwithstanding the foregoing, Ignite Payments shall not be prohibited from disclosing Confidential Information to the extent that it is related to Merchant Agreements, Merchant Accounts and Merchant or Prospective Merchant accounts, records and related information and other information relating to Ignite Payments business or Ignite Payments Services, but excluding any other information regarding the business of Agent, to the extent that such disclosure by Ignite Payments is for a bona fide business purpose; and, Agent's Confidential Information may be made available by or on behalf of Ignite Payments at Ignite Payments or Ignite Payments sponsor bank's direction to any Card Brand or to any other supervisory or regulatory authority to which Ignite Payments may be subject (including the Securities and Exchange Commission), upon their written request, or to secure advice from a legal or tax advisor.

## 10. Indemnity and Limitation of Liability

**10.1.     Indemnification**. Agent shall indemnify, defend and hold harmless Ignite Payments and its officers, directors, shareholders, employees, agents and representatives against any and all Damages incurred directly or indirectly by Ignite Payments, whether or not litigation is commenced, incurred by or asserted against Ignite Payments, arising from or related to: (i) any debts incurred by Agent or Agent Personnel, including debts incurred with telephone, utility, and express mail companies; (ii) any claim of any officer, director, shareholder of the Agent or any Agent Personnel made against Ignite Payments for any compensation, benefit or other payment to such person; (iii) any activity or representation by Agent or any Agent Personnel in marketing, advertising, promoting or otherwise engaging in any activity arising from or related to this Agreement; (iv) any claim arising from the unauthorized use of the Trademarks or other Ignite Payments or Card Brand intellectual property; (v) any actions concerning alleged Agent or Representative improprieties in the solicitation, sale or leasing of the Ignite Payments Services or equipment; (vi) any breach of any term or condition of this Agreement, any Rules, law, regulation or court order or Business Conduct Standards; (vii) any representation, warranty or covenant of Agent made in or in connection with this Agreement being false or misleading; or (viii) losses experienced by Ignite Payments attributable to chargebacks, fines, penalties and other amounts due from a Merchant to Ignite Payments caused by the gross negligence or willful misconduct of Agent or Agent Personnel. As stated in elsewhere in this Agreement, Agent is acting hereunder as an independent contractor and neither Agent nor any Agent Personnel shall be considered to be an employee of Ignite Payments or its Affiliates or Ignite Payments' sponsor bank (collectively "Ignite Payments" for purposes of this **Section 10.1**). Notwithstanding anything to the contrary in **Section 10.4**, if (a) Agent or any Agent Personnel assert that Agent or any Agent Personnel is an employee of Ignite Payments; or (b) a federal, state or local governmental agency or court asserts or determines Agent or any Agent Personnel are employees of Ignite Payments, then Agent shall indemnify, defend and hold harmless Ignite Payments, its Affiliates, and their respective officers, directors and employees from any and all Damages and exemplary, punitive

or special damages associated with such claim and/or determination whether or not litigation is commenced, incurred by or asserted against Ignite Payments.

**10.2.    Statute of Limitations**. Notwithstanding the fact that the statute of limitations for bringing a legal action on a written contract, or other limitation period that could apply based upon the type of action or act, omission or violation being alleged, may be shorter or longer, the parties agree that any action, legal or equitable, based on, related to or arising out of the subject matter of this Agreement, and whether based on contract, tort, strict liability or some other legal or equitable theory of recovery, must be commenced by a party within one year after the earlier of (i) the date on which such party knew or should have known of the first alleged act, omission or violation, or (ii) with respect to obligations that do not survive termination of this Agreement, the date of termination of this Agreement.

**10.3.    Limitation of Liability**. Notwithstanding anything contained in this Agreement or otherwise, Ignite Payments' cumulative liability to Agent and anyone claiming by through or under Agent, for all Damages arising out of or related to this Agreement, and regardless of the form of action or legal theory shall not exceed, in the aggregate, the lesser of aggregate Residuals paid to agent in the twelve months preceding the act giving rise to the claim or $500,000.00. Agent understands the limitation on damages to be a reasonable allocation of risk and expressly consents to such risk allocation.

