**EXHIBIT B**

**PREMIER AGENT AGREEMENT**  **INTERNAL USE ONLY:**
**AGENT NO.: 33670**
**DBA NAME: FDIS MINNEAPOLIS**

This Premier Agent Agreement (this "**Agreement**") is between Cardservice International, LLC, a California limited liability company, doing business as First Data Independent Sales ("**FDIS**") and Hunter Grace, LLC, a[n] _____ (State) [corporation/partnership/sole proprietorship/limited liability company] ("**Agent**").

FDIS is an Independent Sales Organization and Member Service Provider as defined under Card Organization Rules. FDIS is in the business of providing Services. Agent is a person or entity in the business of soliciting purchasers of Services. FDIS and Agent wish to enter into a relationship in which Agent will represent FDIS with respect to soliciting purchasers of FDIS Services on the terms and conditions contained in this Agreement.

**Agreement**

In consideration of the foregoing and the covenants and conditions in this Agreement, Agent and FDIS agree as follows:

**1. Agent Obligations**

**1.1.    General Obligations**.

a. <u>Professional and Compliant Business Practices</u>. Agent will operate its business, including maintaining the security of related business, Prospective Merchant, Merchant and cardholder records, in a professional manner in compliance with this Agreement and all applicable laws (including Privacy Laws and USPS Move Update Requirements), regulations, court orders, Card Organization Rules and Agent Business Conduct Standards, which are incorporated into this Agreement as they may now exist or be enacted, adopted, issued or promulgated.

b. <u>Promotional Information; Use of Trade names and Trademarks</u>. Marketing materials, including business cards and stationary, and Web sites created by Agent (other than those FDIS materials printed from the FDIS Brand Center at fdisbrandcenter.com) that contain trade names, trademarks, service marks or logos of, or that reference the services provided by, FDIS, FDIS' sponsor bank, FDC or any Card Organization must be submitted to agent.compliance@firstdata.com for review. Agent agrees to not disseminate or publish any such materials or Web sites until Agent has received written approval from agent.compliance@firstdata.com. In compliance with the law, Agent may not send unsolicited fax advertisements that promote FDIS Services to Merchants or Prospective Merchants. Because Agent is not a registered ISO, Card Organization Rules require that Agent's business telephone be listed and answered by reference to the registered ISO (i.e. "First Data Independent Sales" or "FDIS") and permit Agent to also reference its approved fictitious business name.

**1.2.    Agent Representations**. To comply with legal requirements, Agent represents, warrants and covenants that:

i. Agent shall present, and shall cause its Representatives to present, to each person who executes a Merchant Agreement a copy of such Merchant Agreement at or before the time the person executes the Merchant Agreement.
ii. Agent shall use, and shall cause its Representatives to use, only the Merchant Agreement that is designated by FDIS. Agent shall use, and shall cause its Representatives to use, the most current version of such Merchant Agreement.

EXHIBIT B

    iii. In Face-to-Face Transactions ("**Face-to-Face Agent Transactions**" means those transactions in which Agent meets in person with a merchant, which does not include transactions conducted over the telephone, by facsimile, or over the Internet) where a person executes a paper, rather than an electronic, version of the Merchant Agreement, Agent shall leave, and shall cause his or her Representatives to leave, with each such person a copy of the executed Merchant Agreement.

    iv. In Face-to-Face Agent Transactions where a person executes an electronic, rather than a paper, version of the Merchant Agreement, Agent shall, and shall cause its Representatives to, either (1) advise each such person that a sample copy of the then-current version of the standard Merchant Agreement is available on the FDIS Web site, or (2) leave with each such person a hardcopy or electronic copy of the executed Merchant Agreement.

    v. Agent shall not misrepresent, and shall prohibit its Representatives from misrepresenting, any term of the Merchant Agreement.

    vi. Agent shall provide, and shall cause its Representatives to provide, full and fair disclosure of the Merchant Agreement to Prospective Merchants and Merchants, including disclosures related to all charges, minimum fees, limitations, initial and renewal terms of agreements and warranty services.

    vii. Agent shall not misrepresent, and shall prohibit its Representatives from misrepresenting, the manner in which FDIS provides its services or the procedures FDIS follows, including services and procedures related to chargebacks, loss prevention, ATM/Debit and equipment leasing.

    viii. Agent and Agent Personnel will not make, or offer to make, any payments to, or confer, or offer to confer, any benefit upon any employee, agent or fiduciary of any third party (including any government, or agency or instrumentality thereof) with the intent to influence the conduct of such employee, agent or fiduciary in relation to the business or affairs of such third party.

    ix. If Agent becomes aware of any actual or alleged fraudulent activities or misrepresentations by it or its Representatives, whether or not related to the FDIS Services, Agent will promptly advise FDIS and take all necessary corrective action the Agent determines in its discretion, to be necessary or appropriate.

Agent's failure to satisfy any of the above legal requirements will constitute a breach of this Agreement and be subject to remedial and other action as provided under this Agreement.

Additionally, as Agent is engaged in a separate business, Agent represents, warrants and covenants will use its full legal name (not Agent's DBA name) (1) for Agent's bank accounts, recruiting and similar materials relating to operation of Agent's business, (2) when signing any agreements with merchants for any services offered by Agent that are not described in and billed under the Merchant Agreement including sale, lease and/or rental of point-of-sale terminals and other ancillary products or services, and (3) for any agreements that are between Agent and a third party (including any merchant, lease company, bank, Yellow Page company or other vendor) for any purchase, sale or services (including leases, rental agreements, agreements for web design services, advertising services).

Agent also represents, warrants and covenants that execution and delivery of this Agreement by Agent and the consummation of the transaction herein contemplated does not conflict in any material respect with or constitute a material breach or material default under the terms and conditions of any documents, agreements or other writings to which it is a party, including any covenant not to compete or confidentiality agreement with any third party.

**1.3.**    **Assessments**. Subject to Agent's challenge rights as noted below, the parties agree that Agent shall pay to FDIS immediately upon written demand to Agent from agent.compliance@firstdata.com: (i) the amount of any fine, assessment or other amount charged to FDIS by any third party relating to

EXHIBIT B

Agent's violation of any law, regulation, court order or Card Organization Rule; or (ii) fines to Agent by FDIS for Agent's breach of a material term of this Agreement (including **Section 1.2**) or repeated breach of any term of this Agreement, which fines shall be an amount equal to the greater of $250.00 or: (1) for the first fine, an amount equal to the product of (A) 10% multiplied by (B) an amount equal to the average of Agent's monthly Residuals for the 3 calendar months preceding the date on which the fine is assessed ("**Three Month Average Residuals**"), or (2) for each fine thereafter, an amount equal to the product of (A) 20% multiplied by (B) Three Month Average Residuals. The parties agree that if Agent disputes any demand made to Agent by FDIS pursuant to this **Section 1.3**, Agent may challenge such demand by delivering a written notice ("**Challenge Notice**") to FDIS at agent.compliance@firstdata.com within 10 Business Days after Agent's receipt of FDIS' written demand. The Challenge Notice must state all reasons why such demand should not have been made. If FDIS fails to act on the Challenge Notice within 20 Business Days after its receipt of such, then Agent shall not be obligated to pay to FDIS the amount demanded. The imposition by FDIS or a third party of any assessment, fine or charge against Agent does not constitute a waiver of any legal rights or remedies FDIS may have against Agent. FDIS reserves the right to pursue any and all legal rights and remedies against Agent under this Agreement or applicable law.

