# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## JACKSONVILLE DIVISION

KMF SERVICES, LLC d/b/a DELTA
PAYMENTS, a Florida limited liability
company, and FRANCES GRACE, LP, a          Case No.: 3:23-cv-815
Florida limited partnership,

        Plaintiff,

v.

FISERV, INC., a Wisconsin for-profit
corporation; CARDCONNECT, LLC, a
Wisconsin for-profit corporation; and
IGNITE PAYMENTS, LLC, a Texas limited
liability company.

        Defendants.

_____/

## JOINT STIPULATION

COMES NOW the parties hereto, by and through their undersigned attorneys, file their Joint Stipulation Denying Plaintiffs' Motion for Preliminary Injunction and in support thereof, state as follows:

1.      On or about July 13, 2023, Plaintiffs filed their Verified Complaint [ECF No. 1]. *Attached here to as Exhibit "A".*

2.      On or about July 18, 2023, Plaintiffs' filed their Motion for Preliminary Injunction [ECF No. 9]. *Attached here to as Exhibit "B".*

3.      On or about July 13, 2023, Plaintiffs filed Kent Flannery's Affidavit in Support of the Motion for Preliminary Injunction [ECF No. 3]. *Attached here to as Exhibit "C".*

4.      On August 1, 2023, Defendants, CardConnect, LLC, Fiserv Inc., and Ignite Payments, LLC, filed their Waiver of the Service of Summons [ECF No. 11, 12, & 13]. *Attached here to as Exhibit "D".*

5.      Defendants have stayed further deductions from Plaintiff's DDA account rendering Plaintiff's Motion for Preliminary Injunction moot.

6.      Plaintiff reserves the right to re-file a motion for preliminary injunction in the instance that Defendants resume DDA account deductions from the Plaintiff.

7.      Counsel for Defendants, as evidenced in waivers of service (add references), and Plaintiff's counsel conferred good faith as to the filing of this Joint Stipulation. Counsel for Defendants is in agreement with and consents to the filing of this Joint Stipulation.

WHEREFORE the parties jointly move this honorable Court to deny Plaintiffs' Motion for Preliminary Injunction **without prejudice** given the foregoing representation and any other further relief it deems just and proper.

Dated: August 22, 2023

**MATHIS LAW GROUP**
515 E. Las Olas Blvd., Suite 120
Ft. Lauderdale, FL 33301

*/s/ Jessica Cappock, Esq.*
Jessica Cappock, Esq.
Florida Bar No.: 1028337
954-616-4404
jcappock@mathislawgroup.com
*Attorneys for Plaintiffs*

# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF FLORIDA
# JACKSONVILLE DIVISION

KMF SERVICES, LLC d/b/a DELTA
PAYMENTS, a Florida limited liability
company, and FRANCES GRACE, LP, a
Florida limited partnership,

                    Plaintiff,                Case No.: 3:23-cv-815

                    v.

FISERV, INC., a Wisconsin for-profit
corporation; CARDCONNECT, LLC, a
Wisconsin for-profit corporation; and
IGNITE PAYMENTS, LLC, a Texas
limited liability company.

                    Defendants.

_____/

## **VERIFIED COMPLAINT**

Plaintiffs, KMF SERVICES, LLC d/b/a DELTA PAYMENTS ("KMF") and

FRANCES GRACE, LP ("FRANCES GRACE") (collectively "Plaintiffs"), sue

Defendants, FISERV, INC., ("FISERV"), CARDCONNECT, LLC,

("CARDCONNECT"), and IGNITE PAYMENTS, LLC, ("IGNITE") (collectively

"Defendants"), and allege:

EXHIBIT A

## The Parties

1.     Plaintiff, KMF SERVICES, LLC d/b/a DELTA PAYMENTS is a Florida limited liability company authorized to conduct business in this State. KMF operates in Florida, with its principal place of business in Nassau County, Florida.

2.     Plaintiff, FRANCES GRACE, LP is a Florida limited liability company authorized to conduct business in this State. FRANCES GRACE operates in Florida, with its principal place of business in Nassau County, Florida.

3.     Defendant, FISERV, INC., is a corporation organized and existing under the laws of the State of Wisconsin, with its principal place of business in Brookfield, Wisconsin.

4.     Defendant, CARDCONNECT, LLC is a corporation organized and existing under the laws of the State of Pennsylvania, with its principal place of business in King of Prussia, Pennsylvania.

5.     Defendant, IGNITE PAYMENTS, LLC is a corporation organized and existing under the laws of the State of Texas, with its principal place of business in Sugar Land, Texas.

## Jurisdiction and Venue

6.     Jurisdiction is conferred upon this Court pursuant to 28 U.S.C. § 1332(a) in that this is an Action between citizens of different states and the amount in controversy exceeds $75,000, exclusive of interest and costs.

7.      Venue is proper in this District pursuant to 28 U.S.C. § 1391 in that (1) the Defendants regularly do and solicit business in this District; (2) substantial events giving rise to the claims herein occurred in this District; and (3) the personal property that is subject to this Action is situated in this District.

8.      All conditions precedent to bringing this Action have either been satisfied, been performed, or have been waived and/or excused.

## General Allegations

9.      On or about May 18, 2015, FRANCES GRACE, LP entered into the Launch Compensation Plan, ("2015 Agreement"), with IGNITE PAYMENTS, LLC for the sale of credit card processing services. A true and accurate copy of the 2015 Agreement is attached hereto as Exhibit A.

10.      On or about June 7, 2019, non-party HUNTER GRACE, LLC, ("HUNTER GRACE"), entered into the Assignment, Assumption, and Consent Agreement ("Assignment Agreement") with KMF SERVICES, LLC and CARDCONNECT, LLC to assign the Premier Agent Agreement ("PA Agreement") to KMF and obtain the consent of CARDCONNECT to the assignment of the same. A true and accurate copy of the Premier Agent Agreement and the Assignment Agreement is attached hereto respectively as Exhibits B and C.

11.      Pursuant to Sections 1 and 2 of the PA Agreement, CARDCONNECT consented to KMF stepping in the place of HUNTER GRACE by way of assignment

3

of "all of [HUNTER GRACE's] rights, title and interests in and under the [PA] Agreement to Assignee, [KMF], and Assignee accept[ed] the assignment of Assignor's, [HUNTER GRACE's], rights and interests in the [PA] Agreement and assume[d] all of Assignor's obligations and liabilities under the [PA] Agreement."

12. On or about May 8, 2023, CARDCONNECT sent an email correspondence, ("May 8 Correspondence") notifying Plaintiffs of CARDCONNECT's, and assumingly its predecessor's alleged "Incorrect Calculation of Gross Processing Revenue" ("Incorrect Calculations") in the amount of $643,392.63, spanning from January 2018 through December 2022. A true and accurate copy of the May 8 Correspondence is attached hereto as Exhibit D.

13. IGNITE PAYMENTS is a payment platform of FISERV.

14. CARDCONNECT is a payment platform of FISERV and a successor in interest to IGNITE PAYMENTS pursuant to the Assignment Agreement.

15. Upon information and belief, FISERV acquired FIRST DATA INDEPENDENT SALES, ("FDIS") on or about January 16, 2019.

16. Pursuant to the May 8 Correspondence, CARDCONNECT would collect the Incorrect Calculations in their entirety from Plaintiffs in equal installments over the course of the next seventeen (17) months in an effort to rectify its error and shift resulting damages to Plaintiffs.

4

17.     On or about May 12, 2023, Plaintiffs sent their Notice of Anticipated Breach and Denial of the Incorrect Calculations Recovery ("Notice and Denial") demanded by Defendants. A true and accurate copy of the Notice and Denial is attached hereto as Exhibit E.

18.     Section 7.3 of both the 2015 Agreement and PA Agreement governing the Incorrect Calculations require that Defendants, respectively, "bear the risk for Merchant Losses (other than those caused by the gross negligence or willful misconduct of Agent or Agent Personnel) and **shall not deduct such Merchant Losses from any amounts due to Agent under this Agreement**." (emphasis added).

19.     Section 7.2 of both the 2015 Agreement and PA Agreement obligates Defendants respectively to make residual payments to the Plaintiffs for merchant accounts boarded by Plaintiffs.

20.     Moreover, Section 10.2 of both the 2015 Agreement and PA Agreement includes a contractual statute of limitations of commencement "within one year after the earlier of (i) the date on which such party knew or should have known of the first alleged act, omission or violation, or (ii) with respect to obligations that do not survive termination of [the] Agreement, the date of termination of [the] Agreement."

21.     Section 10.4 of both the 2015 Agreement and PA Agreement provides that,

> Except as set forth in this Agreement, **in no event shall either party**, its parents, Affiliates or any of its or their directors, officers, employees, agents or sub-contractors **be liable under any theory of tort, contract, strict liability or other legal or equitable theory for lost profits, exemplary, punitive, special, incidental, indirect or consequential damages, each of which is hereby excluded by agreement of the parties regardless of whether such damages were foreseeable or whether either party or any entity has been advised of the possibility of such damages**. (emphasis added).

22.     On May 20, 2023, Defendants deducted $18,427.97 from Plaintiffs' monthly residual payments to recover its Merchant Losses and/or lost profits resulting from its Incorrect Calculations.

23.     Upon information and belief, the majority of Incorrect Calculations relate to residual payments far beyond the applicable contractual statute of limitations addressed herein.

24.     Defendants have charged $643,392.63 against Plaintiffs and will continue to deduct $18,427.97 each month from residual payments due to Plaintiffs.

25.     In its May 8 Correspondence, CARDCONNECT acknowledged that "collection of these overpaid residuals could impact your business…."

26.     Plaintiffs have paid out various non-parties for services related to the Incorrect Calculations dating back through January 2018.

27.     Deduction of the Incorrect Calculations would substantially and detrimentally affect Plaintiffs and their aforementioned related non-party relationships.

## COUNT I
### (Temporary and Permanent Injunctive Relief)

28.     Plaintiff re-alleges and incorporates paragraphs 1 through 27 as if fully stated herein.

29.     This is an action seeking an injunction against all Defendants from the withholding or deduction of any residual payments and from engaging in any further conduct or activity which constitutes a violation of the terms of the 2015 Agreement and PA Agreement during the pendency of this Action.

30.     As set forth more fully above, Defendants have improperly charged, retained, and deducted Plaintiffs' funds in contravention of the 2015 Agreement and PA Agreement respectively.

31.     Plaintiffs have no adequate remedy at law with respect to the protection of and improper acquisition and possible disposition of their property wrongfully taken by Defendants.

32.     Based upon the obligations arising under the 2015 Agreement and PA Agreement, Plaintiffs have a substantial likelihood of success on the merits of their claims.

33.     Furthermore, Plaintiffs believe in good faith that Defendants will continue to retain and/or deduct residual payments in violation of the terms of the 2015 Agreement and PA Agreement respectively, unless prohibited by an injunction from this Court.

34.     Plaintiffs have paid out various non-parties for services related to the Incorrect Calculations dating back through January 2018.

35.     Deduction of the Incorrect Calculations would substantially and detrimentally affect Plaintiffs and their aforementioned related non-party relationships.

36.     As a result of Defendants' actions, Plaintiffs have been, and will continue to be directly and irreparably harmed.

37.     The threatened injury to Plaintiffs outweighs any threatened harm the injunction may do to Defendants.

38.     The issuance of the injunctive relief requested does not offend the public interest for such relief will uphold and promote the validity and integrity of enforcement of legal and binding contracts.

39.     The temporary injunctive relief sought herein is directed solely at preserving the *status quo* until this matter can be set for a final hearing on the merits.

WHEREFORE, Plaintiffs, KMF SERVICES, LLC d/b/a DELTA PAYMENTS and FRANCES GRACE, LP, request the entry of a temporary

injunction and ultimately a permanent injunction against Defendants, FISERV, INC, CARDCONNECT, LLC, and IGNITE PAYMENTS, LLC which enjoins them as follows:

     (i)      from withholding and/or deducting any further residual payments under the Agreements;

     (ii)     from engaging in any conduct or activity which constitutes a violation of the terms of their Agreements attached as exhibits;

     (iii)    for any such further relief this Court deems equitable and just.

## COUNT II
## BREACH OF CONTRACT – PA AGREEMENT
## (FISERV/CARDCONNECT)

40. Plaintiff re-alleges and incorporates paragraphs 1 through 39 as if fully stated herein.

41. This is an action against Defendants, FISERV and CARDCONNECT for their breach of contract.

42. FISERV and CARDCONNECT entered into the PA Agreement and the Assignment Agreement with Plaintiffs by way of FDIS.

43. Pursuant to Section 7.2 of the PA Agreement, FISERV and CARDCONNECT are obligated to make residual payments to the Plaintiffs "on or about the 20th day of each calendar month" for residuals for merchant accounts boarded by Plaintiffs at an agreed upon rate.

9

44.     Moreover, Section 3.2 of the PA Agreement, renders FISERV and

CARDCONNECT

> responsible for all processing and accounting functions
> relating to the clearing and settlement of Card transactions,
> including: (i) Merchant processing and settlement; (ii)
> Merchant credit research; (iii) Merchant activation and
> approval; (iv) Merchant security and recovery; (v)
> Merchant customer services; (vi) Merchant chargeback
> and retrieval services; and (vii) all other back office
> services, including collecting amounts due from
> Merchants to FDIS. FDIS may contract with other persons
> to perform these functions on behalf of FDIS but FDIS
> remains primarily responsible for the functions. Subject to
> Section 5.2, FDIS will make available to Agent training on
> the FDIS Services.

45.     Section 7.3 of the PA Agreement governing the Incorrect Calculations

requires that FISERV and CARDCONNECT "bear the risk for Merchant Losses

(other than those caused by the gross negligence or willful misconduct of Agent or

Agent Personnel) and **shall not deduct such Merchant Losses from any amounts**

**due to Agent under this Agreement**." (emphasis added).

46.     Section 10.4 of the PA Agreement provides that, "**in no event shall**

**either party**…**be liable…for lost profits, exemplary, punitive, special,**

**incidental, indirect or consequential damages…regardless of whether such**

**damages were foreseeable or whether either party or any entity has been**

**advised of the possibility of such damages**." (emphasis added).

47.     Defendants, FISERV and CARDCONNECT, materially breached the PA Agreement by (1) failing to properly process and account for Gross Processing Revenue, specifically (a) failing to implement network assessment rate increases; (b) not fully passing through all association fees; (c) including network association fees collected from merchants into the Gross Processing Revenue while excluding the offsetting payment to networks; (2) charging and reducing the amounts due to Plaintiffs in order to remediate its Incorrect Calculations; and (3) deducting Merchant Losses from the amounts due to the Plaintiffs under the PA Agreement.

48.     Moreover, Defendants have pursued and charged Plaintiffs for their Incorrect Calculations, well beyond the one-year statute of limitations as laid out in Section 10.2 and addressed more fully above.

49.     Plaintiffs have fully performed under the PA Agreement.

50.     As a result of the Defendants' aforementioned material breaches of the PA Agreement, Plaintiffs have been damaged.

WHEREFORE, Plaintiffs, KMF SERVICES, LLC d/b/a DELTA PAYMENTS ("KMF") and FRANCES GRACE, LP ("FRANCES GRACE"), respectfully demand judgment against Defendants, FISERV and CARDCONNECT for damages, prejudgment interest, and for such other and further relief as this Court deems just and proper.

## COUNT III
## BREACH OF CONTRACT – 2015 AGREEMENT
## (IGNITE PAYMENTS/CARDCONNECT)

51.     Plaintiff re-alleges and incorporates paragraphs 1 through 50 as if fully stated herein.

52.     This is an Action against Defendants, IGNITE PAYMENTS and CARDCONNECT for their breach of contract.

53.     IGNITE PAYMENTS and CARDCONNECT entered into the 2015 Agreement with Plaintiffs.

54.     Pursuant to Section 7.2 of the 2015 Agreement, IGNITE PAYMENTS and CARDCONNECT are obligated to make residual payments to the Plaintiffs "on or about the 20th day of each calendar month" for residuals for merchant accounts boarded by Plaintiffs at an agreed upon rate.

55.     Moreover, Section 3.2 of the 2015 Agreement, renders IGNITE PAYMENTS and CARDCONNECT

> responsible for all processing and accounting functions relating to the clearing and settlement of Card transactions, including: (i) Merchant processing and settlement; (ii) Merchant credit research; (iii) Merchant activation and approval; (iv) Merchant security and recovery; (v) Merchant customer services; (vi) Merchant chargeback and retrieval services; and (vii) all other back office services, including collecting amounts due from Merchants to Ignite Payments. Ignite Payments may contract with other persons to perform these functions on behalf of Ignite Payments but Ignite Payments remains primarily responsible for the functions. Subject to Section

12

5.2, Ignite Payments will make available to Agent training on the Ignite Payments Services.

56.     Section 7.3 of the 2015 Agreement governing the Incorrect Calculations requires that IGNITE PAYMENTS and CARDCONNECT "bear the risk for Merchant Losses (other than those caused by the gross negligence or willful misconduct of Agent or Agent Personnel) and **shall not deduct such Merchant Losses from any amounts due to Agent under this Agreement**." (emphasis added).

57.     Section 10.4 of the 2015 Agreement provides that, "**in no event shall either party**…**be liable…for lost profits, exemplary, punitive, special, incidental, indirect or consequential damages…regardless of whether such damages were foreseeable or whether either party or any entity has been advised of the possibility of such damages**." (emphasis added).

58.     Defendants, IGNITE PAYMENTS and CARDCONNECT, materially breached the 2015 Agreement by (1) failing to properly process and account for Gross Processing Revenue, specifically (a) failing to implement network assessment rate increases; (b) not fully passing through all association fees; (c) including network association fees collected from merchants into the Gross Processing Revenue while excluding the offsetting payment to networks; (2) charging and reducing the amounts due to Plaintiffs in order to remediate its Incorrect

13

Calculations; and (3) deducting Merchant Losses from the amounts due to the Plaintiffs under the 2015 Agreement.

59.     Moreover, Defendants have pursued and charged Plaintiffs for their Incorrect Calculations, well beyond the one-year statute of limitations as laid out in Section 10.2 and addressed more fully above.

60.     Plaintiffs have fully performed under the 2015 Agreement.

61.     As a result of the Defendants' aforementioned material breaches of the 2015 Agreement, Plaintiffs have been damaged.

WHEREFORE, Plaintiffs, KMF SERVICES, LLC d/b/a DELTA PAYMENTS ("KMF") and FRANCES GRACE, LP ("FRANCES GRACE"), respectfully demand judgment against Defendants, IGNITE PAYMENTS and CARDCONNECT for damages, prejudgment interest, and for such other and further relief as this Court deems just and proper.

## COUNT IV
## UNJUST ENRICHMENT

62.     Plaintiff re-alleges and incorporates paragraphs 1 through 9, 12 through 17, 22, and 24 through 27 as if fully stated herein.

63.     Plaintiffs provided certain labor and services to Defendants consisting of selling credit card processing services at the request of the Defendants.

64.     Defendants had knowledge of, assented to, accepted, and retained the benefit conferred by Plaintiffs without paying a sum representing the reasonable value of the benefit conferred.

65.     Defendants have no valid or equitable claim to Plaintiffs' services and/or residual payments.

66.     It would be inequitable for Defendants to retain possession and benefit from the wrongfully obtained May 20, 2023, residual payment and any future residual payments due to Plaintiffs.

67.     Defendants have and will continue to be unjustly enriched.

WHEREFORE, Plaintiffs, KMF SERVICES, LLC d/b/a DELTA PAYMENTS and FRANCES GRACE, LP demand judgment in an amount equal to the amount of Defendants' unjust enrichment so as to divest the inequitable benefit from them, interest, costs, and for such other and further relief as this Court may deem just and proper.

## <u>REQUEST FOR JURY TRIAL</u>

Plaintiff requests a trial by jury on all issues so triable.

## <u>VERIFICATION</u>

Under the penalties of perjury, I declare that I have read the foregoing, and the facts alleged are true to the best of my knowledge.

15

DATED this 13th day of July, 2023.

Respectfully submitted,

**MATHIS LAW GROUP**
/s/ JESSICA CAPPOCK, ESQ.
**JESSICA CAPPOCK, ESQ.**
Florida Bar No.: 1028337
jcappock@mathislawgroup.com
jkirkland@mathislawgroup.com
515 E. Las Olas Blvd., Suite 120
Ft. Lauderdale, FL 33301
Mailing: P.O. Box 91657
Lakeland, FL 33804
T: (954) 616-4404
F: (954) 616-4405
Attorney for Plaintiff

## **VERIFICATION**

**UNDER PENALTY OF PERJURY**, I declare that I have read the foregoing **Complaint** and the facts alleged therein are true and correct to the best of my knowledge and belief. I hereby authorize our counsel to file the same on behalf of KMF SERVICES d/b/a DELTA PAYMENTS.

_____ Signature:

Founder/CEO
_____
Title:
KMF SERVICES d/b/a DELTA PAYMENTS

16

## <u>VERIFICATION</u>

**UNDER PENALTY OF PERJURY**, I declare that I have read the foregoing **Complaint** and the facts alleged therein are true and correct to the best of my knowledge and belief. I hereby authorize our counsel to file the same on behalf of FRANCES GRACE, LP.

Signature: _____

General Partner
_____
Title:
FRANCES GRACE, LP

JS 44   (Rev. 06/17)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court.  This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet.   *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

| I. (a) **PLAINTIFFS** | **DEFENDANTS** |
|---|---|
| KMF SERVICES, LLC d/b/a DELTA PAYMENTS, a Florida limited liability | FISERV, INC., a Wisconsin for-profit corporation; CARDCONNECT, LLC, a |

| **(b)** County of Residence of First Listed Plaintiff | County of Residence of First Listed Defendant |
|---|---|
| *(EXCEPT IN U.S. PLAINTIFF CASES)* | *(IN U.S. PLAINTIFF CASES ONLY)* |
| | NOTE:   IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED. |

| **(c)** Attorneys *(Firm Name, Address, and Telephone Number)* | Attorneys *(If Known)* |
|---|---|
| Jessica A. Cappock, Esq. 515 E. Las Olas Blvd., Suite 120 Ft. Lauderdale, FL 33301 | |

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

- [ ] 1   U.S. Government  Plaintiff
- [ ] 2   U.S. Government  Defendant
- [ ] 3   Federal Question  *(U.S. Government Not a Party)*
- [X] 4   Diversity  *(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff*
*(For Diversity Cases Only)*                                         *and One Box for Defendant)*

|  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | [ ] 1 | [ ] 1 | Incorporated *or* Principal Place  of Business In This State | [X] 4 | [ ] 4 |
| Citizen of Another State | [ ] 2 | [ ] 2 | Incorporated *and* Principal Place  of Business In Another State | [ ] 5 | [X] 5 |
| Citizen or Subject of a  Foreign Country | [ ] 3 | [ ] 3 | Foreign Nation | [ ] 6 | [ ] 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

Click here for: Nature of Suit Code Descriptions.

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| [ ] 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | [ ] 625 Drug Related Seizure  of Property 21 USC 881 | [ ] 422 Appeal 28 USC 158 | [ ] 375 False Claims Act |
| [ ] 120 Marine | [ ] 310 Airplane | [ ] 365 Personal Injury -  Product Liability | [ ] 690 Other | [ ] 423 Withdrawal  28 USC 157 | [ ] 376 Qui Tam (31 USC  3729(a)) |
| [ ] 130 Miller Act | [ ] 315 Airplane Product  Liability | | | | [ ] 400 State Reapportionment |
| [ ] 140 Negotiable Instrument | [ ] 320 Assault, Libel &  Slander | [ ] 367 Health Care/  Pharmaceutical  Personal Injury  Product Liability | | **INTELLECTUAL PROPERTY RIGHTS** | [ ] 410 Antitrust |
| [ ] 150 Recovery of Overpayment  & Enforcement of Judgment | [ ] 330 Federal Employers'  Liability | | | [ ] 820 Copyrights | [ ] 430 Banks and Banking |
| [ ] 151 Medicare Act | | [ ] 368 Asbestos Personal  Injury Product  Liability | | [ ] 830 Patent | [ ] 450 Commerce |
| [ ] 152 Recovery of Defaulted  Student Loans  (Excludes Veterans) | [ ] 340 Marine | | | [ ] 835 Patent - Abbreviated  New Drug Application | [ ] 460 Deportation |
| | [ ] 345 Marine Product  Liability | **PERSONAL PROPERTY** | **LABOR** | [ ] 840 Trademark | [ ] 470 Racketeer Influenced and  Corrupt Organizations |
| [ ] 153 Recovery of Overpayment  of Veteran's Benefits | [ ] 350 Motor Vehicle | [ ] 370 Other Fraud | [ ] 710 Fair Labor Standards  Act | [ ] 880 Defend Trade Secrets  Act of 2016 | [ ] 480 Consumer Credit  (15 USC 1681 or 1692) |
| [ ] 160 Stockholders' Suits | [ ] 355 Motor Vehicle  Product Liability | [ ] 371 Truth in Lending | [ ] 720 Labor/Management  Relations | | [ ] 485 Telephone Consumer  Protection Act |
| [X] 190 Other Contract | [ ] 360 Other Personal  Injury | [ ] 380 Other Personal  Property Damage | | **SOCIAL SECURITY** | [ ] 490 Cable/Sat TV |
| [ ] 195 Contract Product Liability | [ ] 362 Personal Injury -  Medical Malpractice | [ ] 385 Property Damage  Product Liability | [ ] 740 Railway Labor Act | [ ] 861 HIA (1395ff) | [ ] 850 Securities/Commodities/  Exchange |
| [ ] 196 Franchise | | | [ ] 751 Family and Medical  Leave Act | [ ] 862 Black Lung (923) | [ ] 890 Other Statutory Actions |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | [ ] 790 Other Labor Litigation | [ ] 863 DIWC/DIWW (405(g)) | [ ] 891 Agricultural Acts |
| [ ] 210 Land Condemnation | [ ] 440 Other Civil Rights | **Habeas Corpus:** | [ ] 791 Employee Retirement  Income Security Act | [ ] 864 SSID Title XVI | [ ] 893 Environmental Matters |
| [ ] 220 Foreclosure | [ ] 441 Voting | [ ] 463 Alien Detainee | | [ ] 865 RSI (405(g)) | [ ] 895 Freedom of Information  Act |
| [ ] 230 Rent Lease & Ejectment | [ ] 442 Employment | [ ] 510 Motions to Vacate  Sentence | | **FEDERAL TAX SUITS** | [ ] 896 Arbitration |
| [ ] 240 Torts to Land | [ ] 443 Housing/  Accommodations | [ ] 530 General | | [ ] 870 Taxes (U.S. Plaintiff  or Defendant) | [ ] 899 Administrative Procedure  Act/Review or Appeal of  Agency Decision |
| [ ] 245 Tort Product Liability | [ ] 445 Amer. w/Disabilities -  Employment | [ ] 535 Death Penalty | **IMMIGRATION** | [ ] 871 IRS—Third Party  26 USC 7609 | |
| [ ] 290 All Other Real Property | [ ] 446 Amer. w/Disabilities -  Other | **Other:** | [ ] 462 Naturalization Application | | [ ] 950 Constitutionality of  State Statutes |
| | [ ] 448 Education | [ ] 540 Mandamus & Other | [ ] 465 Other Immigration  Actions | | |
| | | [ ] 550 Civil Rights | | | |
| | | [ ] 555 Prison Condition | | | |
| | | [ ] 560 Civil Detainee -  Conditions of  Confinement | | | |

## V. ORIGIN *(Place an "X" in One Box Only)*

- [X] 1   Original  Proceeding
- [ ] 2   Removed from  State Court
- [ ] 3   Remanded from  Appellate Court
- [ ] 4   Reinstated or  Reopened
- [ ] 5   Transferred from  Another District  *(specify)*
- [ ] 6   Multidistrict  Litigation -  Transfer
- [ ] 8   Multidistrict  Litigation -  Direct File

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
28 U.S.C. § 1332(a)

Brief description of cause:
This is an Action between citizens of different states and the amount in controversy exceeds $75,000, exclusive of interest and costs

## VII. REQUESTED IN COMPLAINT:

- [ ] CHECK IF THIS IS A **CLASS ACTION**  UNDER RULE 23, F.R.Cv.P.

DEMAND $

CHECK YES only if demanded in complaint:
JURY DEMAND:   [ ] Yes   [X] No

## VIII. RELATED CASE(S) IF ANY

*(See instructions):*

JUDGE _____   DOCKET NUMBER _____

| DATE | SIGNATURE OF ATTORNEY OF RECORD |
|---|---|
| 7/13/2023 | |

**FOR OFFICE USE ONLY**

RECEIPT # _____   AMOUNT _____   APPLYING IFP _____   JUDGE _____   MAG. JUDGE _____

# INSTRUCTIONS FOR ATTORNEYS COMPLETING CIVIL COVER SHEET FORM JS 44

Authority For Civil Cover Sheet

The JS 44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleading or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently, a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. The attorney filing a case should complete the form as follows:

**I.(a)**   **Plaintiffs-Defendants.** Enter names (last, first, middle initial) of plaintiff and defendant. If the plaintiff or defendant is a government agency, use only the full name or standard abbreviations. If the plaintiff or defendant is an official within a government agency, identify first the agency and then the official, giving both name and title.

  **(b)**   **County of Residence.** For each civil case filed, except U.S. plaintiff cases, enter the name of the county where the first listed plaintiff resides at the time of filing. In U.S. plaintiff cases, enter the name of the county in which the first listed defendant resides at the time of filing. (NOTE: In land condemnation cases, the county of residence of the "defendant" is the location of the tract of land involved.)

  **(c)**   **Attorneys.** Enter the firm name, address, telephone number, and attorney of record. If there are several attorneys, list them on an attachment, noting in this section "(see attachment)".

**II.**   **Jurisdiction.** The basis of jurisdiction is set forth under Rule 8(a), F.R.Cv.P., which requires that jurisdictions be shown in pleadings. Place an "X" in one of the boxes. If there is more than one basis of jurisdiction, precedence is given in the order shown below.
United States plaintiff. (1) Jurisdiction based on 28 U.S.C. 1345 and 1348. Suits by agencies and officers of the United States are included here.
United States defendant. (2) When the plaintiff is suing the United States, its officers or agencies, place an "X" in this box.
Federal question. (3) This refers to suits under 28 U.S.C. 1331, where jurisdiction arises under the Constitution of the United States, an amendment to the Constitution, an act of Congress or a treaty of the United States. In cases where the U.S. is a party, the U.S. plaintiff or defendant code takes precedence, and box 1 or 2 should be marked.
Diversity of citizenship. (4) This refers to suits under 28 U.S.C. 1332, where parties are citizens of different states. When Box 4 is checked, the citizenship of the different parties must be checked**. (See Section III below; **NOTE: federal question actions take precedence over diversity cases.**)

**III.**   **Residence (citizenship) of Principal Parties.** This section of the JS 44 is to be completed if diversity of citizenship was indicated above. Mark this section for each principal party.

**IV.**   **Nature of Suit.** Place an "X" in the appropriate box. If there are multiple nature of suit codes associated with the case, pick the nature of suit code that is most applicable. Click here for: Nature of Suit Code Descriptions.

**V.**   **Origin.** Place an "X" in one of the seven boxes.
Original Proceedings. (1) Cases which originate in the United States district courts.
Removed from State Court. (2) Proceedings initiated in state courts may be removed to the district courts under Title 28 U.S.C., Section 1441.
Remanded from Appellate Court. (3) Check this box for cases remanded to the district court for further action. Use the date of remand as the filing date.
Reinstated or Reopened. (4) Check this box for cases reinstated or reopened in the district court. Use the reopening date as the filing date.
Transferred from Another District. (5) For cases transferred under Title 28 U.S.C. Section 1404(a). Do not use this for within district transfers or multidistrict litigation transfers.
Multidistrict Litigation – Transfer. (6) Check this box when a multidistrict case is transferred into the district under authority of Title 28 U.S.C. Section 1407.
Multidistrict Litigation – Direct File. (8) Check this box when a multidistrict case is filed in the same district as the Master MDL docket.
**PLEASE NOTE THAT THERE IS NOT AN ORIGIN CODE 7.** Origin Code 7 was used for historical records and is no longer relevant due to changes in statute.

**VI.**   **Cause of Action.** Report the civil statute directly related to the cause of action and give a brief description of the cause. **Do not cite jurisdictional statutes unless diversity.** Example: U.S. Civil Statute: 47 USC 553 Brief Description: Unauthorized reception of cable service.

**VII.**   **Requested in Complaint.** Class Action. Place an "X" in this box if you are filing a class action under Rule 23, F.R.Cv.P.
Demand. In this space enter the actual dollar amount being demanded or indicate other demand, such as a preliminary injunction.
Jury Demand. Check the appropriate box to indicate whether or not a jury is being demanded.

**VIII.**   **Related Cases.** This section of the JS 44 is used to reference related pending cases, if any. If there are related pending cases, insert the docket numbers and the corresponding judge names for such cases.

**Date and Attorney Signature.** Date and sign the civil cover sheet.

# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### JACKSONVILLE DIVISION

KMF SERVICES, LLC d/b/a DELTA
PAYMENTS, a Florida limited liability company,
and FRANCES GRACE, LP, a Florida limited
partnership,

                Plaintiff,                          Case No.: 3:23-cv-815

v.

FISERV, INC., a Wisconsin for-profit corporation;
CARDCONNECT, LLC, a Wisconsin for-profit
corporation; and IGNITE PAYMENTS, LLC, a
Texas limited liability company.

                Defendants.

_____/

## CERTIFICATE OF INTERESTED PERSONS AND
## CORPORATE DISCLOSURE STATEMENT

Pursuant to Local Rule 3.03 Plaintiffs, KMF SERVICES, LLC d/b/a DELTA PAYMENTS

a Florida limited liability company, and FRANCES GRACE, LP, a Florida limited partnership,

through the undersigned counsel, hereby submits this Certificate of Interested Parties and

Corporate Disclosure Statement as follows:

## CERTIFICATE OF INTERESTED PERSONS

1.      The name of each person, attorney, association of persons, firm, lawfirm,

partnership, corporation, limited liability company, subsidiary, conglomerate, affiliate, member,

and other identifiable and related legal entity that has or might have an interest in the outcome of

this action:

a.      Plaintiff, KMF SERVICES, LLC d/b/a DELTA PAYMENTS , a Florida limited

liability company.

b.  Plaintiff, FRANCES GRACE, LP, a Florida limited partnership

c.  Defendant, FISERV, INC., a Wisconsin for-profit corporation

d.  Defendant, CARDCONNECT, LLC, a Wisconsin for-profit corporation.

e.  Defendant: IGNITE PAYMENTS, LLC, a Texas limited liability company.

Counsel for Plaintiffs and Defendants in this action.

2.  The name of every other entity whose publicly traded stock, equity, or debt may be substantially affected by the outcome of these proceedings:

a.  KMF Services, LLC d/b/a Delta Payments

b.  FRANCES GRACE, LP

3.  The name of every other entity which is likely to be an active participant in the proceedings, including the debtor and members of the creditors committee (or twenty largest unsecured creditors) in bankruptcy cases:

None at this time.

4.  The name of each victim (individual or corporate) of civil and criminal conduct alleged to be wrongful, including every person who may be entitled to restitution:

a.  KMF Services, LLC d/b/a Delta Payments

b.  FRANCES GRACE, LP

## **CERTIFICATION**

I certify that, except as disclosed, I am unaware of any actual or potential conflict of interest affecting the district judge or the magistrate judge in this action, and I will immediately notify the judge in writing within fourteen days after I know of a conflict.

Dated this 13th day of July, 2023.

Respectfully Submitted,

**MATHIS LAW GROUP**


/s/  Jessica A. Cappock, Esq
**JESSICA A. CAPPOCK, ESQ.**
Florida Bar No.: 1028337
jcappock@mathislawgroup.com
jkirkland@mathislawgroup.com
**JESSICA L. KLEIN, ESQ.**
Florida Bar No.: 63412
jklein@mathislawgroup.com
acolmenares@mathislawgroup.com
**BRIAN K. MATHIS, ESQUIRE**
Florida Bar No.: 0046223
bmathis@mathislawgroup.com
Physical: 515 E. Las Olas Blvd., Suite 120
Ft. Lauderdale, FL 33301
T: 954-616-4404
F: 954-616-4405
*Attorneys for Plaintiffs*

DocuSign Envelope ID: D9888385-F95E-4B89-ACE5-AE555CB7CEEE

**EXHIBIT A**

**IGNITE LAUNCH AGENT AGREEMENT**                INTERNAL USE ONLY:

AGENT NO.: 33670 _____

DBA NAME: MINNEAPOLIS _____

This Ignite Launch Agent Agreement (this "**Agreement**") is between Ignite Payments, LLC ("**Ignite Payments**") and FRANCES GRACE, LP _____ (*Insert Agent legal name*) ("**Agent**").

Ignite Payments is an Independent Sales Organization and Member Service Provider as defined under the Rules. Ignite Payments is in the business of providing Services. Agent is a person or entity in the business of soliciting purchasers of Services. Ignite Payments and Agent wish to enter into a relationship in which Agent will represent Ignite Payments with respect to soliciting purchasers of Ignite Payments Services on the terms and conditions contained in this Agreement.

**Agreement**

In consideration of the foregoing and the covenants and conditions in this Agreement, Agent and Ignite Payments agree as follows:

**1. Agent Obligations**

**1.1.    General Obligations**.

a. Professional and Compliant Business Practices. Agent will operate its business, including maintaining the security of related business, Prospective Merchant, Merchant and cardholder records, in a professional manner in compliance with this Agreement and all applicable laws (including Privacy Laws), regulations, court orders, Rules and Agent Business Conduct Standards, which are incorporated into this Agreement as they may now exist or be enacted, adopted, issued or promulgated.

b. Promotional Information; Use of Trade names and Trademarks.  Marketing materials, including business cards and stationary, and Web sites created by Agent (other than those Ignite Payments materials printed from the Ignite Payments marketing website) that contain trade names, trademarks, service marks or logos of, or that reference the services provided by, Ignite Payments, Ignite Payments' sponsor bank, FDC or any Card Brand must be submitted to agent.compliance@firstdata.com for review. Agent agrees to not disseminate or publish any such materials or Web sites until Agent has received written approval from agent.compliance@firstdata.com. In compliance with the law, Agent may not send unsolicited fax advertisements that promote Ignite Payments Services to Merchants or Prospective Merchants. Because Agent is not a registered ISO, Rules require that Agent's business telephone be listed and answered by reference to the registered ISO (i.e. "Ignite Payments") and permit Agent to also reference its approved fictitious business name.

**1.2.    Agent Representations**. To comply with legal requirements, Agent represents, warrants and covenants that:

i.      Agent shall present, and shall cause its Representatives to present, to each person who executes a Merchant Agreement a copy of such Merchant Agreement at or before the time the person executes the Merchant Agreement.

ii.     Agent shall use, and shall cause its Representatives to use, only the Merchant Agreement that is designated by Ignite Payments. Agent shall use, and shall cause its Representatives to use, the most current version of such Merchant Agreement.

iii.    In Face-to-Face Agent Transactions ("**Face-to-Face Agent Transactions**" means those transactions in which Agent meets in person with a merchant, which does not include

DocuSign Envelope ID: ...
Case 3:... 15 Filed 07/08/23 Page 27 of 161 Page ID 281

transactions conducted over the telephone, by facsimile, or over the Internet) where a person executes a paper, rather than an electronic, version of the Merchant Agreement, Agent shall leave, and shall cause his or her Representatives to leave, with each such person a copy of the executed Merchant Agreement.

iv. In Face-to-Face Agent Transactions where a person executes an electronic, rather than a paper, version of the Merchant Agreement, Agent shall, and shall cause its Representatives to, either (1) advise each such person that a sample copy of the then-current version of the standard Merchant Agreement is available on the Ignite Payments Web site, or (2) leave with each such person a hardcopy or electronic copy of the executed Merchant Agreement.

v. Agent shall not misrepresent, and shall prohibit its Representatives from misrepresenting, any term of the Merchant Agreement.

vi. Agent shall provide, and shall cause its Representatives to provide, full and fair disclosure of the Merchant Agreement to Prospective Merchants and Merchants, including disclosures related to all charges, minimum fees, limitations, initial and renewal terms of agreements and warranty services.

vii. Agent shall not misrepresent, and shall prohibit its Representatives from misrepresenting, the manner in which Ignite Payments provides its services or the procedures Ignite Payments follows, including services and procedures related to chargebacks, loss prevention, ATM/Debit and equipment leasing.

viii. Agent and Agent Personnel will not make, or offer to make, any payments to, or confer, or offer to confer, any benefit upon any employee, agent or fiduciary of any third party (including any government, or agency or instrumentality thereof) with the intent to influence the conduct of such employee, agent or fiduciary in relation to the business or affairs of such third party.

ix. If Agent becomes aware of any actual or alleged fraudulent activities or misrepresentations by it or its Representatives, whether or not related to the Ignite Payments Services, Agent will promptly advise Ignite Payments and take all necessary corrective action the Agent determines in its discretion, to be necessary or appropriate.

x. Agent shall not charge any fee to any of its Representatives in respect of such Representative's right to act on Agent's behalf in connection with performance of Agent's obligations under this Agreement.

Agent's failure to satisfy any of the above legal requirements will constitute a breach of this Agreement and be subject to remedial and other action as provided under this Agreement.

Additionally, as Agent is engaged in a separate business, Agent represents, warrants and covenants will use its full legal name (not Agent's DBA name) (1) for Agent's bank accounts, recruiting and similar materials relating to operation of Agent's business, (2) when signing any agreements with merchants for any services offered by Agent that are not described in and billed under the Merchant Agreement including sale, lease and/or rental of point-of-sale terminals and other ancillary products or services, and (3) for any agreements that are between Agent and a third party (including any merchant, lease company, bank, Yellow Page company or other vendor) for any purchase, sale or services (including leases, rental agreements, agreements for web design services, advertising services).

Agent also represents, warrants and covenants that execution and delivery of this Agreement by Agent and the consummation of the transaction herein contemplated does not conflict in any material respect with or constitute a material breach or material default under the terms and conditions of any documents, agreements or other writings to which it is a party, including any covenant not to compete or confidentiality agreement with any third party.

**1.3.**    **Assessments**.       Subject to Agent's challenge rights as noted below, the parties agree that at any time following the 10th Business Days after delivery of written notice to Agent from agent.compliance@firstdata.com (a "**Deduction Notice**"), Ignite Payments may deduct from any Residuals payable to Agent hereunder: (i) the amount of any fine, assessment or other amount charged to Ignite Payments by any third party relating to Agent's violation of any law, regulation, court order or Rule; or (ii) fines to Agent by Ignite Payments for Agent's breach of a material term of this Agreement (including **Section 1.2**) or repeated breach of any term of this Agreement, which fines shall be an amount equal to the greater of $250.00 or: (1) for the first fine, an amount equal to the product of (A) 10% multiplied by (B) an amount equal to the average of Agent's monthly Residuals for the 3 calendar months preceding the date on which the fine is assessed ("**Three Month Average Residuals**"), or (2) for each fine thereafter, an amount equal to the product of (A) 20% multiplied by (B) Three Month Average Residuals. The parties agree that if Agent disputes any such Deduction Notice issued to Agent pursuant to this **Section 1.3**, Agent may challenge such Deduction Notice by delivering a written notice ("**Challenge Notice**") to Ignite Payments at agent.compliance@firstdata.com within 10 Business Days after Ignite Payment's delivery of such Deduction Notice. The Challenge Notice must state all reasons why the Deduction Notice should not have been issued. If Ignite Payments fails to act on the Challenge Notice within 20 Business Days after its receipt thereof, then First Data shall not deduct any amount from Residuals payable to Agent in respect of the Deduction Notice. The deduction by Ignite Payments of the amount of any assessment, fine or charge against Agent from Residuals payable hereunder does not constitute a waiver of any legal rights or remedies Ignite Payments may have against Agent. Ignite Payments reserves the right to pursue any and all legal rights and remedies against Agent under this Agreement or applicable law.

**1.4.**    **Prospective Merchants; Merchants; Merchant Agreements**.

a.       Ignite Payments will not accept Prospective Merchant types that are identified as "Unqualified/Unacceptable" in the Ignite Payments Credit Policy posted under Resources/Policies on MyAgentOffice.com, as it may be modified from time to time by Ignite Payments in its sole discretion (the "**Unacceptable List**"). Agent agrees to use best efforts to verify that each Prospective Merchant conducts or intends to conduct a bona fide, lawful business operation (e.g., by inspecting a Prospective Merchant's premises to determine if it has the proper facilities, equipment, inventory and license to conduct its business or reviewing its Internet site).  Agent also agrees to use its best efforts to inform Ignite Payments of any information that could reasonably be considered relevant to a determination of any Prospective Merchant or Merchant's creditworthiness.

b.       All Merchant Agreements are subject to review and rejection or approval by Ignite Payments in its sole discretion. Ignite Payments will not approve Merchant Agreements that are not fully completed and executed by the Prospective Merchant. Ignite Payments may terminate any Merchant Agreement at any time in accordance with its terms.

c.       Agent may recommend to Ignite Payments and/or its sponsor bank the discount rate and fees charged to a Prospective Merchant or Merchant pursuant to the Merchant Agreement, but Ignite Payments and/or its sponsor bank in its final and sole discretion may accept or reject such recommendation. Ignite Payments or its sponsor bank in its sole discretion may change any fees charged to a Merchant under a Merchant Agreement from time to time without prior notice to Agent.

d.       All Merchant Agreements (whether partially or fully completed), Merchant Accounts and Merchant or Prospective Merchant accounts, records and related information are owned by Ignite Payments, its sponsor bank or the applicable acquirer and may not be transferred, assigned, sold or exchanged, in whole or in part, by Agent. Accordingly, at Ignite Payments' request, Agent agrees to provide Ignite Payments with all information, files and materials related to Prospective Merchants and

Merchants solicited or signed by Agent under this Agreement. If this Agreement terminates or Agent abandons a Prospective Merchant, Ignite Payments may complete the processing of such Prospective Merchant's submitted application and assist such merchant with the installation of any equipment. If this Agreement terminates, Ignite Payments shall not be required to terminate any Merchant Agreement with any Merchant.

**1.5.** **Non-Competitive Sale of Services**. Agent, any former or current owner of a controlling interest in Agent, or any former or current partner, member, officer or director of Agent: (i) will not engage in any act that would injure Ignite Payments' relationship with its employees, agents, Prospective Merchants, Merchants or Ignite Payments' sponsor bank; (ii) will not directly or indirectly induce or influence any merchant to cancel or terminate any existing Merchant Account or Merchant Agreement; and, (iii) except with respect to any Prospective Merchant that Ignite Payments rejects or is on the Unacceptable List, (1) shall represent only Ignite Payments with respect to soliciting Prospective Merchants for the purchase of Services within the Territory, and (2) may not engage in any other Competing Activity. Nothing in this Agreement restricts or prohibits Agent from soliciting merchants, Prospective Merchants or Merchants for the purchase of any product or service that is not competitive to the Ignite Payments Services.

## 2. Agent Personnel

**2.1.** **Agent Personnel**. Subject to **Section 2.2**, Agent shall have the right to designate suitable and desirable Agent Personnel, including Representatives. Agent shall be solely responsible for Agent Personnel and their acts, including any failure to comply with the terms of this Agreement that are applicable to Agent or failure to comply with Rules and applicable law, regulations and court orders. Agent Personnel shall be hired at Agent's own risk, expense and supervision, and Agent Personnel shall not have any claim against Ignite Payments for salaries, residuals, benefits, commissions, items of cost, or any other form of compensation or reimbursement. Agent acknowledges and agrees that no Agent Personnel are employees of Ignite Payments, and Agent is solely responsible for any taxes, payroll reporting, workers' or unemployment compensation insurance, compensation, benefits or any other obligations or liabilities that may arise (including verification of work eligibility in U.S.) due to Agent's hiring, retention or termination of or relationship with any Agent Personnel.

**2.2.** **Representative Registration**. Prior to a Representative being permitted to solicit or submit any Merchant Applications, Agent must receive written confirmation from agent.compliance@firstdata.com that Ignite Payments has registered such Representative. Agent must provide Ignite Payments with a completed Ignite Payments Sales Representative Registration Form (located under Resources/Forms at MyAgentOffice.com) for such Representative and any other documentation or information concerning the Representative requested by Ignite Payments from time to time. Ignite Payments reserves the right to refuse to register or revoke the registration of any proposed or approved Representative that Ignite Payments, in its sole discretion, determines is a detriment to the business of Ignite Payments. Agent must notify Ignite Payments in writing of the termination of any Representative within three Business Days of such termination.

## 3. Ignite Payments' Obligations

**3.1.** **Grant of Authority**. Ignite Payments hereby grants to Agent the right, on a non-exclusive basis, to solicit Prospective Merchants for the purchase of the Services from Ignite Payments within the Territory provided that no such Prospective Merchants already have, and have not had in the previous 90 days, an open Merchant Account.

**3.2.** **Ignite Payments Services**. Ignite Payments shall be responsible for all processing and accounting functions relating to the clearing and settlement of Card transactions, including: (i) Merchant

DocuSign Envelope ID: ...

processing and settlement; (ii) Merchant credit research; (iii) Merchant activation and approval; (iv) Merchant security and recovery; (v) Merchant customer services; (vi) Merchant chargeback and retrieval services; and (vii) all other back office services, including collecting amounts due from Merchants to Ignite Payments. Ignite Payments may contract with other persons to perform these functions on behalf of Ignite Payments but Ignite Payments remains primarily responsible for the functions. Subject to **Section 5.2**, Ignite Payments will make available to Agent training on the Ignite Payments Services.

## 4. Licensing

**4.1.     License.** Subject to **Section 1.1(b)** and this **Section 4**, Ignite Payments grants to the Agent during the Term, the limited, non-exclusive, non-assignable, revocable right to use the Trademarks (i) displayed on **Exhibit B** (as it may be modified from time to time by Ignite Payments in its sole discretion and provided to Agent via email or on MyAgentOffice.com), and (ii) posted under Policies on MyAgentOffice.com (as they may be modified from time to time by Ignite Payments or FDC in their sole discretion and provided to Agent via email or on MyAgentOffice.com) in the Territory in connection with Agent's marketing materials for the Ignite Payments Services. Upon termination of this Agreement, (i) the limited rights granted to Agent to use the Trademarks under this **Section 4** shall immediately terminate; (ii) Agent shall immediately cease and desist from all use of the Trademarks and any trade name, trademark, service mark, or logotype associated with Cards ("**Marks**"), except to the extent such use may be authorized under a separate agreement; (iii) at Ignite Payments' request, Agent will deliver to Ignite Payments all material and papers upon which the Trademarks or Marks appear or to which the Trademarks or Marks relate, including correspondence and information on Prospective Merchants or Merchants solicited or procured while the Agent solicited on behalf of Ignite Payments; and (iv) Agent will take all necessary actions to correct information that states or suggests that Agent is connected in any manner with Ignite Payments or its Trademarks, including correction of telephone and other directories, telephone information providers, postal offices, electronic mail providers, letterhead, business cards, office signage, Web page(s) on the Internet, domain name registries (if applicable), any post domain URL path (if applicable) and other communication delivery services. Agent shall direct that all inquiries be forwarded to Ignite Payments' Moorpark office or such other place designated by Ignite Payments. If Agent fails to take any required action within 30 days of the termination of this Agreement, then Agent appoints, without power of revocation, Ignite Payments as its attorney in fact to act in Agent's place and with Agent's authority to take such corrective actions with the same legal force and effect as if such acts were performed by Agent.

**4.2.     Ownership of Trademarks**. Agent acknowledges that Ignite Payments or FDC is the owner or licensee of the Trademarks, and Card Brands are the owners of their respective Marks. Agent acknowledges that Ignite Payments, FDC and the Card Brands hold the exclusive right, title and interest in and to their respective marks. Agent will not at any time do or cause to be done any act or thing contesting or in any way impairing or tending to impair any part of such right, title and interest. In connection with the use of the Trademarks or Marks, Agent shall not in any manner represent that it has any ownership in the Trademarks, Marks or registrations thereof, and Agent acknowledges that use of the Trademarks or Marks do not create in the Agent's favor any right, title or interest in or to the Trademarks or Marks or the goodwill attached to and associated with the Trademarks or Marks. All uses of the Trademarks or Marks by the Agent shall inure to their respective owner. Agent will at no time during or after the Term register, adopt or use, any word or mark which is likely to be similar to or confusing with the Trademarks or Marks or any other marks owned or utilized by Ignite Payments or FDC. Agent agrees to not, at any time, use any Mark on its own behalf or suggest, imply or in any manner create an impression that it is a member of MasterCard, VISA, American Express, Discover or any other Card Brand with respect to which merchants submit transactions for processing under a Merchant Agreement. Any Card Brand may at any time and without notice prohibit Agent from using its Marks for any reason.

DocuSign Envelope ID: D9888B3BFA95E4C9384C5EAF555CB7CEE2

Agent must comply with additional terms governing Agent's use of Trademarks or Marks that may be posted on MyAgentOffice.com from time to time.

## 5. Relationship of the Parties

**5.1.    Independent Contractor**. Neither Agent nor any Agent Personnel is an employee of Ignite Payments for any purpose whatsoever. Agent is an independent contractor and as such is not eligible for any compensation, benefits, insurance or other employment terms that are provided to employees of Ignite Payments or any Ignite Payments Affiliates. Ignite Payments is interested only in the results obtained by Agent and Ignite Payments has no right to control Agent or Agent Personnel, including no right to require Agent or Agent Personnel to: (i) devote a fixed or minimum number of hours to selling or any other effort, (ii) follow prescribed itineraries or instructions, (iii) bind Ignite Payments, or (iv) do anything that would alter Agent's independent contractor status.  At all times, Agent has the sole right and responsibility to supervise, direct, and control Agent's business operations and Agent Personnel, including Agent office account receivables and payables and other office administration functions.

**5.2.    Expenses; Taxes**. Agent is solely responsible for all expenses and disbursements that may be incurred or due by Agent in connection with its performance of its obligations under this Agreement, including promotional materials, general selling, training, travel, entertainment, insurance, office equipment, maintenance, supplies, rental, lease, legal or accounting expenses; purchase or lease of office space; Agent Personnel salaries, benefits, taxes and other costs and expenses; and any federal, state or local tax or insurance obligations that may arise in connection with Agent's activities or due to receipt of payments by Agent under this Agreement.

**5.3.    Other**. Agent does not have the right or authority to and will not, and will not permit any Agent Personnel to, hold itself out as having any right, power or authority to create any contract or obligation, either express or implied, on behalf of, in the name of or binding upon Ignite Payments, or to pledge Ignite Payments' credit, or to extend credit in Ignite Payments' name. Without the prior written consent of Agent, Ignite Payments has no right or authority to, and will not, commit Agent in any matter or use Agent's name in any way not specifically authorized by this Agreement.

## 6. Term

**6.1.    Term**. Provided that both Agent and Ignite Payments execute this Agreement, this Agreement is effective on the first day of the calendar month in which it is signed by the last of the parties hereto (the "**Effective Date**"). This Agreement shall remain in effect for a one year period that begins on the Effective Date (the "**Initial Term**") and automatically renew for successive terms of one year each (each a "**Renewal Term**" and together with the Initial Term, the "**Term**"), unless either party provides the other party with written notice at least 60 days before the end of the then-current term that it will terminate this Agreement at the end of the then-current term.

**6.2.    Termination by Ignite Payments**.

a.    With Cause without any Right to Cure. In addition to any other rights and remedies that it may have and notwithstanding **Section 6.2.b.**, Ignite Payments in its sole discretion may terminate this Agreement upon five calendar days prior written notice to Agent if any reasonable evidence is discovered indicating (i) Agent or any Agent Personnel have: (1) violated any confidentiality or intellectual property rights protected by this Agreement; (2) violated any applicable law, regulation, court order or Rule; or (3) committed any act of misrepresentation, fraud, forgery, dishonesty or other willful or malicious act; (ii) Agent has ceased its operation and activity as a sales agent for Ignite Payments; (iii) Ignite Payments is unable, after good faith efforts for a period of 30 days, to locate Agent; (iv) Agent generates less than 25

DocuSign Envelope ID: D9888B3E7A05E4C9394CB5AF555CB7CE53

new Open Accounts during any consecutive twelve month period; (v) Agent, any former or current owner of a controlling interest in Agent, or any former or current partner, member, officer or director of Agent, or any Agent Personnel breaches Agents obligations under **Section 8.1.d.** of this Agreement; or (vi) Agent's monthly Residual payment falls below $250.00.

       b.    <u>With Cause with a Right to Cure</u>. In addition to any other rights and remedies that it may have and notwithstanding **Section 6.2.a.**, Ignite Payments may terminate this Agreement if Agent is in breach of any of the terms, conditions, representations, warranties or covenants of this Agreement, including, without limitation, **Section 1.5.**, or the Agent Business Conduct Standards, but only upon giving Agent written notice of such breach and Agent's failure to cure such breach within 10 Business Days after receipt of such notice; provided, however, that if a cure cannot reasonably be accomplished within such 10-day period, Ignite Payments, in its sole discretion, may toll the cure period so long as the Agent commences a cure within such 10-day period and thereafter diligently pursues such cure as promptly as practical, but in no event will a cure period exceed 90 calendar days.

       c.    <u>Agent Insolvency</u>. If Agent makes any assignment of assets or business for the benefit of creditors, or if a trustee or receiver is appointed to administer or conduct its business or affairs, or if it is adjudged in any legal proceeding to be either a voluntary or involuntary bankruptcy, then the rights granted herein to Agent shall forthwith cease and terminate without prior notice or legal action by Ignite Payments.

**6.3.**    **Termination by Agent**. In addition to any other rights and remedies that it may have, Agent may terminate this Agreement if Ignite Payments is in breach of its obligations under **Section 7**, but only upon giving Ignite Payments written notice of such breach and Ignite Payments' failure to cure such breach within 10 Business Days after receipt of such notice, unless a cure cannot reasonably be accomplished within such period. In that case, the cure period will be tolled so long as Ignite Payments commences a cure within such 10-day period and thereafter diligently pursues such cure as promptly as practical, but in no event may a cure period exceed 90 calendar days.

**6.4.**    **Termination by Mutual Agreement**. The parties may terminate this Agreement at any time in a writing signed by both parties.

<h3 align="center">7. <u>Payments</u></h3>

**7.1.**    **Right to Payment**.

       a.    Ignite Payments shall pay Residuals and certain other amounts set forth in this **Section 7** to Agent during the Term and after termination of this Agreement subject to the terms of this Agreement, including this **Section 7** and **Section 8**. Agent acknowledges and agrees that notwithstanding anything to the contrary set forth in any agreement entered into between Agent and Ignite Payments prior to the Effective Date (each, a "**Prior Agreement**"), all Merchant Accounts boarded by Agent on or after the Effective Date shall be boarded solely under this Agreement, and no such Merchant Accounts may be boarded under any Prior Agreement.

       b.    Ignite Payments in its sole discretion may immediately discontinue payment of any amounts due to Agent after termination of this Agreement if: (i) Ignite Payments terminates this Agreement pursuant to **Sections 6.2.a(i), 6.2.a(ii), 6.2.a(iii), 6.2.a(v), 6.2(a)(vi), 6.2.b** or **6.2.c** above; (ii) Agent, any former or current owner of a controlling interest in Agent, or any former or current partner, member, officer or director of Agent: (1) engages in any act that would injure Ignite Payments' relationship with its employees, agents, Prospective Merchants, Merchants or Ignite Payments' sponsor bank; (2) directly or indirectly induces or influence any merchant to cancel or terminate any existing

DocuSign Envelope ID: D988B3B5A05E4C833AC6F4F555CB7CEF2

Merchant Account or Merchant Agreement; or, (3) engages in a Competing Activity; (iii) Agent fails to remain in compliance with all terms and conditions of this Agreement that survive termination of this Agreement; (iv) Agent fails to remain current on all obligations to Ignite Payments and Ignite Payments' sponsor bank(s); or (v) Agent's monthly Residual payment falls below $250.00.

**7.2.     Payment for Services**. Subject to the terms of this Agreement,

a.       On or about the 20th day of each calendar month Ignite Payments shall pay to Agent a Residual for Merchant Accounts boarded by Agent on or after the Effective Date that are Open Accounts in accordance with the terms set forth in **Exhibit C**.

b.       At least monthly Ignite Payments shall pay to Agent payments for certain third party or other products and services subject to the terms set forth under Resources/Forms on MyAgentOffice.com. Ignite Payments may change the terms, including the amounts, of any such payments by providing Agent with at least 30 days prior written notice of such changes.

Agent must request an adjustment to any amounts paid to or by Agent pursuant to this **Section 7** within the 90 day period following the initial credit or debit or Ignite Payments has no obligation to make such adjustment.

**7.3.     Merchant Losses**. Ignite Payments shall bear the risk for Merchant Losses (other than those caused by the gross negligence or willful misconduct of Agent or Agent Personnel) and shall not deduct such Merchant Losses from any amounts due to Agent under this Agreement.

**7.4.     Right to Offset**. Agent hereby authorizes Ignite Payments at any time and from time to time, without notice or demand to Agent or to any other person (any such notice and demand being hereby expressly waived), to set off, recoup and to appropriate and apply any and all funds of Agent held by Ignite Payments, Ignite Payments' Affiliates or Ignite Payments' sponsor bank, against and on account of Agent's obligations to Ignite Payments or any Ignite Payments' Affiliates under this Agreement or any other agreement, including fees for equipment or the Services, whether such obligations are liquidated, unliquidated, fixed, contingent, matured or unmatured. Agent is prohibited from setting-off, offsetting or otherwise reducing or applying against any amounts due and owing to Ignite Payments under this Agreement or otherwise, any amounts owed or alleged to be owed to Agent by Ignite Payments under this Agreement or otherwise. Ignite Payments may in its sole discretion exercise the rights described in this **Section 7.4** by direct debit to Agent's bank account.  This offset right is in addition to all other rights and remedies available to Ignite Payments.

**7.5.     Right to Debit and Credit Agent's Bank Account**. All financial transactions between Agent and Ignite Payments, including payment for equipment purchases, may be automatically debited and credited by Ignite Payments, in its sole discretion, directly through Agent's bank account. Agent irrevocably consents to the debiting and crediting of its bank account(s) as provided herein. With respect to equipment transactions only, Ignite Payments shall provide 10 days advance written notice to Agent prior to initiating a debit entry. In order to activate automatic debit and credit service, Agent shall provide Ignite Payments with the required depository information and execute ACH Authorization Agreement Direct payments (Debits) Form and ACH Authorization Agreement Direct Payments (Credits) Form provided to Agent by Ignite Payments or any other form that Ignite Payments may request from time to time to accomplish the purposes set forth in this **Section 7.5**.

**7.6.     Loan**. Subject to applicable law, once every 12 months during the Term of this Agreement, Agent may be eligible (in Ignite Payments' sole discretion) to receive a loan from Ignite Payments in an amount equal to the product of two multiplied by Three Month Average Residuals subject to the terms and

DocuSign Envelope ID: D988B3F5A05E4C994ACF54F555CB7CFF9

<p style="text-align:center; color:red;">EXHIBIT A</p>

conditions of a promissory note in the form provided by Ignite Payments and executed by Agent if Agent: (a) is not in breach of its obligations under this Agreement; (b) is current on all financial obligations to Ignite Payments and Ignite Payments Affiliates; and (c) has not had a promissory note payable to Ignite Payments outstanding at any time within the preceding 30 days.

<h2 style="text-align:center;">8. Purchase and Sale of Agent Residual Rights</h2>

**8.1. Residual Rights - Purchase**.

a. During the Term, Ignite Payments may elect but is not required to purchase Agent's unencumbered right to receive future Residuals (excluding Residuals for Referral Open Accounts) subject to: (i) the terms and conditions of this Section 8.1; and (ii) Agent's completion of Ignite Payment's online Residual purchase process through MyAgentOffice.com.

b. Agent will not be eligible to accept any Residual purchase offer until the end of the second calendar quarter occurring after the Effective Date of this Agreement. In no event will Ignite Payments purchase (i) more than $500,000 worth of Residual rights from Agent during any consecutive 365 day period; (ii) more than $5,000,000 worth of Residual rights in the aggregate under this Agreement; and (iii) more than 5% of Agent's Residual rights in the number of Eligible Accounts during any calendar quarter. The 5% ceiling will be based on the number of Eligible Accounts existing on the first day of the calendar quarter following the date Acceptance is received by Ignite Payments. Ignite Payments online Residual purchase process is available through MyAgentOffice.com.

c. For purposes of this **Section 8.1**, Residual rights shall be valued at the multiples for each merchant account type established from time to time by Ignite Payments, in its sole discretion. Ignite Payments will post said multiples on MyAgentOffice.com. Ignite Payments shall have the right, in its sole discretion, to modify said multiples on 90 days prior written notice to Agent.

d. Agent agrees and covenants on behalf of: (i) itself, (ii) any former or current owner of a controlling interest in Agent, (iii) any former or current partner, member, officer or director of Agent and (iv) Agents Personnel that they will not directly or indirectly (a) solicit any Merchant corresponding to any Residual rights purchased by Ignite Payments; or (b) influence any Merchant corresponding to any Residual rights purchased by Ignite Payments to cancel its Ignite Payments Merchant Account.

**8.2. Residual Rights – Cessation of Business**.

a. During the Term of this Agreement, as long as Agent has not Accepted an Ignite Payments' offer to purchase Residual rights, if applicable, under **Section 8.1** of this Agreement within the prior 365 days, Ignite Payments, in its sole discretion, may elect but is not required to purchase Agent's unencumbered rights to receive future Residuals if Agent ceases to conduct the business of soliciting merchants for the purchase of Services from Ignite Payments and any and all competitors of Ignite Payments ("**Cessation of Business**") subject to the terms and conditions of this **Section 8.2**. Ignite Payments shall not purchase (i) more than $1,000,000 worth of Residual rights from Agent during any consecutive 365-day period; (ii) more than $4,000,000 worth of Residual rights in the aggregate under this Agreement. If Residual rights corresponding to Agent's Open Accounts exceed the aggregate ceiling of $4,000,000, Ignite Payments shall have the option of purchasing, the excess Residual rights over the aggregate ceiling of $4,000,000 in the final installment or continuing to pay monthly Residuals on the Open Accounts. Agent may Accept Ignite Payments offer to purchase Agent's Residual rights by completing and submitting the Acceptance of Ignite Payments Offer to Purchase Agent's Residual Rights (Cessation of Business) form as it is found at MyAgentOffice.com (also known as the Acceptance of Ignite Payments Offer to Purchase Agent's Residual Rights (Retirement) form) (the "**Cessation of**

DocuSign Envelope ID: 3A98B3B5-A0EF-4CB3-AC51-455B5CB7CFE3

<p style="text-align:center"><strong style="color:red">EXHIBIT A</strong></p>

**Business Form**"), to Ignite Payments on or before the last day of the calendar quarter in which Agent retires. Submission of Acceptance shall be deemed made as of the date that the Cessation of Business Form is received by Ignite Payments.

b. For purposes of this **Section 8.2**, Residual rights shall be valued at the multiples for each Merchant Account Type established from time to time by Ignite Payments, in its sole discretion. Ignite Payments shall post said multiples on MyAgentOffice.com. Ignite Payments shall have the right, in its sole discretion, to modify said multiples on 90 days prior written notice to Agent.

c. Upon receiving Acceptance: (i) Ignite Payments will fix Agent's percentage of Gross Processing Revenue at its then current level; (ii) Ignite Payments will not be required to pay Agent Residuals or any other payment for any Open Accounts opened after receipt of Acceptance; and (iii) the portfolio of Eligible Accounts existing on the date Acceptance is received and which continue to exist on the date the last Residual rights are purchased shall be referred to herein as "**Cessation of Business Portfolio**"; and (iv) this Agreement will automatically terminate.

d. Ignite Payments' remaining purchase and payment obligations to Agent, if any, pursuant to this **Section 8.2** shall immediately terminate if, after delivering Acceptance pursuant to this **Section 8.2** and before all Ignite Payments payment obligations have been met, (i) Agent or any person having any ownership interest in Agent engages in a Competing Activity or carries out any act that would injure Ignite Payments in its relationship with its employees, customers or Merchants; (ii) Agent or any former or current owner of a controlling interest in Agent, or any former or current partner, member, officer or director of Agent or Agents Personnel directly or indirectly (a) solicit any Merchant in the Cessation of Business Portfolio; or (b) influence any Merchant in the Cessation of Business Portfolio to cancel its Ignite Payments Merchant Account.

**8.3. Right to Receive Future Residuals; Right of Last Refusal**. Subject to **Section 9** and provided Agent is not in breach of this Agreement, at any time during the Term, Agent may sell its right to receive future Residuals under this Agreement ("**Right to Receive Future Residuals**") to an Unrelated Third Party subject to the following terms and conditions:

a. Agent hereby grants to Ignite Payments a right of last refusal to purchase Agent's Right to Receive Future Residuals. If Agent receives a bona fide offer from a willing and able Unrelated Third Party buyer to purchase Agent's Right to Receive Future Residuals (a "**TP Offer**"), Agent shall notify Ignite Payments of the amount and terms of such TP Offer. Ignite Payments shall have the right to purchase Agent's Right to Receive Future Residuals on terms equal to the TP Offer, and Agent shall not sell or in any way transfer Agent's Right to Receive Future Residuals without first presenting Ignite Payments with the opportunity to match any TP Offer. Ignite Payments shall have 15 days to notify Agent of its decision whether or not to exercise its right to purchase Agent's Right to Receive Future Residuals.

b. If Ignite Payments does not exercise its right of last refusal, provided that Agent and Unrelated Third Party buyer execute and provide to Ignite Payments a residual re-direction letter in the form required by Ignite Payments, Agent may sell its Right to Receive Future Residuals in accordance with the terms of this **Section 8.3** and the TP Offer.

c. Nothing in this **Section 8.3** shall be construed or interpreted to impair any of Ignite Payments' rights under this Agreement, including **Section 9**, or to allow Agent to sell any interest in a Merchant, Merchant Agreement or Merchant Account, except for the sale of Agent's Right to Receive Future Residuals as set forth in this **Section 8.3**.

<p style="text-align:center"><strong>9. <u>Confidentiality</u></strong></p>

DocuSign Envelope ID: 0088B3B5-405E-4GB3-AC51-455E5CB2CEE3

**9.1.    Restrictions on Use or Disclosure of Confidential Information**. Each of Ignite Payments and Agent agree that, without the written consent of the other, it will not divulge or disclose to third parties, directly or indirectly, any Confidential Information or use such Confidential Information except to the extent required in its business relationship with the other party or to carry out its obligations under this Agreement. For the avoidance of doubt, Agent shall keep the terms, conditions and existence of this Agreement strictly confidential, and under no circumstance may Agent distribute this Agreement or any other Ignite Payments Confidential Information for any purpose, including with respect to Agent's rights under **Section 8.3**, without Ignite Payments' prior written consent. No party will obtain any proprietary rights to any Confidential Information of the other party. Each party shall retain Confidential Information in its possession and control and shall protect the secrecy of such Confidential Information using the degree of care it uses to protect the secrecy of its own Confidential Information, but in no event less than a commercially reasonable degree of care.

**9.2.    Exceptions**. Notwithstanding the foregoing, Ignite Payments shall not be prohibited from disclosing Confidential Information to the extent that it is related to Merchant Agreements, Merchant Accounts and Merchant or Prospective Merchant accounts, records and related information and other information relating to Ignite Payments business or Ignite Payments Services, but excluding any other information regarding the business of Agent, to the extent that such disclosure by Ignite Payments is for a bona fide business purpose; and, Agent's Confidential Information may be made available by or on behalf of Ignite Payments at Ignite Payments or Ignite Payments sponsor bank's direction to any Card Brand or to any other supervisory or regulatory authority to which Ignite Payments may be subject (including the Securities and Exchange Commission), upon their written request, or to secure advice from a legal or tax advisor.

## 10. Indemnity and Limitation of Liability

**10.1.    Indemnification**. Agent shall indemnify, defend and hold harmless Ignite Payments and its officers, directors, shareholders, employees, agents and representatives against any and all Damages incurred directly or indirectly by Ignite Payments, whether or not litigation is commenced, incurred by or asserted against Ignite Payments, arising from or related to: (i) any debts incurred by Agent or Agent Personnel, including debts incurred with telephone, utility, and express mail companies; (ii) any claim of any officer, director, shareholder of the Agent or any Agent Personnel made against Ignite Payments for any compensation, benefit or other payment to such person; (iii) any activity or representation by Agent or any Agent Personnel in marketing, advertising, promoting or otherwise engaging in any activity arising from or related to this Agreement; (iv) any claim arising from the unauthorized use of the Trademarks or other Ignite Payments or Card Brand intellectual property; (v) any actions concerning alleged Agent or Representative improprieties in the solicitation, sale or leasing of the Ignite Payments Services or equipment; (vi) any breach of any term or condition of this Agreement, any Rules, law, regulation or court order or Business Conduct Standards; (vii) any representation, warranty or covenant of Agent made in or in connection with this Agreement being false or misleading; or (viii) losses experienced by Ignite Payments attributable to chargebacks, fines, penalties and other amounts due from a Merchant to Ignite Payments caused by the gross negligence or willful misconduct of Agent or Agent Personnel. As stated in elsewhere in this Agreement, Agent is acting hereunder as an independent contractor and neither Agent nor any Agent Personnel shall be considered to be an employee of Ignite Payments or its Affiliates or Ignite Payments' sponsor bank (collectively "Ignite Payments" for purposes of this **Section 10.1**). Notwithstanding anything to the contrary in **Section 10.4**, if (a) Agent or any Agent Personnel assert that Agent or any Agent Personnel is an employee of Ignite Payments; or (b) a federal, state or local governmental agency or court asserts or determines Agent or any Agent Personnel are employees of Ignite Payments, then Agent shall indemnify, defend and hold harmless Ignite Payments, its Affiliates, and their respective officers, directors and employees from any and all Damages and exemplary, punitive

or special damages associated with such claim and/or determination whether or not litigation is commenced, incurred by or asserted against Ignite Payments.

**10.2.    Statute of Limitations**. Notwithstanding the fact that the statute of limitations for bringing a legal action on a written contract, or other limitation period that could apply based upon the type of action or act, omission or violation being alleged, may be shorter or longer, the parties agree that any action, legal or equitable, based on, related to or arising out of the subject matter of this Agreement, and whether based on contract, tort, strict liability or some other legal or equitable theory of recovery, must be commenced by a party within one year after the earlier of (i) the date on which such party knew or should have known of the first alleged act, omission or violation, or (ii) with respect to obligations that do not survive termination of this Agreement, the date of termination of this Agreement.

**10.3.    Limitation of Liability**. Notwithstanding anything contained in this Agreement or otherwise, Ignite Payments' cumulative liability to Agent and anyone claiming by through or under Agent, for all Damages arising out of or related to this Agreement, and regardless of the form of action or legal theory shall not exceed, in the aggregate, the lesser of aggregate Residuals paid to agent in the twelve months preceding the act giving rise to the claim or $500,000.00. Agent understands the limitation on damages to be a reasonable allocation of risk and expressly consents to such risk allocation.

**10.4.    Exclusion of Damages**. Except as set forth in this Agreement, in no event shall either party, its parents, Affiliates or any of its or their directors, officers, employees, agents or sub-contractors be liable under any theory of tort, contract, strict liability or other legal or equitable theory for lost profits, exemplary, punitive, special, incidental, indirect or consequential damages, each of which is hereby excluded by agreement of the parties regardless of whether such damages were foreseeable or whether either party or any entity has been advised of the possibility of such damages.

## 11. <u>General Provisions</u>

**11.1.    Definitions; Word Usage.** Capitalized terms have the meanings set forth in **Exhibit A**. Unless the context clearly requires otherwise, (i) the plural and singular numbers shall each be deemed to include the other; (ii) "**shall**," "**will**," or "**agrees**" are mandatory, and "**may**" is permissive; (iii) "**or**" is not exclusive; and (iv) "**includes**" and "**including**" are not limiting.

**11.2.    Effect of Headings**. Subject headings of sections and subsections of this Agreement are included for convenience only and shall not affect the construction or interpretation of any of its provisions.

**11.3.    Entire Agreement**. This Agreement, including the exhibits hereto, constitutes the sole and exclusive terms and conditions and agreement between the parties relating to the subject matter hereof, and supersedes all prior or contemporaneous discussions, writings, negotiations, understandings and agreements with respect thereto.

**11.4.    Waiver or Modification Ineffective Unless in Writing**. Except as set forth in this Agreement, no amendment of any provision of this Agreement will be valid unless the same will be in writing and signed by each of the parties. No waiver by any party of any provision of this Agreement or any default, misrepresentation, or breach of warranty or covenant hereunder, whether intentional or not, will be valid unless the same will be in writing and signed by the party making such waiver nor will such waiver be deemed to extend to any prior or subsequent waiver, default, misrepresentation, or breach of warranty or covenant hereunder or affect in any way any rights arising by virtue of any prior or subsequent  waiver, default, misrepresentation, or breach of warranty or covenant except pursuant to its express terms.

DocuSign Envelope ID: 3A98B3F5-405F-4GR3-A6B5-455B5CB7CFF2

**11.5.    Assignment**. The rights and obligations of Agent under this Agreement are personal. Except as otherwise expressly provided in this Agreement, Agent shall not assign, subcontract, license, franchise, or in any manner attempt to transfer or extend to any third party this Agreement or any right or obligation of Agent under this Agreement, by operation of law or otherwise, without the prior written consent of Ignite Payments, which may be granted or withheld at the sole discretion of Ignite Payments.  For purposes of this Agreement, any transfer of ownership or voting control of Agent shall be considered an assignment or transfer hereof. This Agreement shall be binding upon and inure to the benefit of the parties hereto and their permitted successors and assigns.

**11.6.    Written Notice**. Unless otherwise specified in this Agreement, all notices and other communications required or permitted under this Agreement shall be in writing and shall be deemed delivered and effective when given by personal delivery, telefax (confirmed by a mailed copy) or first-class mail, postage prepaid, addressed as follows: (i) if to Agent, to the address set forth below Agent's signature line in this Agreement; and (ii) if to Ignite Payments to 5898 Condor Drive, Suite 220, Moorpark, CA 93021, Attention: Senior Vice President (Facsimile: 402.916.6610); with a copy to First Data Corporation, 5575 DTC Blvd., Suite 100 North, Greenwood Village, Colorado 80111, Attention: Legal Department (Facsimile: 303.967.8292). A party may change its address or addresses set forth above by giving the other party notice of the change in accordance with the provisions of this **Section 11.6**. In addition, Agent and Ignite Payments each may update its address through MyAgentOffice.com, and Ignite Payments may change the location of any documents, information or forms referenced in this Agreement and located on MyAgentOffice.com or the Ignite Payments marketing website on notice to Agent via email or MyAgentOffice.com.

**11.7.    Cooperation**. Ignite Payments and Agent will each timely furnish to the other any and all information and materials that the other may, from time to time, reasonably request in connection with all matters contemplated by this Agreement.  Each party also shall take the action as the other may, from time to time, reasonably request in order that the purposes of this Agreement will be fully accomplished and that all matters contemplated hereby will comply with all applicable laws, regulations, court orders and Rules.

**11.8.    Severability**. The invalidity of any paragraph or subparagraph hereof shall not affect the validity of any other paragraph or subparagraph hereof.

**11.9.    Governing Law and Waiver**. This Agreement shall be governed by the laws of the State of New York.  Agent waives personal service of process and consents that service of process upon it may be made by certified or registered mail, return receipt requested, at the address provided below the signature line of this Agreement.

**11.10.  Survival of Terms**. Subject to Section 10.2, the parties agree that those provisions of this Agreement that logically should survive its termination in order to accomplish the fundamental purposes of it will do so, including **Sections 1.1.a**, **1.2 (v)**, **(vii)** and **(ix)**, **1.3.**, **1.4.b – d**, **1.5.**, **2.1**, **4**, **5**, **7.1 – 7.5**, **9**, **10** and **11**.

**11.11.  Third Party Beneficiaries**. This Agreement is made for the benefit of Ignite Payments, Agent and their respective successors and assigns. In addition, Ignite Payments' sponsor bank is a third party beneficiary of this Agreement and may enforce this Agreement against Agent. No other person or entity has or acquires any rights by virtue of this Agreement.

**11.12.  Authority**. The person executing this document on behalf of Agent warrants that they have the full right, capacity and authority to cause such party to enter into this Agreement and that such party has all necessary authority to perform this Agreement.

DocuSign Envelope ID: 3098B3B5-405E-4GP3-AC85-A5FB56B7CFE3

**11.13. No Presumption Against Drafter**. Ignite Payments and Agent have jointly participated in the negotiation of the terms of this Agreement. This Agreement shall be construed as if drafted jointly by Ignite Payments and Agent, and no presumptions arise favoring any party by virtue of the authorship of any provision of this Agreement.

*[Signatures appear on following page.]*

Ignite Payments Existing Agent Launch Agreement

*5-2015*

DocuSign Envelope ID: B988B3B5-405F-4GB9-A0B5-A55B5GB7CFF2

**EXHIBIT A**

In consideration of the foregoing, the parties hereby execute this Agreement.

*Insert Agent Legal Name*   FRANCES GRACE, LP          **Ignite Payments, LLC**

**Signature:** _____   **By:** _____

**Printed Name:** _____   **Name:** _____

**Title:** _____   **Title:** _____

**Date:** _____   **Date:** _____

**Address:** _____   **Approver:** _____

_____

EXHIBIT A

# Exhibit A

## Definitions

**Accept or Acceptance** means the completion, execution and delivery to Ignite Payments of the Agent's acceptance through the buyout process in MyAgentOffice.com for Residual purchases or Ignite Payments receipt of a completed Cessation of Business Form, as applicable, as the process or form now exist and as they may be modified by Ignite Payments from time to time.

**Affiliate** means any entity that directly or indirectly controls, is controlled by or is under common control with a party.

**Agent Business Conduct Standards** means the business conduct standards that may be established or modified by Ignite Payments from time to time and posted under Policies on MyAgentOffice.com.

**Agent Personnel** means Representatives and any other personnel or contractors of Agent.

**Business Day** means any calendar day other than Saturdays, Sundays, or California or federal holidays.

**Buy Rates** means the amounts set forth under Resources/Forms on MyAgentOffice.com.

**Card** means a credit, debit or other card issued by a member of a Card Brand, including MasterCard, Visa and Discover, and bearing its respective trade name, Mark, or trade symbol, which is of the type accepted for processing under the Merchant Agreement.

**Card Brand** means an entity formed to govern the proper administration and promotion of credit, debit and other cards, including MasterCard, Visa, American Express, Discover and any other entity whose cards may be accepted by merchants for payment for goods or services under the Merchant Agreement.

**Cessation of Business** is defined in **Section 8.2.a**.

**Cessation of Business Portfolio** is defined in Section **8.2.c**.

**Challenge Notice** is defined in **Section 1.3**.

**Competing Activity** means, whether directly or indirectly, the ownership, management, operation, control, participation in, performance of services for, the solicitation of merchants for, or otherwise carrying on, a business similar to or competitive with the electronic transaction processing business of Ignite Payments, including the Services (whether as a principal, agent, independent contractor, partner, employer, proprietor, stockholder, director or otherwise), anywhere in the Territory.

**Confidential Information** means all proprietary, secret or confidential information or data relating to a party and its Affiliates, operations, employees, products or services, clients, customers, potential customers and Ignite Payments' Services. Confidential Information shall include proprietary information of Card Brands, pricing information, Merchant Agreements (whether partially or fully completed), Merchant Accounts and Merchant or Prospective Merchant accounts, records and related information, customer lists, cardholder account numbers, Personal Data, computer access codes, instruction and/or procedural manuals and this Agreement and the terms and conditions of this Agreement. Information shall not be considered Confidential Information to the extent, but only to the extent, that such information: (i) is already known to the receiving party free of any restriction at the time it is obtained; (ii) is subsequently learned from an independent third party free of any restriction and without breach of

this Agreement; (iii) becomes publicly available through no wrongful act of the receiving party; (iv) is independently developed by the receiving party without reference to any Confidential Information of the other; or (v) is required to be disclosed under law, provided that the receiving party first gives the disclosing party prompt written notice of the required disclosure and commercially reasonable time to allow the disclosing party to seek a protective order or other appropriate remedy.

**Current Level of Account Production** means the number of new Merchant Accounts for Merchants boarded by Agent during the specified time period.

**Damages** means demands, claims, actions or causes of action, assessments, losses, damages, liabilities, judgments, settlement amounts, costs and expenses, including interest, fines, penalties and reasonable expert witness fees and expenses, and attorneys' fees and expenses.

**Deduction Notice** is defined in **Section 1.3**.

**Effective Date** is defined in **Section 6.1**.

**Eligible Accounts** means those Open Accounts that: i) are either in their first renewal term or have been open for more than 12 consecutive months; ii) are not in collections; iii) have not provided Ignite Payments with notice of cancellation; and iv) are in compliance with all Rules.

**FDC** means First Data Corporation or its successors or assigns.

**Gross Processing Revenue** means all Income collected on Open Accounts, excluding those for which Ignite Payments has purchased the Residual rights, minus: Card Brand interchange fees; Card Brand dues and assessments; Buy Rates; Refunds caused by processing errors or the gross negligence or willful misconduct of Agent or Agent Personnel; and Merchant Losses caused by the gross negligence or willful misconduct of Agent or Agent Personnel.

**Ignite Launch Residual Schedule** or **Ignite Launch Schedule** is defined in **Exhibit C**.

**Ignite Payments' sponsor bank** means the bank that is the sponsoring bank or acquiring bank for Card transactions processed pursuant to the Merchant Agreement, as applicable.

**Income** consists of the following items on all Open Accounts: (1) all discount fees (qualified, mid-qualified, and non-qualified) on MasterCard, Visa, Discover, Diners, debit and JCB transactions; (2) transaction fees, (3) batch header fees, (4) address verification service fees, (5) monthly minimum fees, (6) customer support fees, (7) statement fees, (8) monthly Ignite Payments merchant club fees, (9) American Express residuals, (10) JCB fees, (11) chargeback/retrieval fees, (12) annual fees (13) account closure fees and (14) early termination fees**.**

**Initial Term** is defined in **Section 6.1**.

**Marks** are defined in **Section 4.1**.

**Merchant** means an entity that submits a Merchant Agreement to Ignite Payments that indicates such entity was solicited by Agent and results in a Merchant Account.

**Merchant Account** means a Merchant Agreement that has been approved and entered into by Ignite Payments and Ignite Payments sponsor bank.

**Merchant Agreement** means the form of merchant application and merchant agreement in use by Ignite Payments and its sponsor bank in connection with the Ignite Payments Services, as it may be modified from time to time by Ignite Payments and its sponsor bank in their sole discretion.

**MCC Codes** means the four digit Merchant Category Classification codes created by Visa International, Inc. and listed in the Visa USA Merchant Data Manual to identify a particular merchant's principal trade, profession or line of business.

**Merchant Losses** means all losses experienced by Ignite Payments attributable to chargebacks, fines, penalties and other amounts due from a Merchant to Ignite Payments in excess of a Merchant's reserve account.

**Open Account** means a Merchant Account for a Merchant that is classified as "open" on an Ignite Payments settlement platform and has not been cancelled or terminated.

**Personal Data** means any information that is "personally identifiable" within the meaning of the Gramm-Leach-Bliley Act (15 USC § 6801, et seq.) and its implementing regulations (or any superseding or replacement laws, regulations or guidelines), as they may now exist or be enacted, adopted, issued or promulgated.

**Privacy Laws** means all laws, regulations and guidelines applicable to the use, disclosure and processing of Personal Data on behalf of Ignite Payments or its Affiliates, including the Gramm-Leach-Bliley Act (GLBA) and the Healthcare Insurance Portability and Accountability Act (HIPAA), as they may now exist or be enacted, adopted, issued or promulgated.

**Prospective Merchant** means any entity solicited by Agent for Services to be provided by Ignite Payments pursuant to a Merchant Agreement.

**Referral Open Account** means an Open Account resulting from a lead from a third party referral source to Agent with respect to which Ignite Payments is obligated to pay such third party a referral fee.

**Refunds** means refunds to Merchants of any billed and collected amounts.

**Renewal Term** is defined in **Section 6.1**.

**Representative** means all salespersons, employees, agents or representatives appointed or designated by Agent to act on Agent's behalf in connection with performance of Agent's obligations under this Agreement.

**Residuals** means the payments due to Agent by Ignite Payments pursuant to **Section 7.2.a.** of this Agreement.

**Rules** means the rules and regulations now existing, as they may be modified in the future, and any rules and regulations hereafter promulgated by any Card Brand, including the rules and regulations contained in: (i) the Visa U.S.A. Inc. ("**Visa**") Operating Regulations, (ii) MasterCard International Incorporated ("**MasterCard**") Operations Manual, (iii) Discover Financial Services, LLC ("**Discover**") operating regulations, (iv) American Express Travel Related Services Company, Inc. ("**American Express**") operating regulations, as applicable.

**Services** means electronic transaction processing of Card and certain other transactions and related services and support systems as described in the Merchant Agreement.

**Term** is defined in **Section 6.1**.

**Territory** means the United States, as currently defined by Visa.

**Three Month Average Residuals** is defined in **Section 1.3**.

**TP Offer** is defined in **Section 8.3 b**.

**Trademarks** means the marks set forth on **Exhibit B** and FDC's marks posted under Policies on MyAgentOffice.com.

**Unacceptable List** is defined in **Section 1.4**.

**Unrelated Third Party** means any person who is not and is not a relative of, Agent, any former or current owner of a controlling interest in Agent, or any former or current partner, member, officer or director of Agent or any entity in which Agent, any former or current owner of a controlling interest in Agent, or any former or current partner, member, officer or director of Agent has ownership interest or employment relationship.

**Exhibit B**

**Trademarks**

(1) **IGNITE PAYMENTS™**

(2)



(3)



**Exhibit C**

**Residuals Paid for Merchants Boarded on or after the Effective Date**

A.     Notwithstanding anything to the contrary in this **Exhibit C**, if Agent entered into his or her first Prior Agreement with Ignite Payments on or after January 1, 2014, Agent's Residuals during the Initial Period for Launch Open Accounts shall be fixed at 60% of Gross Processing Revenue for such Launch Open Accounts.  "**Initial Period**" shall mean the first 12 full calendar months following the execution of this Agreement; provided, however, that if Agent entered into his or her first Prior Agreement with Ignite Payments on or after January 1, 2015, the Initial Period shall mean the first 24 full calendar months following the execution of this Agreement.  "**Launch Open Accounts**" means Merchant Accounts boarded by Agent on or after the Effective Date that are Open Accounts.

B.     Residuals for Launch Open Accounts for a calendar month shall be an amount equal to the product of Gross Processing Revenue for Launch Open Accounts for such calendar month multiplied by the applicable percentage from the Ignite Launch Residual Schedule set forth below ("**Ignite Launch Schedule**"):

| Gross Processing Revenue for Open Accounts | | Percentage |
|---|---|---|
| - | 20,000 | 40% |
| 20,001 | 30,000 | 45% |
| 30,001 | 70,000 | 50% |
| 70,001 | 100,000 | 55% |
| 100,001 | 130,000 | 60% |
| 130,001 | 330,000 | 65% |
| 330,001 | 670,000 | 70% |
| 670,001 | 1,330,000 | 75% |
| 1,330,001+ | | 80% |

The Ignite Launch Schedule percentage shall be determined based upon the Gross Processing Revenue at the end of each calendar month under this Agreement. The percentage shall be recalculated and effective on the first day of each month. The monthly recalculation may result in an increase, decrease or no change to the Ignite Launch Schedule percentage. The Ignite Launch Schedule percentage will be increased or decreased if the Gross Processing Revenue during the Measurement Period is in a higher or lower tier, as applicable on the Ignite Launch Schedule. The following schedule summarizes the trigger dates regarding the calculation of the percentage that will be used to calculate Residuals:

| Measurement Period | Effective Date |
|---|---|
| December | January 1 |
| January | February 1 |
| February | March 1 |
| March | April 1 |
| April | May 1 |
| May | June 1 |
| June | July 1 |
| July | August 1 |
| August | September 1 |

Ignite Payments Existing Agent Launch Agreement

EXHIBIT A

| September | October 1 |
|-----------|-----------|
| October | November 1 |
| November | December 1 |

C.      Ignite Payments in its sole discretion may modify the Ignite Launch Schedule in so far as it affects Ignite Payments Residual obligations prospectively, with respect to any existing Open Accounts subject to the Ignite Launch Schedule or both, by giving Agent 90 days prior written notice; provided, however, that Agent may terminate this Agreement within 90 days of receiving such notice from Ignite Payments by giving Ignite Payments written notice of termination within such 90 day period.

D.      Ignite Payments may, in its sole discretion, credit Agent for Referral Open Accounts. To "**credit Agent**" means that Ignite Payments will pay Agent Residuals for such Merchant, provided, however, that Agent's Residuals for such Merchant will be reduced by 100% of any recurring referral fee paid by Ignite Payments to the third party referral source during each month preceding payment of Agent's Residuals for the referral. The adjustments to Agent's Residuals referenced above will apply to all recurring referral fees paid by Ignite Payments after the execution of this Agreement including referral fees paid with respect to Merchants referred by third parties prior to the execution of this Agreement. Agent's Residuals will also be reduced by 100% of any non-recurring referral fees such as one-time commissions paid by Ignite Payments to any third party referral source.

**EXHIBIT A**



## Certificate of Completion

| | | |
|---|---|---|
| Envelope Number: D088B3BFA05F4CB9AC25A5EB5CB7CFE2 | | Status: Sent |
| Subject: Please DocuSign this document: Ignite Launch Agent Agreement - Existing Agents.pdf | | |
| Agent NO: | | |
| Source Envelope: | | |
| Document Pages: 22 | Signatures: 2 | Envelope Originator: |
| Certificate Pages: 5 | Initials: 1 | Ignite Payments |
| AutoNav: Enabled | | 5565 Glenridge Dr |
| EnvelopeId Stamping: Enabled | | Atlanta, WA  30342-1335 |
| | | agent.administration@firstdata.com |
| | | IP Address: 204.194.143.30 |

## Record Tracking

| | | |
|---|---|---|
| Status: Original | Holder: Ignite Payments | Location: DocuSign |
|     5/18/2015 4:56:11 PM ET |     agent.administration@firstdata.com | |

| Signer Events | Signature | Timestamp |
|---|---|---|
| KENT FLANNERY | | Sent: 5/18/2015 4:56:13 PM ET |
| KENT@IGNITEPAYMENTS-MPLS.COM | | Viewed: 5/18/2015 5:01:05 PM ET |
| Security Level: Email, Account Authentication (None) | | |
| Electronic Record and Signature Disclosure:<br>   Accepted: 5/18/2015 5:01:05 PM ET<br>   ID: 77125f75-4cb5-4132-98c5-3485181ae147 | | |
| | | |
| Ignite Payments | | |
| agent.administration@firstdata.com | | |
| Security Level: Email, Account Authentication (None) | | |
| Electronic Record and Signature Disclosure:<br>   Not Offered<br>   ID: | | |
| | | |
| Brian Goudie | | |
| Brian.Goudie@firstdata.com | | |
| Security Level: Email, Account Authentication (None) | | |
| Electronic Record and Signature Disclosure:<br>   Not Offered<br>   ID: | | |

| In Person Signer Events | Signature | Timestamp |
|---|---|---|

| Editor Delivery Events | Status | Timestamp |
|---|---|---|

| Agent Delivery Events | Status | Timestamp |
|---|---|---|

| Intermediary Delivery Events | Status | Timestamp |
|---|---|---|

| Certified Delivery Events | Status | Timestamp |
|---|---|---|

| Carbon Copy Events | Status | Timestamp |
|---|---|---|

| Notary Events | | Timestamp |
|---|---|---|

| Envelope Summary Events | Status | Timestamps |
|---|---|---|
| Envelope Sent | Hashed/Encrypted | 5/18/2015 4:56:13 PM ET |

EXHIBIT A

**Electronic Record and Signature Disclosure**

Electronic Record and Signature Disclosure created on: 5/11/2015 5:58:55 PM
Parties agreed to: KENT FLANNERY

EXHIBIT A

## ELECTRONIC RECORD AND SIGNATURE DISCLOSURE

From time to time, Ignite (we, us or Company) may be required by law to provide to you certain written notices or disclosures. Described below are the terms and conditions for providing to you such notices and disclosures electronically through your DocuSign, Inc. (DocuSign) Express user account. Please read the information below carefully and thoroughly, and if you can access this information electronically to your satisfaction and agree to these terms and conditions, please confirm your agreement by clicking the 'I agree' button at the bottom of this document.

### Getting paper copies

At any time, you may request from us a paper copy of any record provided or made available electronically to you by us. For such copies, as long as you are an authorized user of the DocuSign system you will have the ability to download and print any documents we send to you through your DocuSign user account for a limited period of time (usually 30 days) after such documents are first sent to you. After such time, if you wish for us to send you paper copies of any such documents from our office to you, you will be charged a $0.00 per-page fee. You may request delivery of such paper copies from us by following the procedure described below.

### Withdrawing your consent

If you decide to receive notices and disclosures from us electronically, you may at any time change your mind and tell us that thereafter you want to receive required notices and disclosures only in paper format. How you must inform us of your decision to receive future notices and disclosure in paper format and withdraw your consent to receive notices and disclosures electronically is described below.

### Consequences of changing your mind

If you elect to receive required notices and disclosures only in paper format, it will slow the speed at which we can complete certain steps in transactions with you and delivering services to you because we will need first to send the required notices or disclosures to you in paper format, and then wait until we receive back from you your acknowledgment of your receipt of such paper notices or disclosures. To indicate to us that you are changing your mind, you must withdraw your consent using the DocuSign 'Withdraw Consent' form on the signing page of your DocuSign account. This will indicate to us that you have withdrawn your consent to receive required notices and disclosures electronically from us and you will no longer be able to use your DocuSign Express user account to receive required notices and consents electronically from us or to sign electronically documents from us.

### All notices and disclosures will be sent to you electronically

Unless you tell us otherwise in accordance with the procedures described herein, we will provide electronically to you through your DocuSign user account all required notices, disclosures, authorizations, acknowledgements, and other documents that are required to be provided or made available to you during the course of our relationship with you. To reduce the chance of you inadvertently not receiving any notice or disclosure, we prefer to provide all of the required notices and disclosures to you by the same method and to the same address that you have given us. Thus, you can receive all the disclosures and notices electronically or in paper format through the paper mail delivery system. If you do not agree with this process, please let us know as described below. Please also see the paragraph immediately above that describes the consequences of your electing not to receive delivery of the notices and disclosures electronically from us.

### How to contact Ignite:

You may contact us to let us know of your changes as to how we may contact you electronically, to request paper copies of certain information from us, and to withdraw your prior consent to receive notices and disclosures electronically as follows:
 To contact us by email send messages to: chris.jones@firstdata.com

**To advise Ignite of your new e-mail address**

To let us know of a change in your e-mail address where we should send notices and disclosures electronically to you, you must send an email message to us at chris.jones@firstdata.com and in the body of such request you must state: your previous e-mail address, your new e-mail address. We do not require any other information from you to change your email address..

In addition, you must notify DocuSign, Inc to arrange for your new email address to be reflected in your DocuSign account by following the process for changing e-mail in DocuSign.

**To request paper copies from Ignite**

To request delivery from us of paper copies of the notices and disclosures previously provided by us to you electronically, you must send us an e-mail to chris.jones@firstdata.com and in the body of such request you must state your e-mail address, full name, US Postal address, and telephone number. We will bill you for any fees at that time, if any.

**To withdraw your consent with Ignite**

To inform us that you no longer want to receive future notices and disclosures in electronic format you may:

    i. decline to sign a document from within your DocuSign account, and on the subsequent page, select the check-box indicating you wish to withdraw your consent, or you may;
    ii. send us an e-mail to chris.jones@firstdata.com and in the body of such request you must state your e-mail, full name, IS Postal Address, telephone number, and account number. We do not need any other information from you to withdraw consent..  The consequences of your withdrawing consent for online documents will be that transactions may take a longer time to process..

**Required hardware and software**

| Operating Systems: | Windows2000? or WindowsXP? |
|---|---|
| Browsers (for SENDERS): | Internet Explorer 6.0? or above |
| Browsers (for SIGNERS): | Internet Explorer 6.0?, Mozilla FireFox 1.0, NetScape 7.2 (or above) |
| Email: | Access to a valid email account |
| Screen Resolution: | 800 x 600 minimum |
| Enabled Security Settings: | •Allow per session cookies<br><br>•Users accessing the internet behind a Proxy Server must enable HTTP 1.1 settings via proxy connection |

** These minimum requirements are subject to change. If these requirements change, we will provide you with an email message at the email address we have on file for you at that time providing you with the revised hardware and software requirements, at which time you will have the right to withdraw your consent.

**Acknowledging your access and consent to receive materials electronically**

To confirm to us that you can access this information electronically, which will be similar to other electronic notices and disclosures that we will provide to you, please verify that you were able to read this electronic disclosure and that you also were able to print on paper or electronically save this page for your future reference and access or that you were able to e-mail this disclosure and consent to an address where you will be able to print on paper or save it for your future reference and access. Further, if you consent to receiving notices and disclosures exclusively in electronic format on the terms and conditions described above, please let us know by clicking the 'I agree' button below.

By checking the 'I Agree' box, I confirm that:

- I can access and read this Electronic CONSENT TO ELECTRONIC RECEIPT OF ELECTRONIC RECORD AND SIGNATURE DISCLOSURES document; and

- I can print on paper the disclosure or save or send the disclosure to a place where I can print it, for future reference and access; and

- Until or unless I notify Ignite as described above, I consent to receive from exclusively through electronic means all notices, disclosures, authorizations, acknowledgements, and other documents that are required to be provided or made available to me by Ignite during the course of my relationship with you.

**PREMIER AGENT AGREEMENT**

<div align="right">

**INTERNAL USE ONLY:**

**AGENT NO.: 33670**

**DBA NAME: FDIS MINNEAPOLIS**

</div>

This Premier Agent Agreement (this "**Agreement**") is between Cardservice International, LLC, a California limited liability company, doing business as First Data Independent Sales ("**FDIS**") and Hunter Grace, LLC, a[n] _____ (State) [corporation/partnership/sole proprietorship/limited liability company] ("**Agent**").

FDIS is an Independent Sales Organization and Member Service Provider as defined under Card Organization Rules. FDIS is in the business of providing Services. Agent is a person or entity in the business of soliciting purchasers of Services. FDIS and Agent wish to enter into a relationship in which Agent will represent FDIS with respect to soliciting purchasers of FDIS Services on the terms and conditions contained in this Agreement.

<div align="center">

**Agreement**

</div>

In consideration of the foregoing and the covenants and conditions in this Agreement, Agent and FDIS agree as follows:

<div align="center">

**1. Agent Obligations**

</div>

**1.1.    General Obligations**.

      a. Professional and Compliant Business Practices. Agent will operate its business, including maintaining the security of related business, Prospective Merchant, Merchant and cardholder records, in a professional manner in compliance with this Agreement and all applicable laws (including Privacy Laws and USPS Move Update Requirements), regulations, court orders, Card Organization Rules and Agent Business Conduct Standards, which are incorporated into this Agreement as they may now exist or be enacted, adopted, issued or promulgated.

      b. Promotional Information; Use of Trade names and Trademarks. Marketing materials, including business cards and stationary, and Web sites created by Agent (other than those FDIS materials printed from the FDIS Brand Center at fdisbrandcenter.com) that contain trade names, trademarks, service marks or logos of, or that reference the services provided by, FDIS, FDIS' sponsor bank, FDC or any Card Organization must be submitted to agent.compliance@firstdata.com for review. Agent agrees to not disseminate or publish any such materials or Web sites until Agent has received written approval from agent.compliance@firstdata.com. In compliance with the law, Agent may not send unsolicited fax advertisements that promote FDIS Services to Merchants or Prospective Merchants. Because Agent is not a registered ISO, Card Organization Rules require that Agent's business telephone be listed and answered by reference to the registered ISO (i.e. "First Data Independent Sales" or "FDIS") and permit Agent to also reference its approved fictitious business name.

**1.2.    Agent Representations**. To comply with legal requirements, Agent represents, warrants and covenants that:

    i.    Agent shall present, and shall cause its Representatives to present, to each person who executes a Merchant Agreement a copy of such Merchant Agreement at or before the time the person executes the Merchant Agreement.

    ii.    Agent shall use, and shall cause its Representatives to use, only the Merchant Agreement that is designated by FDIS. Agent shall use, and shall cause its Representatives to use, the most current version of such Merchant Agreement.

iii. In Face-to-Face Transactions ("**Face-to-Face Agent Transactions**" means those transactions in which Agent meets in person with a merchant, which does not include transactions conducted over the telephone, by facsimile, or over the Internet) where a person executes a paper, rather than an electronic, version of the Merchant Agreement, Agent shall leave, and shall cause his or her Representatives to leave, with each such person a copy of the executed Merchant Agreement.

iv. In Face-to-Face Agent Transactions where a person executes an electronic, rather than a paper, version of the Merchant Agreement, Agent shall, and shall cause its Representatives to, either (1) advise each such person that a sample copy of the then-current version of the standard Merchant Agreement is available on the FDIS Web site, or (2) leave with each such person a hardcopy or electronic copy of the executed Merchant Agreement.

v. Agent shall not misrepresent, and shall prohibit its Representatives from misrepresenting, any term of the Merchant Agreement.

vi. Agent shall provide, and shall cause its Representatives to provide, full and fair disclosure of the Merchant Agreement to Prospective Merchants and Merchants, including disclosures related to all charges, minimum fees, limitations, initial and renewal terms of agreements and warranty services.

vii. Agent shall not misrepresent, and shall prohibit its Representatives from misrepresenting, the manner in which FDIS provides its services or the procedures FDIS follows, including services and procedures related to chargebacks, loss prevention, ATM/Debit and equipment leasing.

viii. Agent and Agent Personnel will not make, or offer to make, any payments to, or confer, or offer to confer, any benefit upon any employee, agent or fiduciary of any third party (including any government, or agency or instrumentality thereof) with the intent to influence the conduct of such employee, agent or fiduciary in relation to the business or affairs of such third party.

ix. If Agent becomes aware of any actual or alleged fraudulent activities or misrepresentations by it or its Representatives, whether or not related to the FDIS Services, Agent will promptly advise FDIS and take all necessary corrective action the Agent determines in its discretion, to be necessary or appropriate.

Agent's failure to satisfy any of the above legal requirements will constitute a breach of this Agreement and be subject to remedial and other action as provided under this Agreement.

Additionally, as Agent is engaged in a separate business, Agent represents, warrants and covenants will use its full legal name (not Agent's DBA name) (1) for Agent's bank accounts, recruiting and similar materials relating to operation of Agent's business, (2) when signing any agreements with merchants for any services offered by Agent that are not described in and billed under the Merchant Agreement including sale, lease and/or rental of point-of-sale terminals and other ancillary products or services, and (3) for any agreements that are between Agent and a third party (including any merchant, lease company, bank, Yellow Page company or other vendor) for any purchase, sale or services (including leases, rental agreements, agreements for web design services, advertising services).

Agent also represents, warrants and covenants that execution and delivery of this Agreement by Agent and the consummation of the transaction herein contemplated does not conflict in any material respect with or constitute a material breach or material default under the terms and conditions of any documents, agreements or other writings to which it is a party, including any covenant not to compete or confidentiality agreement with any third party.

**1.3.    Assessments**. Subject to Agent's challenge rights as noted below, the parties agree that Agent shall pay to FDIS immediately upon written demand to Agent from agent.compliance@firstdata.com: (i) the amount of any fine, assessment or other amount charged to FDIS by any third party relating to

Agent's violation of any law, regulation, court order or Card Organization Rule; or (ii) fines to Agent by FDIS for Agent's breach of a material term of this Agreement (including **Section 1.2**) or repeated breach of any term of this Agreement, which fines shall be an amount equal to the greater of $250.00 or: (1) for the first fine, an amount equal to the product of (A) 10% multiplied by (B) an amount equal to the average of Agent's monthly Residuals for the 3 calendar months preceding the date on which the fine is assessed ("**Three Month Average Residuals**"), or (2) for each fine thereafter, an amount equal to the product of (A) 20% multiplied by (B) Three Month Average Residuals. The parties agree that if Agent disputes any demand made to Agent by FDIS pursuant to this **Section 1.3**, Agent may challenge such demand by delivering a written notice ("**Challenge Notice**") to FDIS at agent.compliance@firstdata.com within 10 Business Days after Agent's receipt of FDIS' written demand. The Challenge Notice must state all reasons why such demand should not have been made. If FDIS fails to act on the Challenge Notice within 20 Business Days after its receipt of such, then Agent shall not be obligated to pay to FDIS the amount demanded. The imposition by FDIS or a third party of any assessment, fine or charge against Agent does not constitute a waiver of any legal rights or remedies FDIS may have against Agent. FDIS reserves the right to pursue any and all legal rights and remedies against Agent under this Agreement or applicable law.

**1.4.     Prospective Merchants; Merchants; Merchant Agreements**.

a.      FDIS will not accept Prospective Merchant types that are identified as "Unqualified/Unacceptable" in the FDIS Credit Policy posted under Resources/Policies on MyagentOffice.com, as it may be modified from time to time by FDIS in its sole discretion (the "**Unacceptable List**"). Agent agrees to use best efforts to verify that each Prospective Merchant conducts or intends to conduct a bona fide, lawful business operation (e.g., by inspecting a Prospective Merchant's premises to determine if it has the proper facilities, equipment, inventory and license to conduct its business or reviewing its Internet site). Agent also agrees to use its best efforts to inform FDIS of any information that could reasonably be considered relevant to a determination of any Prospective Merchant or Merchant's creditworthiness.

b.      All Merchant Agreements are subject to review and rejection or approval by FDIS in its sole discretion. FDIS will not approve Merchant Agreements that are not fully completed and executed by the Prospective Merchant. FDIS may terminate any Merchant Agreement at any time in accordance with its terms.

c.      Agent may recommend to FDIS and/or its sponsor bank the discount rate and fees charged to a Prospective Merchant or Merchant pursuant to the Merchant Agreement, but FDIS and/or its sponsor bank in its final and sole discretion may accept or reject such recommendation. FDIS or its sponsor bank in its sole discretion may change any fees charged to a Merchant under a Merchant Agreement from time to time without prior notice to Agent.

d.      All Merchant Agreements (whether partially or fully completed), Merchant Accounts and Merchant or Prospective Merchant accounts, records and related information are owned by FDIS, its sponsor bank or the applicable acquirer and may not be transferred, assigned, sold or exchanged, in whole or in part, by Agent. Accordingly, at FDIS' request, Agent agrees to provide FDIS with all information, files and materials related to Prospective Merchants and Merchants solicited or signed by Agent under this Agreement. If this Agreement terminates or Agent abandons a Prospective Merchant, FDIS may complete the processing of such Prospective Merchant's submitted application and assist such merchant with the installation of any equipment. If this Agreement terminates, FDIS shall not be required to terminate any Merchant Agreement with any Merchant.

**1.5.     Exclusivity for Sale of Services**. Agent, any former or current owner of a controlling interest in Agent, or any former or current partner, member, officer or director of Agent: (i) will not engage in any

act that would injure FDIS' relationship with its employees, agents, Prospective Merchants or Merchants; (ii) will not directly or indirectly induce or influence any merchant to cancel or terminate any existing Merchant Account or Merchant Agreement; and, (iii) except with respect to any Prospective Merchant for which FDIS cannot provide the Services such Prospective Merchant requires or that FDIS rejects or is on the Unacceptable List, (1) shall represent only FDIS with respect to soliciting Prospective Merchants for the purchase of Services within the Territory, and (2) may not engage in any other Competing Activity. Nothing in this Agreement restricts or prohibits Agent from soliciting merchants, Prospective Merchants or Merchants for the purchase any product or service that is not competitive to the FDIS Services.

## 2. **Agent Personnel**

**2.1.** **Agent Personnel**. Subject to **Section 2.2**, Agent shall have the right to designate suitable and desirable Agent Personnel, including Representatives. Agent shall be solely responsible for Agent Personnel and their acts, including any failure to comply with the terms of this Agreement that are applicable to Agent or failure to comply with Card Organization Rules and applicable law, regulations and court orders. Agent Personnel shall be hired at Agent's own risk, expense and supervision, and Agent Personnel shall not have any claim against FDIS for salaries, residuals, benefits, commissions, items of cost, or any other form of compensation or reimbursement. Agent acknowledges and agrees that no Agent Personnel are employees of FDIS, and Agent is solely responsible for any taxes, payroll reporting, workers' or unemployment compensation insurance, compensation, benefits or any other obligations or liabilities that may arise (including verification of work eligibility in U.S.) due to Agent's hiring, retention or termination of or relationship with any Agent Personnel.

**2.2.** **Representative Registration**. Prior to a Representative being permitted to solicit or submit any Merchant Applications, Agent must receive written confirmation from agent.compliance@firstdata.com that FDIS has registered such Representative. Agent must provide FDIS with a completed FDIS Sales Representative Registration Form (located under Resources/Forms at MyagentOffice.com) for such Representative and any other documentation or information concerning the Representative requested by FDIS from time to time. FDIS reserves the right to refuse to register or revoke the registration of any proposed or approved Representative that FDIS, in its sole discretion, determines is a detriment to the business of FDIS. Agent must notify FDIS in writing of the termination of any Representative within three Business Days of such termination.

## 3. **FDIS' Obligations**

**3.1.** **Grant of Authority**. FDIS hereby grants to Agent the right, on a non-exclusive basis, to solicit Prospective Merchants for the purchase of the Services from FDIS within the Territory as long as the merchant does not already have, and has not had in the previous 90 days, an open Merchant Account.

**3.2.** **FDIS Services**. FDIS shall be responsible for all processing and accounting functions relating to the clearing and settlement of Card transactions, including: (i) Merchant processing and settlement; (ii) Merchant credit research; (iii) Merchant activation and approval; (iv) Merchant security and recovery; (v) Merchant customer services; (vi) Merchant chargeback and retrieval services; and (vii) all other back office services, including collecting amounts due from Merchants to FDIS. FDIS may contract with other persons to perform these functions on behalf of FDIS but FDIS remains primarily responsible for the functions. Subject to **Section 5.2**, FDIS will make available to Agent training on the FDIS Services.

## 4. **Licensing**

**4.1.** **License**. Subject to **Section 1.1(b)** and this **Section 4**, FDIS grants to the Agent during the Term, the limited, non-exclusive, non-assignable, revocable right to use the Trademarks displayed on **Exhibit B** (as it may be modified from time to time by FDIS in its sole discretion and provided to Agent via email or

on MyagentOffice.com) in the Territory in connection with Agent's marketing materials for the FDIS Services. Upon termination of this Agreement, (i) the limited rights granted to Agent to use the Trademarks under this **Section 4** shall immediately terminate; (ii) Agent shall immediately cease and desist from all use of the Trademarks and any trade name, trademark, service mark, or logotype associated with Cards ("**Marks**"), except to the extent such use may be authorized under a separate agreement; (iii) at FDIS' request, Agent will deliver to FDIS all material and papers upon which the Trademarks or Marks appear or to which the Trademarks or Marks relate, including correspondence and information on Prospective Merchants or Merchants solicited or procured while the Agent solicited on behalf of FDIS; and (iv) Agent will take all necessary actions to correct information that states or suggests that Agent is connected in any manner with FDIS or its Trademarks, including correction of telephone and other directories, telephone information providers, postal offices, electronic mail providers, letterhead, business cards, office signage, Web page(s) on the Internet, domain name registries (if applicable), any post domain URL path (if applicable) and other communication delivery services. Agent shall direct that all inquiries be forwarded to FDIS' Moorpark office or such other place designated by FDIS. If Agent fails to take any required action within 30 days of the termination of this Agreement, then Agent appoints, without power of revocation, FDIS as its attorney in fact to act in Agent's place and with Agent's authority to take such corrective actions with the same legal force and effect as if such acts were performed by Agent.

**4.2. Ownership of Trademarks**. Agent acknowledges that FDIS or FDC is the owner or licensee of the Trademarks, and Card Organizations are the owners of their respective Marks. Agent acknowledges that FDIS, FDC and the Card Organizations hold the exclusive right, title and interest in and to their respective marks. Agent will not at any time do or cause to be done any act or thing contesting or in any way impairing or tending to impair any part of such right, title and interest. In connection with the use of the Trademarks or Marks, Agent shall not in any manner represent that it has any ownership in the Trademarks, Marks or registrations thereof, and Agent acknowledges that use of the Trademarks or Marks do not create in the Agent's favor any right, title or interest in or to the Trademarks or Marks or the goodwill attached to an associated with the Trademarks or Marks. All uses of the Trademarks or Marks by the Agent shall inure to their respective owner. Agent will at no time during or after the Term register, adopt or use, any word or mark which is likely to be similar to or confusing with the Trademarks or Marks or any other marks owned or utilized by FDIS or FDC. Agent agrees to not, at any time, use any Mark on its own behalf or suggest, imply or in any manner create an impression that it is a member of MasterCard, VISA, American Express, Discover or any other Card Organization with respect to which merchants submit transactions for processing under a Merchant Agreement. Any Card Organization may at any time and without notice prohibit Agent from using its Marks for any reason. Agent must comply with additional terms governing Agent's use of Trademarks or Marks that may be posted on MyagentOffice.com from time to time.

## 5. Relationship of the Parties

**5.1. Independent Contractor**. Neither Agent nor any Agent Personnel is an employee of FDIS for any purpose whatsoever. Agent is an independent contractor and as such is not eligible for any compensation, benefits, insurance or other employment terms that are provided to employees of FDIS or any FDIS Affiliates. FDIS is interested only in the results obtained by Agent and FDIS has no right to control Agent or Agent Personnel, including no right to require Agent or Agent Personnel to: (i) devote a fixed or minimum number of hours to selling or any other effort, (ii) follow prescribed itineraries or instructions, (iii) bind FDIS, or (iv) do anything that would alter Agent's independent contractor status. At all times, Agent has the sole right and responsibility to supervise, direct, and control Agent's business operations and Agent Personnel, including Agent office account receivables and payables and other office administration functions.

EXHIBIT B

**5.2.    Expenses; Taxes**. Agent is solely responsible for all expenses and disbursements that may be incurred or due by Agent in connection with its performance of its obligations under this Agreement, including promotional materials, general selling, training, travel, entertainment, insurance, office equipment, maintenance, supplies, rental, lease, legal or accounting expenses; purchase or lease of office space; Agent Personnel salaries, benefits, taxes and other costs and expenses; and any federal, state or local tax or insurance obligations that may arise in connection with Agent's activities or due to receipt of payments by Agent under this Agreement.

**5.3.    Other**. Agent does not have the right or authority to and will not, and will not permit any Agent Personnel to, hold itself out as having any right, power or authority to create any contract or obligation, either express or implied, on behalf of, in the name of or binding upon FDIS, or to pledge FDIS' credit, or to extend credit in FDIS' name. Without the prior written consent of Agent, FDIS has no right or authority to, and will not, commit Agent in any matter or use Agent's name in any way not specifically authorized by this Agreement.

## 6. Term

**6.1.    Term**. Provided that both Agent and FDIS execute this Agreement, this Agreement is effective (the "**Effective Date**") on (i) if it is executed by Agent and provided to FDIS on or before the tenth day of a calendar month, the first day of such calendar month, or, (ii) if it is executed by Agent and provided to FDIS after the tenth day of a calendar month, the first day of the following calendar month. This Agreement shall remain in effect for a one year period that begins on the Effective Date (the "**Initial Term**") and automatically renew for successive terms of one year each (each a "**Renewal Term**" and together with the Initial Term, the "**Term**"), unless either party provides the other party with written notice at least 60 days before the end of the then-current term that it will terminate this Agreement at the end of the then-current term.

**6.2.    Termination by FDIS**.

a.    <u>With Cause without any Right to Cure</u>. In addition to any other rights and remedies that it may have and notwithstanding **Section 6.2.b.**, FDIS in its sole discretion may terminate this Agreement upon five calendar days prior written notice to Agent if any reasonable evidence is discovered indicating (i) Agent or any Agent Personnel have: (1) violated any confidentiality or intellectual property rights protected by this Agreement; (2) violated any applicable law, regulation, court order or Card Organization Rule; or (3) committed any act of misrepresentation, fraud, forgery, dishonesty or other willful or malicious act; or (ii) Agent has ceased its operation and activity as a sales agent for FDIS.

b.    <u>With Cause with a Right to Cure</u>. In addition to any other rights and remedies that it may have and notwithstanding **Section 6.2.a.**, FDIS may terminate this Agreement if Agent is in breach of any of the terms, conditions, representations, warranties or covenants of this Agreement or Agent Business Conduct Standards or for any violation of **Section 1.5**, but only upon giving Agent written notice of such breach and Agent's failure to cure such breach within 10 Business Days after receipt of such notice; provided, however, that if a cure cannot reasonably be accomplished within such 10-day period, FDIS, in its sole discretion, may toll the cure period so long as the Agent commences a cure within such 10-day period and thereafter diligently pursues such cure as promptly as practical, but in no event will a cure period exceed 90 calendar days.

c.    <u>Agent Insolvency</u>. If Agent makes any assignment of assets or business for the benefit of creditors, or if a trustee or receiver is appointed to administer or conduct its business or affairs, or if it is adjudged in any legal proceeding to be either a voluntary or involuntary bankruptcy, then the rights granted herein to Agent shall forthwith cease and terminate without prior notice or legal action by FDIS.

**6.3.** **Termination by Agent**. In addition to any other rights and remedies that it may have, Agent may terminate this Agreement if FDIS is in breach of its obligations under **Section 7**, but only upon giving FDIS written notice of such breach and FDIS' failure to cure such breach within 10 Business Days after receipt of such notice, unless a cure cannot reasonably be accomplished within such period. In that case, the cure period will be tolled so long as FDIS commences a cure within such 10-day period and thereafter diligently pursues such cure as promptly as practical, but in no event may a cure period exceed 90 calendar days.

**6.4.** **Termination by Mutual Agreement**. The parties may terminate this Agreement at any time in a writing signed by both parties.

## 7. Payments

**7.1.** **Right to Payment**.

a. FDIS shall pay Residuals and certain other amounts set forth in this **Section 7** to Agent during the Term and after termination of this Agreement subject to the terms of this Agreement, including this **Section 7** and **Section 8**.

b. FDIS in its sole discretion may immediately discontinue payment of any amounts due to Agent after termination of this Agreement if: (i) FDIS terminates this Agreement pursuant to **Section 6.2** above; (ii) Agent, any former or current owner of a controlling interest in Agent, or any former or current partner, member, officer or director of Agent: (1) engages in any act that would injure FDIS' relationship with its employees, agents, Prospective Merchants or Merchants; (2) directly or indirectly induces or influence any merchant to cancel or terminate any existing Merchant Account or Merchant Agreement; or, (3) engages in a Competing Activity; (iii) Agent fails to remain in compliance with all terms and conditions of this Agreement that survive termination of this Agreement; (iv) Agent fails to remain current on all obligations to FDIS and FDIS' sponsor bank(s); (v) FDIS is unable, after good faith efforts for a period of 90 days, to locate Agent and make payment of Residuals to Agent; or (vi) Agent's monthly Residual payment falls below $250.00.

**7.2.** **Payment for Services**. Subject to the terms of this Agreement,

a. On or about the 20th day of each calendar month FDIS shall pay to Agent a Residual equal to the sum of the following amounts:

i. Residuals for Merchant Accounts boarded by Agent prior to the Effective Date that are Open Accounts in accordance with the terms set forth in **Exhibit C**.

ii. Residuals for Merchant Accounts boarded by Agent on or after the Effective Date that are Open Accounts in accordance with the terms set forth in **Exhibit D**.

b. At least monthly FDIS shall pay to Agent payments for certain third party or other products and services subject to the terms set forth under Resources/Forms on MyagentOffice.com. FDIS may change the terms, including the amounts, of any such payments by providing Agent with at least 30 days prior written notice of such changes.

Agent must request an adjustment to any amounts paid to or by Agent pursuant to this **Section 7** within the 90 day period following the initial credit or debit or FDIS has no obligation to make such adjustment.

**7.3.** **Merchant Losses**. FDIS shall bear the risk for Merchant Losses (other than those caused by the gross negligence or willful misconduct of Agent or Agent Personnel) and shall not deduct such Merchant Losses from any amounts due to Agent under this Agreement.

**7.4.** **Right to Offset**. Agent hereby authorizes FDIS at any time and from time to time, without notice or demand to Agent or to any other person (any such notice and demand being hereby expressly waived), to set off, recoup and to appropriate and apply any and all funds of Agent held by FDIS, FDIS' Affiliates or FDIS' sponsor bank, against and on account of Agent's obligations to FDIS or any FDIS' Affiliates under this Agreement or any other agreement, including fees for equipment or the Services, whether such obligations are liquidated, unliquidated, fixed, contingent, matured or unmatured. Agent is prohibited from setting-off, offsetting or otherwise reducing or applying against any amounts due and owing to FDIS under this Agreement or otherwise, any amounts owed or alleged to be owed to Agent by FDIS under this Agreement or otherwise. FDIS may in its sole discretion exercise the rights described in this **Section 7.4** by direct debit to Agent's bank account. This offset right is in addition to all other rights and remedies available to FDIS.

**7.5.** **Right to Debit and Credit Agent's Bank Account**. All financial transactions between Agent and FDIS, including payment for equipment purchases, may be automatically debited and credited by FDIS, in its sole discretion, directly through Agent's bank account. Agent irrevocably consents to the debiting and crediting of its bank account(s) as provided herein. With respect to equipment transactions only, FDIS shall provide 10 days advance written notice to Agent prior to initiating a debit entry. In order to activate automatic debit and credit service, Agent shall provide FDIS with the required depository information and execute ACH Authorization Agreement Direct payments (Debits) Form and ACH Authorization Agreement Direct Payments (Credits) Form provided to Agent by FDIS or any other form that FDIS may request from time to time to accomplish the purposes set forth in this **Section 7.5**.

**7.6.** **Loan**. Once every 12 months during the Term, Agent is eligible to receive a loan from FDIS in an amount equal to the product of two multiplied by Three Month Average Residuals subject to the terms and conditions of a promissory note in the form provided by FDIS and executed by Agent if Agent: (i) is not in breach of its obligations under this Agreement; (ii) is current on all financial obligations to FDIS and FDIS Affiliates; and (iii) has not had a promissory note payable to FDIS outstanding at any time within the preceding 30 days. Notwithstanding the foregoing, FDIS is not obligated under this **Section 7.6** to loan agent an amount less than $5,000.00 or greater than $500,000.00 during any 12 month period; and FDIS may modify or discontinue the loan program described in this **Section 7.6** at any time without notice to Agent.

## 8. <u>Purchase and Sale of Agent Residual Rights</u>

**8.1.** **Continuing Offer to Purchase**. During the Term, FDIS hereby offers to purchase Agent's unencumbered right to receive future Residuals (excluding Residuals for Referral Open Accounts) subject to the terms and conditions regarding FDIS' online Residual rights buyout process found set forth under Resources/Forms on MyagentOffice.com, including the Acceptance of Cardservice International's Offer to Purchase Agent's Residual Rights form.

**8.2.** **Offer to Purchase Upon Retirement**. During the Term, FDIS hereby offers to purchase Agent's unencumbered rights to receive future Residuals if Agent ceases to conduct the business of soliciting merchants for the purchase of Services from FDIS and any and all competitors of FDIS ("**Retirement**") subject to the terms and conditions set forth under Resources/Forms on MyagentOffice.com, including the Acceptance of Cardservice International's Offer to Purchase Agent's Residual Rights (Retirement) form.

**8.3.    Right to Receive Future Residuals; Right of First Refusal**. Subject to **Section 9**, at any time during the Term, Agent may sell its right to receive future Residuals under this Agreement ("**Right to Receive Future Residuals**") to an Unrelated Third Party subject to the following terms and conditions:

(i)      The terms governing the rate at which Residuals are being paid to Agent as of the date of Agent's sale of Residuals pursuant to an Offer (as defined below) will be fixed and apply to the calculation of future Residuals subject to the Offer.

(ii)      Agent hereby grants to FDIS a right of first refusal to purchase Agent's Right to Receive Future Residuals. If Agent receives a bona fide offer from a willing and able Unrelated Third Party to purchase Agent's Right to Receive Future Residuals (an "**Offer**"), Agent shall notify FDIS of the amount and terms of such Offer. FDIS shall have the first right to purchase Agent's Right to Receive Future Residuals on terms equal to the Offer, and Agent shall not sell or in any way transfer Agent's Right to Receive Future Residuals without first presenting FDIS with the opportunity to match any Offer. FDIS shall have 15 days to notify Agent of its decision whether or not to exercise its right to purchase Agent's Right to Receive Future Residuals.

(iii)      If FDIS does not exercise its right of first refusal, provided that Agent and Unrelated Third Party buyer execute and provide to FDIS a residual re-direction letter in the form required by FDIS, Agent may sell its Right to Receive Future Residuals in accordance with the terms of this **Section 8.3** and the Offer.

(iv)      Nothing in this **Section 8.3** shall be construed or interpreted to impair any of FDIS' rights under this Agreement, including **Section 9**, or to allow Agent to sell any interest in a Merchant, Merchant Agreement or Merchant Account, except for the sale of Agent's Right to Receive Future Residuals as set forth in this **Section 8.3**.

(v)      "**Unrelated Third Party**" means any person who is not and is not a relative of, Agent, any former or current owner of a controlling interest in Agent, or any former or current partner, member, officer or director of Agent or any entity in which Agent, any former or current owner of a controlling interest in Agent, or any former or current partner, member, officer or director of Agent has ownership interest or employment relationship.

## 9. Confidentiality

**9.1.    Restrictions on Use or Disclosure of Confidential Information**. Each of FDIS and Agent agree that, without the written consent of the other, it will not divulge or disclose to third parties, directly or indirectly, any Confidential Information or use such Confidential Information except to the extent required in its business relationship with the other party or to carry out its obligations under this Agreement. For the avoidance of doubt, Agent shall keep the terms, conditions and existence of this Agreement strictly confidential, and under no circumstance may Agent distribute this Agreement or any other FDIS Confidential Information for any purpose, including with respect to Agent's rights under **Section 8.3**, without FDIS' prior written consent. No party will obtain any proprietary rights to any Confidential Information of the other party. Each party shall retain Confidential Information in its possession and control and shall protect the secrecy of such Confidential Information using the degree of care it uses to protect the secrecy of its own Confidential Information, but in no event less than a commercially reasonable degree of care.

**9.2.    Exceptions**. Notwithstanding the foregoing: FDIS shall not be prohibited from disclosing Confidential Information to the extent that it is related to Merchant Agreements, Merchant Accounts and Merchant or Prospective Merchant accounts, records and related information and other information relating to FDIS business or FDIS Services, but excluding any other information regarding the business of

ISO, to the extent that such disclosure by FDIS is for a bona fide business purpose; and, Agent's Confidential Information may be made available by or on behalf of FDIS at FDIS or FDIS sponsor bank's direction to any Card Organization or to any other supervisory or regulatory authority to which FDIS may be subject, upon their written request.

## 10. Indemnity and Limitation of Liability

**10.1.    Indemnification**. Agent shall indemnify, defend and hold harmless FDIS and its officers, directors, shareholders, employees, agents and representatives against any and all Damages incurred directly or indirectly by FDIS, whether or not litigation is commenced, incurred by or asserted against FDIS, arising from or related to: (i) any debts incurred by Agent or Agent Personnel, including debts incurred with telephone, utility, and express mail companies; (ii) any claim of any officer, director, shareholder of the Agent or any Agent Personnel made against FDIS for any compensation, benefit or other payment to such person; (iii) any activity or representation by Agent or any Agent Personnel in marketing, advertising, promoting or otherwise engaging in any activity arising from or related to this Agreement; (iv) any claim arising from the unauthorized use of the Trademarks or other FDIS or Card Organization intellectual property; (v) any actions concerning alleged Agent or Representative improprieties in the solicitation, sale or leasing of the FDIS Services or equipment; (vi) any breach of any term or condition of this Agreement, any Card Organization Rules, law, regulation or court order or Business Conduct Standards; or (vii) any representation, warranty or covenant of Agent made in or in connection with this Agreement being false or misleading. As stated in elsewhere in this Agreement, Agent is acting hereunder as an independent contractor and neither Agent nor any Agent Personnel shall be considered to be an employee of FDIS or its Affiliates or FDIS' sponsor bank (collectively "FDIS" for purposes of this **Section 10.1**).  Notwithstanding anything to the contrary in **Section 10.4**, if (a) Agent or any Agent Personnel assert that Agent or any Agent Personnel is an employee of FDIS; or (b) a federal, state or local governmental agency or court asserts or determines Agent or any Agent Personnel are employees of FDIS, then Agent shall indemnify, defend and hold harmless FDIS, its Affiliates, and their respective officers, directors and employees from any and all Damages and exemplary, punitive or special damages associated with such claim and/or determination whether or not litigation is commenced, incurred by or asserted against FDIS.

**10.2.    Statute of Limitations**. Notwithstanding the fact that the statute of limitations for bringing a legal action on a written contract, or other limitation period that could apply based upon the type of action or act, omission or violation being alleged, may be shorter or longer, the parties agree that any action, legal or equitable, based on, related to or arising out of the subject matter of this Agreement, and whether based on contract, tort, strict liability or some other legal or equitable theory of recovery, must be commenced by a party within one year after the earlier of (i) the date on which such party knew or should have known of the first alleged act, omission or violation, or (ii) with respect to obligations that do not survive termination of this Agreement, the date of termination of this Agreement.

**10.3.    Limitation of Liability**. Notwithstanding anything contained in this Agreement or otherwise, FDIS' cumulative liability to Agent and anyone claiming by through or under Agent, for all Damages arising out of or related to this Agreement, and regardless of the form of action or legal theory shall not exceed, in the aggregate, the lesser of aggregate Residuals paid to agent in the twelve months preceding the act giving rise to the claim or $500,000.00. Agent understands the limitation on damages to be a reasonable allocation of risk and expressly consents to such risk allocation.

**10.4.    Exclusion of Damages**. Except as set forth in this Agreement, in no event shall either party, its parents, Affiliates or any of its or their directors, officers, employees, agents or sub-contractors be liable under any theory of tort, contract, strict liability or other legal or equitable theory for lost profits, exemplary, punitive, special, incidental, indirect or consequential damages, each of which is hereby

excluded by agreement of the parties regardless of whether such damages were foreseeable or whether either party or any entity has been advised of the possibility of such damages.

## 11. <u>General Provisions</u>

**11.1.    Definitions; Word Usage**.  Capitalized terms have the meanings set forth in **Exhibit A**. Unless the context clearly requires otherwise, (i) the plural and singular numbers shall each be deemed to include the other; (ii) "**shall**," "**will**," or "**agrees**" are mandatory, and "**may**" is permissive; (iii) "**or**" is not exclusive; and (iv) "**includes**" and "**including**" are not limiting.

**11.2.    Effect of Headings**. Subject headings of sections and subsections of this Agreement are included for convenience only and shall not affect the construction or interpretation of any of its provisions.

**11.3.    Entire Agreement**. This Agreement, including the exhibits hereto, constitutes the sole and exclusive terms and conditions and agreement between the parties relating to the subject matter hereof, and supersedes all prior or contemporaneous discussions, writings, negotiations, understandings and agreements with respect thereto, between the parties and their respective assignors, predecessors, predecessors–in-interest, owners or previous owners ("**Superseded Agreements**"), which are hereby terminated and of no further force or effect.  For the avoidance of doubt, the Superseded Agreements do not include any promissory notes, guarantees or security agreements executed prior to the Effective Date.

**11.4.    Waiver or Modification Ineffective Unless in Writing**. Except as set forth in this Agreement, no amendment of any provision of this Agreement will be valid unless the same will be in writing and signed by each of the parties. No waiver by any party of any provision of this Agreement or any default, misrepresentation, or breach of warranty or covenant hereunder, whether intentional or not, will be valid unless the same will be in writing and signed by the party making such waiver nor will such waiver be deemed to extend to any prior or subsequent waiver, default, misrepresentation, or breach of warranty or covenant hereunder or affect in any way any rights arising by virtue of any prior or subsequent  waiver, default, misrepresentation, or breach of warranty or covenant except pursuant to its express terms.

**11.5.    Assignment**. The rights and obligations of Agent under this Agreement are personal. Except as otherwise expressly provided in this Agreement, Agent shall not assign, subcontract, license, franchise, or in any manner attempt to transfer or extend to any third party this Agreement or any right or obligation of Agent under this Agreement, by operation of law or otherwise, without the prior written consent of FDIS, which may be granted or withheld at the sole discretion of FDIS.  For purposes of this Agreement, any transfer of ownership or voting control of Agent shall be considered an assignment or transfer hereof. This Agreement shall be binding upon and inure to the benefit of the parties hereto and their permitted successors and assigns.

**11.6.    Written Notice**. Unless otherwise specified in this Agreement, all notices and other communications required or permitted under this Agreement shall be in writing and shall be deemed delivered and effective when given by personal delivery, telefax (confirmed by a mailed copy) or first-class mail, postage prepaid, addressed as follows: (i) if to Agent, to the address set forth below Agent's signature line in this Agreement; and (ii) if to FDIS to 5898 Condor Drive, Suite 220, Moorpark, CA 93021, Attention: Senior Vice President (Facsimile: 402.916.6610); with a copy to First Data Corporation, 6200 South Quebec Street, Suite 260A, Greenwood Village, Colorado 80111, Attention: Legal Department (Facsimile: 303.967.5216). A party may change its address or addresses set forth above by giving the other party notice of the change in accordance with the provisions of this **Section 11.6**. In addition, Agent and FDIS each may update its address through MyagentOffice.com, and FDIS may change the location of any documents, information or forms referenced in this Agreement and located on MyagentOffice.com or fdisbrandcenter.com on notice to Agent via email or MyagentOffice.com.

**11.7.** **Cooperation**. FDIS and Agent will each timely furnish to the other any and all information and materials that the other may, from time to time, reasonably request in connection with all matters contemplated by this Agreement. Each party also shall take the action as the other may, from time to time, reasonably request in order that the purposes of this Agreement will be fully accomplished and that all matters contemplated hereby will comply with all applicable laws, regulations, court orders and Rules.

**11.8.** **Severability**. The invalidity of any paragraph or subparagraph hereof shall not affect the validity of any other paragraph or subparagraph hereof.

**11.9.** **Governing Law and Waiver**. This Agreement shall be governed by the laws of the State of New York. Agent waives personal service of process and consents that service of process upon it may be made by certified or registered mail, return receipt requested, at the address provided below the signature line of this Agreement.

**11.10.** **Survival of Terms**. The parties agree that those provisions of this Agreement that logically should survive its termination in order to accomplish the fundamental purposes of it will do so, including **Sections 1.1.a**, **1.2(v)**, **(vii)** and **(ix)**, **1.3.**, **1.4.b – d**, **1.5**, **2.1**, **4**, **5**, **7.1 – 7.5**, **9**, **10**, **11**.

**11.11.** **Third Party Beneficiaries**. This Agreement is made for the benefit of FDIS, Agent and their respective successors and assigns. In addition, FDIS' sponsor bank is a third party beneficiary of this Agreement and may enforce and this Agreement against Agent. No other person or entity has or acquires any rights by virtue of this Agreement.

**11.12.** **Authority**. The person executing this document on behalf of Agent warrants that they have the full right, capacity and authority to cause such party to enter into this Agreement and that such party has all necessary authority to perform this Agreement.

**11.13.** **No Presumption Against Drafter**. FDIS and Agent have jointly participated in the negotiation of the terms of this Agreement. This Agreement shall be construed as if drafted jointly by FDIS and Agent, and no presumptions arise favoring any party by virtue of the authorship of any provision of this Agreement.

In consideration of the foregoing, the parties hereby execute this Agreement.

**Agent:**                                         **Cardservice International, LLC,**
                                                   **a California limited liability company**

**Signature:** _____   **By:** _____

**Printed Name:** _____   **Name:** _____

**Title:** _____   **Title:** _____

**Date:** _____   **Date:** _____

**Address:** _____

_____

EXHIBIT B

**Exhibit A**
**Definitions**

**Affiliate** means any entity that directly or indirectly controls, is controlled by or is under common control with a party.

**Agent Business Conduct Standards** means the business conduct standards that may be established or modified by FDIS from time to time and posted under Policies on MyagentOffice.com.

**Agent Personnel** means Representatives and any other personnel or contractors of Agent.

**Business Day** means any calendar day other than Saturdays, Sundays, or California or federal holidays.

**Buy Rates** means the amounts set forth under Resources/Forms on MyagentOffice.com.

**Card** means a credit, debit or other card issued by a member of a Card Organization, including MasterCard, Visa and Discover, and bearing its respective trade name, Mark, or trade symbol, which is of the type accepted for processing under the Merchant Agreement.

**Card Organization** means an entity formed to govern the proper administration and promotion of credit, debit and other cards, including MasterCard, Visa, American Express, Discover and any other entity whose cards may be accepted by merchants for payment for goods or services under the Merchant Agreement.

**Card Organization Rules** means the rules and regulations now existing, as they may be modified in the future, and any rules and regulations hereafter promulgated by any Card Organization, including the rules and regulations contained in: (i) the Visa U.S.A. Inc. ("**Visa**") Operating Regulations, (ii) MasterCard International Incorporated ("**MasterCard**") Operations Manual, (iii) Discover Financial Services, LLC ("**Discover**") operating regulations, (iv) American Express Travel Related Services Company, Inc. ("**American Express**") operating regulations, as applicable.

**Competing Activity** means, whether directly or indirectly, the ownership, management, operation, control, participation in, performance of services for, the solicitation of merchants for, or otherwise carrying on, a business similar to or competitive with the electronic transaction processing business of FDIS, including the Services (whether as a principal, agent, independent contractor, partner, employer, proprietor, stockholder, director or otherwise), anywhere in the Territory.

**Confidential Information** means all proprietary, secret or confidential information or data relating to a party and its Affiliates, operations, employees, products or services, clients, customers, potential customers and FDIS' Services. Confidential Information shall include proprietary information of Card Organizations, pricing information, Merchant Agreements (whether partially or fully completed), Merchant Accounts and Merchant or Prospective Merchant accounts, records and related information, customer lists, cardholder account numbers, Personal Data, computer access codes, instruction and/or procedural manuals and this Agreement and the terms and conditions of this Agreement.  Information shall not be considered Confidential Information to the extent, but only to the extent, that such information: (i) is already known to the receiving party free of any restriction at the time it is obtained; (ii) is subsequently learned from an independent third party free of any restriction and without breach of this Agreement; (iii) becomes publicly available through no wrongful act of the receiving party; (iv) is independently developed by the receiving party without reference to any Confidential Information of the other; or (v) is required to be disclosed under law, provided that the receiving party first gives the disclosing party prompt written notice of the required disclosure and commercially reasonable time to allow the disclosing party to seek a protective order or other appropriate remedy.

**Current Level of Account Production** means the number of new Merchant Accounts for Merchants boarded by Agent during the specified time period.

**Damages** means demands, claims, actions or causes of action, assessments, losses, damages, liabilities, judgments, settlement amounts, costs and expenses, including interest, fines, penalties and reasonable expert witness fees and expenses, and attorneys' fees and expenses.

**FDC** means First Data Corporation or its successors or assigns.

**FDIS' sponsor bank** means the bank that is the sponsoring bank or acquiring bank for Card transactions processed pursuant to the Merchant Agreement, as applicable.

**Gross Processing Revenue - CAAP** means all Income - CAAP on Open Accounts, including those in collections and excluding those for which FDIS has purchased the Residual rights, minus: Card Organization interchange fees; Card Organization dues and assessments; Refunds caused by processing errors or the gross negligence or willful misconduct of Agent or Agent Personnel; and Merchant Losses caused by the gross negligence or willful misconduct of Agent or Agent Personnel.

**Gross Processing Revenue - Premier** means all Income - Premier collected on Open Accounts, excluding those for which FDIS has purchased the Residual rights, minus: Card Organization interchange fees; Card Organization dues and assessments; Buy Rates; Refunds caused by processing errors or the gross negligence or willful misconduct of Agent or Agent Personnel; and Merchant Losses caused by the gross negligence or willful misconduct of Agent or Agent Personnel.

**Gross Sales Volume** means all MasterCard, Visa and Discover Card payments accepted by Open Accounts during the specified time period which are processed and settled through FDIS, are not fraudulent and do not result in a chargeback.

**Income - CAAP** consists of the following items on all Open Accounts: (1) all discount fees (qualified, mid-qualified, and non-qualified) on MasterCard, Visa, Discover, Diners, debit and JCB transactions; (2) transaction fees, (3) batch header fees, (4) address verification service fees, (5) monthly minimum fees, (6) customer support fees, (7) statement fees, (8) monthly FDIS merchant club fees, (9) American Express residuals, (10) JCB fees, (11) chargeback/retrieval fees, and (12) annual fees.

**Income - Premier** consists of the following items on all Open Accounts: (1) all discount fees (qualified, mid-qualified, and non-qualified) on MasterCard, Visa, Discover, Diners, debit and JCB transactions; (2) transaction fees, (3) batch header fees, (4) address verification service fees, (5) monthly minimum fees, (6) customer support fees, (7) statement fees, (8) monthly FDIS merchant cub fees, (9) American Express residuals, (10) JCB fees, (11) chargeback/retrieval fees, (12) annual fees (13) account closure fees and (14) early termination fees.

**Marks** are defined in **Section 4.1**.

**Merchant** means an entity that submits a Merchant Agreement to FDIS that indicates such entity was solicited by Agent and results in a Merchant Account.

**Merchant Account** means a Merchant Agreement that has been approved and entered into by FDIS and FDIS sponsor bank.

**Merchant Agreement** means the form of merchant application and merchant agreement in use by FDIS and its sponsor bank in connection with the FDIS Services, as it may be modified from time to time by FDIS and its sponsor bank in their sole discretion.

**MCC Codes** means the four digit Merchant Category Classification codes created by Visa International, Inc. and listed in the Visa USA Merchant Data Manual to identify a particular merchant's principal trade, profession or line of business.

**Merchant Losses** means all losses experienced by FDIS attributable to chargebacks, fines, penalties and other amounts due from a Merchant to FDIS in excess of a Merchant's reserve account.

**Open Account** means a Merchant Account for a Merchant that is classified as "open" on a FDIS settlement platform and has not been cancelled or terminated.

**Personal Data** means any information that is "personally identifiable" within the meaning of the Gramm-Leach-Bliley Act (15 USC § 6801, et seq.) and its implementing regulations (or any superseding or replacement laws, regulations or guidelines), as they may now exist or be enacted, adopted, issued or promulgated.

**Privacy Laws** means all laws, regulations and guidelines applicable to the use, disclosure and processing of Personal Data on behalf of FDIS or its Affiliates, including the Gramm-Leach-Bliley Act (GLBA) and the Healthcare Insurance Portability and Accountability Act (HIPAA), as they may now exist or be enacted, adopted, issued or promulgated.

**Prospective Merchant** means any entity solicited by Agent for Services to be provided by FDIS pursuant to a Merchant Agreement.

**Referral Open Account** means an Open Account resulting from a lead from a third party referral source to Agent with respect to which FDIS is obligated to pay such third party a referral fee.

**Refunds** means refunds to Merchants of any billed and collected amounts.

**Representative** means all salespersons, employees, agents or representatives appointed or designated by Agent to act on Agent's behalf in connection with performance of Agent's obligations under this Agreement.

**Residuals** means the payments due to Agent by FDIS pursuant to **Section 7.2.a.** of this Agreement.

**Services** means electronic transaction processing of Card and certain other transactions and related services and support systems as described in the Merchant Agreement.

**Superseded Agreement** is defined in **Section 11.3**.

**Term** is defined in **Section 6.1**.

**Territory** means the United States, as currently defined by Visa.

**Three Month Average Residuals** is defined in **Section 1.3**.

**Tier 1 Merchants** means Tier I Merchants – CAAP or Tier I Merchants – Premier, as applicable.

**Tier I Merchants – CAAP** means those CAAP III Merchants that: i) fall within the definition of a Swiped Merchant or a Retail Keyed Merchant; and ii) have been assigned an MCC Code by FDIS that corresponds with an MCC Code designated by FDIS in its sole discretion as a Tier I MCC Code on Myagentoffice.com. Tier I Merchants are intended to be those face-to-face Merchants that FDIS in its sole discretion determines are operating businesses in low to moderate risk industries.

**Tier I Merchants - Premier** means those merchants that have been assigned a MCC Code by FDIS that corresponds with a MCC Code designated by FDIS in its sole discretion as a Tier I MCC Code at My Office/Compensation/Rev Share Profile on MyagentOffice.com. Tier I Merchants are intended to be those merchants engaging in face-to-face transactions (which do not include transactions conducted over the telephone, by facsimile, or over the Internet) with cardholders that FDIS in its sole discretion determines are operating businesses in low to moderate risk industries and Internet merchants with Tier 1 MCC codes that have also been processing with FDIS for a period of greater than one year.

**Tier II Merchants** means Tier II Merchants – CAAP or Tier II Merchants – Premier, as applicable.

**Tier II Merchants – CAAP** means all those CAAP III Merchants that do not qualify as Tier I Merchants. Tier II Merchants are intended to be those CAAP III Merchants that FDIS in its sole discretion determines are operating businesses in moderate to high risk industries.

**Tier II Merchants – Premier** means all merchants that do not qualify as Tier I Merchants. Tier II Merchants are intended to be those merchants that FDIS in its sole discretion determines are operating businesses in high risk industries and Internet merchants that have been processing with FDIS for less than a period of one year.

**Trademarks** means the marks set forth on **Exhibit B**.

**Unacceptable List** is defined in **Section 1.4**.

**USPS Move Update Requirements** means the requirements established by the United States Postal Service for First-Class Mail presorted and automation rates, including but not limited to the Move Update requirements for addresses.

**Exhibit B**

**<u>Trademarks</u>**

The trademarks below are owned by Cardservice International, LLC**:

**CARDSERVICE**®

**CARDSERVICE INTERNATIONAL**®

** In conjunction with its use of the either of these trademarks, Agent shall include the following phrase at the bottom of the material: "The "CARDSERVICE mark and logo are registered marks of Cardservice International, LLC and are used with permission."

The trademarks below are owned by First Data Corporation***:

**FIRST DATA**®



*** In conjunction with its use of this trademark, Agent shall include the following phrase at the bottom of the material:  "The "FIRST DATA mark and logo" are trademarks of First Data Corporation and are used with permission".

EXHIBIT B

Exhibit C

**Residuals paid for Merchants Boarded Prior to the Effective Date**

A.     <u>**CAAP Open Accounts**</u>

1.     **Merchants Boarded prior to the Effective Date ("<u>CAAP III</u>")**

(a)     Residuals for CAAP III Open Accounts for a calendar month shall be an amount equal to the product of Gross Processing Revenue - CAAP for CAAP III Open Accounts for the prior calendar month multiplied by the applicable percentage from the applicable "**CAAP III Agent Residual Schedule**" ("**CAAP III Schedule**") at My Office/Compensation/Rev Share Profile on MyagentOffice.com.

The CAAP III Schedule percentage shall be determined by plotting (1) Gross Sales Volume on the applicable CAAP III Schedule's y axis (the "**y Coordinate**"); and (2) Agent's Current Level of Account Production on the applicable CAAP III Schedule's x axis (the "**x Coordinate**," and together with the y Coordinate, the "**CAAP III Coordinates**"). The CAAP III Coordinates on the CAAP III Schedule shall be recalculated by the first day of the last month of each calendar quarter. The quarterly recalculation shall be based upon all Open Accounts and shall be effective as of the first day of each calendar quarter (each a "**CAAP Recalculation Effective Date**"). The quarterly recalculation may result in an increase, decrease or no change to the value of the CAAP III Coordinates. The CAAP III Schedule percentage will be increased if Agent's average monthly Gross Sales Volume or average monthly Current Level of Account Production over the applicable review period for such calendar quarter causes the intercept of the CAAP III Coordinates to move to a higher CAAP III Revenue Share on the CAAP III Schedule. The CAAP III Coordinate values will only be reduced if Agent's average monthly Gross Sales Volume or average monthly Current Level of Account Production over the applicable review period for such calendar quarter cause the intercept of the CAAP III Coordinates to move to a lower CAAP III Revenue Share percentage on the CAAP III Schedule. The following schedule summarizes the trigger dates regarding the calculation of the percentage that will be used to calculate Residuals:

Summary of Trigger Dates Schedule:

| Calendar Quarter | Review Period that may result in increased CAAP % for such quarter | Review Period that may result in decreased CAAP % for such quarter | Date of recalculation for such quarter – no later than: | CAAP Recalculation Effective Date | Period Residuals Paid |
|---|---|---|---|---|---|
| 1st | Aug. 1 - Oct. 31 | May 1 – Oct. 31 | Dec. 1 | Jan. 1 - Mar.31 | Feb. – Apr. |
| 2nd | Nov. 1 - Jan 31 | Aug. 1 – Jan.1 | Mar. 1 | Apr. 1 - June 30 | May – July |
| 3rd | Feb. 1 – Apr. 30 | Nov. 1 – Apr. 1 | June 1 | Jul. 1 - Sept. 30 | Aug. – Oct. |
| 4th | May 1 – July 1 | Feb. 1 – Jul. 1 | Sept. 1 | Oct. 1 – Dec. 31 | Nov. – Jan. |

(b)     Residuals for CAAP III Open Accounts will be paid at two different percentages of Gross Processing Revenue - CAAP: one percentage for Tier I Merchants - CAAP, and one percentage for Tier II Merchants - CAAP. Accordingly, FDIS will post separate CAAP III Schedules for Tier I Merchants - CAAP and Tier II Merchants - CAAP. For purposes of clarification, combined Gross Sales Volume for Tier I Merchants and Tier II Merchants will be used to plot the x Coordinate on the Tier I Merchant CAAP III Schedule and the Tier II Merchant CAAP III Schedule. Likewise, the combined Current Level of Account Production for Tier I Merchants and Tier II Merchants will be used to plot the y Coordinate on the Tier I Merchant CAAP III Schedule and the Tier II Merchant CAAP III Schedule.

(i) **Example A**. If Agent's y Coordinate from the prior calendar quarter is 40 and Agent generates 32 Open Accounts in August, 74 Open Accounts in September and 44 Open Accounts in October,

Agent's y Coordinate for both the Tier I Merchant CAAP schedule and Tier II Merchant CAAP schedule as of the Recalculation Date of January 1st will be increased to 50.

**(ii) Example B**. If Agent's x Coordinate from the prior calendar quarter is $500,000 and Agent's Open Accounts generate $400,000 in Gross Sales Volume in May, $500,000 in June, $700,000 in July, $300,000 in August, $200,000 in September and $300,000 in October, Agent's x Coordinate for both the Tier I Merchant CAAP schedule and Tier II Merchant CAAP schedule as of the Recalculation Date of January 1st will be decreased to $400,000.

**2.      Right to Modify**. FDIS in its sole discretion may modify the CAAP III Schedule in so far as the CAAP III Schedule affects Residuals paid on existing Open Accounts subject to the CAAP III Schedule by giving Agent at least 90 day's prior written notice; provided, however, that Agent may terminate this Agreement within 90 days of receiving such notice from FDIS by giving FDIS written notice of termination within such 90-day period.

**B.      Referral Open Accounts**

FDIS may, in its sole discretion, credit Agent for Referral Open Accounts. To "**credit Agent**" means that FDIS will pay Agent Residuals for such Referral Open Account, provided, however, that Agent's Residuals for such Referral Open Account will be reduced by 100% of any recurring referral fee paid by FDIS to the third party referral source during each month preceding payment of Agent's Residuals for the referral.

Notwithstanding the foregoing, with respect to each Referral Open Account boarded prior to the Effective Date, Agent's Residuals for such Open Account will be reduced by an amount equal to  the difference between (a) 100% of any recurring referral fee paid by FDIS to the third party referral source during each month preceding payment of Agent's Residuals for the referral, and (b) the lesser of (i) 50% of any recurring referral fee paid by FDIS to such third party, or (ii) 5% of the Gross Processing Revenue – CAAP attributable to such Open Account.

The adjustments to Agent's Residuals referenced above will apply to all recurring referral fees paid by FDIS after the execution of this Agreement including referral fees paid for with respect to Merchants referred by third parties prior to the execution of this Agreement.  Agent's Residuals will also be reduced by 100% of any non-recurring referral fees such as one-time commissions paid by FDIS to any third party referral source.

**Exhibit D**

**Residuals paid for Merchants Boarded on or after the Effective Date ("Premier")**

A. Residuals for Premier Open Accounts for a calendar month shall be an amount equal to the product of Gross Processing Revenue - Premier for Premier Open Accounts for the prior calendar month multiplied by the applicable percentage from the "**Premier Residual Schedule**" ("**Premier Schedule**") at My Office/Compensation/Rev Share Profile on MyagentOffice.com.

The Premier Schedule percentage shall be determined based upon the number of new Open Accounts at the end of each calendar month under this Agreement (or the Superseded Agreement for purposes of the initial calculation). The percentage shall be recalculated by the first day of the last month of each calendar quarter and shall be effective as of the first day of each calendar quarter (each a "**Premier Recalculation Effective Date**"). The quarterly recalculation may result in an increase, decrease or no change to Premier Schedule percentage. The Premier Schedule percentage will be increased if the average number of new Open Accounts for the three calendar month review period for such calendar quarter is in a higher tier on the Premier Schedule. The Premier Schedule Revenue share percentage will only be reduced if the average number of new Premier Open Accounts per month in the applicable six calendar month review period for such calendar quarter is in a lower tier on the Premier Schedule. The following schedule summarizes the trigger dates regarding the calculation of the percentage that will be used to calculate Residuals:

| Calendar Quarter | Review Period that may result in increased Premier % for such quarter | Review Period that may result in decreased Premier % for such quarter | Date of recalculation for such quarter – no later than: | Premier Recalculation Effective Date | Period Residuals Paid |
|---|---|---|---|---|---|
| 1st | Aug. 1 - Oct. 31 | May 1 – Oct. 31 | Dec. 1 | Jan. 1 - Mar.31 | Feb. – Apr. |
| 2nd | Nov. 1 - Jan 31 | Aug. 1 – Jan.1 | Mar. 1 | Apr. 1 - June 30 | May – Jul. |
| 3rd | Feb. 1 – Apr. 30 | Nov. 1 – Apr. 1 | June 1 | Jul. 1 - Sept. 30 | Aug. – Oct. |
| 4th | May 1 – July 1 | Feb. 1 – Jul. 1 | Sept. 1 | Oct. 1 – Dec. 31 | Nov. – Jan. |

B.      FDIS in its sole discretion may modify the Premier Schedule in so far as it affects FDIS Residual obligations prospectively, with respect to any existing Open Accounts subject to the Premier Schedule or both, by giving Agent 90 days prior written notice; provided, however, that Agent may terminate this Agreement within 90 days of receiving such notice from FDIS by giving FDIS written notice of termination within such 90 day period.

C.      FDIS may, in its sole discretion, credit Agent for Referral Open Accounts. To "**credit Agent**" means that FDIS will pay Agent Residuals for such Merchant, provided, however, that Agent's Residuals for such Merchant will be reduced by 100% of any recurring referral fee paid by FDIS to the third party referral source during each month preceding payment of Agent's Residuals for the referral. The adjustments to Agent's Residuals referenced above will apply to all recurring referral fees paid by FDIS after the execution of this Agreement including referral fees paid with respect to Merchants referred by third parties prior to the execution of this Agreement. Agent's Residuals will also be reduced by 100% of any non-recurring referral fees such as one-time commissions paid by FDIS to any third party referral source.

# Assignment, Assumption and Consent Agreement

This Assignment, Assumption and Consent Agreement (this **Assignment Agreement**) is entered into as of __June 7___ __, 2019 (the **Effective Date**) among Hunter Grace, LLC (**Assignor**), KMF Services, LLC (**Assignee**), and CardConnect, LLC (**CardConnect**).

**Background**

- CardConnect (as successor in interest to Ignite Payments LLC) and Assignor are parties to that certain Premier Agent Agreement, dated as of December 28, 2010 (as amended, the **Agreement**).

- Assignor desires to assign the Agreement to Assignee and to obtain the consent of CardConnect to the assignment. Capitalized terms used but not defined in this Assignment Agreement will have the meanings set forth in the Agreement.

**Agreement**

The parties agree as follows:

**1      Assignment and Assumption**

Assignor assigns all of its rights, title and interests in and under the Agreement to Assignee, and Assignee accepts the assignment of Assignor's rights and interests in the Agreement and assumes all of Assignor's obligations and liabilities under the Agreement (collectively, the **Assignment**). CardConnect may enforce the terms of the Agreement against Assignee as of the Effective Date, including any obligations or duties arising from acts of the Assignor or events occurring before the Effective Date.

**2      Consent to Assignment**

Subject to the terms of this Assignment Agreement, CardConnect provides its consent to the Assignment.

**3      Amendment**

As of the Effective Date, the ISO contact person and address for notice purposes is as follows:

KMF Services
606 Bald Eagle Dr
Ste 602
Marco
Island, FL34145
Attention: Kent Flannery

Otherwise, the Agreement remains in full force and effect.

**4      Representations and Warranties**

As of the Effective Date, Assignor and Assignee represent and warrant to one another and to CardConnect, each of the following:

(1)     Each of Assignor and Assignee are validly existing entities in good standing in the applicable state of organization.

(2)     All obligations to be performed by Assignor under the Agreement have been performed.

(3)     No party to the Agreement is in breach or default in the performance or observance of any of its obligations under the Agreement and no event has occurred and no condition exists that, with the giving of notice or the passage of time, would constitute a breach or default or permit termination, modification or acceleration under the terms of the Agreement.

A&A 040518

DocuSign Envelope ID: 655A5428-0D21-454B-AB92-BF9935152957

EXHIBIT C

**5      Release and Indemnification**

5.1      Assignor and Assignee, each on behalf of itself, its agents, its affiliates, and its assigns, releases and forever discharges CardConnect and each of its respective officers, directors, employees, agents, and affiliates (each, an **Indemnified Party**) from any and all liabilities, claims, demands, obligations and actions of any nature whatsoever, in law or in equity, whether known or unknown, suspected or unsuspected, contingent or non-contingent arising from or in any way related to the Assignment.

5.2      Assignor and Assignee each agree, jointly and severally, to indemnify, defend and hold harmless each Indemnified Party of, from and against all claims, losses, damages, costs, and expenses that the Indemnified Parties may suffer related to the Assignment.

5.3      CardConnect shall not be responsible to any other party in connection with this Assignment for any consequential, punitive, special or similar damages, regardless of whether any such party has been advised of the possibility of any of the foregoing.

5.4      This Section 5 will survive termination of the Agreement.

**6      Other Acknowledgements and Agreements**

6.1      Assignee and Assignor will perform such additional reasonable acts in good faith as may be necessary to consummate the Assignment.

6.2      CardConnect remains the exclusive owner of all Merchants and Merchant Agreements, and nothing in this Assignment Agreement transfers or conveys any interest in any Merchant or Merchant Agreement to Assignee. The pricing in Exhibit C to the Agreement will continue to apply to Assignor following the Effective Date.

**7      General**

7.1      This Assignment Agreement will be governed by New York law (without regard to its choice of law provisions). The courts of New York, New York will be the proper venue for legal proceedings brought in connection with this Assignment Agreement. ***Each party waives its right to a jury trial for claims arising in connection with this Agreement***.

7.2      This Assignment Agreement is the entire agreement between the parties and replaces any prior agreements or understandings (written or oral) with respect to its subject matter. This Assignment Agreement may be executed electronically and in counterparts, each of which constitutes one agreement when taken together. Electronic and other copies of the executed Assignment Agreement are valid.

EXHIBIT C

**Authorized Signatures:**

**Assignor**

By:_____

DocuSigned by:



7563F22CD7B2467...

Name:_____

Kent Flannery

Title:_____

GENERAL PARTNER

**Assignee**

By:_____

DocuSigned by:



7563F22CD7B2467...

Name:_____

Kent Flannery

Title:_____

GENERAL PARTNER

**CardConnect, I**

By:_____

DocuSigned by:

*Erik Nicholson*

1F0F3714BCEB43E...

Name:_____

Erik Nicholson

Title:_____

SVP Partner Development

EXHIBIT D

**Subject:** IMPORTANT | Partner Residuals Update
**Date:** Monday, May 8, 2023 at 3:00:44 PM Eastern Daylight Time
**From:** CardConnect
**To:** Kent Flannery

# cardconnect

# Agent Partner Notice

## Incorrect Calculation of Gross Processing Revenue (GPR)
## Collection of Overpaid Residuals Effective with April Residuals

As noted in a message sent to you in December 2022, **CardConnect has identified an incorrect calculation of Gross Processing Revenue (GPR) that resulted in an overpayment of residual payments from January of 2018 to December 2022** to certain partners originating with Ignite Payments, including you.

*CardConnect will begin collecting these overpaid residuals effective with April Residuals paid in May 2023.

The incorrect calculation was related to expenses billed to CardConnect from the card brand networks that were not passed through to you. This was the result of:

- Certain network assessment rate increases were not implemented, resulting in under billing
- Not fully passing through all association fees
- Network association fees collected from merchants were included in the calculation of GPR income while the offsetting payment to the networks were excluded

* *If total amount due is not collected in time period specified we reserve the right extend the collection time frame.*

## Impact Reporting

CardConnect has prepared reporting that details the impact of these overpayments to your residuals, dating back to January 2018. This reporting will be available to you in CoPilot under the ticket type **Residual Backbill** that will contain MID-level detailed reporting and timelines associated with the collection of overpaid residuals.

Additionally, please note that:

- CardConnect will not retroactively change GPR payout percentages as a result of these findings; this will be a net benefit to Agents
- Eligible merchants will be backbilled for network association fees that were underbilled; the income of this action will be deducted from the back bill collection

We understand that the collection of these overpaid residuals could impact your business, and we are committed to helping you minimize disruptions please work with **Cameron Donovan** for any questions as we work through this process.

**Please direct all questions to Cameron Donovan:**
**cameron.donovan@Fiserv.com:**

 

CardConnect, 1000 Continental Drive, Suite 300, King of Prussia, PA 19406

© 2023 CardConnect., The CardConnect name and logo is a registered trademark owned by CardConnect, LLC.

This is an unmonitored email box. Please do not reply to this email.

Unsubscribe from future mailings from

View in Browser

EXHIBIT E



# *ROCK SOLID LAW*
220 Ponte Vedra Park Drive, Suite 280
Ponte Vedra Beach, FL 32082
Phone: (904) 241-1113 Fax: (904) 212-0876
www.RockSolidLaw.com

May 12, 2023

**VIA CERTIFIED MAIL AND EMAIL**
Erik Nicholson
Senior Vice President Partner Development
Card Connect
enicholson@cardconnect.com
100 Continental Drive, Suite 300
King of Prussia, PA 19406

Re:     Anticipated Breach of Ignite Launch Agent Agreement Assigned to Card Connect

Dear Mr. Nicholson:

Our firm has the pleasure of representing Kent Flannery as General Partner of Frances Grace, LP and Authorized Member of KMF Services, LLC ("Flannery") with regard to the Ignite Launch Agent Agreement ("Agreement") and your anticipated breach of the same. A copy of the Agreement is attached hereto for your review.

Despite the decades long working relationship between Card Connect (and its predecessors) and Mr. Flannery/Frances Grace/KMF Services, Card Connect sent an email correspondence to Mr. Flannery on May 8, 2023, confirming an "Incorrect Calculation of Gross Processing Revenue" (GPR) spanning from January 2018 to December 2022 and on behalf of Card Connect and, assumingly, its predecessors. Mr. Flannery was further informed that the total amount miscalculated as a result of Card Connect's errors, amounting to $643,392.63, would be collected from payments due to Frances Grace/KMF Services in equal installments over the next 17 months. It is clear that Card Connect is seeking to rectify its mistake by shifting responsibility to Mr. Flannery and Frances Grace since Card Connect can only collect up to $16,000.00 from the Merchants involved.

Taking the aforementioned action would be done in clear and obvious breach of Section 7.3 of the Agreement titled "Merchant Losses." The aforementioned section states that "Ignite Payments shall bear the risk for Merchant Losses (other than those caused by the gross negligence of willful misconduct of Agent or Agent Personnel) and shall not deduct such Merchant Losses from any amounts due to Agent under this Agreement. The action that has been proposed by Card Connect to recover the losses incurred as a result of mistakes and miscalculations on behalf of Card Connect would be a clear breach of the Agreement under this section as Card Connect is an assignee of this Agreement.

Not only would the aforementioned action be a clear breach of the Agreement, but it would also destroy the business that Mr. Flannery has worked so hard to develop over the years and would not only affect Frances Grace/KMF Services and Mr. Flannery but would affect all others who have been paid for services related to the amounts collected. The effects of Card Connect's errors span much farther than just damage done to Mr. Flannery and Frances Grace/KMF Services. Not only would deducting those funds amounts due to Mr. Flannery and/or Frances Grace/KMF Services "impact" the business as stated in the May 8th email correspondence, but it would ruin the business and severely affect the personal lives of all the individuals involved in a substantially negative way.

John McE. Miller, Esq.
*John@RockSolidLaw.com*

Charles "Walt" Unfricht, Esq.
*Walt@RockSolidLaw.com*

*Erik Nicholson*
*May 12, 2023*

Pursuant to the May 8th email, Mr. Flannery reached out to Cameron Donovan as well as yourself in an attempt to resolve this matter and have the parties continue to operate pursuant to the Agreement. However, neither yourself not Mr. Donovan have so much as responded to address Mr. Flannery's concerns in order to provide assurances that these actions amounting to breach of the Agreement would not be taken. Therefore, it is clear that Card Connect intends to breach the Agreement through its outlined actions.

Please also be reminded that Section 10.2 of the Agreement titled "Statute of Limitations" would prevent Card Connect from initiating any action against Mr. Flannery and/or Frances Grace/KMF Services for reimbursement of the aforementioned amounts. Almost all of the events leading up to the miscalculations happened over one year ago meaning no action can be initiated for recovery of the same even if there was some basis for shifting responsibility of the repayment of these amounts to Mr. Flannery/Frances Grace/KMF Services, which there is not.

At this time, Mr. Flannery is notifying you, on behalf of Frances Grace/KMF Services, of your anticipated breach of the Agreement, specifically Section 7.3 Merchant Losses, for informing Mr. Flannery that his company would have amounts charged against and reduced from amounts due to Frances Grace/KMF Services in order to remediate billing errors made on behalf of Card Connect. Doing so would be in clear breach of Section 7.3 of the Agreement as discussed above, would destroy the business, and would adversely affect the personal lives of those involved in a serious way.

At this time, Mr. Flannery demands that you confirm in writing that the amount of approximately $36,000.00 will not be automatically deducted from any amounts due to Mr. Flannery and Frances Grace/KMF Services, that Mr. Flannery and Frances Grace/KMF Services will incur no responsibility for the miscalculated amounts whatsoever, and that the aforementioned parties shall not be liable for the $643,392.63 as previously stated to Mr. Flannery.

Should you not confirm the aforementioned in writing within five (5) days of receipt of this correspondence, this correspondence shall be considered notice under Section 6.3 of the Agreement and Mr. Flannery and Frances Grace/KMF Services shall be entitled to take all reasonable action under applicable law and will have no other option than to seek every remedy at law and equity available to them, including but not limited to costly litigation.

PLEASE GOVERN YOURSELF ACCORDINGLY.

Very truly yours,

Charles "Walt" Unfricht, Esq.

CWU

John McE. Miller, Esq.          Charles "Walt" Unfricht, Esq.
*John@RockSolidLaw.com*          *Walt@RockSolidLaw.com*

# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF FLORIDA
# JACKSONVILLE DIVISION

KMF SERVICES, LLC d/b/a DELTA
PAYMENTS, a Florida limited liability
company, and FRANCES GRACE, LP, a
Florida limited partnership,

               Plaintiff,              Case No.: 3:23-cv-815

         v.

FISERV, INC., a Wisconsin for-profit
corporation; CARDCONNECT, LLC, a
Wisconsin for-profit corporation; and
IGNITE PAYMENTS, LLC, a Texas limited
liability company.

               Defendants.

_____/

## MOTION FOR PRELIMINARY INJUNCTION AND SUPPORTING MEMORANDUM OF LAW

       Plaintiffs, KMF SERVICES, LLC d/b/a DELTA PAYMENTS ("KMF") and FRANCES

GRACE, LP ("FRANCES GRACE") (collectively "Plaintiffs"), by and through their undersigned

counsel, and, pursuant to Fed. R. Civ. P. 65(a) and Local Rule 6.02, hereby file their Motion for

Preliminary Injunction and Supporting Memorandum of Law ("Motion") against FISERV, INC.,

("FISERV"), CARDCONNECT, LLC, ("CARDCONNECT"), and IGNITE PAYMENTS, LLC,

("IGNITE") (collectively "Defendants") moving this Court for an immediate preliminary

injunction enjoining Defendants as set forth below and as supported by the sworn testimony

submitted herewith:

EXHIBIT B

1. Plaintiffs have filed their Verified Complaint and contemporaneously herewith file the Affidavit of Kent Flannery in support of this Motion.

2. Plaintiffs allege breach of contract and unjust enrichment claims for which injunctive relief is proper.

3. Plaintiffs, KMF SERVICES d/b/a DELTA PAYMENTS, LLC and FRANCES GRACE, LP are entitled to a preliminary injunction to prevent Defendants from continuing to violate the Agreement, by way of $18,427.97 monthly deductions from the amounts due to Plaintiffs pursuant to the Agreement, and in turn causing irreparable harm to Plaintiffs' substantial relationships and goodwill it has formed and maintained with those paid for services related to the amounts collected.

4. All of the factors under Fed. R. Civ. P. 65(a) and Local Rule 6.02 to be considered in granting a preliminary injunction have been satisfied. Plaintiffs have established a substantial likelihood of success on the merits of their breach of contract and unjust enrichment claims. Plaintiffs will suffer irreparable harm absent injunctive relief. The balancing of hardships weighs in favor of granting Plaintiffs' Motion for Preliminary Injunction. Moreover, public interest favors granting injunctive relief.

5. Plaintiffs are seeking injunctive relief in good faith and to preserve the status quo until this matter can be set for a final hearing on the merits. Defendants will continue to deduct funds at a rate of at minimum $18,427.97 per month unless prohibited by this Court.

6. Due to the immediate and irreparable nature of the Defendants' conduct and actions, this Court should exercise its discretion and not require the posting of a bond for the Preliminary Injunction to issue. Plaintiffs have a clear right to the monetary funds Defendants seek to wrongfully collect.

7.      In the alternative, Plaintiffs respectfully request that if the Court does not grant a preliminary injunction, that an expedited hearing be set so that the issues presented herein may be resolved at the earliest possible opportunity.

WHEREFORE, Plaintiffs, KMF SERVICES, LLC d/b/a DELTA PAYMENTS ("KMF") and FRANCES GRACE, LP, respectfully move this Court to grant their Motion for Preliminary Injunction and issue a proposed order enjoining Defendants from any further deductions under the Agreements, and from engaging in any further conduct or activity which constitutes a violation of the terms of the Agreements identified in the Verified Complaint, together with such other and further relief as this Court deems just and proper.

## **MEMORANDUM OF LAW**

### I.      **FACTUAL BACKGROUND**

On or about May 18, 2015, FRANCES GRACE, LP entered into the Launch Compensation Plan, ("2015 Agreement"), with IGNITE PAYMENTS, LLC for the sale of credit card processing services, payable by monthly residual payments. A true and accurate copy of the 2015 Agreement is attached hereto as Exhibit A. On June 7, 2019, non-party HUNTER GRACE, LLC, ("HUNTER GRACE"), entered into the Assignment, Assumption, and Consent Agreement ("Assignment Agreement") with KMF SERVICES, LLC and CARDCONNECT, LLC to assign the Premier Agent Agreement ("PA Agreement") to KMF and obtain the consent of CARDCONNECT to the assignment of the same. A true and accurate copy of the Premier Agent Agreement and the Assignment Agreement is attached hereto respectively as Exhibits B and C.

Pursuant to Sections 1 and 2 of the PA Agreement, CARDCONNECT consented to KMF stepping in the place of HUNTER GRACE by way of assignment of "all of [HUNTER GRACE's] rights, title and interests in and under the [PA] Agreement to Assignee, [KMF], and Assignee accept[ed] the assignment of Assignor's, [HUNTER GRACE's], rights and interests in the [PA] Agreement and assume[d] all of Assignor's obligations and liabilities under the [PA] Agreement."[1]

On December 29, 2022, CARDCONNECT sent an Agent Notice to Plaintiffs regarding an accounting error, specifically its miscalculation of the Gross Processing Revenue resulting in residual overpayment for a period of approximately four (4) years, dating back through January 2018. A true and accurate copy of the Agent Notice is attached hereto as Exhibit D. On or about May 8, 2023, CARDCONNECT sent an email correspondence, ("May 8 Correspondence") adding specificity to the "Incorrect Calculation of Gross Processing Revenue" ("Incorrect Calculations") in the amount of $643,392.63, spanning from January 2018 through December 2022. A true and accurate copy of the May 8 Correspondence is attached hereto as Exhibit E.

Pursuant to the May 8 Correspondence, CARDCONNECT would charge and collect the Incorrect Calculations in their entirety from Plaintiffs in equal installments over the course of the next seventeen (17) months in an effort to rectify its error and shift resulting damages to Plaintiffs. Plaintiffs immediately disputed the aforementioned charge and collection, and moreover, on or about May 12, 2023, Plaintiffs sent their Notice of Anticipated Breach and Denial of the Incorrect Calculations Recovery ("Notice and Denial") demanded by Defendants. A true and accurate copy of the Notice and Denial is attached hereto as Exhibit F.

---

[1] IGNITE PAYMENTS is a payment platform of FISERV. CARDCONNECT is a payment platform of FISERV and a successor in interest to IGNITE PAYMENTS pursuant to the Assignment Agreement. Moreover, upon information and belief, FISERV acquired FIRST DATA INDEPENDENT SALES, ("FDIS") on or about January 16, 2019.

Section 7.3 of both the 2015 Agreement and PA Agreement, (collectively "Agreements") governing the Incorrect Calculations require that Defendants, respectively, "bear the risk for Merchant Losses (other than those caused by the gross negligence or willful misconduct of Agent or Agent Personnel) and **shall not deduct such Merchant Losses from any amounts due to Agent under this Agreement**." (emphasis added). Section 7.2 of both the 2015 Agreement and PA Agreement obligates Defendants respectively to make residual payments to the Plaintiffs for merchant accounts boarded by Plaintiffs.

Moreover, Section 10.2 of both the 2015 Agreement and PA Agreement includes a contractual statute of limitations of commencement "within one year after the earlier of (i) the date on which such party knew or should have known of the first alleged act, omission or violation, or (ii) with respect to obligations that do not survive termination of [the] Agreement, the date of termination of [the] Agreement."

Section 10.4 of both the 2015 Agreement and PA Agreement provides that,

> Except as set forth in this Agreement, **in no event shall either party**, its parents, Affiliates or any of its or their directors, officers, employees, agents or sub-contractors **be liable under any theory of tort, contract, strict liability or other legal or equitable theory for lost profits, exemplary, punitive, special, incidental, indirect or consequential damages, each of which is hereby excluded by agreement of the parties regardless of whether such damages were foreseeable or whether either party or any entity has been advised of the possibility of such damages**. (emphasis added).

Despite the foregoing provisions of the Agreements, on May 20, 2023, Defendants deducted $18,427.97 from Plaintiffs' monthly residual payments to recover their Merchant Losses and/or lost profits resulting from their Incorrect Calculations, occurring over a span dating back at minimum, four (4) years. To date, Defendants have charged $643,392.63 against Plaintiffs and will continue to deduct $18,427.97 each month from residual payments due to Plaintiffs until the

aforementioned charge balance is satisfied. In its May 8 Correspondence, CARDCONNECT acknowledged that "collection of these overpaid residuals could impact your business…." and it has and will continue to do just that. Plaintiffs have paid out various non-parties for services related to the Incorrect Calculations dating back through January 2018 which will undoubtedly be affected by the Defendants attempts to circumvent its errors and place the blame and thereby damages on Plaintiffs.

## II.    ARGUMENT

Federal Rule of Civil Procedure 65 grants courts the authority to issue preliminary injunctions in an effort to preserve the relative positions of the parties. Fed. R. Civ. P. 65; *University of Texas v. Camenisch*, 451 U.S. 390, 395 (1981). The purpose of a preliminary injunction is "to keep the status quo for a merits decision." *Vital Pharmaceuticals, Inc. v. Alfieri*, 23 F.4th 1282, 1290 (11th Cir. 2022). Entry of a preliminary injunction is proper if Plaintiffs show: (1) a substantial likelihood that it will prevail on the merits; (2) it will suffer irreparable injury if the injunction is not issued; (3) the potential injury to it outweighs the possible harm to Defendant; and (4) the injunction is not adverse to the public interest. *Keister v. Bell*, 879 F.3d 1282, 1287 (11th Cir. 2018); *Four Seasons Hotels And Resorts, B.V. v. Consorcio Barr, S.A.*, 320 F.3d 1205, 1209-10 (11th Cir. 2003); *Cumulus Media, Inc. v. Clear Channel Commc'ns, Inc.*, 304 F.3d 1167, 1171 and n.1 (11th Cir. 2002); *McDonald's Corp. v. Robertson*, 147 F.3d 1301, 1306 (11th Cir. 1998); *Carillon Imps., Ltd. v. Frank Pesce Int'l Group Ltd.*, 112 F.3d 1125, 1126 (11th Cir. 1997)(per curiam).

When considering granting a preliminary injunction to preserve the status quo, Courts may consider the four factors on a "sliding scale, such that if one factor weighs heavily in favor of a party, the other factors may become less important." *Energy Professionals, LLC v. Pomella*, 8:15-

cv-02470-MSS-EAJ, 2015 WL 10960876, *3 (M.D. Fla. Oct. 29, 2015); *see also Florida Democratic Party v. Scott*, 215 F.Supp.3d 1250, 1256 (N.D. Fla. 2016) (explaining that "[w]hile all of these elements must be established, none is controlling"). Specifically, each factor is analyzed using a sliding scale that balances the other factors in light of the particular case.[2] *Anheuser-Busch, Inc. v. A-B Distribs.*, Inc., No. 96-CV-241,1995 WL 17108555, at *4-5 (M.D. Fla. Apr. 6, 1995).

### a. There is a Substantial Likelihood that Plaintiffs will Ultimately Prevail on the Merits of their Claims.

In their Verified Complaint, Plaintiffs allege two counts in addition to injunctive relief: (1) Breach of Contract and (2) Unjust Enrichment. Plaintiffs already have sufficient evidence that they will succeed on each claim against Defendants, although they need to only make out such a case for one claim for this Motion to succeed. *See Schiavo ex. Rel. Schindler v. Schiavo*, 357 F. Supp. 2d 1378, 1384 (M.D. Fla. 2005) (holding that to obtain temporary injunctive relief, a plaintiff must show a substantial likelihood of success on at least one claim). The Court need not "find that the evidence positively guarantees a final verdict in [Plaintiffs'] favor," but need only to show it is *substantially likely* to prevail as to one or more of its claims. *Levi Strauss & Co.,* 51 F. 3d at 985.

Section 11.9 of the Agreements requires that the Agreements "shall be governed by the laws of the State of New York." The essential elements for pleading a cause of action to recover damages for breach of contract under New York law are (1) the existence of a contract; (2) the plaintiff's performance pursuant to the contract; (3) the defendant's breach of his or her contractual obligations; and (4) damages resulting from the breach. *See Stennet v. Goldberg & Cohn, LLP,*

---

[2] In considering a request for a preliminary injunction, the Court may rely on hearsay materials that may not be admissible to support an order of permanent injunctive relief "if the evidence is 'appropriate given the character and objectives of the injunctive proceeding.'" *Levi Strauss & Co. v. Sunrise Int'l Trading Inc.*, 51 F.3d 982,985 (11th Cir. 1995) (citations omitted).

2020 N.Y. Misc. LEXIS 10192 (N.Y. Sup. Ct., Nov. 23, 2020); *Elisa Dreier Reporting Corp. v. Global Naps Networks, Inc*., 84 A.D.3d 122, 127, (2d. Dept. 2011); *Brualdi v. IBERIA, Lineas Aereas de España, S.A*., 79 A.D. 3d 959, 960 (2d. Dept. 2010); *JP Morgan Chase v. J.H. Elec. of N.Y., Inc*., 69 A.D. 3d 802, 803 (2d. Dept. 2010); *Furia v. Furia*, 116 AD2d 694, 695, 498 (2d. Dept. 1986).

Here, as laid out in the Verified Complaint, Plaintiff, FRANCES GRACE, entered into the 2015 Agreement with IGNITE PAYMENTS for the sale of credit card processing services. Moreover, KMF entered into the PA Agreement with FDIS and thereby its successors in interest FISERV and CARDCONNECT by way of the Assignment Agreement, again for the sale of credit card processing services. Throughout their relationship with Defendants, Plaintiffs fully performed pursuant to the Agreements as addressed herein, making significant sales of Defendants' credit card processing services, evidenced by the residual payments at issue in this Action.

Pursuant to Section 7.2 of the Agreements, Defendants are obligated to make residual payments to the Plaintiffs for merchant accounts boarded. Sections 7.3 and 10.4 of the Agreements govern the Incorrect Calculations, specifically by way of Merchant Losses and/or lost profits and precluding the deduction of the same from any amounts due to the Plaintiffs. Moreover, the Agreements include a contractual statute of limitations limiting commencement to "within one year after" the date the party knew or should have known of the first alleged act, omission or violation. Here, Defendants should have known of those Incorrect Calculations claimed at minimum annually pursuant to standard business accounting practices and account reconciliations for tax purposes. Irrespective of the foregoing, Defendants failed to assert its claim or notify Plaintiffs of any error whatsoever for a period of up to four (4) years of incorrect Gross Processing Revenue calculations.

Despite Plaintiffs' full performance under the Agreements, Defendants breached their contractual obligations by charging Plaintiffs $643,392.63 in an effort circumvent their damages due to their own internal accounting errors. Moreover, Defendants began monthly reductions in residual payments owed to Plaintiffs pursuant to the Agreements, by way of $18,427.97 monthly reductions beginning May 20, 2023. It is important to note that Plaintiffs utilize residual payments to payout non-parties related to Plaintiffs' performance under the Agreement, which to date have been paid out according to Defendants' prior residual payments, Incorrect Calculations included. Here, Plaintiffs have been and continue to be damaged by Defendants' unauthorized $643,392.63 charge and $18,427.97 monthly residual payment deductions by way of deprivation of their funds and moreover, inescapable damage to its outside business relationships with related non-parties which have been paid amounts determined pursuant to Defendants' Incorrect Calculations.

In the alternative to its Breach of Contract Counts II and III, Plaintiffs plead unjust enrichment in their Verified Complaint pursuant to Plaintiffs' provision of labor and services consisting of the selling of credit card processing services at the request of the Defendants. "A claim for unjust enrichment has three elements: (1) the plaintiff has conferred a benefit on the defendant; (2) the defendant voluntarily accepted and retained that benefit; and (3) the circumstances are such that it would be inequitable for the defendants to retain it without paying the value thereof." *Virgilio v. Ryland Grp., Inc.*, 680 F.3d 1329, 1337 (11th Cir. 2012) *citing Fla. Power Corp. v. City of Winter Park*, 887 So. 2d 1237, 1241 n.4 (Fla. 2004).

Here, Defendants had knowledge of, assented to, accepted, and retained the benefits of the significant merchant accounts acquired by Plaintiffs without paying a sum representing the reasonable value of benefit conferred pursuant to its $643,392.63 charge and subsequent monthly residual payment deductions. It would be inequitable for Defendants to retain possession and

benefit of the deducted residual payments resulting from Defendants own accounting errors. Moreover, Defendants' possession of the improper residual deductions as addressed herein have and will continue to unjustly enrich Defendants.

### b. Plaintiffs will Suffer Irreparable Injury if the Preliminary Injunction is not Granted.

"The focus of preliminary injunctive relief is on maintaining long standing relationships and preserving the goodwill of a company built up over the course of years of doing business." *North Am. Prod. Corp.*, 196 F.Supp.2d at 1230-31. The damage to Plaintiffs' existing and prospective business relationships with non-parties, as well as the erosion of Plaintiffs' goodwill in the nationwide credit card processing sector, is immediate, irreparable, and not readily quantifiable such that injunctive relief is the only appropriate remedy. *See Id.*

"[U]nder Florida law, a court may presume irreparable injury in cases involving tortious interference with business relationships and misappropriation of trade secrets." *Morgan Stanley Smith Barney, LLC v. Abel*, 318CV00141J34MCR, 2018 WL 515348, at *4 (M.D. Fla. Jan. 23, 2018); *Dotolo v. Schouten*, 426 So. 2d 1013, 1015 (Fla. 2d Dist. Ct. App. 1983). Moreover, "[i]rreparable harm is presumed when . . . solicitation of customers occurs." *Lynch v. Silcox*, No. 01-8800-CIV, 2001 WL 1200656, at *5 (S.D. Fla. Oct. 4, 2001) (citing F.S.A. § 542.33(2)(a); *see also Autonation, Inc. v. O'Brien*, 347 F. Supp. 2d 1299, 1306 (S.D. Fla. Dec. 2, 2004) (in "highly competitive" industry, injunction is proper where defendant could implement knowledge of prior employer in position with direct competitor). The nature of the particular breach of contract at issue here renders harm similar to tortious interference with business relationships and solicitation as laid out above, resulting in a domino effect of irreparable damage to outside non-party relationships resulting from Defendants' breach. Should Defendants continue to make monthly deductions from Plaintiffs' monthly residual payments due, Plaintiffs will be forced to address

these deductions with the associated non-parties as laid out herein. Kent Flannery, authorized agent of both KMF and FRANCES GRACE, testifies to the specific nature of the irreparable harm to the Plaintiffs should this Court fail to grant this Motion in his Affidavit, ("Flannery Affidavit") attached hereto as Exhibit G.

### c. The Potential Injury to Plaintiffs and Other Non-parties if the Preliminary Injunction is not Granted Outweighs any Potential Harm to Defendants if the Preliminary Injunction is Granted.

Companies should be confident that the law protects their legitimate business interests, including their business relationships which are developed over years of substantial time, effort, and expense. The threatened injury to Plaintiffs and the loss of business relationships and past residuals far outweighs the threatened harm to Defendants. In fact, Plaintiffs contend there is no threatened harm to Defendants by enjoining further residual deductions and breaches of the Agreements, as Defendants have already paid out their Incorrect Calculations and have been operating for up to four (4) years without those funds without incidence and apparently without noticing for an extended period of time. Plaintiffs' Motion seeks merely to maintain the status quo and as such does not pose a threat of irreparable harm to Defendants, apart from merely postponing their collection efforts through the pendency of this litigation. In contrast, Plaintiffs' damages pursuant to significant residual payment deductions is detrimental to not only Plaintiffs' operations but also its outside business relationships, as laid out in Flannery's Affidavit. [Ex. G].

### d. A Preliminary Injunction is not Adverse to the Public Interest.

Finally, a preliminary injunction will not disserve the public interest. *See Dermworx, Inc. v. Cooper*, Case No. 09-60284-CIV, 2009 WL 1726333 at *7 (S.D. Fla. 2009) (finding that an injunction will not disserve the public interest where it will preserve the status quo between the parties while during the pendency of this litigation). Moreover, "[t]he public has an interest in

protecting and enforcing valid contracts." *Ryan, LLC v. Evans*, 8:12-CV-289-T-30TBM, 2012 WL 1532492 at *9 (M.D. Fla. Mar. 20, 2012), report and recommendation adopted, 8:12-CV-289-T-30TBM, 2012 WL 1551285 (M.D. Fla. Apr. 30, 2012).

A preliminary injunction in favor of Plaintiffs will not disserve the public interest because it would only be designed to preserve the status quo between the parties during the pendency of this litigation. Moreover, to the contrary, the public interest will be served by the granting of an injunction, for such relief will uphold and promote the validity and integrity of enforcement of legal and binding contracts.

### e. No Bond is Necessary to Protect Defendants' Interests.

Fed. R. Civ. P. 65(c) requires the movant to deposit a bond as security "in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." The bond requirement of Rule 65(c), however, is appropriately waived in certain circumstances. *See Baldree v. Cargill, Inc.*, 758 F.Supp. 704 (M.D. Fla. 1990), aff'd, 925 F.2d 1474 (11th Cir. 1991) (finding that the district court has discretion to waive bond requirement imposed by Rule 65(c)). The factors to consider include the potential loss to the defendant due to the injunction, the hardship to the plaintiff due to expense of the bond, and the impact of the bond on federal rights. *Johnston v. Tampa Sports Auth.*, 2006 WL 2970431, at *1 (M.D. Fla.) (citations omitted).

Given whatever harm Defendants may incur during this period is essentially self-inflicted and moreover, based upon the plain and obvious nature of Defendants' breach of the Agreements, and the unlikelihood of an injunction being wrongfully entered, Plaintiffs respectfully submit that a very minimal bond, if any, is warranted under the circumstances.

### III. CONCLUSION

Pursuant to the foregoing, Plaintiffs, KMF SERVICES, LLC d/b/a DELTA PAYMENTS ("KMF") and FRANCES GRACE, LP respectfully move this Court to grant their Motion for Preliminary Injunction and issue a proposed order enjoining Defendants from any further deductions from residual payments due to the Plaintiffs under the Agreements, and from engaging in any further conduct or activity which constitutes a violation of the terms of the Agreements identified in the Verified Complaint, together with such other and further relief as this Court deems just and proper.

Dated this 13th of July, 2023.

Respectfully submitted,

**MATHIS LAW GROUP**

/s/ JESSICA A. CAPPOCK, ESQ.
**JESSICA A. CAPPOCK, ESQ.**
Florida Bar No.: 1028337
jcappock@mathislawgroup.com
ybecquer@mathislawgroup.com
**JESSICA L. KLEIN, ESQ.**
Florida Bar No.: 0063412
jklein@mathislawgroup.com
acolmenares@mathislawgroup.com
**BRIAN K. MATHIS, ESQUIRE**
Florida Bar No.: 0046223
bmathis@mathislawgroup.com
jkirkland@mathislawgroup.com
515 E. Las Olas Blvd., Suite 120
Ft. Lauderdale, FL 33301
Mailing Address: P.O. Box 91657
Lakeland, FL 33804
T: (954) 616-4404
F: (954) 616-4405
*Attorneys for Plaintiffs*

## CERTIFICATE OF SERVICE

I  HEREBY  CERTIFY  the  foregoing  was/will  be  served  upon  the  above-named

Defendant(s) via Service of Process.


/s/ Jessica A. Cappock

EXHIBIT A

**IGNITE LAUNCH AGENT AGREEMENT**     <span style="float:right">**INTERNAL USE ONLY:**</span>

AGENT NO.: 33670

DBA NAME: MINNEAPOLIS

This Ignite Launch Agent Agreement (this "**Agreement**") is between Ignite Payments, LLC ("**Ignite Payments**") and FRANCES GRACE, LP (*Insert Agent legal name*) ("**Agent**").

Ignite Payments is an Independent Sales Organization and Member Service Provider as defined under the Rules. Ignite Payments is in the business of providing Services. Agent is a person or entity in the business of soliciting purchasers of Services. Ignite Payments and Agent wish to enter into a relationship in which Agent will represent Ignite Payments with respect to soliciting purchasers of Ignite Payments Services on the terms and conditions contained in this Agreement.

<p align="center">Agreement</p>

In consideration of the foregoing and the covenants and conditions in this Agreement, Agent and Ignite Payments agree as follows:

<p align="center">1. <u>Agent Obligations</u></p>

**1.1.**     **General Obligations**.

a. <u>Professional and Compliant Business Practices</u>. Agent will operate its business, including maintaining the security of related business, Prospective Merchant, Merchant and cardholder records, in a professional manner in compliance with this Agreement and all applicable laws (including Privacy Laws), regulations, court orders, Rules and Agent Business Conduct Standards, which are incorporated into this Agreement as they may now exist or be enacted, adopted, issued or promulgated.

b. <u>Promotional Information; Use of Trade names and Trademarks</u>.  Marketing materials, including business cards and stationary, and Web sites created by Agent (other than those Ignite Payments materials printed from the Ignite Payments marketing website) that contain trade names, trademarks, service marks or logos of, or that reference the services provided by, Ignite Payments, Ignite Payments' sponsor bank, FDC or any Card Brand must be submitted to agent.compliance@firstdata.com for review. Agent agrees to not disseminate or publish any such materials or Web sites until Agent has received written approval from agent.compliance@firstdata.com. In compliance with the law, Agent may not send unsolicited fax advertisements that promote Ignite Payments Services to Merchants or Prospective Merchants. Because Agent is not a registered ISO, Rules require that Agent's business telephone be listed and answered by reference to the registered ISO (i.e. "Ignite Payments") and permit Agent to also reference its approved fictitious business name.

**1.2.**     **Agent Representations**. To comply with legal requirements, Agent represents, warrants and covenants that:

    i.    Agent shall present, and shall cause its Representatives to present, to each person who executes a Merchant Agreement a copy of such Merchant Agreement at or before the time the person executes the Merchant Agreement.

    ii.    Agent shall use, and shall cause its Representatives to use, only the Merchant Agreement that is designated by Ignite Payments. Agent shall use, and shall cause its Representatives to use, the most current version of such Merchant Agreement.

    iii.    In Face-to-Face Agent Transactions ("**Face-to-Face Agent Transactions**" means those transactions in which Agent meets in person with a merchant, which does not include

DocuSign Envelope ID: D9888B38FA05E4C993AC65AF555CB7CEF2

**EXHIBIT A**

transactions conducted over the telephone, by facsimile, or over the Internet) where a person executes a paper, rather than an electronic, version of the Merchant Agreement, Agent shall leave, and shall cause his or her Representatives to leave, with each such person a copy of the executed Merchant Agreement.

iv.   In Face-to-Face Agent Transactions where a person executes an electronic, rather than a paper, version of the Merchant Agreement, Agent shall, and shall cause its Representatives to, either (1) advise each such person that a sample copy of the then-current version of the standard Merchant Agreement is available on the Ignite Payments Web site, or (2) leave with each such person a hardcopy or electronic copy of the executed Merchant Agreement.

v.    Agent shall not misrepresent, and shall prohibit its Representatives from misrepresenting, any term of the Merchant Agreement.

vi.   Agent shall provide, and shall cause its Representatives to provide, full and fair disclosure of the Merchant Agreement to Prospective Merchants and Merchants, including disclosures related to all charges, minimum fees, limitations, initial and renewal terms of agreements and warranty services.

vii.  Agent shall not misrepresent, and shall prohibit its Representatives from misrepresenting, the manner in which Ignite Payments provides its services or the procedures Ignite Payments follows, including services and procedures related to chargebacks, loss prevention, ATM/Debit and equipment leasing.

viii. Agent and Agent Personnel will not make, or offer to make, any payments to, or confer, or offer to confer, any benefit upon any employee, agent or fiduciary of any third party (including any government, or agency or instrumentality thereof) with the intent to influence the conduct of such employee, agent or fiduciary in relation to the business or affairs of such third party.

ix.   If Agent becomes aware of any actual or alleged fraudulent activities or misrepresentations by it or its Representatives, whether or not related to the Ignite Payments Services, Agent will promptly advise Ignite Payments and take all necessary corrective action the Agent determines in its discretion, to be necessary or appropriate.

x.    Agent shall not charge any fee to any of its Representatives in respect of such Representative's right to act on Agent's behalf in connection with performance of Agent's obligations under this Agreement.

Agent's failure to satisfy any of the above legal requirements will constitute a breach of this Agreement and be subject to remedial and other action as provided under this Agreement.

Additionally, as Agent is engaged in a separate business, Agent represents, warrants and covenants will use its full legal name (not Agent's DBA name) (1) for Agent's bank accounts, recruiting and similar materials relating to operation of Agent's business, (2) when signing any agreements with merchants for any services offered by Agent that are not described in and billed under the Merchant Agreement including sale, lease and/or rental of point-of-sale terminals and other ancillary products or services, and (3) for any agreements that are between Agent and a third party (including any merchant, lease company, bank, Yellow Page company or other vendor) for any purchase, sale or services (including leases, rental agreements, agreements for web design services, advertising services).

Agent also represents, warrants and covenants that execution and delivery of this Agreement by Agent and the consummation of the transaction herein contemplated does not conflict in any material respect with or constitute a material breach or material default under the terms and conditions of any documents, agreements or other writings to which it is a party, including any covenant not to compete or confidentiality agreement with any third party.

**1.3.** **Assessments**. Subject to Agent's challenge rights as noted below, the parties agree that at any time following the 10th Business Days after delivery of written notice to Agent from agent.compliance@firstdata.com (a "**Deduction Notice**"), Ignite Payments may deduct from any Residuals payable to Agent hereunder: (i) the amount of any fine, assessment or other amount charged to Ignite Payments by any third party relating to Agent's violation of any law, regulation, court order or Rule; or (ii) fines to Agent by Ignite Payments for Agent's breach of a material term of this Agreement (including **Section 1.2**) or repeated breach of any term of this Agreement, which fines shall be an amount equal to the greater of $250.00 or: (1) for the first fine, an amount equal to the product of (A) 10% multiplied by (B) an amount equal to the average of Agent's monthly Residuals for the 3 calendar months preceding the date on which the fine is assessed ("**Three Month Average Residuals**"), or (2) for each fine thereafter, an amount equal to the product of (A) 20% multiplied by (B) Three Month Average Residuals. The parties agree that if Agent disputes any such Deduction Notice issued to Agent pursuant to this **Section 1.3**, Agent may challenge such Deduction Notice by delivering a written notice ("**Challenge Notice**") to Ignite Payments at agent.compliance@firstdata.com within 10 Business Days after Ignite Payment's delivery of such Deduction Notice. The Challenge Notice must state all reasons why the Deduction Notice should not have been issued. If Ignite Payments fails to act on the Challenge Notice within 20 Business Days after its receipt thereof, then First Data shall not deduct any amount from Residuals payable to Agent in respect of the Deduction Notice. The deduction by Ignite Payments of the amount of any assessment, fine or charge against Agent from Residuals payable hereunder does not constitute a waiver of any legal rights or remedies Ignite Payments may have against Agent. Ignite Payments reserves the right to pursue any and all legal rights and remedies against Agent under this Agreement or applicable law.

**1.4.** **Prospective Merchants; Merchants; Merchant Agreements**.

a. Ignite Payments will not accept Prospective Merchant types that are identified as "Unqualified/Unacceptable" in the Ignite Payments Credit Policy posted under Resources/Policies on MyAgentOffice.com, as it may be modified from time to time by Ignite Payments in its sole discretion (the "**Unacceptable List**"). Agent agrees to use best efforts to verify that each Prospective Merchant conducts or intends to conduct a bona fide, lawful business operation (e.g., by inspecting a Prospective Merchant's premises to determine if it has the proper facilities, equipment, inventory and license to conduct its business or reviewing its Internet site). Agent also agrees to use its best efforts to inform Ignite Payments of any information that could reasonably be considered relevant to a determination of any Prospective Merchant or Merchant's creditworthiness.

b. All Merchant Agreements are subject to review and rejection or approval by Ignite Payments in its sole discretion. Ignite Payments will not approve Merchant Agreements that are not fully completed and executed by the Prospective Merchant. Ignite Payments may terminate any Merchant Agreement at any time in accordance with its terms.

c. Agent may recommend to Ignite Payments and/or its sponsor bank the discount rate and fees charged to a Prospective Merchant or Merchant pursuant to the Merchant Agreement, but Ignite Payments and/or its sponsor bank in its final and sole discretion may accept or reject such recommendation. Ignite Payments or its sponsor bank in its sole discretion may change any fees charged to a Merchant under a Merchant Agreement from time to time without prior notice to Agent.

d. All Merchant Agreements (whether partially or fully completed), Merchant Accounts and Merchant or Prospective Merchant accounts, records and related information are owned by Ignite Payments, its sponsor bank or the applicable acquirer and may not be transferred, assigned, sold or exchanged, in whole or in part, by Agent. Accordingly, at Ignite Payments' request, Agent agrees to provide Ignite Payments with all information, files and materials related to Prospective Merchants and

DocuSign Envelope ID: D9888385-A95E-4Q89-AC65-AF555CB7CEF2

Merchants solicited or signed by Agent under this Agreement. If this Agreement terminates or Agent abandons a Prospective Merchant, Ignite Payments may complete the processing of such Prospective Merchant's submitted application and assist such merchant with the installation of any equipment. If this Agreement terminates, Ignite Payments shall not be required to terminate any Merchant Agreement with any Merchant.

**1.5.     Non-Competitive Sale of Services**. Agent, any former or current owner of a controlling interest in Agent, or any former or current partner, member, officer or director of Agent: (i) will not engage in any act that would injure Ignite Payments' relationship with its employees, agents, Prospective Merchants, Merchants or Ignite Payments' sponsor bank; (ii) will not directly or indirectly induce or influence any merchant to cancel or terminate any existing Merchant Account or Merchant Agreement; and, (iii) except with respect to any Prospective Merchant that Ignite Payments rejects or is on the Unacceptable List, (1) shall represent only Ignite Payments with respect to soliciting Prospective Merchants for the purchase of Services within the Territory, and (2) may not engage in any other Competing Activity. Nothing in this Agreement restricts or prohibits Agent from soliciting merchants, Prospective Merchants or Merchants for the purchase of any product or service that is not competitive to the Ignite Payments Services.

## 2. Agent Personnel

**2.1.     Agent Personnel**. Subject to **Section 2.2**, Agent shall have the right to designate suitable and desirable Agent Personnel, including Representatives. Agent shall be solely responsible for Agent Personnel and their acts, including any failure to comply with the terms of this Agreement that are applicable to Agent or failure to comply with Rules and applicable law, regulations and court orders. Agent Personnel shall be hired at Agent's own risk, expense and supervision, and Agent Personnel shall not have any claim against Ignite Payments for salaries, residuals, benefits, commissions, items of cost, or any other form of compensation or reimbursement. Agent acknowledges and agrees that no Agent Personnel are employees of Ignite Payments, and Agent is solely responsible for any taxes, payroll reporting, workers' or unemployment compensation insurance, compensation, benefits or any other obligations or liabilities that may arise (including verification of work eligibility in U.S.) due to Agent's hiring, retention or termination of or relationship with any Agent Personnel.

**2.2.     Representative Registration**. Prior to a Representative being permitted to solicit or submit any Merchant Applications, Agent must receive written confirmation from agent.compliance@firstdata.com that Ignite Payments has registered such Representative. Agent must provide Ignite Payments with a completed Ignite Payments Sales Representative Registration Form (located under Resources/Forms at MyAgentOffice.com) for such Representative and any other documentation or information concerning the Representative requested by Ignite Payments from time to time. Ignite Payments reserves the right to refuse to register or revoke the registration of any proposed or approved Representative that Ignite Payments, in its sole discretion, determines is a detriment to the business of Ignite Payments. Agent must notify Ignite Payments in writing of the termination of any Representative within three Business Days of such termination.

## 3. Ignite Payments' Obligations

**3.1.     Grant of Authority**. Ignite Payments hereby grants to Agent the right, on a non-exclusive basis, to solicit Prospective Merchants for the purchase of the Services from Ignite Payments within the Territory provided that no such Prospective Merchants already have, and have not had in the previous 90 days, an open Merchant Account.

**3.2.     Ignite Payments Services**. Ignite Payments shall be responsible for all processing and accounting functions relating to the clearing and settlement of Card transactions, including: (i) Merchant

DocuSign Envelope ID: D9B8B3BF-A95E-4C99-ACB5-AE585CB7CFF0

**EXHIBIT A**

processing and settlement; (ii) Merchant credit research; (iii) Merchant activation and approval; (iv) Merchant security and recovery; (v) Merchant customer services; (vi) Merchant chargeback and retrieval services; and (vii) all other back office services, including collecting amounts due from Merchants to Ignite Payments. Ignite Payments may contract with other persons to perform these functions on behalf of Ignite Payments but Ignite Payments remains primarily responsible for the functions. Subject to **Section 5.2**, Ignite Payments will make available to Agent training on the Ignite Payments Services.

## 4. Licensing

**4.1.    License.** Subject to **Section 1.1(b)** and this **Section 4**, Ignite Payments grants to the Agent during the Term, the limited, non-exclusive, non-assignable, revocable right to use the Trademarks (i) displayed on **Exhibit B** (as it may be modified from time to time by Ignite Payments in its sole discretion and provided to Agent via email or on MyAgentOffice.com), and (ii) posted under Policies on MyAgentOffice.com (as they may be modified from time to time by Ignite Payments or FDC in their sole discretion and provided to Agent via email or on MyAgentOffice.com) in the Territory in connection with Agent's marketing materials for the Ignite Payments Services. Upon termination of this Agreement, (i) the limited rights granted to Agent to use the Trademarks under this **Section 4** shall immediately terminate; (ii) Agent shall immediately cease and desist from all use of the Trademarks and any trade name, trademark, service mark, or logotype associated with Cards ("**Marks**"), except to the extent such use may be authorized under a separate agreement; (iii) at Ignite Payments' request, Agent will deliver to Ignite Payments all material and papers upon which the Trademarks or Marks appear or to which the Trademarks or Marks relate, including correspondence and information on Prospective Merchants or Merchants solicited or procured while the Agent solicited on behalf of Ignite Payments; and (iv) Agent will take all necessary actions to correct information that states or suggests that Agent is connected in any manner with Ignite Payments or its Trademarks, including correction of telephone and other directories, telephone information providers, postal offices, electronic mail providers, letterhead, business cards, office signage, Web page(s) on the Internet, domain name registries (if applicable), any post domain URL path (if applicable) and other communication delivery services.  Agent shall direct that all inquiries be forwarded to Ignite Payments' Moorpark office or such other place designated by Ignite Payments. If Agent fails to take any required action within 30 days of the termination of this Agreement, then Agent appoints, without power of revocation, Ignite Payments as its attorney in fact to act in Agent's place and with Agent's authority to take such corrective actions with the same legal force and effect as if such acts were performed by Agent.

**4.2.    Ownership of Trademarks**. Agent acknowledges that Ignite Payments or FDC is the owner or licensee of the Trademarks, and Card Brands are the owners of their respective Marks. Agent acknowledges that Ignite Payments, FDC and the Card Brands hold the exclusive right, title and interest in and to their respective marks. Agent will not at any time do or cause to be done any act or thing contesting or in any way impairing or tending to impair any part of such right, title and interest. In connection with the use of the Trademarks or Marks, Agent shall not in any manner represent that it has any ownership in the Trademarks, Marks or registrations thereof, and Agent acknowledges that use of the Trademarks or Marks do not create in the Agent's favor any right, title or interest in or to the Trademarks or Marks or the goodwill attached to and associated with the Trademarks or Marks. All uses of the Trademarks or Marks by the Agent shall inure to their respective owner. Agent will at no time during or after the Term register, adopt or use, any word or mark which is likely to be similar to or confusing with the Trademarks or Marks or any other marks owned or utilized by Ignite Payments or FDC. Agent agrees to not, at any time, use any Mark on its own behalf or suggest, imply or in any manner create an impression that it is a member of MasterCard, VISA, American Express, Discover or any other Card Brand with respect to which merchants submit transactions for processing under a Merchant Agreement. Any Card Brand may at any time and without notice prohibit Agent from using its Marks for any reason.

Agent must comply with additional terms governing Agent's use of Trademarks or Marks that may be posted on MyAgentOffice.com from time to time.

## 5. Relationship of the Parties

**5.1.    Independent Contractor**. Neither Agent nor any Agent Personnel is an employee of Ignite Payments for any purpose whatsoever. Agent is an independent contractor and as such is not eligible for any compensation, benefits, insurance or other employment terms that are provided to employees of Ignite Payments or any Ignite Payments Affiliates. Ignite Payments is interested only in the results obtained by Agent and Ignite Payments has no right to control Agent or Agent Personnel, including no right to require Agent or Agent Personnel to: (i) devote a fixed or minimum number of hours to selling or any other effort, (ii) follow prescribed itineraries or instructions, (iii) bind Ignite Payments, or (iv) do anything that would alter Agent's independent contractor status.  At all times, Agent has the sole right and responsibility to supervise, direct, and control Agent's business operations and Agent Personnel, including Agent office account receivables and payables and other office administration functions.

**5.2.    Expenses; Taxes**. Agent is solely responsible for all expenses and disbursements that may be incurred or due by Agent in connection with its performance of its obligations under this Agreement, including promotional materials, general selling, training, travel, entertainment, insurance, office equipment, maintenance, supplies, rental, lease, legal or accounting expenses; purchase or lease of office space; Agent Personnel salaries, benefits, taxes and other costs and expenses; and any federal, state or local tax or insurance obligations that may arise in connection with Agent's activities or due to receipt of payments by Agent under this Agreement.

**5.3.    Other**. Agent does not have the right or authority to and will not, and will not permit any Agent Personnel to, hold itself out as having any right, power or authority to create any contract or obligation, either express or implied, on behalf of, in the name of or binding upon Ignite Payments, or to pledge Ignite Payments' credit, or to extend credit in Ignite Payments' name. Without the prior written consent of Agent, Ignite Payments has no right or authority to, and will not, commit Agent in any matter or use Agent's name in any way not specifically authorized by this Agreement.

## 6. Term

**6.1.    Term**. Provided that both Agent and Ignite Payments execute this Agreement, this Agreement is effective on the first day of the calendar month in which it is signed by the last of the parties hereto (the "**Effective Date**"). This Agreement shall remain in effect for a one year period that begins on the Effective Date (the "**Initial Term**") and automatically renew for successive terms of one year each (each a "**Renewal Term**" and together with the Initial Term, the "**Term**"), unless either party provides the other party with written notice at least 60 days before the end of the then-current term that it will terminate this Agreement at the end of the then-current term.

**6.2.    Termination by Ignite Payments**.

          a.     With Cause without any Right to Cure. In addition to any other rights and remedies that it may have and notwithstanding **Section 6.2.b.,** Ignite Payments in its sole discretion may terminate this Agreement upon five calendar days prior written notice to Agent if any reasonable evidence is discovered indicating (i) Agent or any Agent Personnel have: (1) violated any confidentiality or intellectual property rights protected by this Agreement; (2) violated any applicable law, regulation, court order or Rule; or (3) committed any act of misrepresentation, fraud, forgery, dishonesty or other willful or malicious act; (ii) Agent has ceased its operation and activity as a sales agent for Ignite Payments; (iii) Ignite Payments is unable, after good faith efforts for a period of 30 days, to locate Agent; (iv) Agent generates less than 25

DocuSign Envelope ID: C988B3BE-A95E-4398-A985-AF585687CEE2

**EXHIBIT A**

new Open Accounts during any consecutive twelve month period; (v) Agent, any former or current owner of a controlling interest in Agent, or any former or current partner, member, officer or director of Agent, or any Agent Personnel breaches Agents obligations under **Section 8.1.d.** of this Agreement; or (vi) Agent's monthly Residual payment falls below $250.00.

b. <u>With Cause with a Right to Cure</u>. In addition to any other rights and remedies that it may have and notwithstanding **Section 6.2.a.**, Ignite Payments may terminate this Agreement if Agent is in breach of any of the terms, conditions, representations, warranties or covenants of this Agreement, including, without limitation, **Section 1.5.**, or the Agent Business Conduct Standards, but only upon giving Agent written notice of such breach and Agent's failure to cure such breach within 10 Business Days after receipt of such notice; provided, however, that if a cure cannot reasonably be accomplished within such 10-day period, Ignite Payments, in its sole discretion, may toll the cure period so long as the Agent commences a cure within such 10-day period and thereafter diligently pursues such cure as promptly as practical, but in no event will a cure period exceed 90 calendar days.

c. <u>Agent Insolvency</u>. If Agent makes any assignment of assets or business for the benefit of creditors, or if a trustee or receiver is appointed to administer or conduct its business or affairs, or if it is adjudged in any legal proceeding to be either a voluntary or involuntary bankruptcy, then the rights granted herein to Agent shall forthwith cease and terminate without prior notice or legal action by Ignite Payments.

**6.3.     Termination by Agent**. In addition to any other rights and remedies that it may have, Agent may terminate this Agreement if Ignite Payments is in breach of its obligations under **Section 7**, but only upon giving Ignite Payments written notice of such breach and Ignite Payments' failure to cure such breach within 10 Business Days after receipt of such notice, unless a cure cannot reasonably be accomplished within such period. In that case, the cure period will be tolled so long as Ignite Payments commences a cure within such 10-day period and thereafter diligently pursues such cure as promptly as practical, but in no event may a cure period exceed 90 calendar days.

**6.4.     Termination by Mutual Agreement**. The parties may terminate this Agreement at any time in a writing signed by both parties.

<div align="center">

**7. <u>Payments</u>**

</div>

**7.1.     Right to Payment**.

a.      Ignite Payments shall pay Residuals and certain other amounts set forth in this **Section 7** to Agent during the Term and after termination of this Agreement subject to the terms of this Agreement, including this **Section 7** and **Section 8**. Agent acknowledges and agrees that notwithstanding anything to the contrary set forth in any agreement entered into between Agent and Ignite Payments prior to the Effective Date (each, a "**Prior Agreement**"), all Merchant Accounts boarded by Agent on or after the Effective Date shall be boarded solely under this Agreement, and no such Merchant Accounts may be boarded under any Prior Agreement.

b.      Ignite Payments in its sole discretion may immediately discontinue payment of any amounts due to Agent after termination of this Agreement if: (i) Ignite Payments terminates this Agreement pursuant to **Sections 6.2.a(i), 6.2.a(ii), 6.2.a(iii), 6.2.a(v), 6.2(a)(vi), 6.2.b** or **6.2.c** above; (ii) Agent, any former or current owner of a controlling interest in Agent, or any former or current partner, member, officer or director of Agent: (1) engages in any act that would injure Ignite Payments' relationship with its employees, agents, Prospective Merchants, Merchants or Ignite Payments' sponsor bank; (2) directly or indirectly induces or influence any merchant to cancel or terminate any existing

DocuSign Envelope ID: C988B3BF-A02F-4B804-98F5-AE585CB7CFFF

Merchant Account or Merchant Agreement; or, (3) engages in a Competing Activity; (iii) Agent fails to remain in compliance with all terms and conditions of this Agreement that survive termination of this Agreement; (iv) Agent fails to remain current on all obligations to Ignite Payments and Ignite Payments' sponsor bank(s); or (v) Agent's monthly Residual payment falls below $250.00.

**7.2.     Payment for Services**. Subject to the terms of this Agreement,

a.     On or about the 20th day of each calendar month Ignite Payments shall pay to Agent a Residual for Merchant Accounts boarded by Agent on or after the Effective Date that are Open Accounts in accordance with the terms set forth in **Exhibit C**.

b.     At least monthly Ignite Payments shall pay to Agent payments for certain third party or other products and services subject to the terms set forth under Resources/Forms on MyAgentOffice.com. Ignite Payments may change the terms, including the amounts, of any such payments by providing Agent with at least 30 days prior written notice of such changes.

Agent must request an adjustment to any amounts paid to or by Agent pursuant to this **Section 7** within the 90 day period following the initial credit or debit or Ignite Payments has no obligation to make such adjustment.

**7.3.     Merchant Losses**. Ignite Payments shall bear the risk for Merchant Losses (other than those caused by the gross negligence or willful misconduct of Agent or Agent Personnel) and shall not deduct such Merchant Losses from any amounts due to Agent under this Agreement.

**7.4.     Right to Offset**. Agent hereby authorizes Ignite Payments at any time and from time to time, without notice or demand to Agent or to any other person (any such notice and demand being hereby expressly waived), to set off, recoup and to appropriate and apply any and all funds of Agent held by Ignite Payments, Ignite Payments' Affiliates or Ignite Payments' sponsor bank, against and on account of Agent's obligations to Ignite Payments or any Ignite Payments' Affiliates under this Agreement or any other agreement, including fees for equipment or the Services, whether such obligations are liquidated, unliquidated, fixed, contingent, matured or unmatured. Agent is prohibited from setting-off, offsetting or otherwise reducing or applying against any amounts due and owing to Ignite Payments under this Agreement or otherwise, any amounts owed or alleged to be owed to Agent by Ignite Payments under this Agreement or otherwise. Ignite Payments may in its sole discretion exercise the rights described in this **Section 7.4** by direct debit to Agent's bank account.  This offset right is in addition to all other rights and remedies available to Ignite Payments.

**7.5.     Right to Debit and Credit Agent's Bank Account**. All financial transactions between Agent and Ignite Payments, including payment for equipment purchases, may be automatically debited and credited by Ignite Payments, in its sole discretion, directly through Agent's bank account. Agent irrevocably consents to the debiting and crediting of its bank account(s) as provided herein. With respect to equipment transactions only, Ignite Payments shall provide 10 days advance written notice to Agent prior to initiating a debit entry. In order to activate automatic debit and credit service, Agent shall provide Ignite Payments with the required depository information and execute ACH Authorization Agreement Direct payments (Debits) Form and ACH Authorization Agreement Direct Payments (Credits) Form provided to Agent by Ignite Payments or any other form that Ignite Payments may request from time to time to accomplish the purposes set forth in this **Section 7.5**.

**7.6.     Loan**. Subject to applicable law, once every 12 months during the Term of this Agreement, Agent may be eligible (in Ignite Payments' sole discretion) to receive a loan from Ignite Payments in an amount equal to the product of two multiplied by Three Month Average Residuals subject to the terms and

conditions of a promissory note in the form provided by Ignite Payments and executed by Agent if Agent: (a) is not in breach of its obligations under this Agreement; (b) is current on all financial obligations to Ignite Payments and Ignite Payments Affiliates; and (c) has not had a promissory note payable to Ignite Payments outstanding at any time within the preceding 30 days.

## 8. Purchase and Sale of Agent Residual Rights

### 8.1. Residual Rights - Purchase.

a. During the Term, Ignite Payments may elect but is not required to purchase Agent's unencumbered right to receive future Residuals (excluding Residuals for Referral Open Accounts) subject to: (i) the terms and conditions of this Section 8.1; and (ii) Agent's completion of Ignite Payment's online Residual purchase process through MyAgentOffice.com.

b. Agent will not be eligible to accept any Residual purchase offer until the end of the second calendar quarter occurring after the Effective Date of this Agreement. In no event will Ignite Payments purchase (i) more than $500,000 worth of Residual rights from Agent during any consecutive 365 day period; (ii) more than $5,000,000 worth of Residual rights in the aggregate under this Agreement; and (iii) more than 5% of Agent's Residual rights in the number of Eligible Accounts during any calendar quarter. The 5% ceiling will be based on the number of Eligible Accounts existing on the first day of the calendar quarter following the date Acceptance is received by Ignite Payments. Ignite Payments online Residual purchase process is available through MyAgentOffice.com.

c. For purposes of this **Section 8.1**, Residual rights shall be valued at the multiples for each merchant account type established from time to time by Ignite Payments, in its sole discretion. Ignite Payments will post said multiples on MyAgentOffice.com. Ignite Payments shall have the right, in its sole discretion, to modify said multiples on 90 days prior written notice to Agent.

d. Agent agrees and covenants on behalf of: (i) itself, (ii) any former or current owner of a controlling interest in Agent, (iii) any former or current partner, member, officer or director of Agent and (iv) Agents Personnel that they will not directly or indirectly (a) solicit any Merchant corresponding to any Residual rights purchased by Ignite Payments; or (b) influence any Merchant corresponding to any Residual rights purchased by Ignite Payments to cancel its Ignite Payments Merchant Account.

### 8.2. Residual Rights – Cessation of Business.

a. During the Term of this Agreement, as long as Agent has not Accepted an Ignite Payments' offer to purchase Residual rights, if applicable, under **Section 8.1** of this Agreement within the prior 365 days, Ignite Payments, in its sole discretion, may elect but is not required to purchase Agent's unencumbered rights to receive future Residuals if Agent ceases to conduct the business of soliciting merchants for the purchase of Services from Ignite Payments and any and all competitors of Ignite Payments ("**Cessation of Business**") subject to the terms and conditions of this **Section 8.2**. Ignite Payments shall not purchase (i) more than $1,000,000 worth of Residual rights from Agent during any consecutive 365-day period; (ii) more than $4,000,000 worth of Residual rights in the aggregate under this Agreement. If Residual rights corresponding to Agent's Open Accounts exceed the aggregate ceiling of $4,000,000, Ignite Payments shall have the option of purchasing, the excess Residual rights over the aggregate ceiling of $4,000,000 in the final installment or continuing to pay monthly Residuals on the Open Accounts. Agent may Accept Ignite Payments offer to purchase Agent's Residual rights by completing and submitting the Acceptance of Ignite Payments Offer to Purchase Agent's Residual Rights (Cessation of Business) form as it is found at MyAgentOffice.com (also known as the Acceptance of Ignite Payments Offer to Purchase Agent's Residual Rights (Retirement) form) (the "**Cessation of**

DocuSign Envelope ID: 29988389FA95E-4998-A925-F2E5E5CBRCFF2

**Business Form**"), to Ignite Payments on or before the last day of the calendar quarter in which Agent retires. Submission of Acceptance shall be deemed made as of the date that the Cessation of Business Form is received by Ignite Payments.

b. For purposes of this **Section 8.2**, Residual rights shall be valued at the multiples for each Merchant Account Type established from time to time by Ignite Payments, in its sole discretion. Ignite Payments shall post said multiples on MyAgentOffice.com. Ignite Payments shall have the right, in its sole discretion, to modify said multiples on 90 days prior written notice to Agent.

c. Upon receiving Acceptance: (i) Ignite Payments will fix Agent's percentage of Gross Processing Revenue at its then current level; (ii) Ignite Payments will not be required to pay Agent Residuals or any other payment for any Open Accounts opened after receipt of Acceptance; and (iii) the portfolio of Eligible Accounts existing on the date Acceptance is received and which continue to exist on the date the last Residual rights are purchased shall be referred to herein as "**Cessation of Business Portfolio**"; and (iv) this Agreement will automatically terminate.

d. Ignite Payments' remaining purchase and payment obligations to Agent, if any, pursuant to this **Section 8.2** shall immediately terminate if, after delivering Acceptance pursuant to this **Section 8.2** and before all Ignite Payments payment obligations have been met, (i) Agent or any person having any ownership interest in Agent engages in a Competing Activity or carries out any act that would injure Ignite Payments in its relationship with its employees, customers or Merchants; (ii) Agent or any former or current owner of a controlling interest in Agent, or any former or current partner, member, officer or director of Agent or Agents Personnel directly or indirectly (a) solicit any Merchant in the Cessation of Business Portfolio; or (b) influence any Merchant in the Cessation of Business Portfolio to cancel its Ignite Payments Merchant Account.

**8.3.** **Right to Receive Future Residuals; Right of Last Refusal**. Subject to **Section 9** and provided Agent is not in breach of this Agreement, at any time during the Term, Agent may sell its right to receive future Residuals under this Agreement ("**Right to Receive Future Residuals**") to an Unrelated Third Party subject to the following terms and conditions:

a. Agent hereby grants to Ignite Payments a right of last refusal to purchase Agent's Right to Receive Future Residuals. If Agent receives a bona fide offer from a willing and able Unrelated Third Party buyer to purchase Agent's Right to Receive Future Residuals (a "**TP Offer**"), Agent shall notify Ignite Payments of the amount and terms of such TP Offer. Ignite Payments shall have the right to purchase Agent's Right to Receive Future Residuals on terms equal to the TP Offer, and Agent shall not sell or in any way transfer Agent's Right to Receive Future Residuals without first presenting Ignite Payments with the opportunity to match any TP Offer. Ignite Payments shall have 15 days to notify Agent of its decision whether or not to exercise its right to purchase Agent's Right to Receive Future Residuals.

b. If Ignite Payments does not exercise its right of last refusal, provided that Agent and Unrelated Third Party buyer execute and provide to Ignite Payments a residual re-direction letter in the form required by Ignite Payments, Agent may sell its Right to Receive Future Residuals in accordance with the terms of this **Section 8.3** and the TP Offer.

c. Nothing in this **Section 8.3** shall be construed or interpreted to impair any of Ignite Payments' rights under this Agreement, including **Section 9**, or to allow Agent to sell any interest in a Merchant, Merchant Agreement or Merchant Account, except for the sale of Agent's Right to Receive Future Residuals as set forth in this **Section 8.3**.

## 9. Confidentiality

**9.1.** **Restrictions on Use or Disclosure of Confidential Information**. Each of Ignite Payments and Agent agree that, without the written consent of the other, it will not divulge or disclose to third parties, directly or indirectly, any Confidential Information or use such Confidential Information except to the extent required in its business relationship with the other party or to carry out its obligations under this Agreement. For the avoidance of doubt, Agent shall keep the terms, conditions and existence of this Agreement strictly confidential, and under no circumstance may Agent distribute this Agreement or any other Ignite Payments Confidential Information for any purpose, including with respect to Agent's rights under **Section 8.3**, without Ignite Payments' prior written consent. No party will obtain any proprietary rights to any Confidential Information of the other party. Each party shall retain Confidential Information in its possession and control and shall protect the secrecy of such Confidential Information using the degree of care it uses to protect the secrecy of its own Confidential Information, but in no event less than a commercially reasonable degree of care.

**9.2.** **Exceptions**. Notwithstanding the foregoing, Ignite Payments shall not be prohibited from disclosing Confidential Information to the extent that it is related to Merchant Agreements, Merchant Accounts and Merchant or Prospective Merchant accounts, records and related information and other information relating to Ignite Payments business or Ignite Payments Services, but excluding any other information regarding the business of Agent, to the extent that such disclosure by Ignite Payments is for a bona fide business purpose; and, Agent's Confidential Information may be made available by or on behalf of Ignite Payments at Ignite Payments or Ignite Payments sponsor bank's direction to any Card Brand or to any other supervisory or regulatory authority to which Ignite Payments may be subject (including the Securities and Exchange Commission), upon their written request, or to secure advice from a legal or tax advisor.

## 10. Indemnity and Limitation of Liability

**10.1.** **Indemnification**. Agent shall indemnify, defend and hold harmless Ignite Payments and its officers, directors, shareholders, employees, agents and representatives against any and all Damages incurred directly or indirectly by Ignite Payments, whether or not litigation is commenced, incurred by or asserted against Ignite Payments, arising from or related to: (i) any debts incurred by Agent or Agent Personnel, including debts incurred with telephone, utility, and express mail companies; (ii) any claim of any officer, director, shareholder of the Agent or any Agent Personnel made against Ignite Payments for any compensation, benefit or other payment to such person; (iii) any activity or representation by Agent or any Agent Personnel in marketing, advertising, promoting or otherwise engaging in any activity arising from or related to this Agreement; (iv) any claim arising from the unauthorized use of the Trademarks or other Ignite Payments or Card Brand intellectual property; (v) any actions concerning alleged Agent or Representative improprieties in the solicitation, sale or leasing of the Ignite Payments Services or equipment; (vi) any breach of any term or condition of this Agreement, any Rules, law, regulation or court order or Business Conduct Standards; (vii) any representation, warranty or covenant of Agent made in or in connection with this Agreement being false or misleading; or (viii) losses experienced by Ignite Payments attributable to chargebacks, fines, penalties and other amounts due from a Merchant to Ignite Payments caused by the gross negligence or willful misconduct of Agent or Agent Personnel. As stated in elsewhere in this Agreement, Agent is acting hereunder as an independent contractor and neither Agent nor any Agent Personnel shall be considered to be an employee of Ignite Payments or its Affiliates or Ignite Payments' sponsor bank (collectively "Ignite Payments" for purposes of this **Section 10.1**). Notwithstanding anything to the contrary in **Section 10.4**, if (a) Agent or any Agent Personnel assert that Agent or any Agent Personnel is an employee of Ignite Payments; or (b) a federal, state or local governmental agency or court asserts or determines Agent or any Agent Personnel are employees of Ignite Payments, then Agent shall indemnify, defend and hold harmless Ignite Payments, its Affiliates, and their respective officers, directors and employees from any and all Damages and exemplary, punitive

or special damages associated with such claim and/or determination whether or not litigation is commenced, incurred by or asserted against Ignite Payments.

**10.2.    Statute of Limitations**. Notwithstanding the fact that the statute of limitations for bringing a legal action on a written contract, or other limitation period that could apply based upon the type of action or act, omission or violation being alleged, may be shorter or longer, the parties agree that any action, legal or equitable, based on, related to or arising out of the subject matter of this Agreement, and whether based on contract, tort, strict liability or some other legal or equitable theory of recovery, must be commenced by a party within one year after the earlier of (i) the date on which such party knew or should have known of the first alleged act, omission or violation, or (ii) with respect to obligations that do not survive termination of this Agreement, the date of termination of this Agreement.

**10.3.    Limitation of Liability**. Notwithstanding anything contained in this Agreement or otherwise, Ignite Payments' cumulative liability to Agent and anyone claiming by through or under Agent, for all Damages arising out of or related to this Agreement, and regardless of the form of action or legal theory shall not exceed, in the aggregate, the lesser of aggregate Residuals paid to agent in the twelve months preceding the act giving rise to the claim or $500,000.00. Agent understands the limitation on damages to be a reasonable allocation of risk and expressly consents to such risk allocation.

**10.4.    Exclusion of Damages**. Except as set forth in this Agreement, in no event shall either party, its parents, Affiliates or any of its or their directors, officers, employees, agents or sub-contractors be liable under any theory of tort, contract, strict liability or other legal or equitable theory for lost profits, exemplary, punitive, special, incidental, indirect or consequential damages, each of which is hereby excluded by agreement of the parties regardless of whether such damages were foreseeable or whether either party or any entity has been advised of the possibility of such damages.

## 11. General Provisions

**11.1.    Definitions; Word Usage.** Capitalized terms have the meanings set forth in **Exhibit A**. Unless the context clearly requires otherwise, (i) the plural and singular numbers shall each be deemed to include the other; (ii) "**shall**," "**will**," or "**agrees**" are mandatory, and "**may**" is permissive; (iii) "**or**" is not exclusive; and (iv) "**includes**" and "**including**" are not limiting.

**11.2.    Effect of Headings**. Subject headings of sections and subsections of this Agreement are included for convenience only and shall not affect the construction or interpretation of any of its provisions.

**11.3.    Entire Agreement**. This Agreement, including the exhibits hereto, constitutes the sole and exclusive terms and conditions and agreement between the parties relating to the subject matter hereof, and supersedes all prior or contemporaneous discussions, writings, negotiations, understandings and agreements with respect thereto.

**11.4.    Waiver or Modification Ineffective Unless in Writing**. Except as set forth in this Agreement, no amendment of any provision of this Agreement will be valid unless the same will be in writing and signed by each of the parties. No waiver by any party of any provision of this Agreement or any default, misrepresentation, or breach of warranty or covenant hereunder, whether intentional or not, will be valid unless the same will be in writing and signed by the party making such waiver nor will such waiver be deemed to extend to any prior or subsequent waiver, default, misrepresentation, or breach of warranty or covenant hereunder or affect in any way any rights arising by virtue of any prior or subsequent  waiver, default, misrepresentation, or breach of warranty or covenant except pursuant to its express terms.

DocuSign Envelope ID: ...

<p style="text-align:center"><span style="color:red">EXHIBIT A</span></p>

**11.5.    Assignment**. The rights and obligations of Agent under this Agreement are personal. Except as otherwise expressly provided in this Agreement, Agent shall not assign, subcontract, license, franchise, or in any manner attempt to transfer or extend to any third party this Agreement or any right or obligation of Agent under this Agreement, by operation of law or otherwise, without the prior written consent of Ignite Payments, which may be granted or withheld at the sole discretion of Ignite Payments.  For purposes of this Agreement, any transfer of ownership or voting control of Agent shall be considered an assignment or transfer hereof. This Agreement shall be binding upon and inure to the benefit of the parties hereto and their permitted successors and assigns.

**11.6.    Written Notice**. Unless otherwise specified in this Agreement, all notices and other communications required or permitted under this Agreement shall be in writing and shall be deemed delivered and effective when given by personal delivery, telefax (confirmed by a mailed copy) or first-class mail, postage prepaid, addressed as follows: (i) if to Agent, to the address set forth below Agent's signature line in this Agreement; and (ii) if to Ignite Payments to 5898 Condor Drive, Suite 220, Moorpark, CA 93021, Attention: Senior Vice President (Facsimile: 402.916.6610); with a copy to First Data Corporation, 5575 DTC Blvd., Suite 100 North, Greenwood Village, Colorado 80111, Attention: Legal Department (Facsimile: 303.967.8292). A party may change its address or addresses set forth above by giving the other party notice of the change in accordance with the provisions of this **Section 11.6**. In addition, Agent and Ignite Payments each may update its address through MyAgentOffice.com, and Ignite Payments may change the location of any documents, information or forms referenced in this Agreement and located on MyAgentOffice.com or the Ignite Payments marketing website on notice to Agent via email or MyAgentOffice.com.

**11.7.    Cooperation**. Ignite Payments and Agent will each timely furnish to the other any and all information and materials that the other may, from time to time, reasonably request in connection with all matters contemplated by this Agreement.  Each party also shall take the action as the other may, from time to time, reasonably request in order that the purposes of this Agreement will be fully accomplished and that all matters contemplated hereby will comply with all applicable laws, regulations, court orders and Rules.

**11.8.    Severability**. The invalidity of any paragraph or subparagraph hereof shall not affect the validity of any other paragraph or subparagraph hereof.

**11.9.    Governing Law and Waiver**. This Agreement shall be governed by the laws of the State of New York.  Agent waives personal service of process and consents that service of process upon it may be made by certified or registered mail, return receipt requested, at the address provided below the signature line of this Agreement.

**11.10.   Survival of Terms**. Subject to Section 10.2, the parties agree that those provisions of this Agreement that logically should survive its termination in order to accomplish the fundamental purposes of it will do so, including **Sections 1.1.a**, **1.2 (v)**, **(vii)** and **(ix)**, **1.3.**, **1.4.b – d**, **1.5.**, **2.1**, **4**, **5**, **7.1 – 7.5**, **9**, **10** and **11**.

**11.11.   Third Party Beneficiaries**. This Agreement is made for the benefit of Ignite Payments, Agent and their respective successors and assigns. In addition, Ignite Payments' sponsor bank is a third party beneficiary of this Agreement and may enforce this Agreement against Agent. No other person or entity has or acquires any rights by virtue of this Agreement.

**11.12.   Authority**. The person executing this document on behalf of Agent warrants that they have the full right, capacity and authority to cause such party to enter into this Agreement and that such party has all necessary authority to perform this Agreement.

DocuSign Envelope ID: D9B8B39F3A95E4098A635AE5B5C87CEF2

EXHIBIT A

**11.13.  No Presumption Against Drafter**. Ignite Payments and Agent have jointly participated in the negotiation of the terms of this Agreement. This Agreement shall be construed as if drafted jointly by Ignite Payments and Agent, and no presumptions arise favoring any party by virtue of the authorship of any provision of this Agreement.

*[Signatures appear on following page.]*

<span style="color:red">EXHIBIT A</span>

In consideration of the foregoing, the parties hereby execute this Agreement.

*Insert Agent Legal Name*  FRANCES GRACE, LP  **Ignite Payments, LLC**

Signature: _____  By: _____

Printed Name: _____  Name: _____

Title: _____  Title: _____

Date: _____  Date: _____

Address: _____  Approver: _____

_____

DocuSign Envelope ID: D9888397A95E4388A625C5E585GB7CFE3

<p style="text-align:center"><span style="color:red">EXHIBIT A</span></p>

# Exhibit A

### Definitions

**Accept or Acceptance** means the completion, execution and delivery to Ignite Payments of the Agent's acceptance through the buyout process in MyAgentOffice.com for Residual purchases or Ignite Payments receipt of a completed Cessation of Business Form, as applicable, as the process or form now exist and as they may be modified by Ignite Payments from time to time.

**Affiliate** means any entity that directly or indirectly controls, is controlled by or is under common control with a party.

**Agent Business Conduct Standards** means the business conduct standards that may be established or modified by Ignite Payments from time to time and posted under Policies on MyAgentOffice.com.

**Agent Personnel** means Representatives and any other personnel or contractors of Agent.

**Business Day** means any calendar day other than Saturdays, Sundays, or California or federal holidays.

**Buy Rates** means the amounts set forth under Resources/Forms on MyAgentOffice.com.

**Card** means a credit, debit or other card issued by a member of a Card Brand, including MasterCard, Visa and Discover, and bearing its respective trade name, Mark, or trade symbol, which is of the type accepted for processing under the Merchant Agreement.

**Card Brand** means an entity formed to govern the proper administration and promotion of credit, debit and other cards, including MasterCard, Visa, American Express, Discover and any other entity whose cards may be accepted by merchants for payment for goods or services under the Merchant Agreement.

**Cessation of Business** is defined in **Section 8.2.a**.

**Cessation of Business Portfolio** is defined in Section **8.2.c**.

**Challenge Notice** is defined in **Section 1.3**.

**Competing Activity** means, whether directly or indirectly, the ownership, management, operation, control, participation in, performance of services for, the solicitation of merchants for, or otherwise carrying on, a business similar to or competitive with the electronic transaction processing business of Ignite Payments, including the Services (whether as a principal, agent, independent contractor, partner, employer, proprietor, stockholder, director or otherwise), anywhere in the Territory.

**Confidential Information** means all proprietary, secret or confidential information or data relating to a party and its Affiliates, operations, employees, products or services, clients, customers, potential customers and Ignite Payments' Services. Confidential Information shall include proprietary information of Card Brands, pricing information, Merchant Agreements (whether partially or fully completed), Merchant Accounts and Merchant or Prospective Merchant accounts, records and related information, customer lists, cardholder account numbers, Personal Data, computer access codes, instruction and/or procedural manuals and this Agreement and the terms and conditions of this Agreement. Information shall not be considered Confidential Information to the extent, but only to the extent, that such information: (i) is already known to the receiving party free of any restriction at the time it is obtained; (ii) is subsequently learned from an independent third party free of any restriction and without breach of

Ignite Payments Existing Agent Launch Agreement

DocuSign Envelope ID: 2988B80F-A95F-4388-A62C-C5F5E5BZCEE2

this Agreement; (iii) becomes publicly available through no wrongful act of the receiving party; (iv) is independently developed by the receiving party without reference to any Confidential Information of the other; or (v) is required to be disclosed under law, provided that the receiving party first gives the disclosing party prompt written notice of the required disclosure and commercially reasonable time to allow the disclosing party to seek a protective order or other appropriate remedy.

**Current Level of Account Production** means the number of new Merchant Accounts for Merchants boarded by Agent during the specified time period.

**Damages** means demands, claims, actions or causes of action, assessments, losses, damages, liabilities, judgments, settlement amounts, costs and expenses, including interest, fines, penalties and reasonable expert witness fees and expenses, and attorneys' fees and expenses.

**Deduction Notice** is defined in **Section 1.3**.

**Effective Date** is defined in **Section 6.1**.

**Eligible Accounts** means those Open Accounts that: i) are either in their first renewal term or have been open for more than 12 consecutive months; ii) are not in collections; iii) have not provided Ignite Payments with notice of cancellation; and iv) are in compliance with all Rules.

**FDC** means First Data Corporation or its successors or assigns.

**Gross Processing Revenue** means all Income collected on Open Accounts, excluding those for which Ignite Payments has purchased the Residual rights, minus: Card Brand interchange fees; Card Brand dues and assessments; Buy Rates; Refunds caused by processing errors or the gross negligence or willful misconduct of Agent or Agent Personnel; and Merchant Losses caused by the gross negligence or willful misconduct of Agent or Agent Personnel.

**Ignite Launch Residual Schedule** or **Ignite Launch Schedule** is defined in **Exhibit C**.

**Ignite Payments' sponsor bank** means the bank that is the sponsoring bank or acquiring bank for Card transactions processed pursuant to the Merchant Agreement, as applicable.

**Income** consists of the following items on all Open Accounts: (1) all discount fees (qualified, mid-qualified, and non-qualified) on MasterCard, Visa, Discover, Diners, debit and JCB transactions; (2) transaction fees, (3) batch header fees, (4) address verification service fees, (5) monthly minimum fees, (6) customer support fees, (7) statement fees, (8) monthly Ignite Payments merchant club fees, (9) American Express residuals, (10) JCB fees, (11) chargeback/retrieval fees, (12) annual fees (13) account closure fees and (14) early termination fees**.**

**Initial Term** is defined in **Section 6.1**.

**Marks** are defined in **Section 4.1**.

**Merchant** means an entity that submits a Merchant Agreement to Ignite Payments that indicates such entity was solicited by Agent and results in a Merchant Account.

**Merchant Account** means a Merchant Agreement that has been approved and entered into by Ignite Payments and Ignite Payments sponsor bank.

# EXHIBIT A

**Merchant Agreement** means the form of merchant application and merchant agreement in use by Ignite Payments and its sponsor bank in connection with the Ignite Payments Services, as it may be modified from time to time by Ignite Payments and its sponsor bank in their sole discretion.

**MCC Codes** means the four digit Merchant Category Classification codes created by Visa International, Inc. and listed in the Visa USA Merchant Data Manual to identify a particular merchant's principal trade, profession or line of business.

**Merchant Losses** means all losses experienced by Ignite Payments attributable to chargebacks, fines, penalties and other amounts due from a Merchant to Ignite Payments in excess of a Merchant's reserve account.

**Open Account** means a Merchant Account for a Merchant that is classified as "open" on an Ignite Payments settlement platform and has not been cancelled or terminated.

**Personal Data** means any information that is "personally identifiable" within the meaning of the Gramm-Leach-Bliley Act (15 USC § 6801, et seq.) and its implementing regulations (or any superseding or replacement laws, regulations or guidelines), as they may now exist or be enacted, adopted, issued or promulgated.

**Privacy Laws** means all laws, regulations and guidelines applicable to the use, disclosure and processing of Personal Data on behalf of Ignite Payments or its Affiliates, including the Gramm-Leach-Bliley Act (GLBA) and the Healthcare Insurance Portability and Accountability Act (HIPAA), as they may now exist or be enacted, adopted, issued or promulgated.

**Prospective Merchant** means any entity solicited by Agent for Services to be provided by Ignite Payments pursuant to a Merchant Agreement.

**Referral Open Account** means an Open Account resulting from a lead from a third party referral source to Agent with respect to which Ignite Payments is obligated to pay such third party a referral fee.

**Refunds** means refunds to Merchants of any billed and collected amounts.

**Renewal Term** is defined in **Section 6.1**.

**Representative** means all salespersons, employees, agents or representatives appointed or designated by Agent to act on Agent's behalf in connection with performance of Agent's obligations under this Agreement.

**Residuals** means the payments due to Agent by Ignite Payments pursuant to **Section 7.2.a.** of this Agreement.

**Rules** means the rules and regulations now existing, as they may be modified in the future, and any rules and regulations hereafter promulgated by any Card Brand, including the rules and regulations contained in: (i) the Visa U.S.A. Inc. ("**Visa**") Operating Regulations, (ii) MasterCard International Incorporated ("**MasterCard**") Operations Manual, (iii) Discover Financial Services, LLC ("**Discover**") operating regulations, (iv) American Express Travel Related Services Company, Inc. ("**American Express**") operating regulations, as applicable.

**Services** means electronic transaction processing of Card and certain other transactions and related services and support systems as described in the Merchant Agreement.

DocuSign Envelope ID: 19888BDF3A95E4B88A635AE5B56B7CEE2

**Term** is defined in **Section 6.1**.

**Territory** means the United States, as currently defined by Visa.

**Three Month Average Residuals** is defined in **Section 1.3**.

**TP Offer** is defined in **Section 8.3 b**.

**Trademarks** means the marks set forth on **Exhibit B** and FDC's marks posted under Policies on MyAgentOffice.com.

**Unacceptable List** is defined in **Section 1.4**.

**Unrelated Third Party** means any person who is not and is not a relative of, Agent, any former or current owner of a controlling interest in Agent, or any former or current partner, member, officer or director of Agent or any entity in which Agent, any former or current owner of a controlling interest in Agent, or any former or current partner, member, officer or director of Agent has ownership interest or employment relationship.

DocuSign Envelope ID: D988B3BF-A95F-4988-A635-A5EB56B7CEF3

**EXHIBIT A**

**Exhibit B**

**Trademarks**

(1) **IGNITE PAYMENTS™**

(2)



(3)



*5-2015*

DocuSign Envelope ID: 2988B38D7A95E4388A925CA5B856B2CE52

EXHIBIT A

**Exhibit C**

**Residuals Paid for Merchants Boarded on or after the Effective Date**

A.      Notwithstanding anything to the contrary in this **Exhibit C**, if Agent entered into his or her first Prior Agreement with Ignite Payments on or after January 1, 2014, Agent's Residuals during the Initial Period for Launch Open Accounts shall be fixed at 60% of Gross Processing Revenue for such Launch Open Accounts. "**Initial Period**" shall mean the first 12 full calendar months following the execution of this Agreement; provided, however, that if Agent entered into his or her first Prior Agreement with Ignite Payments on or after January 1, 2015, the Initial Period shall mean the first 24 full calendar months following the execution of this Agreement. "**Launch Open Accounts**" means Merchant Accounts boarded by Agent on or after the Effective Date that are Open Accounts.

B.      Residuals for Launch Open Accounts for a calendar month shall be an amount equal to the product of Gross Processing Revenue for Launch Open Accounts for such calendar month multiplied by the applicable percentage from the Ignite Launch Residual Schedule set forth below ("**Ignite Launch Schedule**"):

| Gross Processing Revenue for Open Accounts | | Percentage |
|---|---|---|
| - | 20,000 | 40% |
| 20,001 | 30,000 | 45% |
| 30,001 | 70,000 | 50% |
| 70,001 | 100,000 | 55% |
| 100,001 | 130,000 | 60% |
| 130,001 | 330,000 | 65% |
| 330,001 | 670,000 | 70% |
| 670,001 | 1,330,000 | 75% |
| 1,330,001+ | | 80% |

The Ignite Launch Schedule percentage shall be determined based upon the Gross Processing Revenue at the end of each calendar month under this Agreement. The percentage shall be recalculated and effective on the first day of each month. The monthly recalculation may result in an increase, decrease or no change to the Ignite Launch Schedule percentage. The Ignite Launch Schedule percentage will be increased or decreased if the Gross Processing Revenue during the Measurement Period is in a higher or lower tier, as applicable on the Ignite Launch Schedule. The following schedule summarizes the trigger dates regarding the calculation of the percentage that will be used to calculate Residuals:

| Measurement Period | Effective Date |
|---|---|
| December | January 1 |
| January | February 1 |
| February | March 1 |
| March | April 1 |
| April | May 1 |
| May | June 1 |
| June | July 1 |
| July | August 1 |
| August | September 1 |

DocuSign Envelope ID: 2988B89F3A95E4D88A635A45E55EB7CEE2

EXHIBIT A

| September | October 1 |
|-----------|-----------|
| October | November 1 |
| November | December 1 |

C.     Ignite Payments in its sole discretion may modify the Ignite Launch Schedule in so far as it affects Ignite Payments Residual obligations prospectively, with respect to any existing Open Accounts subject to the Ignite Launch Schedule or both, by giving Agent 90 days prior written notice; provided, however, that Agent may terminate this Agreement within 90 days of receiving such notice from Ignite Payments by giving Ignite Payments written notice of termination within such 90 day period.

D.     Ignite Payments may, in its sole discretion, credit Agent for Referral Open Accounts. To "**credit Agent**" means that Ignite Payments will pay Agent Residuals for such Merchant, provided, however, that Agent's Residuals for such Merchant will be reduced by 100% of any recurring referral fee paid by Ignite Payments to the third party referral source during each month preceding payment of Agent's Residuals for the referral. The adjustments to Agent's Residuals referenced above will apply to all recurring referral fees paid by Ignite Payments after the execution of this Agreement including referral fees paid with respect to Merchants referred by third parties prior to the execution of this Agreement. Agent's Residuals will also be reduced by 100% of any non-recurring referral fees such as one-time commissions paid by Ignite Payments to any third party referral source.

EXHIBIT A



## Certificate of Completion

| | | |
|---|---|---|
| Envelope Number: D088B3BFA05F4CB9AC25A5EB5CB7CFE2 | | Status: Sent |
| Subject: Please DocuSign this document: Ignite Launch Agent Agreement - Existing Agents.pdf | | |
| Agent NO: | | |
| Source Envelope: | | |
| Document Pages: 22 | Signatures: 2 | Envelope Originator: |
| Certificate Pages: 5 | Initials: 1 | Ignite Payments |
| AutoNav: Enabled | | 5565 Glenridge Dr |
| EnvelopeId Stamping: Enabled | | Atlanta, WA  30342-1335 |
| | | agent.administration@firstdata.com |
| | | IP Address: 204.194.143.30 |

## Record Tracking

| | | |
|---|---|---|
| Status: Original | Holder: Ignite Payments | Location: DocuSign |
| 5/18/2015 4:56:11 PM ET | agent.administration@firstdata.com | |

| Signer Events | Signature | Timestamp |
|---|---|---|
| KENT FLANNERY | | Sent: 5/18/2015 4:56:13 PM ET |
| KENT@IGNITEPAYMENTS-MPLS.COM | | Viewed: 5/18/2015 5:01:05 PM ET |
| Security Level: Email, Account Authentication (None) | | |
| Electronic Record and Signature Disclosure: | | |
| Accepted: 5/18/2015 5:01:05 PM ET | | |
| ID: 77125f75-4cb5-4132-98c5-3485181ae147 | | |
| | | |
| Ignite Payments | | |
| agent.administration@firstdata.com | | |
| Security Level: Email, Account Authentication (None) | | |
| Electronic Record and Signature Disclosure: | | |
| Not Offered | | |
| ID: | | |
| | | |
| Brian Goudie | | |
| Brian.Goudie@firstdata.com | | |
| Security Level: Email, Account Authentication (None) | | |
| Electronic Record and Signature Disclosure: | | |
| Not Offered | | |
| ID: | | |

| In Person Signer Events | Signature | Timestamp |
|---|---|---|

| Editor Delivery Events | Status | Timestamp |
|---|---|---|

| Agent Delivery Events | Status | Timestamp |
|---|---|---|

| Intermediary Delivery Events | Status | Timestamp |
|---|---|---|

| Certified Delivery Events | Status | Timestamp |
|---|---|---|

| Carbon Copy Events | Status | Timestamp |
|---|---|---|

| Notary Events | | Timestamp |
|---|---|---|

| Envelope Summary Events | Status | Timestamps |
|---|---|---|
| Envelope Sent | Hashed/Encrypted | 5/18/2015 4:56:13 PM ET |

EXHIBIT A

**Electronic Record and Signature Disclosure**

## ELECTRONIC RECORD AND SIGNATURE DISCLOSURE

From time to time, Ignite (we, us or Company) may be required by law to provide to you certain written notices or disclosures. Described below are the terms and conditions for providing to you such notices and disclosures electronically through your DocuSign, Inc. (DocuSign) Express user account. Please read the information below carefully and thoroughly, and if you can access this information electronically to your satisfaction and agree to these terms and conditions, please confirm your agreement by clicking the 'I agree' button at the bottom of this document.

### Getting paper copies

At any time, you may request from us a paper copy of any record provided or made available electronically to you by us. For such copies, as long as you are an authorized user of the DocuSign system you will have the ability to download and print any documents we send to you through your DocuSign user account for a limited period of time (usually 30 days) after such documents are first sent to you. After such time, if you wish for us to send you paper copies of any such documents from our office to you, you will be charged a $0.00 per-page fee. You may request delivery of such paper copies from us by following the procedure described below.

### Withdrawing your consent

If you decide to receive notices and disclosures from us electronically, you may at any time change your mind and tell us that thereafter you want to receive required notices and disclosures only in paper format. How you must inform us of your decision to receive future notices and disclosure in paper format and withdraw your consent to receive notices and disclosures electronically is described below.

### Consequences of changing your mind

If you elect to receive required notices and disclosures only in paper format, it will slow the speed at which we can complete certain steps in transactions with you and delivering services to you because we will need first to send the required notices or disclosures to you in paper format, and then wait until we receive back from you your acknowledgment of your receipt of such paper notices or disclosures. To indicate to us that you are changing your mind, you must withdraw your consent using the DocuSign 'Withdraw Consent' form on the signing page of your DocuSign account. This will indicate to us that you have withdrawn your consent to receive required notices and disclosures electronically from us and you will no longer be able to use your DocuSign Express user account to receive required notices and consents electronically from us or to sign electronically documents from us.

### All notices and disclosures will be sent to you electronically

Unless you tell us otherwise in accordance with the procedures described herein, we will provide electronically to you through your DocuSign user account all required notices, disclosures, authorizations, acknowledgements, and other documents that are required to be provided or made available to you during the course of our relationship with you. To reduce the chance of you inadvertently not receiving any notice or disclosure, we prefer to provide all of the required notices and disclosures to you by the same method and to the same address that you have given us. Thus, you can receive all the disclosures and notices electronically or in paper format through the paper mail delivery system. If you do not agree with this process, please let us know as described below. Please also see the paragraph immediately above that describes the consequences of your electing not to receive delivery of the notices and disclosures electronically from us.

### How to contact Ignite:

You may contact us to let us know of your changes as to how we may contact you electronically, to request paper copies of certain information from us, and to withdraw your prior consent to receive notices and disclosures electronically as follows:
 To contact us by email send messages to: chris.jones@firstdata.com

**To advise Ignite of your new e-mail address**
To let us know of a change in your e-mail address where we should send notices and disclosures electronically to you, you must send an email message to us at chris.jones@firstdata.com and in the body of such request you must state: your previous e-mail address, your new e-mail address. We do not require any other information from you to change your email address..
In addition, you must notify DocuSign, Inc to arrange for your new email address to be reflected in your DocuSign account by following the process for changing e-mail in DocuSign.

**To request paper copies from Ignite**
To request delivery from us of paper copies of the notices and disclosures previously provided by us to you electronically, you must send us an e-mail to chris.jones@firstdata.com and in the body of such request you must state your e-mail address, full name, US Postal address, and telephone number. We will bill you for any fees at that time, if any.

**To withdraw your consent with Ignite**
To inform us that you no longer want to receive future notices and disclosures in electronic format you may:
> i. decline to sign a document from within your DocuSign account, and on the subsequent page, select the check-box indicating you wish to withdraw your consent, or you may;
> ii. send us an e-mail to chris.jones@firstdata.com and in the body of such request you must state your e-mail, full name, IS Postal Address, telephone number, and account number. We do not need any other information from you to withdraw consent..  The consequences of your withdrawing consent for online documents will be that transactions may take a longer time to process..

**Required hardware and software**

| Operating Systems: | Windows2000? or WindowsXP? |
|---|---|
| Browsers (for SENDERS): | Internet Explorer 6.0? or above |
| Browsers (for SIGNERS): | Internet Explorer 6.0?, Mozilla FireFox 1.0, NetScape 7.2 (or above) |
| Email: | Access to a valid email account |
| Screen Resolution: | 800 x 600 minimum |
| Enabled Security Settings: | •Allow per session cookies  •Users accessing the internet behind a Proxy Server must enable HTTP 1.1 settings via proxy connection |

** These minimum requirements are subject to change. If these requirements change, we will provide you with an email message at the email address we have on file for you at that time providing you with the revised hardware and software requirements, at which time you will have the right to withdraw your consent.

**Acknowledging your access and consent to receive materials electronically**

To confirm to us that you can access this information electronically, which will be similar to other electronic notices and disclosures that we will provide to you, please verify that you were able to read this electronic disclosure and that you also were able to print on paper or electronically save this page for your future reference and access or that you were able to e-mail this disclosure and consent to an address where you will be able to print on paper or save it for your future reference and access. Further, if you consent to receiving notices and disclosures exclusively in electronic format on the terms and conditions described above, please let us know by clicking the 'I agree' button below.

By checking the 'I Agree' box, I confirm that:

- I can access and read this Electronic CONSENT TO ELECTRONIC RECEIPT OF ELECTRONIC RECORD AND SIGNATURE DISCLOSURES document; and

- I can print on paper the disclosure or save or send the disclosure to a place where I can print it, for future reference and access; and

- Until or unless I notify Ignite as described above, I consent to receive from exclusively through electronic means all notices, disclosures, authorizations, acknowledgements, and other documents that are required to be provided or made available to me by Ignite during the course of my relationship with you.

**PREMIER AGENT AGREEMENT**

<div align="right">

**INTERNAL USE ONLY:**

**AGENT NO.: 33670**

**DBA NAME: FDIS MINNEAPOLIS**

</div>

This Premier Agent Agreement (this "**Agreement**") is between Cardservice International, LLC, a California limited liability company, doing business as First Data Independent Sales ("**FDIS**") and Hunter Grace, LLC, a[n] _____ (State) [corporation/partnership/sole proprietorship/limited liability company] ("**Agent**").

FDIS is an Independent Sales Organization and Member Service Provider as defined under Card Organization Rules. FDIS is in the business of providing Services. Agent is a person or entity in the business of soliciting purchasers of Services. FDIS and Agent wish to enter into a relationship in which Agent will represent FDIS with respect to soliciting purchasers of FDIS Services on the terms and conditions contained in this Agreement.

<div align="center">

**Agreement**

</div>

In consideration of the foregoing and the covenants and conditions in this Agreement, Agent and FDIS agree as follows:

<div align="center">

**1. <u>Agent Obligations</u>**

</div>

**1.1.    General Obligations**.

       a. <u>Professional and Compliant Business Practices</u>. Agent will operate its business, including maintaining the security of related business, Prospective Merchant, Merchant and cardholder records, in a professional manner in compliance with this Agreement and all applicable laws (including Privacy Laws and USPS Move Update Requirements), regulations, court orders, Card Organization Rules and Agent Business Conduct Standards, which are incorporated into this Agreement as they may now exist or be enacted, adopted, issued or promulgated.

       b. <u>Promotional Information; Use of Trade names and Trademarks</u>. Marketing materials, including business cards and stationary, and Web sites created by Agent (other than those FDIS materials printed from the FDIS Brand Center at fdisbrandcenter.com) that contain trade names, trademarks, service marks or logos of, or that reference the services provided by, FDIS, FDIS' sponsor bank, FDC or any Card Organization must be submitted to agent.compliance@firstdata.com for review. Agent agrees to not disseminate or publish any such materials or Web sites until Agent has received written approval from agent.compliance@firstdata.com. In compliance with the law, Agent may not send unsolicited fax advertisements that promote FDIS Services to Merchants or Prospective Merchants. Because Agent is not a registered ISO, Card Organization Rules require that Agent's business telephone be listed and answered by reference to the registered ISO (i.e. "First Data Independent Sales" or "FDIS") and permit Agent to also reference its approved fictitious business name.

**1.2.    Agent Representations**. To comply with legal requirements, Agent represents, warrants and covenants that:

    i.    Agent shall present, and shall cause its Representatives to present, to each person who executes a Merchant Agreement a copy of such Merchant Agreement at or before the time the person executes the Merchant Agreement.

    ii.   Agent shall use, and shall cause its Representatives to use, only the Merchant Agreement that is designated by FDIS. Agent shall use, and shall cause its Representatives to use, the most current version of such Merchant Agreement.

iii. In Face-to-Face Transactions ("**Face-to-Face Agent Transactions**" means those transactions in which Agent meets in person with a merchant, which does not include transactions conducted over the telephone, by facsimile, or over the Internet) where a person executes a paper, rather than an electronic, version of the Merchant Agreement, Agent shall leave, and shall cause his or her Representatives to leave, with each such person a copy of the executed Merchant Agreement.

iv. In Face-to-Face Agent Transactions where a person executes an electronic, rather than a paper, version of the Merchant Agreement, Agent shall, and shall cause its Representatives to, either (1) advise each such person that a sample copy of the then-current version of the standard Merchant Agreement is available on the FDIS Web site, or (2) leave with each such person a hardcopy or electronic copy of the executed Merchant Agreement.

v. Agent shall not misrepresent, and shall prohibit its Representatives from misrepresenting, any term of the Merchant Agreement.

vi. Agent shall provide, and shall cause its Representatives to provide, full and fair disclosure of the Merchant Agreement to Prospective Merchants and Merchants, including disclosures related to all charges, minimum fees, limitations, initial and renewal terms of agreements and warranty services.

vii. Agent shall not misrepresent, and shall prohibit its Representatives from misrepresenting, the manner in which FDIS provides its services or the procedures FDIS follows, including services and procedures related to chargebacks, loss prevention, ATM/Debit and equipment leasing.

viii. Agent and Agent Personnel will not make, or offer to make, any payments to, or confer, or offer to confer, any benefit upon any employee, agent or fiduciary of any third party (including any government, or agency or instrumentality thereof) with the intent to influence the conduct of such employee, agent or fiduciary in relation to the business or affairs of such third party.

ix. If Agent becomes aware of any actual or alleged fraudulent activities or misrepresentations by it or its Representatives, whether or not related to the FDIS Services, Agent will promptly advise FDIS and take all necessary corrective action the Agent determines in its discretion, to be necessary or appropriate.

Agent's failure to satisfy any of the above legal requirements will constitute a breach of this Agreement and be subject to remedial and other action as provided under this Agreement.

Additionally, as Agent is engaged in a separate business, Agent represents, warrants and covenants will use its full legal name (not Agent's DBA name) (1) for Agent's bank accounts, recruiting and similar materials relating to operation of Agent's business, (2) when signing any agreements with merchants for any services offered by Agent that are not described in and billed under the Merchant Agreement including sale, lease and/or rental of point-of-sale terminals and other ancillary products or services, and (3) for any agreements that are between Agent and a third party (including any merchant, lease company, bank, Yellow Page company or other vendor) for any purchase, sale or services (including leases, rental agreements, agreements for web design services, advertising services).

Agent also represents, warrants and covenants that execution and delivery of this Agreement by Agent and the consummation of the transaction herein contemplated does not conflict in any material respect with or constitute a material breach or material default under the terms and conditions of any documents, agreements or other writings to which it is a party, including any covenant not to compete or confidentiality agreement with any third party.

**1.3.    Assessments**. Subject to Agent's challenge rights as noted below, the parties agree that Agent shall pay to FDIS immediately upon written demand to Agent from agent.compliance@firstdata.com: (i) the amount of any fine, assessment or other amount charged to FDIS by any third party relating to

Agent's violation of any law, regulation, court order or Card Organization Rule; or (ii) fines to Agent by FDIS for Agent's breach of a material term of this Agreement (including **Section 1.2**) or repeated breach of any term of this Agreement, which fines shall be an amount equal to the greater of $250.00 or: (1) for the first fine, an amount equal to the product of (A) 10% multiplied by (B) an amount equal to the average of Agent's monthly Residuals for the 3 calendar months preceding the date on which the fine is assessed ("**Three Month Average Residuals**"), or (2) for each fine thereafter, an amount equal to the product of (A) 20% multiplied by (B) Three Month Average Residuals. The parties agree that if Agent disputes any demand made to Agent by FDIS pursuant to this **Section 1.3**, Agent may challenge such demand by delivering a written notice ("**Challenge Notice**") to FDIS at agent.compliance@firstdata.com within 10 Business Days after Agent's receipt of FDIS' written demand. The Challenge Notice must state all reasons why such demand should not have been made. If FDIS fails to act on the Challenge Notice within 20 Business Days after its receipt of such, then Agent shall not be obligated to pay to FDIS the amount demanded. The imposition by FDIS or a third party of any assessment, fine or charge against Agent does not constitute a waiver of any legal rights or remedies FDIS may have against Agent. FDIS reserves the right to pursue any and all legal rights and remedies against Agent under this Agreement or applicable law.

**1.4.    Prospective Merchants; Merchants; Merchant Agreements**.

a.    FDIS will not accept Prospective Merchant types that are identified as "Unqualified/Unacceptable" in the FDIS Credit Policy posted under Resources/Policies on MyagentOffice.com, as it may be modified from time to time by FDIS in its sole discretion (the "**Unacceptable List**"). Agent agrees to use best efforts to verify that each Prospective Merchant conducts or intends to conduct a bona fide, lawful business operation (e.g., by inspecting a Prospective Merchant's premises to determine if it has the proper facilities, equipment, inventory and license to conduct its business or reviewing its Internet site). Agent also agrees to use its best efforts to inform FDIS of any information that could reasonably be considered relevant to a determination of any Prospective Merchant or Merchant's creditworthiness.

b.    All Merchant Agreements are subject to review and rejection or approval by FDIS in its sole discretion. FDIS will not approve Merchant Agreements that are not fully completed and executed by the Prospective Merchant. FDIS may terminate any Merchant Agreement at any time in accordance with its terms.

c.    Agent may recommend to FDIS and/or its sponsor bank the discount rate and fees charged to a Prospective Merchant or Merchant pursuant to the Merchant Agreement, but FDIS and/or its sponsor bank in its final and sole discretion may accept or reject such recommendation. FDIS or its sponsor bank in its sole discretion may change any fees charged to a Merchant under a Merchant Agreement from time to time without prior notice to Agent.

d.    All Merchant Agreements (whether partially or fully completed), Merchant Accounts and Merchant or Prospective Merchant accounts, records and related information are owned by FDIS, its sponsor bank or the applicable acquirer and may not be transferred, assigned, sold or exchanged, in whole or in part, by Agent. Accordingly, at FDIS' request, Agent agrees to provide FDIS with all information, files and materials related to Prospective Merchants and Merchants solicited or signed by Agent under this Agreement. If this Agreement terminates or Agent abandons a Prospective Merchant, FDIS may complete the processing of such Prospective Merchant's submitted application and assist such merchant with the installation of any equipment. If this Agreement terminates, FDIS shall not be required to terminate any Merchant Agreement with any Merchant.

**1.5.    Exclusivity for Sale of Services**. Agent, any former or current owner of a controlling interest in Agent, or any former or current partner, member, officer or director of Agent: (i) will not engage in any

act that would injure FDIS' relationship with its employees, agents, Prospective Merchants or Merchants; (ii) will not directly or indirectly induce or influence any merchant to cancel or terminate any existing Merchant Account or Merchant Agreement; and, (iii) except with respect to any Prospective Merchant for which FDIS cannot provide the Services such Prospective Merchant requires or that FDIS rejects or is on the Unacceptable List, (1) shall represent only FDIS with respect to soliciting Prospective Merchants for the purchase of Services within the Territory, and (2) may not engage in any other Competing Activity. Nothing in this Agreement restricts or prohibits Agent from soliciting merchants, Prospective Merchants or Merchants for the purchase any product or service that is not competitive to the FDIS Services.

## 2. **Agent Personnel**

**2.1.     Agent Personnel**. Subject to **Section 2.2**, Agent shall have the right to designate suitable and desirable Agent Personnel, including Representatives. Agent shall be solely responsible for Agent Personnel and their acts, including any failure to comply with the terms of this Agreement that are applicable to Agent or failure to comply with Card Organization Rules and applicable law, regulations and court orders. Agent Personnel shall be hired at Agent's own risk, expense and supervision, and Agent Personnel shall not have any claim against FDIS for salaries, residuals, benefits, commissions, items of cost, or any other form of compensation or reimbursement. Agent acknowledges and agrees that no Agent Personnel are employees of FDIS, and Agent is solely responsible for any taxes, payroll reporting, workers' or unemployment compensation insurance, compensation, benefits or any other obligations or liabilities that may arise (including verification of work eligibility in U.S.) due to Agent's hiring, retention or termination of or relationship with any Agent Personnel.

**2.2.     Representative Registration**. Prior to a Representative being permitted to solicit or submit any Merchant Applications, Agent must receive written confirmation from agent.compliance@firstdata.com that FDIS has registered such Representative. Agent must provide FDIS with a completed FDIS Sales Representative Registration Form (located under Resources/Forms at MyagentOffice.com) for such Representative and any other documentation or information concerning the Representative requested by FDIS from time to time. FDIS reserves the right to refuse to register or revoke the registration of any proposed or approved Representative that FDIS, in its sole discretion, determines is a detriment to the business of FDIS. Agent must notify FDIS in writing of the termination of any Representative within three Business Days of such termination.

## 3. **FDIS' Obligations**

**3.1.     Grant of Authority**. FDIS hereby grants to Agent the right, on a non-exclusive basis, to solicit Prospective Merchants for the purchase of the Services from FDIS within the Territory as long as the merchant does not already have, and has not had in the previous 90 days, an open Merchant Account.

**3.2.     FDIS Services**. FDIS shall be responsible for all processing and accounting functions relating to the clearing and settlement of Card transactions, including: (i) Merchant processing and settlement; (ii) Merchant credit research; (iii) Merchant activation and approval; (iv) Merchant security and recovery; (v) Merchant customer services; (vi) Merchant chargeback and retrieval services; and (vii) all other back office services, including collecting amounts due from Merchants to FDIS. FDIS may contract with other persons to perform these functions on behalf of FDIS but FDIS remains primarily responsible for the functions. Subject to **Section 5.2**, FDIS will make available to Agent training on the FDIS Services.

## 4. **Licensing**

**4.1.     License**. Subject to **Section 1.1(b)** and this **Section 4**, FDIS grants to the Agent during the Term, the limited, non-exclusive, non-assignable, revocable right to use the Trademarks displayed on **Exhibit B** (as it may be modified from time to time by FDIS in its sole discretion and provided to Agent via email or

on MyagentOffice.com) in the Territory in connection with Agent's marketing materials for the FDIS Services. Upon termination of this Agreement, (i) the limited rights granted to Agent to use the Trademarks under this **Section 4** shall immediately terminate; (ii) Agent shall immediately cease and desist from all use of the Trademarks and any trade name, trademark, service mark, or logotype associated with Cards ("**Marks**"), except to the extent such use may be authorized under a separate agreement; (iii) at FDIS' request, Agent will deliver to FDIS all material and papers upon which the Trademarks or Marks appear or to which the Trademarks or Marks relate, including correspondence and information on Prospective Merchants or Merchants solicited or procured while the Agent solicited on behalf of FDIS; and (iv) Agent will take all necessary actions to correct information that states or suggests that Agent is connected in any manner with FDIS or its Trademarks, including correction of telephone and other directories, telephone information providers, postal offices, electronic mail providers, letterhead, business cards, office signage, Web page(s) on the Internet, domain name registries (if applicable), any post domain URL path (if applicable) and other communication delivery services. Agent shall direct that all inquiries be forwarded to FDIS' Moorpark office or such other place designated by FDIS. If Agent fails to take any required action within 30 days of the termination of this Agreement, then Agent appoints, without power of revocation, FDIS as its attorney in fact to act in Agent's place and with Agent's authority to take such corrective actions with the same legal force and effect as if such acts were performed by Agent.

**4.2. Ownership of Trademarks**. Agent acknowledges that FDIS or FDC is the owner or licensee of the Trademarks, and Card Organizations are the owners of their respective Marks. Agent acknowledges that FDIS, FDC and the Card Organizations hold the exclusive right, title and interest in and to their respective marks. Agent will not at any time do or cause to be done any act or thing contesting or in any way impairing or tending to impair any part of such right, title and interest. In connection with the use of the Trademarks or Marks, Agent shall not in any manner represent that it has any ownership in the Trademarks, Marks or registrations thereof, and Agent acknowledges that use of the Trademarks or Marks do not create in the Agent's favor any right, title or interest in or to the Trademarks or Marks or the goodwill attached to an associated with the Trademarks or Marks. All uses of the Trademarks or Marks by the Agent shall inure to their respective owner. Agent will at no time during or after the Term register, adopt or use, any word or mark which is likely to be similar to or confusing with the Trademarks or Marks or any other marks owned or utilized by FDIS or FDC. Agent agrees to not, at any time, use any Mark on its own behalf or suggest, imply or in any manner create an impression that it is a member of MasterCard, VISA, American Express, Discover or any other Card Organization with respect to which merchants submit transactions for processing under a Merchant Agreement. Any Card Organization may at any time and without notice prohibit Agent from using its Marks for any reason. Agent must comply with additional terms governing Agent's use of Trademarks or Marks that may be posted on MyagentOffice.com from time to time.

## 5. Relationship of the Parties

**5.1. Independent Contractor**. Neither Agent nor any Agent Personnel is an employee of FDIS for any purpose whatsoever. Agent is an independent contractor and as such is not eligible for any compensation, benefits, insurance or other employment terms that are provided to employees of FDIS or any FDIS Affiliates. FDIS is interested only in the results obtained by Agent and FDIS has no right to control Agent or Agent Personnel, including no right to require Agent or Agent Personnel to: (i) devote a fixed or minimum number of hours to selling or any other effort, (ii) follow prescribed itineraries or instructions, (iii) bind FDIS, or (iv) do anything that would alter Agent's independent contractor status. At all times, Agent has the sole right and responsibility to supervise, direct, and control Agent's business operations and Agent Personnel, including Agent office account receivables and payables and other office administration functions.

**5.2.** **Expenses; Taxes**. Agent is solely responsible for all expenses and disbursements that may be incurred or due by Agent in connection with its performance of its obligations under this Agreement, including promotional materials, general selling, training, travel, entertainment, insurance, office equipment, maintenance, supplies, rental, lease, legal or accounting expenses; purchase or lease of office space; Agent Personnel salaries, benefits, taxes and other costs and expenses; and any federal, state or local tax or insurance obligations that may arise in connection with Agent's activities or due to receipt of payments by Agent under this Agreement.

**5.3.** **Other**. Agent does not have the right or authority to and will not, and will not permit any Agent Personnel to, hold itself out as having any right, power or authority to create any contract or obligation, either express or implied, on behalf of, in the name of or binding upon FDIS, or to pledge FDIS' credit, or to extend credit in FDIS' name. Without the prior written consent of Agent, FDIS has no right or authority to, and will not, commit Agent in any matter or use Agent's name in any way not specifically authorized by this Agreement.

## 6. Term

**6.1.** **Term**. Provided that both Agent and FDIS execute this Agreement, this Agreement is effective (the "**Effective Date**") on (i) if it is executed by Agent and provided to FDIS on or before the tenth day of a calendar month, the first day of such calendar month, or, (ii) if it is executed by Agent and provided to FDIS after the tenth day of a calendar month, the first day of the following calendar month. This Agreement shall remain in effect for a one year period that begins on the Effective Date (the "**Initial Term**") and automatically renew for successive terms of one year each (each a "**Renewal Term**" and together with the Initial Term, the "**Term**"), unless either party provides the other party with written notice at least 60 days before the end of the then-current term that it will terminate this Agreement at the end of the then-current term.

**6.2.** **Termination by FDIS**.

    a. <u>With Cause without any Right to Cure</u>. In addition to any other rights and remedies that it may have and notwithstanding **Section 6.2.b.**, FDIS in its sole discretion may terminate this Agreement upon five calendar days prior written notice to Agent if any reasonable evidence is discovered indicating (i) Agent or any Agent Personnel have: (1) violated any confidentiality or intellectual property rights protected by this Agreement; (2) violated any applicable law, regulation, court order or Card Organization Rule; or (3) committed any act of misrepresentation, fraud, forgery, dishonesty or other willful or malicious act; or (ii) Agent has ceased its operation and activity as a sales agent for FDIS.

    b. <u>With Cause with a Right to Cure</u>. In addition to any other rights and remedies that it may have and notwithstanding **Section 6.2.a.**, FDIS may terminate this Agreement if Agent is in breach of any of the terms, conditions, representations, warranties or covenants of this Agreement or Agent Business Conduct Standards or for any violation of **Section 1.5**, but only upon giving Agent written notice of such breach and Agent's failure to cure such breach within 10 Business Days after receipt of such notice; provided, however, that if a cure cannot reasonably be accomplished within such 10-day period, FDIS, in its sole discretion, may toll the cure period so long as the Agent commences a cure within such 10-day period and thereafter diligently pursues such cure as promptly as practical, but in no event will a cure period exceed 90 calendar days.

    c. <u>Agent Insolvency</u>. If Agent makes any assignment of assets or business for the benefit of creditors, or if a trustee or receiver is appointed to administer or conduct its business or affairs, or if it is adjudged in any legal proceeding to be either a voluntary or involuntary bankruptcy, then the rights granted herein to Agent shall forthwith cease and terminate without prior notice or legal action by FDIS.

**6.3.    Termination by Agent**. In addition to any other rights and remedies that it may have, Agent may terminate this Agreement if FDIS is in breach of its obligations under **Section 7**, but only upon giving FDIS written notice of such breach and FDIS' failure to cure such breach within 10 Business Days after receipt of such notice, unless a cure cannot reasonably be accomplished within such period. In that case, the cure period will be tolled so long as FDIS commences a cure within such 10-day period and thereafter diligently pursues such cure as promptly as practical, but in no event may a cure period exceed 90 calendar days.

**6.4.    Termination by Mutual Agreement**. The parties may terminate this Agreement at any time in a writing signed by both parties.

## 7. <u>Payments</u>

**7.1.    Right to Payment**.

a.    FDIS shall pay Residuals and certain other amounts set forth in this **Section 7** to Agent during the Term and after termination of this Agreement subject to the terms of this Agreement, including this **Section 7** and **Section 8**.

b.    FDIS in its sole discretion may immediately discontinue payment of any amounts due to Agent after termination of this Agreement if: (i) FDIS terminates this Agreement pursuant to **Section 6.2** above; (ii) Agent, any former or current owner of a controlling interest in Agent, or any former or current partner, member, officer or director of Agent: (1) engages in any act that would injure FDIS' relationship with its employees, agents, Prospective Merchants or Merchants; (2) directly or indirectly induces or influence any merchant to cancel or terminate any existing Merchant Account or Merchant Agreement; or, (3) engages in a Competing Activity; (iii) Agent fails to remain in compliance with all terms and conditions of this Agreement that survive termination of this Agreement; (iv) Agent fails to remain current on all obligations to FDIS and FDIS' sponsor bank(s); (v) FDIS is unable, after good faith efforts for a period of 90 days, to locate Agent and make payment of Residuals to Agent; or (vi) Agent's monthly Residual payment falls below $250.00.

**7.2.    Payment for Services**. Subject to the terms of this Agreement,

a.    On or about the 20th day of each calendar month FDIS shall pay to Agent a Residual equal to the sum of the following amounts:

i.    Residuals for Merchant Accounts boarded by Agent prior to the Effective Date that are Open Accounts in accordance with the terms set forth in **Exhibit C**.

ii.    Residuals for Merchant Accounts boarded by Agent on or after the Effective Date that are Open Accounts in accordance with the terms set forth in **Exhibit D**.

b.    At least monthly FDIS shall pay to Agent payments for certain third party or other products and services subject to the terms set forth under Resources/Forms on MyagentOffice.com. FDIS may change the terms, including the amounts, of any such payments by providing Agent with at least 30 days prior written notice of such changes.

Agent must request an adjustment to any amounts paid to or by Agent pursuant to this **Section 7** within the 90 day period following the initial credit or debit or FDIS has no obligation to make such adjustment.

**7.3.**    **Merchant Losses**. FDIS shall bear the risk for Merchant Losses (other than those caused by the gross negligence or willful misconduct of Agent or Agent Personnel) and shall not deduct such Merchant Losses from any amounts due to Agent under this Agreement.

**7.4.**    **Right to Offset**. Agent hereby authorizes FDIS at any time and from time to time, without notice or demand to Agent or to any other person (any such notice and demand being hereby expressly waived), to set off, recoup and to appropriate and apply any and all funds of Agent held by FDIS, FDIS' Affiliates or FDIS' sponsor bank, against and on account of Agent's obligations to FDIS or any FDIS' Affiliates under this Agreement or any other agreement, including fees for equipment or the Services, whether such obligations are liquidated, unliquidated, fixed, contingent, matured or unmatured. Agent is prohibited from setting-off, offsetting or otherwise reducing or applying against any amounts due and owing to FDIS under this Agreement or otherwise, any amounts owed or alleged to be owed to Agent by FDIS under this Agreement or otherwise. FDIS may in its sole discretion exercise the rights described in this **Section 7.4** by direct debit to Agent's bank account. This offset right is in addition to all other rights and remedies available to FDIS.

**7.5.**    **Right to Debit and Credit Agent's Bank Account**. All financial transactions between Agent and FDIS, including payment for equipment purchases, may be automatically debited and credited by FDIS, in its sole discretion, directly through Agent's bank account. Agent irrevocably consents to the debiting and crediting of its bank account(s) as provided herein. With respect to equipment transactions only, FDIS shall provide 10 days advance written notice to Agent prior to initiating a debit entry. In order to activate automatic debit and credit service, Agent shall provide FDIS with the required depository information and execute ACH Authorization Agreement Direct payments (Debits) Form and ACH Authorization Agreement Direct Payments (Credits) Form provided to Agent by FDIS or any other form that FDIS may request from time to time to accomplish the purposes set forth in this **Section 7.5**.

**7.6.**    **Loan**. Once every 12 months during the Term, Agent is eligible to receive a loan from FDIS in an amount equal to the product of two multiplied by Three Month Average Residuals subject to the terms and conditions of a promissory note in the form provided by FDIS and executed by Agent if Agent: (i) is not in breach of its obligations under this Agreement; (ii) is current on all financial obligations to FDIS and FDIS Affiliates; and (iii) has not had a promissory note payable to FDIS outstanding at any time within the preceding 30 days. Notwithstanding the foregoing, FDIS is not obligated under this **Section 7.6** to loan agent an amount less than $5,000.00 or greater than $500,000.00 during any 12 month period; and FDIS may modify or discontinue the loan program described in this **Section 7.6** at any time without notice to Agent.

## 8. Purchase and Sale of Agent Residual Rights

**8.1.**    **Continuing Offer to Purchase**. During the Term, FDIS hereby offers to purchase Agent's unencumbered right to receive future Residuals (excluding Residuals for Referral Open Accounts) subject to the terms and conditions regarding FDIS' online Residual rights buyout process found set forth under Resources/Forms on MyagentOffice.com, including the Acceptance of Cardservice International's Offer to Purchase Agent's Residual Rights form.

**8.2.**    **Offer to Purchase Upon Retirement**. During the Term, FDIS hereby offers to purchase Agent's unencumbered rights to receive future Residuals if Agent ceases to conduct the business of soliciting merchants for the purchase of Services from FDIS and any and all competitors of FDIS ("**Retirement**") subject to the terms and conditions set forth under Resources/Forms on MyagentOffice.com, including the Acceptance of Cardservice International's Offer to Purchase Agent's Residual Rights (Retirement) form.

**8.3.** **Right to Receive Future Residuals; Right of First Refusal**. Subject to **Section 9**, at any time during the Term, Agent may sell its right to receive future Residuals under this Agreement ("**Right to Receive Future Residuals**") to an Unrelated Third Party subject to the following terms and conditions:

(i)    The terms governing the rate at which Residuals are being paid to Agent as of the date of Agent's sale of Residuals pursuant to an Offer (as defined below) will be fixed and apply to the calculation of future Residuals subject to the Offer.

(ii)    Agent hereby grants to FDIS a right of first refusal to purchase Agent's Right to Receive Future Residuals. If Agent receives a bona fide offer from a willing and able Unrelated Third Party buyer to purchase Agent's Right to Receive Future Residuals (an "**Offer**"), Agent shall notify FDIS of the amount and terms of such Offer. FDIS shall have the first right to purchase Agent's Right to Receive Future Residuals on terms equal to the Offer, and Agent shall not sell or in any way transfer Agent's Right to Receive Future Residuals without first presenting FDIS with the opportunity to match any Offer. FDIS shall have 15 days to notify Agent of its decision whether or not to exercise its right to purchase Agent's Right to Receive Future Residuals.

(iii)    If FDIS does not exercise its right of first refusal, provided that Agent and Unrelated Third Party buyer execute and provide to FDIS a residual re-direction letter in the form required by FDIS, Agent may sell its Right to Receive Future Residuals in accordance with the terms of this **Section 8.3** and the Offer.

(iv)    Nothing in this **Section 8.3** shall be construed or interpreted to impair any of FDIS' rights under this Agreement, including **Section 9**, or to allow Agent to sell any interest in a Merchant, Merchant Agreement or Merchant Account, except for the sale of Agent's Right to Receive Future Residuals as set forth in this **Section 8.3**.

(v)    "**Unrelated Third Party**" means any person who is not and is not a relative of, Agent, any former or current owner of a controlling interest in Agent, or any former or current partner, member, officer or director of Agent or any entity in which Agent, any former or current owner of a controlling interest in Agent, or any former or current partner, member, officer or director of Agent has ownership interest or employment relationship.

## 9. Confidentiality

**9.1.** **Restrictions on Use or Disclosure of Confidential Information**. Each of FDIS and Agent agree that, without the written consent of the other, it will not divulge or disclose to third parties, directly or indirectly, any Confidential Information or use such Confidential Information except to the extent required in its business relationship with the other party or to carry out its obligations under this Agreement. For the avoidance of doubt, Agent shall keep the terms, conditions and existence of this Agreement strictly confidential, and under no circumstance may Agent distribute this Agreement or any other FDIS Confidential Information for any purpose, including with respect to Agent's rights under **Section 8.3**, without FDIS' prior written consent. No party will obtain any proprietary rights to any Confidential Information of the other party. Each party shall retain Confidential Information in its possession and control and shall protect the secrecy of such Confidential Information using the degree of care it uses to protect the secrecy of its own Confidential Information, but in no event less than a commercially reasonable degree of care.

**9.2.** **Exceptions**. Notwithstanding the foregoing: FDIS shall not be prohibited from disclosing Confidential Information to the extent that it is related to Merchant Agreements, Merchant Accounts and Merchant or Prospective Merchant accounts, records and related information and other information relating to FDIS business or FDIS Services, but excluding any other information regarding the business of

ISO, to the extent that such disclosure by FDIS is for a bona fide business purpose; and, Agent's Confidential Information may be made available by or on behalf of FDIS at FDIS or FDIS sponsor bank's direction to any Card Organization or to any other supervisory or regulatory authority to which FDIS may be subject, upon their written request.

## 10. Indemnity and Limitation of Liability

**10.1.** **Indemnification**. Agent shall indemnify, defend and hold harmless FDIS and its officers, directors, shareholders, employees, agents and representatives against any and all Damages incurred directly or indirectly by FDIS, whether or not litigation is commenced, incurred by or asserted against FDIS, arising from or related to: (i) any debts incurred by Agent or Agent Personnel, including debts incurred with telephone, utility, and express mail companies; (ii) any claim of any officer, director, shareholder of the Agent or any Agent Personnel made against FDIS for any compensation, benefit or other payment to such person; (iii) any activity or representation by Agent or any Agent Personnel in marketing, advertising, promoting or otherwise engaging in any activity arising from or related to this Agreement; (iv) any claim arising from the unauthorized use of the Trademarks or other FDIS or Card Organization intellectual property; (v) any actions concerning alleged Agent or Representative improprieties in the solicitation, sale or leasing of the FDIS Services or equipment; (vi) any breach of any term or condition of this Agreement, any Card Organization Rules, law, regulation or court order or Business Conduct Standards; or (vii) any representation, warranty or covenant of Agent made in or in connection with this Agreement being false or misleading. As stated in elsewhere in this Agreement, Agent is acting hereunder as an independent contractor and neither Agent nor any Agent Personnel shall be considered to be an employee of FDIS or its Affiliates or FDIS' sponsor bank (collectively "FDIS" for purposes of this **Section 10.1**). Notwithstanding anything to the contrary in **Section 10.4**, if (a) Agent or any Agent Personnel assert that Agent or any Agent Personnel is an employee of FDIS; or (b) a federal, state or local governmental agency or court asserts or determines Agent or any Agent Personnel are employees of FDIS, then Agent shall indemnify, defend and hold harmless FDIS, its Affiliates, and their respective officers, directors and employees from any and all Damages and exemplary, punitive or special damages associated with such claim and/or determination whether or not litigation is commenced, incurred by or asserted against FDIS.

**10.2.** **Statute of Limitations**. Notwithstanding the fact that the statute of limitations for bringing a legal action on a written contract, or other limitation period that could apply based upon the type of action or act, omission or violation being alleged, may be shorter or longer, the parties agree that any action, legal or equitable, based on, related to or arising out of the subject matter of this Agreement, and whether based on contract, tort, strict liability or some other legal or equitable theory of recovery, must be commenced by a party within one year after the earlier of (i) the date on which such party knew or should have known of the first alleged act, omission or violation, or (ii) with respect to obligations that do not survive termination of this Agreement, the date of termination of this Agreement.

**10.3.** **Limitation of Liability**. Notwithstanding anything contained in this Agreement or otherwise, FDIS' cumulative liability to Agent and anyone claiming by through or under Agent, for all Damages arising out of or related to this Agreement, and regardless of the form of action or legal theory shall not exceed, in the aggregate, the lesser of aggregate Residuals paid to agent in the twelve months preceding the act giving rise to the claim or $500,000.00. Agent understands the limitation on damages to be a reasonable allocation of risk and expressly consents to such risk allocation.

**10.4.** **Exclusion of Damages**. Except as set forth in this Agreement, in no event shall either party, its parents, Affiliates or any of its or their directors, officers, employees, agents or sub-contractors be liable under any theory of tort, contract, strict liability or other legal or equitable theory for lost profits, exemplary, punitive, special, incidental, indirect or consequential damages, each of which is hereby

excluded by agreement of the parties regardless of whether such damages were foreseeable or whether either party or any entity has been advised of the possibility of such damages.

## 11. General Provisions

**11.1.    Definitions; Word Usage**.  Capitalized terms have the meanings set forth in **Exhibit A**. Unless the context clearly requires otherwise, (i) the plural and singular numbers shall each be deemed to include the other; (ii) "**shall**," "**will**," or "**agrees**" are mandatory, and "**may**" is permissive; (iii) "**or**" is not exclusive; and (iv) "**includes**" and "**including**" are not limiting.

**11.2.    Effect of Headings**. Subject headings of sections and subsections of this Agreement are included for convenience only and shall not affect the construction or interpretation of any of its provisions.

**11.3.    Entire Agreement**. This Agreement, including the exhibits hereto, constitutes the sole and exclusive terms and conditions and agreement between the parties relating to the subject matter hereof, and supersedes all prior or contemporaneous discussions, writings, negotiations, understandings and agreements with respect thereto, between the parties and their respective assignors, predecessors, predecessors–in-interest, owners or previous owners ("**Superseded Agreements**"), which are hereby terminated and of no further force or effect.  For the avoidance of doubt, the Superseded Agreements do not include any promissory notes, guarantees or security agreements executed prior to the Effective Date.

**11.4.    Waiver or Modification Ineffective Unless in Writing**. Except as set forth in this Agreement, no amendment of any provision of this Agreement will be valid unless the same will be in writing and signed by each of the parties. No waiver by any party of any provision of this Agreement or any default, misrepresentation, or breach of warranty or covenant hereunder, whether intentional or not, will be valid unless the same will be in writing and signed by the party making such waiver nor will such waiver be deemed to extend to any prior or subsequent waiver, default, misrepresentation, or breach of warranty or covenant hereunder or affect in any way any rights arising by virtue of any prior or subsequent  waiver, default, misrepresentation, or breach of warranty or covenant except pursuant to its express terms.

**11.5.    Assignment**. The rights and obligations of Agent under this Agreement are personal. Except as otherwise expressly provided in this Agreement, Agent shall not assign, subcontract, license, franchise, or in any manner attempt to transfer or extend to any third party this Agreement or any right or obligation of Agent under this Agreement, by operation of law or otherwise, without the prior written consent of FDIS, which may be granted or withheld at the sole discretion of FDIS.  For purposes of this Agreement, any transfer of ownership or voting control of Agent shall be considered an assignment or transfer hereof. This Agreement shall be binding upon and inure to the benefit of the parties hereto and their permitted successors and assigns.

**11.6.    Written Notice**. Unless otherwise specified in this Agreement, all notices and other communications required or permitted under this Agreement shall be in writing and shall be deemed delivered and effective when given by personal delivery, telefax (confirmed by a mailed copy) or first-class mail, postage prepaid, addressed as follows: (i) if to Agent, to the address set forth below Agent's signature line in this Agreement; and (ii) if to FDIS to 5898 Condor Drive, Suite 220, Moorpark, CA 93021, Attention: Senior Vice President (Facsimile: 402.916.6610); with a copy to First Data Corporation, 6200 South Quebec Street, Suite 260A, Greenwood Village, Colorado 80111, Attention: Legal Department (Facsimile: 303.967.5216). A party may change its address or addresses set forth above by giving the other party notice of the change in accordance with the provisions of this **Section 11.6**. In addition, Agent and FDIS each may update its address through MyagentOffice.com, and FDIS may change the location of any documents, information or forms referenced in this Agreement and located on MyagentOffice.com or fdisbrandcenter.com on notice to Agent via email or MyagentOffice.com.

EXHIBIT B

**11.7. Cooperation**. FDIS and Agent will each timely furnish to the other any and all information and materials that the other may, from time to time, reasonably request in connection with all matters contemplated by this Agreement. Each party also shall take the action as the other may, from time to time, reasonably request in order that the purposes of this Agreement will be fully accomplished and that all matters contemplated hereby will comply with all applicable laws, regulations, court orders and Rules.

**11.8. Severability**. The invalidity of any paragraph or subparagraph hereof shall not affect the validity of any other paragraph or subparagraph hereof.

**11.9. Governing Law and Waiver**. This Agreement shall be governed by the laws of the State of New York. Agent waives personal service of process and consents that service of process upon it may be made by certified or registered mail, return receipt requested, at the address provided below the signature line of this Agreement.

**11.10. Survival of Terms**. The parties agree that those provisions of this Agreement that logically should survive its termination in order to accomplish the fundamental purposes of it will do so, including **Sections 1.1.a**, **1.2(v)**, **(vii)** and **(ix)**, **1.3.**, **1.4.b – d**, **1.5**, **2.1**, **4**, **5**, **7.1 – 7.5**, **9**, **10**, **11**.

**11.11. Third Party Beneficiaries**. This Agreement is made for the benefit of FDIS, Agent and their respective successors and assigns. In addition, FDIS' sponsor bank is a third party beneficiary of this Agreement and may enforce and this Agreement against Agent. No other person or entity has or acquires any rights by virtue of this Agreement.

**11.12. Authority**. The person executing this document on behalf of Agent warrants that they have the full right, capacity and authority to cause such party to enter into this Agreement and that such party has all necessary authority to perform this Agreement.

**11.13. No Presumption Against Drafter**. FDIS and Agent have jointly participated in the negotiation of the terms of this Agreement. This Agreement shall be construed as if drafted jointly by FDIS and Agent, and no presumptions arise favoring any party by virtue of the authorship of any provision of this Agreement.

In consideration of the foregoing, the parties hereby execute this Agreement.

**Agent:**

**Cardservice International, LLC,**
**a California limited liability company**

**Signature:** _____  **By:** _____

**Printed Name:** _____  **Name:** _____

**Title:** _____  **Title:** _____

**Date:** _____  **Date:** _____

**Address:** _____

_____

**Exhibit A**
**Definitions**

**Affiliate** means any entity that directly or indirectly controls, is controlled by or is under common control with a party.

**Agent Business Conduct Standards** means the business conduct standards that may be established or modified by FDIS from time to time and posted under Policies on MyagentOffice.com.

**Agent Personnel** means Representatives and any other personnel or contractors of Agent.

**Business Day** means any calendar day other than Saturdays, Sundays, or California or federal holidays.

**Buy Rates** means the amounts set forth under Resources/Forms on Myagentoffice.com.

**Card** means a credit, debit or other card issued by a member of a Card Organization, including MasterCard, Visa and Discover, and bearing its respective trade name, Mark, or trade symbol, which is of the type accepted for processing under the Merchant Agreement.

**Card Organization** means an entity formed to govern the proper administration and promotion of credit, debit and other cards, including MasterCard, Visa, American Express, Discover and any other entity whose cards may be accepted by merchants for payment for goods or services under the Merchant Agreement.

**Card Organization Rules** means the rules and regulations now existing, as they may be modified in the future, and any rules and regulations hereafter promulgated by any Card Organization, including the rules and regulations contained in: (i) the Visa U.S.A. Inc. ("**Visa**") Operating Regulations, (ii) MasterCard International Incorporated ("**MasterCard**") Operations Manual, (iii) Discover Financial Services, LLC ("**Discover**") operating regulations, (iv) American Express Travel Related Services Company, Inc. ("**American Express**") operating regulations, as applicable.

**Competing Activity** means, whether directly or indirectly, the ownership, management, operation, control, participation in, performance of services for, the solicitation of merchants for, or otherwise carrying on, a business similar to or competitive with the electronic transaction processing business of FDIS, including the Services (whether as a principal, agent, independent contractor, partner, employer, proprietor, stockholder, director or otherwise), anywhere in the Territory.

**Confidential Information** means all proprietary, secret or confidential information or data relating to a party and its Affiliates, operations, employees, products or services, clients, customers, potential customers and FDIS' Services. Confidential Information shall include proprietary information of Card Organizations, pricing information, Merchant Agreements (whether partially or fully completed), Merchant Accounts and Merchant or Prospective Merchant accounts, records and related information, customer lists, cardholder account numbers, Personal Data, computer access codes, instruction and/or procedural manuals and this Agreement and the terms and conditions of this Agreement. Information shall not be considered Confidential Information to the extent, but only to the extent, that such information: (i) is already known to the receiving party free of any restriction at the time it is obtained; (ii) is subsequently learned from an independent third party free of any restriction and without breach of this Agreement; (iii) becomes publicly available through no wrongful act of the receiving party; (iv) is independently developed by the receiving party without reference to any Confidential Information of the other; or (v) is required to be disclosed under law, provided that the receiving party first gives the disclosing party prompt written notice of the required disclosure and commercially reasonable time to allow the disclosing party to seek a protective order or other appropriate remedy.

**Current Level of Account Production** means the number of new Merchant Accounts for Merchants boarded by Agent during the specified time period.

**Damages** means demands, claims, actions or causes of action, assessments, losses, damages, liabilities, judgments, settlement amounts, costs and expenses, including interest, fines, penalties and reasonable expert witness fees and expenses, and attorneys' fees and expenses.

**FDC** means First Data Corporation or its successors or assigns.

**FDIS' sponsor bank** means the bank that is the sponsoring bank or acquiring bank for Card transactions processed pursuant to the Merchant Agreement, as applicable.

**Gross Processing Revenue - CAAP** means all Income - CAAP on Open Accounts, including those in collections and excluding those for which FDIS has purchased the Residual rights, minus: Card Organization interchange fees; Card Organization dues and assessments; Refunds caused by processing errors or the gross negligence or willful misconduct of Agent or Agent Personnel; and Merchant Losses caused by the gross negligence or willful misconduct of Agent or Agent Personnel.

**Gross Processing Revenue - Premier** means all Income - Premier collected on Open Accounts, excluding those for which FDIS has purchased the Residual rights, minus: Card Organization interchange fees; Card Organization dues and assessments; Buy Rates; Refunds caused by processing errors or the gross negligence or willful misconduct of Agent or Agent Personnel; and Merchant Losses caused by the gross negligence or willful misconduct of Agent or Agent Personnel.

**Gross Sales Volume** means all MasterCard, Visa and Discover Card payments accepted by Open Accounts during the specified time period which are processed and settled through FDIS, are not fraudulent and do not result in a chargeback.

**Income - CAAP** consists of the following items on all Open Accounts: (1) all discount fees (qualified, mid-qualified, and non-qualified) on MasterCard, Visa, Discover, Diners, debit and JCB transactions; (2) transaction fees, (3) batch header fees, (4) address verification service fees, (5) monthly minimum fees, (6) customer support fees, (7) statement fees, (8) monthly FDIS merchant club fees, (9) American Express residuals, (10) JCB fees, (11) chargeback/retrieval fees, and (12) annual fees.

**Income - Premier** consists of the following items on all Open Accounts: (1) all discount fees (qualified, mid-qualified, and non-qualified) on MasterCard, Visa, Discover, Diners, debit and JCB transactions; (2) transaction fees, (3) batch header fees, (4) address verification service fees, (5) monthly minimum fees, (6) customer support fees, (7) statement fees, (8) monthly FDIS merchant cub fees, (9) American Express residuals, (10) JCB fees, (11) chargeback/retrieval fees, (12) annual fees (13) account closure fees and (14) early termination fees.

**Marks** are defined in **Section 4.1**.

**Merchant** means an entity that submits a Merchant Agreement to FDIS that indicates such entity was solicited by Agent and results in a Merchant Account.

**Merchant Account** means a Merchant Agreement that has been approved and entered into by FDIS and FDIS sponsor bank.

**Merchant Agreement** means the form of merchant application and merchant agreement in use by FDIS and its sponsor bank in connection with the FDIS Services, as it may be modified from time to time by FDIS and its sponsor bank in their sole discretion.

**MCC Codes** means the four digit Merchant Category Classification codes created by Visa International, Inc. and listed in the Visa USA Merchant Data Manual to identify a particular merchant's principal trade, profession or line of business.

**Merchant Losses** means all losses experienced by FDIS attributable to chargebacks, fines, penalties and other amounts due from a Merchant to FDIS in excess of a Merchant's reserve account.

**Open Account** means a Merchant Account for a Merchant that is classified as "open" on a FDIS settlement platform and has not been cancelled or terminated.

**Personal Data** means any information that is "personally identifiable" within the meaning of the Gramm-Leach-Bliley Act (15 USC § 6801, et seq.) and its implementing regulations (or any superseding or replacement laws, regulations or guidelines), as they may now exist or be enacted, adopted, issued or promulgated.

**Privacy Laws** means all laws, regulations and guidelines applicable to the use, disclosure and processing of Personal Data on behalf of FDIS or its Affiliates, including the Gramm-Leach-Bliley Act (GLBA) and the Healthcare Insurance Portability and Accountability Act (HIPAA), as they may now exist or be enacted, adopted, issued or promulgated.

**Prospective Merchant** means any entity solicited by Agent for Services to be provided by FDIS pursuant to a Merchant Agreement.

**Referral Open Account** means an Open Account resulting from a lead from a third party referral source to Agent with respect to which FDIS is obligated to pay such third party a referral fee.

**Refunds** means refunds to Merchants of any billed and collected amounts.

**Representative** means all salespersons, employees, agents or representatives appointed or designated by Agent to act on Agent's behalf in connection with performance of Agent's obligations under this Agreement.

**Residuals** means the payments due to Agent by FDIS pursuant to **Section 7.2.a.** of this Agreement.

**Services** means electronic transaction processing of Card and certain other transactions and related services and support systems as described in the Merchant Agreement.

**Superseded Agreement** is defined in **Section 11.3**.

**Term** is defined in **Section 6.1**.

**Territory** means the United States, as currently defined by Visa.

**Three Month Average Residuals** is defined in **Section 1.3**.

**Tier 1 Merchants** means Tier I Merchants – CAAP or Tier I Merchants – Premier, as applicable.

**Tier I Merchants – CAAP** means those CAAP III Merchants that: i) fall within the definition of a Swiped Merchant or a Retail Keyed Merchant; and ii) have been assigned an MCC Code by FDIS that corresponds with an MCC Code designated by FDIS in its sole discretion as a Tier I MCC Code on Myagentoffice.com. Tier I Merchants are intended to be those face-to-face Merchants that FDIS in its sole discretion determines are operating businesses in low to moderate risk industries.

**Tier I Merchants - Premier** means those merchants that have been assigned a MCC Code by FDIS that corresponds with a MCC Code designated by FDIS in its sole discretion as a Tier I MCC Code at My Office/Compensation/Rev Share Profile on MyagentOffice.com. Tier I Merchants are intended to be those merchants engaging in face-to-face transactions (which do not include transactions conducted over the telephone, by facsimile, or over the Internet) with cardholders that FDIS in its sole discretion determines are operating businesses in low to moderate risk industries and Internet merchants with Tier 1 MCC codes that have also been processing with FDIS for a period of greater than one year.

**Tier II Merchants** means Tier II Merchants – CAAP or Tier II Merchants – Premier, as applicable.

**Tier II Merchants – CAAP** means all those CAAP III Merchants that do not qualify as Tier I Merchants. Tier II Merchants are intended to be those CAAP III Merchants that FDIS in its sole discretion determines are operating businesses in moderate to high risk industries.

**Tier II Merchants – Premier** means all merchants that do not qualify as Tier I Merchants. Tier II Merchants are intended to be those merchants that FDIS in its sole discretion determines are operating businesses in high risk industries and Internet merchants that have been processing with FDIS for less than a period of one year.

**Trademarks** means the marks set forth on **Exhibit B**.

**Unacceptable List** is defined in **Section 1.4**.

**USPS Move Update Requirements** means the requirements established by the United States Postal Service for First-Class Mail presorted and automation rates, including but not limited to the Move Update requirements for addresses.

**Exhibit B**

**Trademarks**

The trademarks below are owned by Cardservice International, LLC**:

**CARDSERVICE**®

**CARDSERVICE INTERNATIONAL**®

** In conjunction with its use of the either of these trademarks, Agent shall include the following phrase at the bottom of the material: "The "CARDSERVICE mark and logo are registered marks of Cardservice International, LLC and are used with permission."

The trademarks below are owned by First Data Corporation***:

**FIRST DATA**®



*** In conjunction with its use of this trademark, Agent shall include the following phrase at the bottom of the material:  "The "FIRST DATA mark and logo" are trademarks of First Data Corporation and are used with permission".

Exhibit C

**Residuals paid for Merchants Boarded Prior to the Effective Date**

**A.**      **CAAP Open Accounts**

**1.**      **Merchants Boarded prior to the Effective Date ("CAAP III")**

(a)      Residuals for CAAP III Open Accounts for a calendar month shall be an amount equal to the product of Gross Processing Revenue - CAAP for CAAP III Open Accounts for the prior calendar month multiplied by the applicable percentage from the applicable "**CAAP III Agent Residual Schedule**" ("**CAAP III Schedule**") at My Office/Compensation/Rev Share Profile on MyagentOffice.com.

The CAAP III Schedule percentage shall be determined by plotting (1) Gross Sales Volume on the applicable CAAP III Schedule's y axis (the "**y Coordinate**"); and (2) Agent's Current Level of Account Production on the applicable CAAP III Schedule's x axis (the "**x Coordinate**," and together with the y Coordinate, the "**CAAP III Coordinates**"). The CAAP III Coordinates on the CAAP III Schedule shall be recalculated by the first day of the last month of each calendar quarter. The quarterly recalculation shall be based upon all Open Accounts and shall be effective as of the first day of each calendar quarter (each a "**CAAP Recalculation Effective Date**"). The quarterly recalculation may result in an increase, decrease or no change to the value of the CAAP III Coordinates. The CAAP III Schedule percentage will be increased if Agent's average monthly Gross Sales Volume or average monthly Current Level of Account Production over the applicable review period for such calendar quarter causes the intercept of the CAAP III Coordinates to move to a higher CAAP III Revenue Share on the CAAP III Schedule. The CAAP III Coordinate values will only be reduced if Agent's average monthly Gross Sales Volume or average monthly Current Level of Account Production over the applicable review period for such calendar quarter cause the intercept of the CAAP III Coordinates to move to a lower CAAP III Revenue Share percentage on the CAAP III Schedule. The following schedule summarizes the trigger dates regarding the calculation of the percentage that will be used to calculate Residuals:

Summary of Trigger Dates Schedule:

| Calendar Quarter | Review Period that may result in increased CAAP % for such quarter | Review Period that may result in decreased CAAP % for such quarter | Date of recalculation for such quarter – no later than: | CAAP Recalculation Effective Date | Period Residuals Paid |
|---|---|---|---|---|---|
| 1st | Aug. 1 - Oct. 31 | May 1 – Oct. 31 | Dec. 1 | Jan. 1 - Mar.31 | Feb. – Apr. |
| 2nd | Nov. 1 - Jan 31 | Aug. 1 – Jan.1 | Mar. 1 | Apr. 1 - June 30 | May – July |
| 3rd | Feb. 1 – Apr. 30 | Nov. 1 – Apr. 1 | June 1 | Jul. 1 - Sept. 30 | Aug. – Oct. |
| 4th | May 1 – July 1 | Feb. 1 – Jul. 1 | Sept. 1 | Oct. 1 – Dec. 31 | Nov. – Jan. |

(b)      Residuals for CAAP III Open Accounts will be paid at two different percentages of Gross Processing Revenue - CAAP: one percentage for Tier I Merchants - CAAP, and one percentage for Tier II Merchants - CAAP. Accordingly, FDIS will post separate CAAP III Schedules for Tier I Merchants - CAAP and Tier II Merchants - CAAP. For purposes of clarification, combined Gross Sales Volume for Tier I Merchants and Tier II Merchants will be used to plot the x Coordinate on the Tier I Merchant CAAP III Schedule and the Tier II Merchant CAAP III Schedule. Likewise, the combined Current Level of Account Production for Tier I Merchants and Tier II Merchants will be used to plot the y Coordinate on the Tier I Merchant CAAP III Schedule and the Tier II Merchant CAAP III Schedule.

**(i) Example A**. If Agent's y Coordinate from the prior calendar quarter is 40 and Agent generates 32 Open Accounts in August, 74 Open Accounts in September and 44 Open Accounts in October,

Agent's y Coordinate for both the Tier I Merchant CAAP schedule and Tier II Merchant CAAP schedule as of the Recalculation Date of January 1st will be increased to 50.

**(ii) Example B**. If Agent's x Coordinate from the prior calendar quarter is $500,000 and Agent's Open Accounts generate $400,000 in Gross Sales Volume in May, $500,000 in June, $700,000 in July, $300,000 in August, $200,000 in September and $300,000 in October, Agent's x Coordinate for both the Tier I Merchant CAAP schedule and Tier II Merchant CAAP schedule as of the Recalculation Date of January 1st will be decreased to $400,000.

**2.** **Right to Modify**. FDIS in its sole discretion may modify the CAAP III Schedule in so far as the CAAP III Schedule affects Residuals paid on existing Open Accounts subject to the CAAP III Schedule by giving Agent at least 90 day's prior written notice; provided, however, that Agent may terminate this Agreement within 90 days of receiving such notice from FDIS by giving FDIS written notice of termination within such 90-day period.

**B.** **Referral Open Accounts**

FDIS may, in its sole discretion, credit Agent for Referral Open Accounts. To "**credit Agent**" means that FDIS will pay Agent Residuals for such Referral Open Account, provided, however, that Agent's Residuals for such Referral Open Account will be reduced by 100% of any recurring referral fee paid by FDIS to the third party referral source during each month preceding payment of Agent's Residuals for the referral.

Notwithstanding the foregoing, with respect to each Referral Open Account boarded prior to the Effective Date, Agent's Residuals for such Open Account will be reduced by an amount equal to the difference between (a) 100% of any recurring referral fee paid by FDIS to the third party referral source during each month preceding payment of Agent's Residuals for the referral, and (b) the lesser of (i) 50% of any recurring referral fee paid by FDIS to such third party, or (ii) 5% of the Gross Processing Revenue – CAAP attributable to such Open Account.

The adjustments to Agent's Residuals referenced above will apply to all recurring referral fees paid by FDIS after the execution of this Agreement including referral fees paid for with respect to Merchants referred by third parties prior to the execution of this Agreement. Agent's Residuals will also be reduced by 100% of any non-recurring referral fees such as one-time commissions paid by FDIS to any third party referral source.

## Exhibit D

**Residuals paid for Merchants Boarded on or after the Effective Date ("Premier")**

A. Residuals for Premier Open Accounts for a calendar month shall be an amount equal to the product of Gross Processing Revenue - Premier for Premier Open Accounts for the prior calendar month multiplied by the applicable percentage from the "**Premier Residual Schedule**" ("**Premier Schedule**") at My Office/Compensation/Rev Share Profile on MyagentOffice.com.

The Premier Schedule percentage shall be determined based upon the number of new Open Accounts at the end of each calendar month under this Agreement (or the Superseded Agreement for purposes of the initial calculation). The percentage shall be recalculated by the first day of the last month of each calendar quarter and shall be effective as of the first day of each calendar quarter (each a "**Premier Recalculation Effective Date**"). The quarterly recalculation may result in an increase, decrease or no change to Premier Schedule percentage. The Premier Schedule percentage will be increased if the average number of new Open Accounts for the three calendar month review period for such calendar quarter is in a higher tier on the Premier Schedule. The Premier Schedule Revenue share percentage will only be reduced if the average number of new Premier Open Accounts per month in the applicable six calendar month review period for such calendar quarter is in a lower tier on the Premier Schedule. The following schedule summarizes the trigger dates regarding the calculation of the percentage that will be used to calculate Residuals:

| Calendar Quarter | Review Period that may result in increased Premier % for such quarter | Review Period that may result in decreased Premier % for such quarter | Date of recalculation for such quarter – no later than: | Premier Recalculation Effective Date | Period Residuals Paid |
|---|---|---|---|---|---|
| 1st | Aug. 1 - Oct. 31 | May 1 – Oct. 31 | Dec. 1 | Jan. 1 - Mar.31 | Feb. – Apr. |
| 2nd | Nov. 1 - Jan 31 | Aug. 1 – Jan.1 | Mar. 1 | Apr. 1 - June 30 | May – Jul. |
| 3rd | Feb. 1 – Apr. 30 | Nov. 1 – Apr. 1 | June 1 | Jul. 1 - Sept. 30 | Aug. – Oct. |
| 4th | May 1 – July 1 | Feb. 1 – Jul. 1 | Sept. 1 | Oct. 1 – Dec. 31 | Nov. – Jan. |

B.      FDIS in its sole discretion may modify the Premier Schedule in so far as it affects FDIS Residual obligations prospectively, with respect to any existing Open Accounts subject to the Premier Schedule or both, by giving Agent 90 days prior written notice; provided, however, that Agent may terminate this Agreement within 90 days of receiving such notice from FDIS by giving FDIS written notice of termination within such 90 day period.

C.      FDIS may, in its sole discretion, credit Agent for Referral Open Accounts. To "**credit Agent**" means that FDIS will pay Agent Residuals for such Merchant, provided, however, that Agent's Residuals for such Merchant will be reduced by 100% of any recurring referral fee paid by FDIS to the third party referral source during each month preceding payment of Agent's Residuals for the referral. The adjustments to Agent's Residuals referenced above will apply to all recurring referral fees paid by FDIS after the execution of this Agreement including referral fees paid with respect to Merchants referred by third parties prior to the execution of this Agreement. Agent's Residuals will also be reduced by 100% of any non-recurring referral fees such as one-time commissions paid by FDIS to any third party referral source.

DocuSign Envelope ID: CCFE4542359EE625E5FEAF4B0F09CB735F530E7

<span style="color:red">EXHIBIT C</span>

# Assignment, Assumption and Consent Agreement

This Assignment, Assumption and Consent Agreement (this **Assignment Agreement**) is entered into as of
⟋IC<Ā¹ ⎵ __, 2019 (the **Effective Date**) among Hunter Grace, LLC (**Assignor**), KMF Services, LLC (**Assignee**), and
CardConnect, LLC (**CardConnect**).

**Background**

- CardConnect (as successor in interest to Ignite Payments LLC) and Assignor are parties to that certain
  Premier Agent Agreement, dated as of December 28, 2010 (as amended, the **Agreement**).

- Assignor desires to assign the Agreement to Assignee and to obtain the consent of CardConnect to the
  assignment. Capitalized terms used but not defined in this Assignment Agreement will have the
  meanings set forth in the Agreement.

**Agreement**

The parties agree as follows:

**1    Assignment and Assumption**

Assignor assigns all of its rights, title and interests in and under the Agreement to Assignee, and Assignee
accepts the assignment of Assignor's rights and interests in the Agreement and assumes all of Assignor's
obligations and liabilities under the Agreement (collectively, the **Assignment**). CardConnect may enforce the
terms of the Agreement against Assignee as of the Effective Date, including any obligations or duties arising
from acts of the Assignor or events occurring before the Effective Date.

**2    Consent to Assignment**

Subject to the terms of this Assignment Agreement, CardConnect provides its consent to the Assignment.

**3    Amendment**

As of the Effective Date, the ISO contact person and address for notice purposes is as follows:

02,Ā6<FJ?:<G
& &Ā)9A;Ā+9=A<Ā*FĀ
6H<Ā& "
29F:DĀ
Attention: 0<CHĀ,A9CC<FK
1sland,FL34145

Otherwise, the Agreement remains in full force and effect.

**4    Representations and Warranties**

As of the Effective Date, Assignor and Assignee represent and warrant to one another and to CardConnect,
each of the following:

(1)    Each of Assignor and Assignee are validly existing entities in good standing in the applicable state of
organization.

(2)    All obligations to be performed by Assignor under the Agreement have been performed.

(3)    No party to the Agreement is in breach or default in the performance or observance of any of its
obligations under the Agreement and no event has occurred and no condition exists that, with the
giving of notice or the passage of time, would constitute a breach or default or permit termination,
modification or acceleration under the terms of the Agreement.

1

A&A 040518

DocuSign Envelope ID: C3EA549A5032-45A8-491B-C9F5735573857

<span style="color:red">EXHIBIT C</span>

**5**      **Release and Indemnification**

5.1      Assignor and Assignee, each on behalf of itself, its agents, its affiliates, and its assigns, releases and forever discharges CardConnect and each of its respective officers, directors, employees, agents, and affiliates (each, an **Indemnified Party**) from any and all liabilities, claims, demands, obligations and actions of any nature whatsoever, in law or in equity, whether known or unknown, suspected or unsuspected, contingent or non-contingent arising from or in any way related to the Assignment.

5.2      Assignor and Assignee each agree, jointly and severally, to indemnify, defend and hold harmless each Indemnified Party of, from and against all claims, losses, damages, costs, and expenses that the Indemnified Parties may suffer related to the Assignment.

5.3      CardConnect shall not be responsible to any other party in connection with this Assignment for any consequential, punitive, special or similar damages, regardless of whether any such party has been advised of the possibility of any of the foregoing.

5.4      This Section 5 will survive termination of the Agreement.

**6**      **Other Acknowledgements and Agreements**

6.1      Assignee and Assignor will perform such additional reasonable acts in good faith as may be necessary to consummate the Assignment.

6.2      CardConnect remains the exclusive owner of all Merchants and Merchant Agreements, and nothing in this Assignment Agreement transfers or conveys any interest in any Merchant or Merchant Agreement to Assignee. The pricing in Exhibit C to the Agreement will continue to apply to Assignor following the Effective Date.

**7**      **General**

7.1      This Assignment Agreement will be governed by New York law (without regard to its choice of law provisions). The courts of New York, New York will be the proper venue for legal proceedings brought in connection with this Assignment Agreement. ***Each party waives its right to a jury trial for claims arising in connection with this Agreement***.

7.2      This Assignment Agreement is the entire agreement between the parties and replaces any prior agreements or understandings (written or oral) with respect to its subject matter. This Assignment Agreement may be executed electronically and in counterparts, each of which constitutes one agreement when taken together. Electronic and other copies of the executed Assignment Agreement are valid.

<p style="text-align:center; color:red;">EXHIBIT C</p>

**Authorized Signatures:**

**Assignor**

By:   —

Name: U<CHA‚A9CC<FK

Title: -+3+5(1Ã4(573+5

**Assignee**

By: 

Name: U<CHA‚A9CC<FK

Title: -+3+5(1Ã4(573+5

**CardConnect, I**

By: *Erik Nicholson*
1F0F3714BCEB43E...

Name: +F?ⓦA3?ⁱ>DAGDC

Title: 684Ã49FHC<FÃ*<J<ADEB<CH

<p style="text-align:center;">3</p>

| From: | Kent Flannery |
|---|---|
| To: | Donovan, Cameron (King of Prussia) |
| Subject: | Fwd: Agent Notice |
| Date: | Thursday, December 29, 2022 1:28:33 PM |

Any insight on this?

Get Outlook for iOS

> **From:** CardConnect <partnersolutions@cardconnect.com>
> **Date:** December 29, 2022 at 12:16:37 PM EST
> **To:** Kent Flannery <kent@deltapayments.com>
> **Subject: Agent Notice**
> **Reply-To:** partnersolutions@cardconnect.com

View in browser



agent notice

**It has come to our attention that the calculation of Gross Processing Revenue (GPR) inadvertently included additional inputs that resulted in an overpayment of residuals to certain partners originating with Ignite Payments, including you.**

We are currently in the process of evaluating the impact of the overpayments and plans for resolution.

This is of utmost importance to us at CardConnect and we will be following up with further communications and detail. Thank you for your patience.

© 2022 CardConnect., The CardConnect name and logo is a registered trademark owned by CardConnect, LLC, All trademarks, service marks, and trade names referenced in this material are property of their respective owners.

Unsubscribe

**Subject:** IMPORTANT | Partner Residuals Update
**Date:** Monday, May 8, 2023 at 3:00:44 PM Eastern Daylight Time
**From:** CardConnect
**To:** Kent Flannery

# cardconnect

# Agent Partner Notice

## Incorrect Calculation of Gross Processing Revenue (GPR)
### Collection of Overpaid Residuals Effective with April Residuals

As noted in a message sent to you in December 2022, **CardConnect has identified an incorrect calculation of Gross Processing Revenue (GPR) that resulted in an overpayment of residual payments from January of 2018 to December 2022** to certain partners originating with Ignite Payments, including you.

*CardConnect will begin collecting these overpaid residuals effective with April Residuals paid in May 2023.

The incorrect calculation was related to expenses billed to CardConnect from the card brand networks that were not passed through to you. This was the result of:

- Certain network assessment rate increases were not implemented, resulting in under billing
- Not fully passing through all association fees
- Network association fees collected from merchants were included in the calculation of GPR income while the offsetting payment to the networks were excluded

* *If total amount due is not collected in time period specified we reserve the right extend the collection time frame.*

## Impact Reporting

EXHIBIT D

CardConnect has prepared reporting that details the impact of these overpayments to your residuals, dating back to January 2018. This reporting will be available to you in CoPilot under the ticket type **Residual Backbill** that will contain MID-level detailed reporting and timelines associated with the collection of overpaid residuals.

Additionally, please note that:

- CardConnect will not retroactively change GPR payout percentages as a result of these findings; this will be a net benefit to Agents
- Eligible merchants will be backbilled for network association fees that were underbilled; the income of this action will be deducted from the back bill collection

We understand that the collection of these overpaid residuals could impact your business, and we are committed to helping you minimize disruptions please work with **Cameron Donovan** for any questions as we work through this process.

**Please direct all questions to Cameron Donovan:**
**cameron.donovan@Fiserv.com:**

 

CardConnect, 1000 Continental Drive, Suite 300, King of Prussia, PA 19406

© 2023 CardConnect., The CardConnect name and logo is a registered trademark owned by CardConnect, LLC.

This is an unmonitored email box. Please do not reply to this email.

Unsubscribe from future mailings from

View in Browser



# ROCK SOLID LAW
220 Ponte Vedra Park Drive, Suite 280
Ponte Vedra Beach, FL 32082
Phone: (904) 241-1113 Fax: (904) 212-0876
www.RockSolidLaw.com

May 12, 2023

**VIA CERTIFIED MAIL AND EMAIL**
Erik Nicholson
Senior Vice President Partner Development
Card Connect
enicholson@cardconnect.com
100 Continental Drive, Suite 300
King of Prussia, PA 19406

Re:     Anticipated Breach of Ignite Launch Agent Agreement Assigned to Card Connect

Dear Mr. Nicholson:

Our firm has the pleasure of representing Kent Flannery as General Partner of Frances Grace, LP and Authorized Member of KMF Services, LLC ("Flannery") with regard to the Ignite Launch Agent Agreement ("Agreement") and your anticipated breach of the same. A copy of the Agreement is attached hereto for your review.

Despite the decades long working relationship between Card Connect (and its predecessors) and Mr. Flannery/Frances Grace/KMF Services, Card Connect sent an email correspondence to Mr. Flannery on May 8, 2023, confirming an "Incorrect Calculation of Gross Processing Revenue" (GPR) spanning from January 2018 to December 2022 and on behalf of Card Connect and, assumingly, its predecessors. Mr. Flannery was further informed that the total amount miscalculated as a result of Card Connect's errors, amounting to $643,392.63, would be collected from payments due to Frances Grace/KMF Services in equal installments over the next 17 months. It is clear that Card Connect is seeking to rectify its mistake by shifting responsibility to Mr. Flannery and Frances Grace since Card Connect can only collect up to $16,000.00 from the Merchants involved.

Taking the aforementioned action would be done in clear and obvious breach of Section 7.3 of the Agreement titled "Merchant Losses." The aforementioned section states that "Ignite Payments shall bear the risk for Merchant Losses (other than those caused by the gross negligence of willful misconduct of Agent or Agent Personnel) and shall not deduct such Merchant Losses from any amounts due to Agent under this Agreement. The action that has been proposed by Card Connect to recover the losses incurred as a result of mistakes and miscalculations on behalf of Card Connect would be a clear breach of the Agreement under this section as Card Connect is an assignee of this Agreement.

Not only would the aforementioned action be a clear breach of the Agreement, but it would also destroy the business that Mr. Flannery has worked so hard to develop over the years and would not only affect Frances Grace/KMF Services and Mr. Flannery but would affect all others who have been paid for services related to the amounts collected. The effects of Card Connect's errors span much farther than just damage done to Mr. Flannery and Frances Grace/KMF Services. Not only would deducting those funds amounts due to Mr. Flannery and/or Frances Grace/KMF Services "impact" the business as stated in the May 8th email correspondence, but it would ruin the business and severely affect the personal lives of all the individuals involved in a substantially negative way.

John McE. Miller, Esq.                                    Charles "Walt" Unfricht, Esq.
John@RockSolidLaw.com                              Walt@RockSolidLaw.com

<span style="color:red">EXHIBIT E</span>

*Erik Nicholson*
*May 12, 2023*

Pursuant to the May 8th email, Mr. Flannery reached out to Cameron Donovan as well as yourself in an attempt to resolve this matter and have the parties continue to operate pursuant to the Agreement. However, neither yourself not Mr. Donovan have so much as responded to address Mr. Flannery's concerns in order to provide assurances that these actions amounting to breach of the Agreement would not be taken. Therefore, it is clear that Card Connect intends to breach the Agreement through its outlined actions.

Please also be reminded that Section 10.2 of the Agreement titled "Statute of Limitations" would prevent Card Connect from initiating any action against Mr. Flannery and/or Frances Grace/KMF Services for reimbursement of the aforementioned amounts. Almost all of the events leading up to the miscalculations happened over one year ago meaning no action can be initiated for recovery of the same even if there was some basis for shifting responsibility of the repayment of these amounts to Mr. Flannery/Frances Grace/KMF Services, which there is not.

At this time, Mr. Flannery is notifying you, on behalf of Frances Grace/KMF Services, of your anticipated breach of the Agreement, specifically Section 7.3 Merchant Losses, for informing Mr. Flannery that his company would have amounts charged against and reduced from amounts due to Frances Grace/KMF Services in order to remediate billing errors made on behalf of Card Connect. Doing so would be in clear breach of Section 7.3 of the Agreement as discussed above, would destroy the business, and would adversely affect the personal lives of those involved in a serious way.

At this time, Mr. Flannery demands that you confirm in writing that the amount of approximately $36,000.00 will not be automatically deducted from any amounts due to Mr. Flannery and Frances Grace/KMF Services, that Mr. Flannery and Frances Grace/KMF Services will incur no responsibility for the miscalculated amounts whatsoever, and that the aforementioned parties shall not be liable for the $643,392.63 as previously stated to Mr. Flannery.

Should you not confirm the aforementioned in writing within five (5) days of receipt of this correspondence, this correspondence shall be considered notice under Section 6.3 of the Agreement and Mr. Flannery and Frances Grace/KMF Services shall be entitled to take all reasonable action under applicable law and will have no other option than to seek every remedy at law and equity available to them, including but not limited to costly litigation.

PLEASE GOVERN YOURSELF ACCORDINGLY.

Very truly yours,

Charles "Walt" Unfricht, Esq.

CWU

John McE. Miller, Esq.
*John@RockSolidLaw.com*

Charles "Walt" Unfricht, Esq.
*Walt@RockSolidLaw.com*

# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## JACKSONVILLE DIVISION

KMF SERVICES, LLC d/b/a DELTA
PAYMENTS, a Florida limited liability
company, and FRANCES GRACE, LP, a
Florida limited partnership,

        Plaintiff,            Case No.: 3:23-cv-815

v.

FISERV, INC., a Wisconsin for-profit
corporation; CARDCONNECT, LLC, a
Wisconsin for-profit corporation; and
IGNITE PAYMENTS, LLC, a Texas
limited liability company.

        Defendants.

_____/

## AFFIDAVIT OF KENT FLANNERY IN SUPPORT OF PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

Before me the undersigned authority personally appeared KENT

FLANNERY, who, after being duly sworn, deposes and states as follows:

1.    I have reached the age of majority, am competent to testify, and make

the following statements on personal knowledge.

2.    I am the Authorized Agent for KMF SERVICES, LLC d/b/a DELTA

PAYMENTS ("KMF"), which is an entity incorporated and doing business in

Florida.

3.     I am the Authorized Agent for FRANCES GRACE ("FRANCES GRACE"), which is an entity incorporated and doing business in Florida.

4.     On or about May 18, 2015, FRANCES GRACE, LP entered into the Launch Compensation Plan, ("2015 Agreement"), with IGNITE PAYMENTS, LLC for the sale of credit card processing services.

5.     On or about June 7, 2019, non-party HUNTER GRACE, LLC, ("HUNTER GRACE"), entered into the Assignment, Assumption, and Consent Agreement ("Assignment Agreement") with KMF and CARDCONNECT, LLC to assign the Premier Agent Agreement ("PA Agreement") to KMF and obtain the consent of CARDCONNECT to the assignment of the same.

6.     Pursuant to both the 2015 Agreement, and PA Agreement, IGNITE PAYMENTS, LLC, FISERV, AND CARDCONNECT were required to pay KMF and FRANCES GRACE residual payments at an agreed upon rate for their merchant accounts boarded.

7.     On December 29, 2022, CARDCONNECT sent an email Agent Notice regarding an accounting error, specifically its miscalculation of the Gross Processing Revenue resulting in residual overpayment for a period of approximately four (4) years, dating back through January 2018.

8.     On or about May 8, 2023, CARDCONNECT sent an email correspondence, adding specificity to the "Incorrect Calculation of Gross Processing

Revenue" ("Incorrect Calculations") in the amount of $643,392.63, spanning from January 2018 through December 2022.

9.     On behalf of KMF and FRANCES GRACE, I objected to foregoing residual payment deductions and overarching charge based on Defendants' accounting errors.

10.    On or about May 12, 2023, we sent our Notice of Anticipated Breach and Denial of the Incorrect Calculations Recovery ("Notice and Denial") demanded by Defendants.

11.    Despite the aforementioned objections, on May 20, 2023, Defendants deducted $18,427.97 from KMF's monthly residual payments due pursuant to the PA Agreement. A true and accurate screenshot of the May 20, 2023 deduction is attached hereto as Exhibit A.

12.    KMF and FRANCES GRACE make payments to their related business partners pursuant to the Gross Processing Revenue, which Defendants claim their Incorrect Calculations.

13.    The foregoing payments related to those Incorrect Calculations have already been paid out to non-parties.

14.    Defendants' monthly residual payment deductions will substantially and irreparably harm KMF and FRANCES GRACE by way of damaging its existing business relationships and depriving it of operating funds.

EXHIBIT G

15.    At no point prior to December 29, 2022, did Defendants put KMF and/or FRANCES GRACE on notice of its accounting errors referenced herein. Moreover, KMF and/or FRANCES GRACE had no outside knowledge of those errors.

16.    Pursuant to the Agreement, Defendants are responsible for all accounting of residual payments.

17.    Should Defendants continue to make monthly deductions from Plaintiffs' monthly residual payments due, Plaintiffs will be forced to address these deductions with the associated non-parties as laid out herein, which will be detrimental to their business relationships and thereby success.

FURTHER AFFIANT SAYETH NOT

_____
Affiant: KENT FLANNERY

EXHIBIT G

STATE OF ~~FLORIDA~~ Minnesota
COUNTY OF Carver

Sworn to and subscribed before me by means of □ physical presence or □ online notarization, this 12ᵗʰ day of July , 2023. Such person did take an oath and: *(Notary must check applicable box)*.

☑ is/are personally known to me.
□ produced a current Florida driver's license as identification.
□ produced _____ as identification.

{Notary Seal must be affixed}

MICHAEL L. PUKLICH
NOTARY PUBLIC
MINNESOTA
My Commission Expires Jan. 31, 2027

SIGNATURE OF NOTARY

Michael Puklich

Name of Notary *(Typed, Printed or Stamped)*

5

# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## JACKSONVILLE DIVISION

KMF SERVICES, LLC d/b/a DELTA
PAYMENTS, a Florida limited liability
company, and FRANCES GRACE, LP, a
Florida limited partnership,

             Plaintiff,              Case No.: 3:23-cv-815

v.

FISERV, INC., a Wisconsin for-profit
corporation; CARDCONNECT, LLC, a
Wisconsin for-profit corporation; and
IGNITE PAYMENTS, LLC, a Texas
limited liability company.

             Defendants.

_____/

## AFFIDAVIT OF KENT FLANNERY IN SUPPORT OF PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

Before me the undersigned authority personally appeared KENT FLANNERY, who, after being duly sworn, deposes and states as follows:

1.    I have reached the age of majority, am competent to testify, and make the following statements on personal knowledge.

2.    I am the Authorized Agent for KMF SERVICES, LLC d/b/a DELTA PAYMENTS ("KMF"), which is an entity incorporated and doing business in Florida.

EXHIBIT C

3.      I am the Authorized Agent for FRANCES GRACE ("FRANCES GRACE"), which is an entity incorporated and doing business in Florida.

4.      On or about May 18, 2015, FRANCES GRACE, LP entered into the Launch Compensation Plan, ("2015 Agreement"), with IGNITE PAYMENTS, LLC for the sale of credit card processing services.

5.      On or about June 7, 2019, non-party HUNTER GRACE, LLC, ("HUNTER GRACE"), entered into the Assignment, Assumption, and Consent Agreement ("Assignment Agreement") with KMF and CARDCONNECT, LLC to assign the Premier Agent Agreement ("PA Agreement") to KMF and obtain the consent of CARDCONNECT to the assignment of the same.

6.      Pursuant to both the 2015 Agreement, and PA Agreement, IGNITE PAYMENTS, LLC, FISERV, AND CARDCONNECT were required to pay KMF and FRANCES GRACE residual payments at an agreed upon rate for their merchant accounts boarded.

7.      On December 29, 2022, CARDCONNECT sent an email Agent Notice regarding an accounting error, specifically its miscalculation of the Gross Processing Revenue resulting in residual overpayment for a period of approximately four (4) years, dating back through January 2018.

8.      On or about May 8, 2023, CARDCONNECT sent an email correspondence, adding specificity to the "Incorrect Calculation of Gross Processing

Revenue" ("Incorrect Calculations") in the amount of $643,392.63, spanning from January 2018 through December 2022.

9.      On behalf of KMF and FRANCES GRACE, I objected to foregoing residual payment deductions and overarching charge based on Defendants' accounting errors.

10.     On or about May 12, 2023, we sent our Notice of Anticipated Breach and Denial of the Incorrect Calculations Recovery ("Notice and Denial") demanded by Defendants.

11.     Despite the aforementioned objections, on May 20, 2023, Defendants deducted $18,427.97 from KMF's monthly residual payments due pursuant to the PA Agreement. A true and accurate screenshot of the May 20, 2023 deduction is attached hereto as Exhibit A.

12.     KMF and FRANCES GRACE make payments to their related business partners pursuant to the Gross Processing Revenue, which Defendants claim their Incorrect Calculations.

13.     The foregoing payments related to those Incorrect Calculations have already been paid out to non-parties.

14.     Defendants' monthly residual payment deductions will substantially and irreparably harm KMF and FRANCES GRACE by way of damaging its existing business relationships and depriving it of operating funds.

15. At no point prior to December 29, 2022, did Defendants put KMF and/or FRANCES GRACE on notice of its accounting errors referenced herein. Moreover, KMF and/or FRANCES GRACE had no outside knowledge of those errors.

16. Pursuant to the Agreement, Defendants are responsible for all accounting of residual payments.

17. Should Defendants continue to make monthly deductions from Plaintiffs' monthly residual payments due, Plaintiffs will be forced to address these deductions with the associated non-parties as laid out herein, which will be detrimental to their business relationships and thereby success.

FURTHER AFFIANT SAYETH NOT

_____
Affiant: KENT FLANNERY

STATE OF ~~FLORIDA~~ Minnesota
COUNTY OF _Carver_

    Sworn to and subscribed before me by means of ☐ physical presence or ☐ online notarization, this _12th_ day of _July_, 2023. Such person did take an oath and: *(Notary must check applicable box).*

    ☑ is/are personally known to me.
    ☐ produced a current Florida driver's license as identification.
    ☐ produced _____ as identification.

{Notary Seal must be affixed}

MICHAEL L. PUKLICH
NOTARY PUBLIC
MINNESOTA
My Commission Expires Jan. 31, 2027

_____
SIGNATURE OF NOTARY

_Michael Puklich_
Name of Notary *(Typed, Printed or Stamped)*

5

# EXHIBIT A

| | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 2023 May | KMF Services LLC dba D... | HOUSE-1033670 | 9999991033670 | KMF Services LLC dba D... | | - | 0 | $0.00 | $18,427.97 | -$18,427.97 | | -$18,427.97 | $0.00 | -$18,427.97 | $0.00 | -$18,427.97 |

# UNITED STATES DISTRICT COURT

for the

Middle District of Florida

| | |
|---|---|
| KMF SERVICES, LLC, dba DELTA PAYMENTS, et al | ) |
| *Plaintiff* | ) |
| v. | ) Civil Action No. 3:23-cv-815 |
| FISERV, INC., et al | ) |
| *Defendant* | ) |

## WAIVER OF THE SERVICE OF SUMMONS

To:  Jessica Cappock, Esq., jcappock@mathislawgroup.com
     *(Name of the plaintiff's attorney or unrepresented plaintiff)*

I have received your request to waive service of a summons in this action along with a copy of the complaint, two copies of this waiver form, and a prepaid means of returning one signed copy of the form to you.

I, or the entity I represent, agree to save the expense of serving a summons and complaint in this case.

I understand that I, or the entity I represent, will keep all defenses or objections to the lawsuit, the court's jurisdiction, and the venue of the action, but that I waive any objections to the absence of a summons or of service.

I also understand that I, or the entity I represent, must file and serve an answer or a motion under Rule 12 within 60 days from _____07/27/2023_____ , the date when this request was sent (or 90 days if it was sent outside the United States). If I fail to do so, a default judgment will be entered against me or the entity I represent.

Date  07/27/2023
 

                                               *Signature of the attorney or unrepresented party*

Fiserve, Inc.                                                    John Peterson, Esq.
*Printed name of party waiving service of summons*                  *Printed name*

Polsinelli PC
401 Commerce St. Suite 900
Nashville, TN 37219
*Address*

john.peterson@polsinelli.com
*E-mail address*

(615) 259-1510
*Telephone number*

---

**Duty to Avoid Unnecessary Expenses of Serving a Summons**

Rule 4 of the Federal Rules of Civil Procedure requires certain defendants to cooperate in saving unnecessary expenses of serving a summons and complaint. A defendant who is located in the United States and who fails to return a signed waiver of service requested by a plaintiff located in the United States will be required to pay the expenses of service, unless the defendant shows good cause for the failure.

"Good cause" does *not* include a belief that the lawsuit is groundless, or that it has been brought in an improper venue, or that the court has no jurisdiction over this matter or over the defendant or the defendant's property.

If the waiver is signed and returned, you can still make these and all other defenses and objections, but you cannot object to the absence of a summons or of service.

If you waive service, then you must, within the time specified on the waiver form, serve an answer or a motion under Rule 12 on the plaintiff and file a copy with the court. By signing and returning the waiver form, you are allowed more time to respond than if a summons had been served.

EXHIBIT D