**10.4.    Exclusion of Damages**. Except as set forth in this Agreement, in no event shall either party, its parents, Affiliates or any of its or their directors, officers, employees, agents or sub-contractors be liable under any theory of tort, contract, strict liability or other legal or equitable theory for lost profits, exemplary, punitive, special, incidental, indirect or consequential damages, each of which is hereby excluded by agreement of the parties regardless of whether such damages were foreseeable or whether either party or any entity has been advised of the possibility of such damages.

## 11. <u>General Provisions</u>

**11.1.    Definitions; Word Usage.** Capitalized terms have the meanings set forth in **Exhibit A**. Unless the context clearly requires otherwise, (i) the plural and singular numbers shall each be deemed to include the other; (ii) "**shall**," "**will**," or "**agrees**" are mandatory, and "**may**" is permissive; (iii) "**or**" is not exclusive; and (iv) "**includes**" and "**including**" are not limiting.

**11.2.    Effect of Headings**. Subject headings of sections and subsections of this Agreement are included for convenience only and shall not affect the construction or interpretation of any of its provisions.

**11.3.    Entire Agreement**. This Agreement, including the exhibits hereto, constitutes the sole and exclusive terms and conditions and agreement between the parties relating to the subject matter hereof, and supersedes all prior or contemporaneous discussions, writings, negotiations, understandings and agreements with respect thereto.

**11.4.    Waiver or Modification Ineffective Unless in Writing**. Except as set forth in this Agreement, no amendment of any provision of this Agreement will be valid unless the same will be in writing and signed by each of the parties. No waiver by any party of any provision of this Agreement or any default, misrepresentation, or breach of warranty or covenant hereunder, whether intentional or not, will be valid unless the same will be in writing and signed by the party making such waiver nor will such waiver be deemed to extend to any prior or subsequent waiver, default, misrepresentation, or breach of warranty or covenant hereunder or affect in any way any rights arising by virtue of any prior or subsequent  waiver, default, misrepresentation, or breach of warranty or covenant except pursuant to its express terms.

Ignite Payments Existing Agent Launch Agreement

**11.5.   Assignment**. The rights and obligations of Agent under this Agreement are personal. Except as otherwise expressly provided in this Agreement, Agent shall not assign, subcontract, license, franchise, or in any manner attempt to transfer or extend to any third party this Agreement or any right or obligation of Agent under this Agreement, by operation of law or otherwise, without the prior written consent of Ignite Payments, which may be granted or withheld at the sole discretion of Ignite Payments.  For purposes of this Agreement, any transfer of ownership or voting control of Agent shall be considered an assignment or transfer hereof. This Agreement shall be binding upon and inure to the benefit of the parties hereto and their permitted successors and assigns.

**11.6.   Written Notice**. Unless otherwise specified in this Agreement, all notices and other communications required or permitted under this Agreement shall be in writing and shall be deemed delivered and effective when given by personal delivery, telefax (confirmed by a mailed copy) or first-class mail, postage prepaid, addressed as follows: (i) if to Agent, to the address set forth below Agent's signature line in this Agreement; and (ii) if to Ignite Payments to 5898 Condor Drive, Suite 220, Moorpark, CA 93021, Attention: Senior Vice President (Facsimile: 402.916.6610); with a copy to First Data Corporation, 5575 DTC Blvd., Suite 100 North, Greenwood Village, Colorado 80111, Attention: Legal Department (Facsimile: 303.967.8292). A party may change its address or addresses set forth above by giving the other party notice of the change in accordance with the provisions of this **Section 11.6**. In addition, Agent and Ignite Payments each may update its address through MyAgentOffice.com, and Ignite Payments may change the location of any documents, information or forms referenced in this Agreement and located on MyAgentOffice.com or the Ignite Payments marketing website on notice to Agent via email or MyAgentOffice.com.