**1.4. Prospective Merchants; Merchants; Merchant Agreements**.

a. FDIS will not accept Prospective Merchant types that are identified as "Unqualified/Unacceptable" in the FDIS Credit Policy posted under Resources/Policies on MyagentOffice.com, as it may be modified from time to time by FDIS in its sole discretion (the "**Unacceptable List**"). Agent agrees to use best efforts to verify that each Prospective Merchant conducts or intends to conduct a bona fide, lawful business operation (e.g., by inspecting a Prospective Merchant's premises to determine if it has the proper facilities, equipment, inventory and license to conduct its business or reviewing its Internet site). Agent also agrees to use its best efforts to inform FDIS of any information that could reasonably be considered relevant to a determination of any Prospective Merchant or Merchant's creditworthiness.

b. All Merchant Agreements are subject to review and rejection or approval by FDIS in its sole discretion. FDIS will not approve Merchant Agreements that are not fully completed and executed by the Prospective Merchant. FDIS may terminate any Merchant Agreement at any time in accordance with its terms.

c. Agent may recommend to FDIS and/or its sponsor bank the discount rate and fees charged to a Prospective Merchant or Merchant pursuant to the Merchant Agreement, but FDIS and/or its sponsor bank in its final and sole discretion may accept or reject such recommendation. FDIS or its sponsor bank in its sole discretion may change any fees charged to a Merchant under a Merchant Agreement from time to time without prior notice to Agent.

d. All Merchant Agreements (whether partially or fully completed), Merchant Accounts and Merchant or Prospective Merchant accounts, records and related information are owned by FDIS, its sponsor bank or the applicable acquirer and may not be transferred, assigned, sold or exchanged, in whole or in part, by Agent. Accordingly, at FDIS' request, Agent agrees to provide FDIS with all information, files and materials related to Prospective Merchants and Merchants solicited or signed by Agent under this Agreement. If this Agreement terminates or Agent abandons a Prospective Merchant, FDIS may complete the processing of such Prospective Merchant's submitted application and assist such merchant with the installation of any equipment. If this Agreement terminates, FDIS shall not be required to terminate any Merchant Agreement with any Merchant.

**1.5. Exclusivity for Sale of Services**. Agent, any former or current owner of a controlling interest in Agent, or any former or current partner, member, officer or director of Agent: (i) will not engage in any

act that would injure FDIS' relationship with its employees, agents, Prospective Merchants or Merchants; (ii) will not directly or indirectly induce or influence any merchant to cancel or terminate any existing Merchant Account or Merchant Agreement; and, (iii) except with respect to any Prospective Merchant for which FDIS cannot provide the Services such Prospective Merchant requires or that FDIS rejects or is on the Unacceptable List, (1) shall represent only FDIS with respect to soliciting Prospective Merchants for the purchase of Services within the Territory, and (2) may not engage in any other Competing Activity. Nothing in this Agreement restricts or prohibits Agent from soliciting merchants, Prospective Merchants or Merchants for the purchase any product or service that is not competitive to the FDIS Services.

## 2. Agent Personnel

**2.1.     Agent Personnel**. Subject to **Section 2.2**, Agent shall have the right to designate suitable and desirable Agent Personnel, including Representatives. Agent shall be solely responsible for Agent Personnel and their acts, including any failure to comply with the terms of this Agreement that are applicable to Agent or failure to comply with Card Organization Rules and applicable law, regulations and court orders. Agent Personnel shall be hired at Agent's own risk, expense and supervision, and Agent Personnel shall not have any claim against FDIS for salaries, residuals, benefits, commissions, items of cost, or any other form of compensation or reimbursement. Agent acknowledges and agrees that no Agent Personnel are employees of FDIS, and Agent is solely responsible for any taxes, payroll reporting, workers' or unemployment compensation insurance, compensation, benefits or any other obligations or liabilities that may arise (including verification of work eligibility in U.S.) due to Agent's hiring, retention or termination of or relationship with any Agent Personnel.

**2.2.     Representative Registration**. Prior to a Representative being permitted to solicit or submit any Merchant Applications, Agent must receive written confirmation from agent.compliance@firstdata.com that FDIS has registered such Representative. Agent must provide FDIS with a completed FDIS Sales Representative Registration Form (located under Resources/Forms at MyagentOffice.com) for such Representative and any other documentation or information concerning the Representative requested by FDIS from time to time. FDIS reserves the right to refuse to register or revoke the registration of any proposed or approved Representative that FDIS, in its sole discretion, determines is a detriment to the business of FDIS. Agent must notify FDIS in writing of the termination of any Representative within three Business Days of such termination.

## 3. FDIS' Obligations

**3.1.     Grant of Authority**. FDIS hereby grants to Agent the right, on a non-exclusive basis, to solicit Prospective Merchants for the purchase of the Services from FDIS within the Territory as long as the merchant does not already have, and has not had in the previous 90 days, an open Merchant Account.

**3.2.     FDIS Services**. FDIS shall be responsible for all processing and accounting functions relating to the clearing and settlement of Card transactions, including: (i) Merchant processing and settlement; (ii) Merchant credit research; (iii) Merchant activation and approval; (iv) Merchant security and recovery; (v) Merchant customer services; (vi) Merchant chargeback and retrieval services; and (vii) all other back office services, including collecting amounts due from Merchants to FDIS. FDIS may contract with other persons to perform these functions on behalf of FDIS but FDIS remains primarily responsible for the functions. Subject to **Section 5.2**, FDIS will make available to Agent training on the FDIS Services.

## 4. Licensing

**4.1.     License**. Subject to **Section 1.1(b)** and this **Section 4**, FDIS grants to the Agent during the Term, the limited, non-exclusive, non-assignable, revocable right to use the Trademarks displayed on **Exhibit B** (as it may be modified from time to time by FDIS in its sole discretion and provided to Agent via email or

on MyagentOffice.com) in the Territory in connection with Agent's marketing materials for the FDIS Services. Upon termination of this Agreement, (i) the limited rights granted to Agent to use the Trademarks under this **Section 4** shall immediately terminate; (ii) Agent shall immediately cease and desist from all use of the Trademarks and any trade name, trademark, service mark, or logotype associated with Cards ("**Marks**"), except to the extent such use may be authorized under a separate agreement; (iii) at FDIS' request, Agent will deliver to FDIS all material and papers upon which the Trademarks or Marks appear or to which the Trademarks or Marks relate, including correspondence and information on Prospective Merchants or Merchants solicited or procured while the Agent solicited on behalf of FDIS; and (iv) Agent will take all necessary actions to correct information that states or suggests that Agent is connected in any manner with FDIS or its Trademarks, including correction of telephone and other directories, telephone information providers, postal offices, electronic mail providers, letterhead, business cards, office signage, Web page(s) on the Internet, domain name registries (if applicable), any post domain URL path (if applicable) and other communication delivery services. Agent shall direct that all inquiries be forwarded to FDIS' Moorpark office or such other place designated by FDIS. If Agent fails to take any required action within 30 days of the termination of this Agreement, then Agent appoints, without power of revocation, FDIS as its attorney in fact to act in Agent's place and with Agent's authority to take such corrective actions with the same legal force and effect as if such acts were performed by Agent.