**11.7.   Cooperation**. Ignite Payments and Agent will each timely furnish to the other any and all information and materials that the other may, from time to time, reasonably request in connection with all matters contemplated by this Agreement.  Each party also shall take the action as the other may, from time to time, reasonably request in order that the purposes of this Agreement will be fully accomplished and that all matters contemplated hereby will comply with all applicable laws, regulations, court orders and Rules.

**11.8.   Severability**. The invalidity of any paragraph or subparagraph hereof shall not affect the validity of any other paragraph or subparagraph hereof.

**11.9.   Governing Law and Waiver**. This Agreement shall be governed by the laws of the State of New York.  Agent waives personal service of process and consents that service of process upon it may be made by certified or registered mail, return receipt requested, at the address provided below the signature line of this Agreement.

**11.10.  Survival of Terms**. Subject to Section 10.2, the parties agree that those provisions of this Agreement that logically should survive its termination in order to accomplish the fundamental purposes of it will do so, including **Sections 1.1.a, 1.2 (v), (vii)** and **(ix), 1.3., 1.4.b – d, 1.5., 2.1, 4, 5, 7.1 – 7.5, 9, 10** and **11**.

**11.11.  Third Party Beneficiaries**. This Agreement is made for the benefit of Ignite Payments, Agent and their respective successors and assigns. In addition, Ignite Payments' sponsor bank is a third party beneficiary of this Agreement and may enforce this Agreement against Agent. No other person or entity has or acquires any rights by virtue of this Agreement.

**11.12.  Authority**. The person executing this document on behalf of Agent warrants that they have the full right, capacity and authority to cause such party to enter into this Agreement and that such party has all necessary authority to perform this Agreement.

**11.13.  No Presumption Against Drafter**. Ignite Payments and Agent have jointly participated in the negotiation of the terms of this Agreement. This Agreement shall be construed as if drafted jointly by Ignite Payments and Agent, and no presumptions arise favoring any party by virtue of the authorship of any provision of this Agreement.

*[Signatures appear on following page.]*

EXHIBIT A

In consideration of the foregoing, the parties hereby execute this Agreement.

*Insert Agent Legal Name*  FRANCES GRACE, LP          **Ignite Payments, LLC**

**Signature:** _____   **By:** _____

**Printed Name:** _____   **Name:** _____

**Title:** _____   **Title:** _____

**Date:** _____   **Date:** _____

**Address:** _____   **Approver:** _____

_____

Ignite Payments Existing Agent Launch Agreement

*5-2015*

## Exhibit A

### Definitions

**Accept or Acceptance** means the completion, execution and delivery to Ignite Payments of the Agent's acceptance through the buyout process in MyAgentOffice.com for Residual purchases or Ignite Payments receipt of a completed Cessation of Business Form, as applicable, as the process or form now exist and as they may be modified by Ignite Payments from time to time.

**Affiliate** means any entity that directly or indirectly controls, is controlled by or is under common control with a party.

**Agent Business Conduct Standards** means the business conduct standards that may be established or modified by Ignite Payments from time to time and posted under Policies on MyAgentOffice.com.

**Agent Personnel** means Representatives and any other personnel or contractors of Agent.

**Business Day** means any calendar day other than Saturdays, Sundays, or California or federal holidays.

**Buy Rates** means the amounts set forth under Resources/Forms on MyAgentOffice.com.

**Card** means a credit, debit or other card issued by a member of a Card Brand, including MasterCard, Visa and Discover, and bearing its respective trade name, Mark, or trade symbol, which is of the type accepted for processing under the Merchant Agreement.

**Card Brand** means an entity formed to govern the proper administration and promotion of credit, debit and other cards, including MasterCard, Visa, American Express, Discover and any other entity whose cards may be accepted by merchants for payment for goods or services under the Merchant Agreement.