**4.2.    Ownership of Trademarks**. Agent acknowledges that FDIS or FDC is the owner or licensee of the Trademarks, and Card Organizations are the owners of their respective Marks. Agent acknowledges that FDIS, FDC and the Card Organizations hold the exclusive right, title and interest in and to their respective marks. Agent will not at any time do or cause to be done any act or thing contesting or in any way impairing or tending to impair any part of such right, title and interest. In connection with the use of the Trademarks or Marks, Agent shall not in any manner represent that it has any ownership in the Trademarks, Marks or registrations thereof, and Agent acknowledges that use of the Trademarks or Marks do not create in the Agent's favor any right, title or interest in or to the Trademarks or Marks or the goodwill attached to an associated with the Trademarks or Marks. All uses of the Trademarks or Marks by the Agent shall inure to their respective owner. Agent will at no time during or after the Term register, adopt or use, any word or mark which is likely to be similar to or confusing with the Trademarks or Marks or any other marks owned or utilized by FDIS or FDC. Agent agrees to not, at any time, use any Mark on its own behalf or suggest, imply or in any manner create an impression that it is a member of MasterCard, VISA, American Express, Discover or any other Card Organization with respect to which merchants submit transactions for processing under a Merchant Agreement. Any Card Organization may at any time and without notice prohibit Agent from using its Marks for any reason. Agent must comply with additional terms governing Agent's use of Trademarks or Marks that may be posted on MyagentOffice.com from time to time.

### 5. Relationship of the Parties

**5.1.    Independent Contractor**. Neither Agent nor any Agent Personnel is an employee of FDIS for any purpose whatsoever. Agent is an independent contractor and as such is not eligible for any compensation, benefits, insurance or other employment terms that are provided to employees of FDIS or any FDIS Affiliates. FDIS is interested only in the results obtained by Agent and FDIS has no right to control Agent or Agent Personnel, including no right to require Agent or Agent Personnel to: (i) devote a fixed or minimum number of hours to selling or any other effort, (ii) follow prescribed itineraries or instructions, (iii) bind FDIS, or (iv) do anything that would alter Agent's independent contractor status. At all times, Agent has the sole right and responsibility to supervise, direct, and control Agent's business operations and Agent Personnel, including Agent office account receivables and payables and other office administration functions.

EXHIBIT B

**5.2.    Expenses; Taxes**. Agent is solely responsible for all expenses and disbursements that may be incurred or due by Agent in connection with its performance of its obligations under this Agreement, including promotional materials, general selling, training, travel, entertainment, insurance, office equipment, maintenance, supplies, rental, lease, legal or accounting expenses; purchase or lease of office space; Agent Personnel salaries, benefits, taxes and other costs and expenses; and any federal, state or local tax or insurance obligations that may arise in connection with Agent's activities or due to receipt of payments by Agent under this Agreement.

**5.3.    Other**. Agent does not have the right or authority to and will not, and will not permit any Agent Personnel to, hold itself out as having any right, power or authority to create any contract or obligation, either express or implied, on behalf of, in the name of or binding upon FDIS, or to pledge FDIS' credit, or to extend credit in FDIS' name. Without the prior written consent of Agent, FDIS has no right or authority to, and will not, commit Agent in any matter or use Agent's name in any way not specifically authorized by this Agreement.

**6. Term**

**6.1.    Term**. Provided that both Agent and FDIS execute this Agreement, this Agreement is effective (the "**Effective Date**") on (i) if it is executed by Agent and provided to FDIS on or before the tenth day of a calendar month, the first day of such calendar month, or, (ii) if it is executed by Agent and provided to FDIS after the tenth day of a calendar month, the first day of the following calendar month. This Agreement shall remain in effect for a one year period that begins on the Effective Date (the "**Initial Term**") and automatically renew for successive terms of one year each (each a "**Renewal Term**" and together with the Initial Term, the "**Term**"), unless either party provides the other party with written notice at least 60 days before the end of the then-current term that it will terminate this Agreement at the end of the then-current term.

**6.2.    Termination by FDIS**.

    a.    With Cause without any Right to Cure. In addition to any other rights and remedies that it may have and notwithstanding **Section 6.2.b.**, FDIS in its sole discretion may terminate this Agreement upon five calendar days prior written notice to Agent if any reasonable evidence is discovered indicating (i) Agent or any Agent Personnel have: (1) violated any confidentiality or intellectual property rights protected by this Agreement; (2) violated any applicable law, regulation, court order or Card Organization Rule; or (3) committed any act of misrepresentation, fraud, forgery, dishonesty or other willful or malicious act; or (ii) Agent has ceased its operation and activity as a sales agent for FDIS.

    b.    With Cause with a Right to Cure. In addition to any other rights and remedies that it may have and notwithstanding **Section 6.2.a.**, FDIS may terminate this Agreement if Agent is in breach of any of the terms, conditions, representations, warranties or covenants of this Agreement or Agent Business Conduct Standards or for any violation of **Section 1.5**, but only upon giving Agent written notice of such breach and Agent's failure to cure such breach within 10 Business Days after receipt of such notice; provided, however, that if a cure cannot reasonably be accomplished within such 10-day period, FDIS, in its sole discretion, may toll the cure period so long as the Agent commences a cure within such 10-day period and thereafter diligently pursues such cure as promptly as practical, but in no event will a cure period exceed 90 calendar days.

    c.    Agent Insolvency. If Agent makes any assignment of assets or business for the benefit of creditors, or if a trustee or receiver is appointed to administer or conduct its business or affairs, or if it is adjudged in any legal proceeding to be either a voluntary or involuntary bankruptcy, then the rights granted herein to Agent shall forthwith cease and terminate without prior notice or legal action by FDIS.

EXHIBIT B

**6.3.    Termination by Agent**. In addition to any other rights and remedies that it may have, Agent may terminate this Agreement if FDIS is in breach of its obligations under **Section 7**, but only upon giving FDIS written notice of such breach and FDIS' failure to cure such breach within 10 Business Days after receipt of such notice, unless a cure cannot reasonably be accomplished within such period. In that case, the cure period will be tolled so long as FDIS commences a cure within such 10-day period and thereafter diligently pursues such cure as promptly as practical, but in no event may a cure period exceed 90 calendar days.

**6.4.    Termination by Mutual Agreement**. The parties may terminate this Agreement at any time in a writing signed by both parties.

### 7. Payments

**7.1.    Right to Payment**.

a.    FDIS shall pay Residuals and certain other amounts set forth in this **Section 7** to Agent during the Term and after termination of this Agreement subject to the terms of this Agreement, including this **Section 7** and **Section 8**.

b.    FDIS in its sole discretion may immediately discontinue payment of any amounts due to Agent after termination of this Agreement if: (i) FDIS terminates this Agreement pursuant to **Section 6.2** above; (ii) Agent, any former or current owner of a controlling interest in Agent, or any former or current partner, member, officer or director of Agent: (1) engages in any act that would injure FDIS' relationship with its employees, agents, Prospective Merchants or Merchants; (2) directly or indirectly induces or influence any merchant to cancel or terminate any existing Merchant Account or Merchant Agreement; or, (3) engages in a Competing Activity; (iii) Agent fails to remain in compliance with all terms and conditions of this Agreement that survive termination of this Agreement; (iv) Agent fails to remain current on all obligations to FDIS and FDIS' sponsor bank(s); (v) FDIS is unable, after good faith efforts for a period of 90 days, to locate Agent and make payment of Residuals to Agent; or (vi) Agent's monthly Residual payment falls below $250.00.