**Cessation of Business** is defined in **Section 8.2.a.**

**Cessation of Business Portfolio** is defined in Section **8.2.c.**

**Challenge Notice** is defined in **Section 1.3.**

**Competing Activity** means, whether directly or indirectly, the ownership, management, operation, control, participation in, performance of services for, the solicitation of merchants for, or otherwise carrying on, a business similar to or competitive with the electronic transaction processing business of Ignite Payments, including the Services (whether as a principal, agent, independent contractor, partner, employer, proprietor, stockholder, director or otherwise), anywhere in the Territory.

**Confidential Information** means all proprietary, secret or confidential information or data relating to a party and its Affiliates, operations, employees, products or services, clients, customers, potential customers and Ignite Payments' Services. Confidential Information shall include proprietary information of Card Brands, pricing information, Merchant Agreements (whether partially or fully completed), Merchant Accounts and Merchant or Prospective Merchant accounts, records and related information, customer lists, cardholder account numbers, Personal Data, computer access codes, instruction and/or procedural manuals and this Agreement and the terms and conditions of this Agreement. Information shall not be considered Confidential Information to the extent, but only to the extent, that such information: (i) is already known to the receiving party free of any restriction at the time it is obtained; (ii) is subsequently learned from an independent third party free of any restriction and without breach of

DocuSign Envelope ID: D088B3BF-A95F-4C89-A625-A5FB5CB7CFE2

this Agreement; (iii) becomes publicly available through no wrongful act of the receiving party; (iv) is independently developed by the receiving party without reference to any Confidential Information of the other; or (v) is required to be disclosed under law, provided that the receiving party first gives the disclosing party prompt written notice of the required disclosure and commercially reasonable time to allow the disclosing party to seek a protective order or other appropriate remedy.

**Current Level of Account Production** means the number of new Merchant Accounts for Merchants boarded by Agent during the specified time period.

**Damages** means demands, claims, actions or causes of action, assessments, losses, damages, liabilities, judgments, settlement amounts, costs and expenses, including interest, fines, penalties and reasonable expert witness fees and expenses, and attorneys' fees and expenses.

**Deduction Notice** is defined in **Section 1.3**.

**Effective Date** is defined in **Section 6.1**.

**Eligible Accounts** means those Open Accounts that: i) are either in their first renewal term or have been open for more than 12 consecutive months; ii) are not in collections; iii) have not provided Ignite Payments with notice of cancellation; and iv) are in compliance with all Rules.

**FDC** means First Data Corporation or its successors or assigns.

**Gross Processing Revenue** means all Income collected on Open Accounts, excluding those for which Ignite Payments has purchased the Residual rights, minus: Card Brand interchange fees; Card Brand dues and assessments; Buy Rates; Refunds caused by processing errors or the gross negligence or willful misconduct of Agent or Agent Personnel; and Merchant Losses caused by the gross negligence or willful misconduct of Agent or Agent Personnel.

**Ignite Launch Residual Schedule** or **Ignite Launch Schedule** is defined in **Exhibit C**.

**Ignite Payments' sponsor bank** means the bank that is the sponsoring bank or acquiring bank for Card transactions processed pursuant to the Merchant Agreement, as applicable.

**Income** consists of the following items on all Open Accounts: (1) all discount fees (qualified, mid-qualified, and non-qualified) on MasterCard, Visa, Discover, Diners, debit and JCB transactions; (2) transaction fees, (3) batch header fees, (4) address verification service fees, (5) monthly minimum fees, (6) customer support fees, (7) statement fees, (8) monthly Ignite Payments merchant club fees, (9) American Express residuals, (10) JCB fees, (11) chargeback/retrieval fees, (12) annual fees (13) account closure fees and (14) early termination fees**.**

**Initial Term** is defined in **Section 6.1**.

**Marks** are defined in **Section 4.1**.

**Merchant** means an entity that submits a Merchant Agreement to Ignite Payments that indicates such entity was solicited by Agent and results in a Merchant Account.

**Merchant Account** means a Merchant Agreement that has been approved and entered into by Ignite Payments and Ignite Payments sponsor bank.

Ignite Payments Existing Agent Launch Agreement

**Merchant Agreement** means the form of merchant application and merchant agreement in use by Ignite Payments and its sponsor bank in connection with the Ignite Payments Services, as it may be modified from time to time by Ignite Payments and its sponsor bank in their sole discretion.