**7.2.    Payment for Services**. Subject to the terms of this Agreement,

a.    On or about the 20th day of each calendar month FDIS shall pay to Agent a Residual equal to the sum of the following amounts:

   i.    Residuals for Merchant Accounts boarded by Agent prior to the Effective Date that are Open Accounts in accordance with the terms set forth in **Exhibit C**.

   ii.    Residuals for Merchant Accounts boarded by Agent on or after the Effective Date that are Open Accounts in accordance with the terms set forth in **Exhibit D**.

b.    At least monthly FDIS shall pay to Agent payments for certain third party or other products and services subject to the terms set forth under Resources/Forms on MyagentOffice.com. FDIS may change the terms, including the amounts, of any such payments by providing Agent with at least 30 days prior written notice of such changes.

Agent must request an adjustment to any amounts paid to or by Agent pursuant to this **Section 7** within the 90 day period following the initial credit or debit or FDIS has no obligation to make such adjustment.

**EXHIBIT B**

**7.3.** **Merchant Losses**. FDIS shall bear the risk for Merchant Losses (other than those caused by the gross negligence or willful misconduct of Agent or Agent Personnel) and shall not deduct such Merchant Losses from any amounts due to Agent under this Agreement.

**7.4.** **Right to Offset**. Agent hereby authorizes FDIS at any time and from time to time, without notice or demand to Agent or to any other person (any such notice and demand being hereby expressly waived), to set off, recoup and to appropriate and apply any and all funds of Agent held by FDIS, FDIS' Affiliates or FDIS' sponsor bank, against and on account of Agent's obligations to FDIS or any FDIS' Affiliates under this Agreement or any other agreement, including fees for equipment or the Services, whether such obligations are liquidated, unliquidated, fixed, contingent, matured or unmatured. Agent is prohibited from setting-off, offsetting or otherwise reducing or applying against any amounts due and owing to FDIS under this Agreement or otherwise, any amounts owed or alleged to be owed to Agent by FDIS under this Agreement or otherwise. FDIS may in its sole discretion exercise the rights described in this **Section 7.4** by direct debit to Agent's bank account. This offset right is in addition to all other rights and remedies available to FDIS.

**7.5.** **Right to Debit and Credit Agent's Bank Account**. All financial transactions between Agent and FDIS, including payment for equipment purchases, may be automatically debited and credited by FDIS, in its sole discretion, directly through Agent's bank account. Agent irrevocably consents to the debiting and crediting of its bank account(s) as provided herein. With respect to equipment transactions only, FDIS shall provide 10 days advance written notice to Agent prior to initiating a debit entry. In order to activate automatic debit and credit service, Agent shall provide FDIS with the required depository information and execute ACH Authorization Agreement Direct payments (Debits) Form and ACH Authorization Agreement Direct Payments (Credits) Form provided to Agent by FDIS or any other form that FDIS may request from time to time to accomplish the purposes set forth in this **Section 7.5**.

**7.6.** **Loan**. Once every 12 months during the Term, Agent is eligible to receive a loan from FDIS in an amount equal to the product of two multiplied by Three Month Average Residuals subject to the terms and conditions of a promissory note in the form provided by FDIS and executed by Agent if Agent: (i) is not in breach of its obligations under this Agreement; (ii) is current on all financial obligations to FDIS and FDIS Affiliates; and (iii) has not had a promissory note payable to FDIS outstanding at any time within the preceding 30 days. Notwithstanding the foregoing, FDIS is not obligated under this **Section 7.6** to loan agent an amount less than $5,000.00 or greater than $500,000.00 during any 12 month period; and FDIS may modify or discontinue the loan program described in this **Section 7.6** at any time without notice to Agent.

### 8. Purchase and Sale of Agent Residual Rights

**8.1.** **Continuing Offer to Purchase**. During the Term, FDIS hereby offers to purchase Agent's unencumbered right to receive future Residuals (excluding Residuals for Referral Open Accounts) subject to the terms and conditions regarding FDIS' online Residual rights buyout process found set forth under Resources/Forms on MyagentOffice.com, including the Acceptance of Cardservice International's Offer to Purchase Agent's Residual Rights form.

**8.2.** **Offer to Purchase Upon Retirement**. During the Term, FDIS hereby offers to purchase Agent's unencumbered rights to receive future Residuals if Agent ceases to conduct the business of soliciting merchants for the purchase of Services from FDIS and any and all competitors of FDIS ("**Retirement**") subject to the terms and conditions set forth under Resources/Forms on MyagentOffice.com, including the Acceptance of Cardservice International's Offer to Purchase Agent's Residual Rights (Retirement) form.

EXHIBIT B

**8.3.     Right to Receive Future Residuals; Right of First Refusal**. Subject to **Section 9**, at any time during the Term, Agent may sell its right to receive future Residuals under this Agreement ("**Right to Receive Future Residuals**") to an Unrelated Third Party subject to the following terms and conditions:

(i)     The terms governing the rate at which Residuals are being paid to Agent as of the date of Agent's sale of Residuals pursuant to an Offer (as defined below) will be fixed and apply to the calculation of future Residuals subject to the Offer.

(ii)     Agent hereby grants to FDIS a right of first refusal to purchase Agent's Right to Receive Future Residuals. If Agent receives a bona fide offer from a willing and able Unrelated Third Party buyer to purchase Agent's Right to Receive Future Residuals (an "**Offer**"), Agent shall notify FDIS of the amount and terms of such Offer. FDIS shall have the first right to purchase Agent's Right to Receive Future Residuals on terms equal to the Offer, and Agent shall not sell or in any way transfer Agent's Right to Receive Future Residuals without first presenting FDIS with the opportunity to match any Offer. FDIS shall have 15 days to notify Agent of its decision whether or not to exercise its right to purchase Agent's Right to Receive Future Residuals.

(iii)     If FDIS does not exercise its right of first refusal, provided that Agent and Unrelated Third Party buyer execute and provide to FDIS a residual re-direction letter in the form required by FDIS, Agent may sell its Right to Receive Future Residuals in accordance with the terms of this **Section 8.3** and the Offer.

(iv)     Nothing in this **Section 8.3** shall be construed or interpreted to impair any of FDIS' rights under this Agreement, including **Section 9**, or to allow Agent to sell any interest in a Merchant, Merchant Agreement or Merchant Account, except for the sale of Agent's Right to Receive Future Residuals as set forth in this **Section 8.3**.

(v)     "**Unrelated Third Party**" means any person who is not and is not a relative of, Agent, any former or current owner of a controlling interest in Agent, or any former or current partner, member, officer or director of Agent or any entity in which Agent, any former or current owner of a controlling interest in Agent, or any former or current partner, member, officer or director of Agent has ownership interest or employment relationship.

### 9. Confidentiality

**9.1.     Restrictions on Use or Disclosure of Confidential Information**. Each of FDIS and Agent agree that, without the written consent of the other, it will not divulge or disclose to third parties, directly or indirectly, any Confidential Information or use such Confidential Information except to the extent required in its business relationship with the other party or to carry out its obligations under this Agreement. For the avoidance of doubt, Agent shall keep the terms, conditions and existence of this Agreement strictly confidential, and under no circumstance may Agent distribute this Agreement or any other FDIS Confidential Information for any purpose, including with respect to Agent's rights under **Section 8.3**, without FDIS' prior written consent. No party will obtain any proprietary rights to any Confidential Information of the other party. Each party shall retain Confidential Information in its possession and control and shall protect the secrecy of such Confidential Information using the degree of care it uses to protect the secrecy of its own Confidential Information, but in no event less than a commercially reasonable degree of care.