**MCC Codes** means the four digit Merchant Category Classification codes created by Visa International, Inc. and listed in the Visa USA Merchant Data Manual to identify a particular merchant's principal trade, profession or line of business.

**Merchant Losses** means all losses experienced by Ignite Payments attributable to chargebacks, fines, penalties and other amounts due from a Merchant to Ignite Payments in excess of a Merchant's reserve account.

**Open Account** means a Merchant Account for a Merchant that is classified as "open" on an Ignite Payments settlement platform and has not been cancelled or terminated.

**Personal Data** means any information that is "personally identifiable" within the meaning of the Gramm-Leach-Bliley Act (15 USC § 6801, et seq.) and its implementing regulations (or any superseding or replacement laws, regulations or guidelines), as they may now exist or be enacted, adopted, issued or promulgated.

**Privacy Laws** means all laws, regulations and guidelines applicable to the use, disclosure and processing of Personal Data on behalf of Ignite Payments or its Affiliates, including the Gramm-Leach-Bliley Act (GLBA) and the Healthcare Insurance Portability and Accountability Act (HIPAA), as they may now exist or be enacted, adopted, issued or promulgated.

**Prospective Merchant** means any entity solicited by Agent for Services to be provided by Ignite Payments pursuant to a Merchant Agreement.

**Referral Open Account** means an Open Account resulting from a lead from a third party referral source to Agent with respect to which Ignite Payments is obligated to pay such third party a referral fee.

**Refunds** means refunds to Merchants of any billed and collected amounts.

**Renewal Term** is defined in **Section 6.1**.

**Representative** means all salespersons, employees, agents or representatives appointed or designated by Agent to act on Agent's behalf in connection with performance of Agent's obligations under this Agreement.

**Residuals** means the payments due to Agent by Ignite Payments pursuant to **Section 7.2.a.** of this Agreement.

**Rules** means the rules and regulations now existing, as they may be modified in the future, and any rules and regulations hereafter promulgated by any Card Brand, including the rules and regulations contained in: (i) the Visa U.S.A. Inc. ("**Visa**") Operating Regulations, (ii) MasterCard International Incorporated ("**MasterCard**") Operations Manual, (iii) Discover Financial Services, LLC ("**Discover**") operating regulations, (iv) American Express Travel Related Services Company, Inc. ("**American Express**") operating regulations, as applicable.

**Services** means electronic transaction processing of Card and certain other transactions and related services and support systems as described in the Merchant Agreement.

**Term** is defined in **Section 6.1**.

**Territory** means the United States, as currently defined by Visa.

**Three Month Average Residuals** is defined in **Section 1.3**.

**TP Offer** is defined in **Section 8.3 b**.

**Trademarks** means the marks set forth on **Exhibit B** and FDC's marks posted under Policies on MyAgentOffice.com.

**Unacceptable List** is defined in **Section 1.4**.

**Unrelated Third Party** means any person who is not and is not a relative of, Agent, any former or current owner of a controlling interest in Agent, or any former or current partner, member, officer or director of Agent or any entity in which Agent, any former or current owner of a controlling interest in Agent, or any former or current partner, member, officer or director of Agent has ownership interest or employment relationship.

EXHIBIT A

**Exhibit B**

**<u>Trademarks</u>**

(1) **IGNITE PAYMENTS™**

(2)



(3)



Ignite Payments Existing Agent Launch Agreement

*5-2015*

**Exhibit C**

**Residuals Paid for Merchants Boarded on or after the Effective Date**

A. Notwithstanding anything to the contrary in this **Exhibit C**, if Agent entered into his or her first Prior Agreement with Ignite Payments on or after January 1, 2014, Agent's Residuals during the Initial Period for Launch Open Accounts shall be fixed at 60% of Gross Processing Revenue for such Launch Open Accounts. "**Initial Period**" shall mean the first 12 full calendar months following the execution of this Agreement; provided, however, that if Agent entered into his or her first Prior Agreement with Ignite Payments on or after January 1, 2015, the Initial Period shall mean the first 24 full calendar months following the execution of this Agreement. "**Launch Open Accounts**" means Merchant Accounts boarded by Agent on or after the Effective Date that are Open Accounts.