**9.2.     Exceptions**. Notwithstanding the foregoing: FDIS shall not be prohibited from disclosing Confidential Information to the extent that it is related to Merchant Agreements, Merchant Accounts and Merchant or Prospective Merchant accounts, records and related information and other information relating to FDIS business or FDIS Services, but excluding any other information regarding the business of

ISO, to the extent that such disclosure by FDIS is for a bona fide business purpose; and, Agent's Confidential Information may be made available by or on behalf of FDIS at FDIS or FDIS sponsor bank's direction to any Card Organization or to any other supervisory or regulatory authority to which FDIS may be subject, upon their written request.

### 10. Indemnity and Limitation of Liability

**10.1. Indemnification**. Agent shall indemnify, defend and hold harmless FDIS and its officers, directors, shareholders, employees, agents and representatives against any and all Damages incurred directly or indirectly by FDIS, whether or not litigation is commenced, incurred by or asserted against FDIS, arising from or related to: (i) any debts incurred by Agent or Agent Personnel, including debts incurred with telephone, utility, and express mail companies; (ii) any claim of any officer, director, shareholder of the Agent or any Agent Personnel made against FDIS for any compensation, benefit or other payment to such person; (iii) any activity or representation by Agent or any Agent Personnel in marketing, advertising, promoting or otherwise engaging in any activity arising from or related to this Agreement; (iv) any claim arising from the unauthorized use of the Trademarks or other FDIS or Card Organization intellectual property; (v) any actions concerning alleged Agent or Representative improprieties in the solicitation, sale or leasing of the FDIS Services or equipment; (vi) any breach of any term or condition of this Agreement, any Card Organization Rules, law, regulation or court order or Business Conduct Standards; or (vii) any representation, warranty or covenant of Agent made in or in connection with this Agreement being false or misleading. As stated in elsewhere in this Agreement, Agent is acting hereunder as an independent contractor and neither Agent nor any Agent Personnel shall be considered to be an employee of FDIS or its Affiliates or FDIS' sponsor bank (collectively "FDIS" for purposes of this **Section 10.1**). Notwithstanding anything to the contrary in **Section 10.4**, if (a) Agent or any Agent Personnel assert that Agent or any Agent Personnel is an employee of FDIS; or (b) a federal, state or local governmental agency or court asserts or determines Agent or any Agent Personnel are employees of FDIS, then Agent shall indemnify, defend and hold harmless FDIS, its Affiliates, and their respective officers, directors and employees from any and all Damages and exemplary, punitive or special damages associated with such claim and/or determination whether or not litigation is commenced, incurred by or asserted against FDIS.

**10.2. Statute of Limitations**. Notwithstanding the fact that the statute of limitations for bringing a legal action on a written contract, or other limitation period that could apply based upon the type of action or act, omission or violation being alleged, may be shorter or longer, the parties agree that any action, legal or equitable, based on, related to or arising out of the subject matter of this Agreement, and whether based on contract, tort, strict liability or some other legal or equitable theory of recovery, must be commenced by a party within one year after the earlier of (i) the date on which such party knew or should have known of the first alleged act, omission or violation, or (ii) with respect to obligations that do not survive termination of this Agreement, the date of termination of this Agreement.

**10.3. Limitation of Liability**. Notwithstanding anything contained in this Agreement or otherwise, FDIS' cumulative liability to Agent and anyone claiming by through or under Agent, for all Damages arising out of or related to this Agreement, and regardless of the form of action or legal theory shall not exceed, in the aggregate, the lesser of aggregate Residuals paid to agent in the twelve months preceding the act giving rise to the claim or $500,000.00. Agent understands the limitation on damages to be a reasonable allocation of risk and expressly consents to such risk allocation.

**10.4. Exclusion of Damages**. Except as set forth in this Agreement, in no event shall either party, its parents, Affiliates or any of its or their directors, officers, employees, agents or sub-contractors be liable under any theory of tort, contract, strict liability or other legal or equitable theory for lost profits, exemplary, punitive, special, incidental, indirect or consequential damages, each of which is hereby

**EXHIBIT B**

excluded by agreement of the parties regardless of whether such damages were foreseeable or whether either party or any entity has been advised of the possibility of such damages.

## 11. General Provisions

**11.1. Definitions; Word Usage**. Capitalized terms have the meanings set forth in **Exhibit A**. Unless the context clearly requires otherwise, (i) the plural and singular numbers shall each be deemed to include the other; (ii) "**shall**," "**will**," or "**agrees**" are mandatory, and "**may**" is permissive; (iii) "**or**" is not exclusive; and (iv) "**includes**" and "**including**" are not limiting.

**11.2. Effect of Headings**. Subject headings of sections and subsections of this Agreement are included for convenience only and shall not affect the construction or interpretation of any of its provisions.

**11.3. Entire Agreement**. This Agreement, including the exhibits hereto, constitutes the sole and exclusive terms and conditions and agreement between the parties relating to the subject matter hereof, and supersedes all prior or contemporaneous discussions, writings, negotiations, understandings and agreements with respect thereto, between the parties and their respective assignors, predecessors, predecessors–in-interest, owners or previous owners ("**Superseded Agreements**"), which are hereby terminated and of no further force or effect.  For the avoidance of doubt, the Superseded Agreements do not include any promissory notes, guarantees or security agreements executed prior to the Effective Date.

**11.4. Waiver or Modification Ineffective Unless in Writing**. Except as set forth in this Agreement, no amendment of any provision of this Agreement will be valid unless the same will be in writing and signed by each of the parties. No waiver by any party of any provision of this Agreement or any default, misrepresentation, or breach of warranty or covenant hereunder, whether intentional or not, will be valid unless the same will be in writing and signed by the party making such waiver nor will such waiver be deemed to extend to any prior or subsequent waiver, default, misrepresentation, or breach of warranty or covenant hereunder or affect in any way any rights arising by virtue of any prior or subsequent waiver, default, misrepresentation, or breach of warranty or covenant except pursuant to its express terms.

**11.5. Assignment**. The rights and obligations of Agent under this Agreement are personal. Except as otherwise expressly provided in this Agreement, Agent shall not assign, subcontract, license, franchise, or in any manner attempt to transfer or extend to any third party this Agreement or any right or obligation of Agent under this Agreement, by operation of law or otherwise, without the prior written consent of FDIS, which may be granted or withheld at the sole discretion of FDIS.  For purposes of this Agreement, any transfer of ownership or voting control of Agent shall be considered an assignment or transfer hereof. This Agreement shall be binding upon and inure to the benefit of the parties hereto and their permitted successors and assigns.

**11.6. Written Notice**. Unless otherwise specified in this Agreement, all notices and other communications required or permitted under this Agreement shall be in writing and shall be deemed delivered and effective when given by personal delivery, telefax (confirmed by a mailed copy) or first-class mail, postage prepaid, addressed as follows: (i) if to Agent, to the address set forth below Agent's signature line in this Agreement; and (ii) if to FDIS to 5898 Condor Drive, Suite 220, Moorpark, CA 93021, Attention: Senior Vice President (Facsimile: 402.916.6610); with a copy to First Data Corporation, 6200 South Quebec Street, Suite 260A, Greenwood Village, Colorado 80111, Attention: Legal Department (Facsimile: 303.967.5216). A party may change its address or addresses set forth above by giving the other party notice of the change in accordance with the provisions of this **Section 11.6**. In addition, Agent and FDIS each may update its address through MyagentOffice.com, and FDIS may change the location of any documents, information or forms referenced in this Agreement and located on MyagentOffice.com or fdisbrandcenter.com on notice to Agent via email or MyagentOffice.com.