B. Residuals for Launch Open Accounts for a calendar month shall be an amount equal to the product of Gross Processing Revenue for Launch Open Accounts for such calendar month multiplied by the applicable percentage from the Ignite Launch Residual Schedule set forth below ("**Ignite Launch Schedule**"):

| Gross Processing Revenue for Open Accounts | | Percentage |
|---|---|---|
| - | 20,000 | 40% |
| 20,001 | 30,000 | 45% |
| 30,001 | 70,000 | 50% |
| 70,001 | 100,000 | 55% |
| 100,001 | 130,000 | 60% |
| 130,001 | 330,000 | 65% |
| 330,001 | 670,000 | 70% |
| 670,001 | 1,330,000 | 75% |
| 1,330,001+ | | 80% |

The Ignite Launch Schedule percentage shall be determined based upon the Gross Processing Revenue at the end of each calendar month under this Agreement. The percentage shall be recalculated and effective on the first day of each month. The monthly recalculation may result in an increase, decrease or no change to the Ignite Launch Schedule percentage. The Ignite Launch Schedule percentage will be increased or decreased if the Gross Processing Revenue during the Measurement Period is in a higher or lower tier, as applicable on the Ignite Launch Schedule. The following schedule summarizes the trigger dates regarding the calculation of the percentage that will be used to calculate Residuals:

| Measurement Period | Effective Date |
|---|---|
| December | January 1 |
| January | February 1 |
| February | March 1 |
| March | April 1 |
| April | May 1 |
| May | June 1 |
| June | July 1 |
| July | August 1 |
| August | September 1 |

DocuSign Envelope ID: D088B3BF-A95F-4C89-A625-A5EB5CB7CEE2

EXHIBIT A

| September | October 1 |
|-----------|-----------|
| October | November 1 |
| November | December 1 |

C.      Ignite Payments in its sole discretion may modify the Ignite Launch Schedule in so far as it affects Ignite Payments Residual obligations prospectively, with respect to any existing Open Accounts subject to the Ignite Launch Schedule or both, by giving Agent 90 days prior written notice; provided, however, that Agent may terminate this Agreement within 90 days of receiving such notice from Ignite Payments by giving Ignite Payments written notice of termination within such 90 day period.

D.      Ignite Payments may, in its sole discretion, credit Agent for Referral Open Accounts. To "**credit Agent**" means that Ignite Payments will pay Agent Residuals for such Merchant, provided, however, that Agent's Residuals for such Merchant will be reduced by 100% of any recurring referral fee paid by Ignite Payments to the third party referral source during each month preceding payment of Agent's Residuals for the referral. The adjustments to Agent's Residuals referenced above will apply to all recurring referral fees paid by Ignite Payments after the execution of this Agreement including referral fees paid with respect to Merchants referred by third parties prior to the execution of this Agreement. Agent's Residuals will also be reduced by 100% of any non-recurring referral fees such as one-time commissions paid by Ignite Payments to any third party referral source.

Ignite Payments Existing Agent Launch Agreement

*5-2015*

EXHIBIT A



## Certificate of Completion

| | | |
|---|---|---|
| Envelope Number: D088B3BFA05F4CB9AC25A5EB5CB7CFE2 | | Status: Sent |
| Subject: Please DocuSign this document: Ignite Launch Agent Agreement - Existing Agents.pdf | | |
| Agent NO: | | |
| Source Envelope: | | |
| Document Pages: 22 | Signatures: 2 | Envelope Originator: |
| Certificate Pages: 5 | Initials: 1 | Ignite Payments |
| AutoNav: Enabled | | 5565 Glenridge Dr |
| EnvelopeId Stamping: Enabled | | Atlanta, WA  30342-1335 |
| | | agent.administration@firstdata.com |
| | | IP Address: 204.194.143.30 |