EXHIBIT B

**11.7.    Cooperation**. FDIS and Agent will each timely furnish to the other any and all information and materials that the other may, from time to time, reasonably request in connection with all matters contemplated by this Agreement. Each party also shall take the action as the other may, from time to time, reasonably request in order that the purposes of this Agreement will be fully accomplished and that all matters contemplated hereby will comply with all applicable laws, regulations, court orders and Rules.

**11.8.    Severability**. The invalidity of any paragraph or subparagraph hereof shall not affect the validity of any other paragraph or subparagraph hereof.

**11.9.    Governing Law and Waiver**. This Agreement shall be governed by the laws of the State of New York.  Agent waives personal service of process and consents that service of process upon it may be made by certified or registered mail, return receipt requested, at the address provided below the signature line of this Agreement.

**11.10.   Survival of Terms**. The parties agree that those provisions of this Agreement that logically should survive its termination in order to accomplish the fundamental purposes of it will do so, including **Sections 1.1.a**, **1.2(v)**, **(vii)** and **(ix)**, **1.3.**, **1.4.b – d**, **1.5, 2.1, 4**, **5, 7.1 – 7.5**, **9**, **10**, **11**.

**11.11.   Third Party Beneficiaries**. This Agreement is made for the benefit of FDIS, Agent and their respective successors and assigns. In addition, FDIS' sponsor bank is a third party beneficiary of this Agreement and may enforce and this Agreement against Agent. No other person or entity has or acquires any rights by virtue of this Agreement.

**11.12.   Authority**. The person executing this document on behalf of Agent warrants that they have the full right, capacity and authority to cause such party to enter into this Agreement and that such party has all necessary authority to perform this Agreement.

**11.13.   No Presumption Against Drafter**. FDIS and Agent have jointly participated in the negotiation of the terms of this Agreement. This Agreement shall be construed as if drafted jointly by FDIS and Agent, and no presumptions arise favoring any party by virtue of the authorship of any provision of this Agreement.

In consideration of the foregoing, the parties hereby execute this Agreement.

| **Agent:** | | **Cardservice International, LLC,**<br>**a California limited liability company** |
|---|---|---|
| **Signature:** | _____ | **By:** _____ |
| **Printed Name:** | _____ | **Name:** _____ |
| **Title:** | _____ | **Title:** _____ |
| **Date:** | _____ | **Date:** _____ |
| **Address:** | _____ | |
| | _____ | |

EXHIBIT B

## Exhibit A
## Definitions

**Affiliate** means any entity that directly or indirectly controls, is controlled by or is under common control with a party.

**Agent Business Conduct Standards** means the business conduct standards that may be established or modified by FDIS from time to time and posted under Policies on MyagentOffice.com.

**Agent Personnel** means Representatives and any other personnel or contractors of Agent.

**Business Day** means any calendar day other than Saturdays, Sundays, or California or federal holidays.

**Buy Rates** means the amounts set forth under Resources/Forms on MyagentOffice.com.

**Card** means a credit, debit or other card issued by a member of a Card Organization, including MasterCard, Visa and Discover, and bearing its respective trade name, Mark, or trade symbol, which is of the type accepted for processing under the Merchant Agreement.

**Card Organization** means an entity formed to govern the proper administration and promotion of credit, debit and other cards, including MasterCard, Visa, American Express, Discover and any other entity whose cards may be accepted by merchants for payment for goods or services under the Merchant Agreement.

**Card Organization Rules** means the rules and regulations now existing, as they may be modified in the future, and any rules and regulations hereafter promulgated by any Card Organization, including the rules and regulations contained in: (i) the Visa U.S.A. Inc. ("**Visa**") Operating Regulations, (ii) MasterCard International Incorporated ("**MasterCard**") Operations Manual, (iii) Discover Financial Services, LLC ("**Discover**") operating regulations, (iv) American Express Travel Related Services Company, Inc. ("**American Express**") operating regulations, as applicable.

**Competing Activity** means, whether directly or indirectly, the ownership, management, operation, control, participation in, performance of services for, the solicitation of merchants for, or otherwise carrying on, a business similar to or competitive with the electronic transaction processing business of FDIS, including the Services (whether as a principal, agent, independent contractor, partner, employer, proprietor, stockholder, director or otherwise), anywhere in the Territory.

**Confidential Information** means all proprietary, secret or confidential information or data relating to a party and its Affiliates, operations, employees, products or services, clients, customers, potential customers and FDIS' Services. Confidential Information shall include proprietary information of Card Organizations, pricing information, Merchant Agreements (whether partially or fully completed), Merchant Accounts and Merchant or Prospective Merchant accounts, records and related information, customer lists, cardholder account numbers, Personal Data, computer access codes, instruction and/or procedural manuals and this Agreement and the terms and conditions of this Agreement.  Information shall not be considered Confidential Information to the extent, but only to the extent, that such information: (i) is already known to the receiving party free of any restriction at the time it is obtained; (ii) is subsequently learned from an independent third party free of any restriction and without breach of this Agreement; (iii) becomes publicly available through no wrongful act of the receiving party; (iv) is independently developed by the receiving party without reference to any Confidential Information of the other; or (v) is required to be disclosed under law, provided that the receiving party first gives the disclosing party prompt written notice of the required disclosure and commercially reasonable time to allow the disclosing party to seek a protective order or other appropriate remedy.

**EXHIBIT B**

**Current Level of Account Production** means the number of new Merchant Accounts for Merchants boarded by Agent during the specified time period.

**Damages** means demands, claims, actions or causes of action, assessments, losses, damages, liabilities, judgments, settlement amounts, costs and expenses, including interest, fines, penalties and reasonable expert witness fees and expenses, and attorneys' fees and expenses.

**FDC** means First Data Corporation or its successors or assigns.

**FDIS' sponsor bank** means the bank that is the sponsoring bank or acquiring bank for Card transactions processed pursuant to the Merchant Agreement, as applicable.

**Gross Processing Revenue - CAAP** means all Income - CAAP on Open Accounts, including those in collections and excluding those for which FDIS has purchased the Residual rights, minus: Card Organization interchange fees; Card Organization dues and assessments; Refunds caused by processing errors or the gross negligence or willful misconduct of Agent or Agent Personnel; and Merchant Losses caused by the gross negligence or willful misconduct of Agent or Agent Personnel.

**Gross Processing Revenue - Premier** means all Income - Premier collected on Open Accounts, excluding those for which FDIS has purchased the Residual rights, minus: Card Organization interchange fees; Card Organization dues and assessments; Buy Rates; Refunds caused by processing errors or the gross negligence or willful misconduct of Agent or Agent Personnel; and Merchant Losses caused by the gross negligence or willful misconduct of Agent or Agent Personnel.

**Gross Sales Volume** means all MasterCard, Visa and Discover Card payments accepted by Open Accounts during the specified time period which are processed and settled through FDIS, are not fraudulent and do not result in a chargeback.

**Income - CAAP** consists of the following items on all Open Accounts: (1) all discount fees (qualified, mid-qualified, and non-qualified) on MasterCard, Visa, Discover, Diners, debit and JCB transactions; (2) transaction fees, (3) batch header fees, (4) address verification service fees, (5) monthly minimum fees, (6) customer support fees, (7) statement fees, (8) monthly FDIS merchant club fees, (9) American Express residuals, (10) JCB fees, (11) chargeback/retrieval fees, and (12) annual fees.

**Income - Premier** consists of the following items on all Open Accounts: (1) all discount fees (qualified, mid-qualified, and non-qualified) on MasterCard, Visa, Discover, Diners, debit and JCB transactions; (2) transaction fees, (3) batch header fees, (4) address verification service fees, (5) monthly minimum fees, (6) customer support fees, (7) statement fees, (8) monthly FDIS merchant cub fees, (9) American Express residuals, (10) JCB fees, (11) chargeback/retrieval fees, (12) annual fees (13) account closure fees and (14) early termination fees.