## Record Tracking

| | | |
|---|---|---|
| Status: Original | Holder: Ignite Payments | Location: DocuSign |
| 5/18/2015 4:56:11 PM ET | agent.administration@firstdata.com | |

| Signer Events | Signature | Timestamp |
|---|---|---|
| KENT FLANNERY | | Sent: 5/18/2015 4:56:13 PM ET |
| KENT@IGNITEPAYMENTS-MPLS.COM | | Viewed: 5/18/2015 5:01:05 PM ET |
| Security Level: Email, Account Authentication (None) | | |
| Electronic Record and Signature Disclosure: Accepted: 5/18/2015 5:01:05 PM ET ID: 77125f75-4cb5-4132-98c5-3485181ae147 | | |
| | | |
| Ignite Payments | | |
| agent.administration@firstdata.com | | |
| Security Level: Email, Account Authentication (None) | | |
| Electronic Record and Signature Disclosure: Not Offered ID: | | |
| | | |
| Brian Goudie | | |
| Brian.Goudie@firstdata.com | | |
| Security Level: Email, Account Authentication (None) | | |
| Electronic Record and Signature Disclosure: Not Offered ID: | | |

| In Person Signer Events | Signature | Timestamp |
|---|---|---|

| Editor Delivery Events | Status | Timestamp |
|---|---|---|

| Agent Delivery Events | Status | Timestamp |
|---|---|---|

| Intermediary Delivery Events | Status | Timestamp |
|---|---|---|

| Certified Delivery Events | Status | Timestamp |
|---|---|---|

| Carbon Copy Events | Status | Timestamp |
|---|---|---|

| Notary Events | | Timestamp |
|---|---|---|

| Envelope Summary Events | Status | Timestamps |
|---|---|---|
| Envelope Sent | Hashed/Encrypted | 5/18/2015 4:56:13 PM ET |

EXHIBIT A

**Electronic Record and Signature Disclosure**

## ELECTRONIC RECORD AND SIGNATURE DISCLOSURE

From time to time, Ignite (we, us or Company) may be required by law to provide to you certain written notices or disclosures. Described below are the terms and conditions for providing to you such notices and disclosures electronically through your DocuSign, Inc. (DocuSign) Express user account. Please read the information below carefully and thoroughly, and if you can access this information electronically to your satisfaction and agree to these terms and conditions, please confirm your agreement by clicking the 'I agree' button at the bottom of this document.

**Getting paper copies**

At any time, you may request from us a paper copy of any record provided or made available electronically to you by us. For such copies, as long as you are an authorized user of the DocuSign system you will have the ability to download and print any documents we send to you through your DocuSign user account for a limited period of time (usually 30 days) after such documents are first sent to you. After such time, if you wish for us to send you paper copies of any such documents from our office to you, you will be charged a $0.00 per-page fee. You may request delivery of such paper copies from us by following the procedure described below.

**Withdrawing your consent**

If you decide to receive notices and disclosures from us electronically, you may at any time change your mind and tell us that thereafter you want to receive required notices and disclosures only in paper format. How you must inform us of your decision to receive future notices and disclosure in paper format and withdraw your consent to receive notices and disclosures electronically is described below.

**Consequences of changing your mind**

If you elect to receive required notices and disclosures only in paper format, it will slow the speed at which we can complete certain steps in transactions with you and delivering services to you because we will need first to send the required notices or disclosures to you in paper format, and then wait until we receive back from you your acknowledgment of your receipt of such paper notices or disclosures. To indicate to us that you are changing your mind, you must withdraw your consent using the DocuSign 'Withdraw Consent' form on the signing page of your DocuSign account. This will indicate to us that you have withdrawn your consent to receive required notices and disclosures electronically from us and you will no longer be able to use your DocuSign Express user account to receive required notices and consents electronically from us or to sign electronically documents from us.