**Marks** are defined in **Section 4.1**.

**Merchant** means an entity that submits a Merchant Agreement to FDIS that indicates such entity was solicited by Agent and results in a Merchant Account.

**Merchant Account** means a Merchant Agreement that has been approved and entered into by FDIS and FDIS sponsor bank.

**EXHIBIT B**

**Merchant Agreement** means the form of merchant application and merchant agreement in use by FDIS and its sponsor bank in connection with the FDIS Services, as it may be modified from time to time by FDIS and its sponsor bank in their sole discretion.

**MCC Codes** means the four digit Merchant Category Classification codes created by Visa International, Inc. and listed in the Visa USA Merchant Data Manual to identify a particular merchant's principal trade, profession or line of business.

**Merchant Losses** means all losses experienced by FDIS attributable to chargebacks, fines, penalties and other amounts due from a Merchant to FDIS in excess of a Merchant's reserve account.

**Open Account** means a Merchant Account for a Merchant that is classified as "open" on a FDIS settlement platform and has not been cancelled or terminated.

**Personal Data** means any information that is "personally identifiable" within the meaning of the Gramm-Leach-Bliley Act (15 USC § 6801, et seq.) and its implementing regulations (or any superseding or replacement laws, regulations or guidelines), as they may now exist or be enacted, adopted, issued or promulgated.

**Privacy Laws** means all laws, regulations and guidelines applicable to the use, disclosure and processing of Personal Data on behalf of FDIS or its Affiliates, including the Gramm-Leach-Bliley Act (GLBA) and the Healthcare Insurance Portability and Accountability Act (HIPAA), as they may now exist or be enacted, adopted, issued or promulgated.

**Prospective Merchant** means any entity solicited by Agent for Services to be provided by FDIS pursuant to a Merchant Agreement.

**Referral Open Account** means an Open Account resulting from a lead from a third party referral source to Agent with respect to which FDIS is obligated to pay such third party a referral fee.

**Refunds** means refunds to Merchants of any billed and collected amounts.

**Representative** means all salespersons, employees, agents or representatives appointed or designated by Agent to act on Agent's behalf in connection with performance of Agent's obligations under this Agreement.

**Residuals** means the payments due to Agent by FDIS pursuant to **Section 7.2.a.** of this Agreement.

**Services** means electronic transaction processing of Card and certain other transactions and related services and support systems as described in the Merchant Agreement.

**Superseded Agreement** is defined in **Section 11.3**.

**Term** is defined in **Section 6.1**.

**Territory** means the United States, as currently defined by Visa.

**Three Month Average Residuals** is defined in **Section 1.3**.

**Tier 1 Merchants** means Tier I Merchants – CAAP or Tier I Merchants – Premier, as applicable.

EXHIBIT B

**Tier I Merchants – CAAP** means those CAAP III Merchants that: i) fall within the definition of a Swiped Merchant or a Retail Keyed Merchant; and ii) have been assigned an MCC Code by FDIS that corresponds with an MCC Code designated by FDIS in its sole discretion as a Tier I MCC Code on Myagentoffice.com. Tier I Merchants are intended to be those face-to-face Merchants that FDIS in its sole discretion determines are operating businesses in low to moderate risk industries.

**Tier I Merchants - Premier** means those merchants that have been assigned a MCC Code by FDIS that corresponds with a MCC Code designated by FDIS in its sole discretion as a Tier I MCC Code at My Office/Compensation/Rev Share Profile on MyagentOffice.com. Tier I Merchants are intended to be those merchants engaging in face-to-face transactions (which do not include transactions conducted over the telephone, by facsimile, or over the Internet) with cardholders that FDIS in its sole discretion determines are operating businesses in low to moderate risk industries and Internet merchants with Tier 1 MCC codes that have also been processing with FDIS for a period of greater than one year.

**Tier II Merchants** means Tier II Merchants – CAAP or Tier II Merchants – Premier, as applicable.

**Tier II Merchants – CAAP** means all those CAAP III Merchants that do not qualify as Tier I Merchants. Tier II Merchants are intended to be those CAAP III Merchants that FDIS in its sole discretion determines are operating businesses in moderate to high risk industries.

**Tier II Merchants – Premier** means all merchants that do not qualify as Tier I Merchants. Tier II Merchants are intended to be those merchants that FDIS in its sole discretion determines are operating businesses in high risk industries and Internet merchants that have been processing with FDIS for less than a period of one year.

**Trademarks** means the marks set forth on **Exhibit B**.

**Unacceptable List** is defined in **Section 1.4**.

**USPS Move Update Requirements** means the requirements established by the United States Postal Service for First-Class Mail presorted and automation rates, including but not limited to the Move Update requirements for addresses.

**EXHIBIT B**

**Exhibit B**

**Trademarks**

The trademarks below are owned by Cardservice International, LLC**:

**CARDSERVICE**®

**CARDSERVICE INTERNATIONAL**®

** In conjunction with its use of the either of these trademarks, Agent shall include the following phrase at the bottom of the material: "The "CARDSERVICE mark and logo are registered marks of Cardservice International, LLC and are used with permission."

The trademarks below are owned by First Data Corporation***:

**FIRST DATA**®



*** In conjunction with its use of this trademark, Agent shall include the following phrase at the bottom of the material: "The "FIRST DATA mark and logo" are trademarks of First Data Corporation and are used with permission".

EXHIBIT B

**Exhibit C**

**Residuals paid for Merchants Boarded Prior to the Effective Date**

A. **CAAP Open Accounts**

1. **Merchants Boarded prior to the Effective Date ("CAAP III")**

(a) Residuals for CAAP III Open Accounts for a calendar month shall be an amount equal to the product of Gross Processing Revenue - CAAP for CAAP III Open Accounts for the prior calendar month multiplied by the applicable percentage from the applicable "**CAAP III Agent Residual Schedule**" ("**CAAP III Schedule**") at My Office/Compensation/Rev Share Profile on MyagentOffice.com.

The CAAP III Schedule percentage shall be determined by plotting (1) Gross Sales Volume on the applicable CAAP III Schedule's y axis (the "**y Coordinate**"); and (2) Agent's Current Level of Account Production on the applicable CAAP III Schedule's x axis (the "**x Coordinate**," and together with the y Coordinate, the "**CAAP III Coordinates**"). The CAAP III Coordinates on the CAAP III Schedule shall be recalculated by the first day of the last month of each calendar quarter. The quarterly recalculation shall be based upon all Open Accounts and shall be effective as of the first day of each calendar quarter (each a "**CAAP Recalculation Effective Date**"). The quarterly recalculation may result in an increase, decrease or no change to the value of the CAAP III Coordinates. The CAAP III Schedule percentage will be increased if Agent's average monthly Gross Sales Volume or average monthly Current Level of Account Production over the applicable review period for such calendar quarter causes the intercept of the CAAP III Coordinates to move to a higher CAAP III Revenue Share on the CAAP III Schedule. The CAAP III Coordinate values will only be reduced if Agent's average monthly Gross Sales Volume or average monthly Current Level of Account Production over the applicable review period for such calendar quarter cause the intercept of the CAAP III Coordinates to move to a lower CAAP III Revenue Share percentage on the CAAP III Schedule. The following schedule summarizes the trigger dates regarding the calculation of the percentage that will be used to calculate Residuals:

Summary of Trigger Dates Schedule:

| Calendar Quarter | Review Period that may result in increased CAAP % for such quarter | Review Period that may result in decreased CAAP % for such quarter | Date of recalculation for such quarter – no later than: | CAAP Recalculation Effective Date | Period Residuals Paid |
|---|---|---|---|---|---|
| 1st | Aug. 1 - Oct. 31 | May 1 – Oct. 31 | Dec. 1 | Jan. 1 - Mar.31 | Feb. – Apr. |
| 2nd | Nov. 1 - Jan 31 | Aug. 1 – Jan.1 | Mar. 1 | Apr. 1 - June 30 | May – July |
| 3rd | Feb. 1 – Apr. 30 | Nov. 1 – Apr. 1 | June 1 | Jul. 1 - Sept. 30 | Aug. – Oct. |
| 4th | May 1 – July 1 | Feb. 1 – Jul. 1 | Sept. 1 | Oct. 1 – Dec. 31 | Nov. – Jan. |

(b) Residuals for CAAP III Open Accounts will be paid at two different percentages of Gross Processing Revenue - CAAP: one percentage for Tier I Merchants - CAAP, and one percentage for Tier II Merchants - CAAP. Accordingly, FDIS will post separate CAAP III Schedules for Tier I Merchants - CAAP and Tier II Merchants - CAAP. For purposes of clarification, combined Gross Sales Volume for Tier I Merchants and Tier II Merchants will be used to plot the x Coordinate on the Tier I Merchant CAAP III Schedule and the Tier II Merchant CAAP III Schedule. Likewise, the combined Current Level of Account Production for Tier I Merchants and Tier II Merchants will be used to plot the y Coordinate on the Tier I Merchant CAAP III Schedule and the Tier II Merchant CAAP III Schedule.

(i) **Example A**. If Agent's y Coordinate from the prior calendar quarter is 40 and Agent generates 32 Open Accounts in August, 74 Open Accounts in September and 44 Open Accounts in October,

**EXHIBIT B**

Agent's y Coordinate for both the Tier I Merchant CAAP schedule and Tier II Merchant CAAP schedule as of the Recalculation Date of January 1st will be increased to 50.

**(ii) Example B**. If Agent's x Coordinate from the prior calendar quarter is $500,000 and Agent's Open Accounts generate $400,000 in Gross Sales Volume in May, $500,000 in June, $700,000 in July, $300,000 in August, $200,000 in September and $300,000 in October, Agent's x Coordinate for both the Tier I Merchant CAAP schedule and Tier II Merchant CAAP schedule as of the Recalculation Date of January 1st will be decreased to $400,000.

**2.     Right to Modify**. FDIS in its sole discretion may modify the CAAP III Schedule in so far as the CAAP III Schedule affects Residuals paid on existing Open Accounts subject to the CAAP III Schedule by giving Agent at least 90 day's prior written notice; provided, however, that Agent may terminate this Agreement within 90 days of receiving such notice from FDIS by giving FDIS written notice of termination within such 90-day period.

**B.     Referral Open Accounts**

FDIS may, in its sole discretion, credit Agent for Referral Open Accounts. To "**credit Agent**" means that FDIS will pay Agent Residuals for such Referral Open Account, provided, however, that Agent's Residuals for such Referral Open Account will be reduced by 100% of any recurring referral fee paid by FDIS to the third party referral source during each month preceding payment of Agent's Residuals for the referral.

Notwithstanding the foregoing, with respect to each Referral Open Account boarded prior to the Effective Date, Agent's Residuals for such Open Account will be reduced by an amount equal to the difference between (a) 100% of any recurring referral fee paid by FDIS to the third party referral source during each month preceding payment of Agent's Residuals for the referral, and (b) the lesser of (i) 50% of any recurring referral fee paid by FDIS to such third party, or (ii) 5% of the Gross Processing Revenue – CAAP attributable to such Open Account.

The adjustments to Agent's Residuals referenced above will apply to all recurring referral fees paid by FDIS after the execution of this Agreement including referral fees paid for with respect to Merchants referred by third parties prior to the execution of this Agreement.  Agent's Residuals will also be reduced by 100% of any non-recurring referral fees such as one-time commissions paid by FDIS to any third party referral source.

**EXHIBIT B**

**Exhibit D**

**Residuals paid for Merchants Boarded on or after the Effective Date ("Premier")**

A. Residuals for Premier Open Accounts for a calendar month shall be an amount equal to the product of Gross Processing Revenue - Premier for Premier Open Accounts for the prior calendar month multiplied by the applicable percentage from the "**Premier Residual Schedule**" ("**Premier Schedule**") at My Office/Compensation/Rev Share Profile on MyagentOffice.com.

The Premier Schedule percentage shall be determined based upon the number of new Open Accounts at the end of each calendar month under this Agreement (or the Superseded Agreement for purposes of the initial calculation). The percentage shall be recalculated by the first day of the last month of each calendar quarter and shall be effective as of the first day of each calendar quarter (each a "**Premier Recalculation Effective Date**"). The quarterly recalculation may result in an increase, decrease or no change to Premier Schedule percentage. The Premier Schedule percentage will be increased if the average number of new Open Accounts for the three calendar month review period for such calendar quarter is in a higher tier on the Premier Schedule. The Premier Schedule Revenue share percentage will only be reduced if the average number of new Premier Open Accounts per month in the applicable six calendar month review period for such calendar quarter is in a lower tier on the Premier Schedule. The following schedule summarizes the trigger dates regarding the calculation of the percentage that will be used to calculate Residuals:

| Calendar Quarter | Review Period that may result in increased Premier % for such quarter | Review Period that may result in decreased Premier % for such quarter | Date of recalculation for such quarter – no later than: | Premier Recalculation Effective Date | Period Residuals Paid |
|---|---|---|---|---|---|
| 1st | Aug. 1 - Oct. 31 | May 1 – Oct. 31 | Dec. 1 | Jan. 1 - Mar.31 | Feb. – Apr. |
| 2nd | Nov. 1 - Jan 31 | Aug. 1 – Jan.1 | Mar. 1 | Apr. 1 - June 30 | May – Jul. |
| 3rd | Feb. 1 – Apr. 30 | Nov. 1 – Apr. 1 | June 1 | Jul. 1 - Sept. 30 | Aug. – Oct. |
| 4th | May 1 – July 1 | Feb. 1 – Jul. 1 | Sept. 1 | Oct. 1 – Dec. 31 | Nov. – Jan. |

B. FDIS in its sole discretion may modify the Premier Schedule in so far as it affects FDIS Residual obligations prospectively, with respect to any existing Open Accounts subject to the Premier Schedule or both, by giving Agent 90 days prior written notice; provided, however, that Agent may terminate this Agreement within 90 days of receiving such notice from FDIS by giving FDIS written notice of termination within such 90 day period.

C. FDIS may, in its sole discretion, credit Agent for Referral Open Accounts. To "**credit Agent**" means that FDIS will pay Agent Residuals for such Merchant, provided, however, that Agent's Residuals for such Merchant will be reduced by 100% of any recurring referral fee paid by FDIS to the third party referral source during each month preceding payment of Agent's Residuals for the referral. The adjustments to Agent's Residuals referenced above will apply to all recurring referral fees paid by FDIS after the execution of this Agreement including referral fees paid with respect to Merchants referred by third parties prior to the execution of this Agreement. Agent's Residuals will also be reduced by 100% of any non-recurring referral fees such as one-time commissions paid by FDIS to any third party referral source.