**All notices and disclosures will be sent to you electronically**

Unless you tell us otherwise in accordance with the procedures described herein, we will provide electronically to you through your DocuSign user account all required notices, disclosures, authorizations, acknowledgements, and other documents that are required to be provided or made available to you during the course of our relationship with you. To reduce the chance of you inadvertently not receiving any notice or disclosure, we prefer to provide all of the required notices and disclosures to you by the same method and to the same address that you have given us. Thus, you can receive all the disclosures and notices electronically or in paper format through the paper mail delivery system. If you do not agree with this process, please let us know as described below. Please also see the paragraph immediately above that describes the consequences of your electing not to receive delivery of the notices and disclosures electronically from us.

**How to contact Ignite:**

EXHIBIT A

You may contact us to let us know of your changes as to how we may contact you electronically, to request paper copies of certain information from us, and to withdraw your prior consent to receive notices and disclosures electronically as follows:
 To contact us by email send messages to: chris.jones@firstdata.com


**To advise Ignite of your new e-mail address**
To let us know of a change in your e-mail address where we should send notices and disclosures electronically to you, you must send an email message to us at chris.jones@firstdata.com and in the body of such request you must state: your previous e-mail address, your new e-mail address. We do not require any other information from you to change your email address..
In addition, you must notify DocuSign, Inc to arrange for your new email address to be reflected in your DocuSign account by following the process for changing e-mail in DocuSign.
**To request paper copies from Ignite**
To request delivery from us of paper copies of the notices and disclosures previously provided by us to you electronically, you must send us an e-mail to chris.jones@firstdata.com and in the body of such request you must state your e-mail address, full name, US Postal address, and telephone number. We will bill you for any fees at that time, if any.
**To withdraw your consent with Ignite**
To inform us that you no longer want to receive future notices and disclosures in electronic format you may:

> i. decline to sign a document from within your DocuSign account, and on the subsequent page, select the check-box indicating you wish to withdraw your consent, or you may;
> ii. send us an e-mail to chris.jones@firstdata.com and in the body of such request you must state your e-mail, full name, IS Postal Address, telephone number, and account number. We do not need any other information from you to withdraw consent..  The consequences of your withdrawing consent for online documents will be that transactions may take a longer time to process..


**Required hardware and software**

| Operating Systems: | Windows2000? or WindowsXP? |
|---|---|
| Browsers (for SENDERS): | Internet Explorer 6.0? or above |
| Browsers (for SIGNERS): | Internet Explorer 6.0?, Mozilla FireFox 1.0, NetScape 7.2 (or above) |
| Email: | Access to a valid email account |
| Screen Resolution: | 800 x 600 minimum |
| Enabled Security Settings: | •Allow per session cookies <br><br> •Users accessing the internet behind a Proxy Server must enable HTTP 1.1 settings via proxy connection |

** These minimum requirements are subject to change. If these requirements change, we will provide you with an email message at the email address we have on file for you at that time providing you with the revised hardware and software requirements, at which time you will have the right to withdraw your consent.
**Acknowledging your access and consent to receive materials electronically**

EXHIBIT A

To confirm to us that you can access this information electronically, which will be similar to other electronic notices and disclosures that we will provide to you, please verify that you were able to read this electronic disclosure and that you also were able to print on paper or electronically save this page for your future reference and access or that you were able to e-mail this disclosure and consent to an address where you will be able to print on paper or save it for your future reference and access. Further, if you consent to receiving notices and disclosures exclusively in electronic format on the terms and conditions described above, please let us know by clicking the 'I agree' button below.

By checking the 'I Agree' box, I confirm that:

- I can access and read this Electronic CONSENT TO ELECTRONIC RECEIPT OF ELECTRONIC RECORD AND SIGNATURE DISCLOSURES document; and

- I can print on paper the disclosure or save or send the disclosure to a place where I can print it, for future reference and access; and

- Until or unless I notify Ignite as described above, I consent to receive from exclusively through electronic means all notices, disclosures, authorizations, acknowledgements, and other documents that are required to be provided or made available to me by Ignite during the course of my relationship with you.